IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 90,196

STATE OF KANSAS,
*Appellee/Cross-appellant*,

v.

JOHN E. ROBINSON, SR.,
*Appellant/Cross-appellee*.

SYLLABUS BY THE COURT

1.

A constitution-based claim for venue change can arise under a theory of presumed or actual prejudice. Presumed prejudice occurs when pretrial publicity is so pervasive and prejudicial that there can be no expectation of an unbiased jury pool in the community. In deciding whether to presume prejudice under the Sixth Amendment to the United States Constitution, an appellate court considers seven factors: (1) media interference with courtroom proceedings; (2) the magnitude and tone of the coverage; (3) the size and characteristics of the community in which the crime occurred; (4) the amount of time that elapsed between the crime and the trial; (5) the jury's verdict; (6) the impact of the crime on the community; and (7) the effect, if any, of a codefendant's publicized decision to plead guilty. Actual prejudice occurs when the effect of pretrial publicity is so substantial as to taint the entire jury pool.

2.

K.S.A. 22-2616(1) compels a venue change when the district judge is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he or she cannot obtain a fair and impartial trial in that county. The

1

court considers nine factors in deciding whether community prejudice warrants a change of venue under K.S.A. 22-2616(1): (1) the particular degree to which the publicity circulated throughout the community; (2) the degree to which the publicity or that of a like nature circulated to other areas to which venue could be changed; (3) the length of time which elapsed from the dissemination of the publicity to the date of trial; (4) the care exercised and the ease encountered in the selection of the jury; (5) the familiarity with the publicity complained of and its resultant effects, if any, upon the prospective jurors or the trial jurors; (6) the challenges exercised by the defendant in the selection of the jury, both peremptory and for cause; (7) the connection of government officials with the release of the publicity; (8) the severity of the offense charged; and (9) the particular size of the area from which the venire is drawn.

3.

The Sixth and Fourteenth Amendments to the United States Constitution guarantee criminal defendants the right to counsel of choice, and due process prohibits judicial officers from punishing or retaliating against a defendant for exercising this right.

4.

Not every restriction on counsel's time or opportunity to investigate or to consult with his or her client or to otherwise prepare for trial violates a defendant's Sixth Amendment right to counsel. Only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to counsel, and this right cannot be manipulated to impede the efficient administration of justice.

5.

Pursuant to K.S.A. 22-3401, continuances may be granted to either party for good cause shown. In a criminal case, the decision to continue a case lies within the sound discretion of the district court, but where a defendant claims the denial of continuance

interfered with his or her ability to present a defense, an appellate court reviews the question de novo.

6.

Where a continuance is sought to retain new counsel, a trial court considers the following five factors: (1) whether a continuance would inconvenience witnesses, the court, counsel, or the parties; (2) whether other continuances have been granted; (3) whether legitimate reasons exist for the delay; (4) whether the delay is the fault of the defendant; and (5) whether denial of a continuance would prejudice the defendant.

7.

The five factors used to consider a request for a continuance for the purpose of retaining new counsel do not apply in situations where one of several defense attorneys withdraws from the case and the defendant seeks a continuance to provide the remaining members of the defense team additional time to prepare for trial but does not seek new counsel.

8.

In this case, the trial court did not abuse its discretion in denying requests for a continuance to provide appointed counsel, two experienced death penalty litigators, additional time to prepare a guilt phase defense following the withdrawal of retained counsel, where appointed counsel had represented defendant for nearly 7 months prior to retained counsel's withdrawal; appointed counsel still had another 7 months to prepare because the district judge had granted a previous, lengthy continuance; appointed counsel had the benefit of the work prepared by their predecessors over the course of nearly 2 years; appointed counsel had adequate resources, including the two lead attorneys and their two associate attorneys, one of whom entered his appearance following the

3

withdrawal of retained counsel, an investigator, and several assistants; and defendant never sought appointment of new counsel following retained counsel's withdrawal.

9.

When requesting a continuance to provide defendant additional time to develop a mitigation defense for the penalty phase of a capital murder trial, defendant must make an adequate proffer as to what mitigation evidence would be developed if relief were granted.

10.

The Fourth Amendment to the United States Constitution requires that search warrants be issued by a neutral and detached magistrate.

11.

The United States Supreme Court has recognized at least two circumstances in which a magistrate fails to satisfy the neutral and detached requirement. First, a magistrate who is involved in or who exercises law enforcement powers of the executive branch lacks neutrality and detachment. Second, a magistrate with a direct pecuniary interest in the outcome of the warrant proceedings also lacks neutrality and detachment.

12.

In assessing whether a magistrate lacks neutrality and detachment, an appellate court considers whether the circumstances would offer a possible temptation to the average judge to abandon the correct balance of consideration between the State and the accused. In applying this standard, it conducts an individualized and contextual inquiry, in light of the totality of the circumstances.

13.

The circumstances here—when the issuing magistrate had prosecuted the defendant 15 years earlier for unrelated financial crimes—do not establish a violation of the neutral and detached magistrate requirement. The magistrate had disengaged completely from law enforcement, had no involvement in any subsequent investigation or prosecution of the defendant, and had no knowledge of the defendant's possible involvement in other missing persons investigations; the former prosecution and current capital murder investigation did not arise from a common investigation or single transaction or event; and any overlapping facts between the magistrate's former prosecution of defendant and the current investigation were not probative of the probable cause determinations made by the magistrate.

14.

When K.S.A. 22-2503 and K.S.A. 22-2505 are read together and considered alongside legislative amendments subsequent to the 1970 codification of the Kansas Code of Criminal Procedure, it is evident the legislature intended that district judges retain their pre-Code authority to issue search warrants executable statewide.

15.

In this case, Lenexa police exercised "their powers as law enforcement officers" by planning, coordinating, and executing trash pulls from the defendant's Olathe residence over the course of several weeks in furtherance of their investigation, and this activity exceeded the officers' territorial jurisdiction pursuant to K.S.A. 22-2401a(2)(a).

16.

When a defendant seeks to suppress evidence based on a violation of state law unrelated to the Fourth Amendment to the United States Constitution or § 15 of the

5

Kansas Constitution Bill of Rights, application of the exclusionary rule does not inevitably follow.

17.

K.S.A. 22-3216(1) provides a vehicle for defendants aggrieved by an unlawful search and seizure to move to suppress evidence, but it does not compel the trial court to grant such relief for any search conducted in violation of state law.

18.

The limitation on the territorial jurisdiction of city officers was intended to protect the local autonomy of neighboring cities and counties, not to create an individual right.

19.

Where, as here, a search is conducted in violation of state law and the statute violated does not vest the defendant with an individual right, does not contemplate exclusion of evidence as a remedy, and its violation results in no cognizable injury to defendant's substantial rights, suppression of the evidence is not an appropriate remedy.

20.

A written request for assistance directed to officers in other jurisdictions that is signed by an officer from the requesting jurisdiction—Linn County in this case—satisfies the requirements of K.S.A. 22-2401a(2)(b) and confers jurisdiction upon officers from other jurisdictions to execute a search warrant in Linn County.

21.

K.S.A. 22-2401a(5) authorizes law enforcement officers in Johnson County to execute search warrants countywide. Based on the plain language of this statute, reinforced by the context and history giving rise to its enactment, Lenexa and Overland

6

Park city police had territorial jurisdiction to execute warrants to search defendant's residence and storage unit located within the city limits of Olathe.

22.

On the facts presented here, law enforcement officers did not search or seize trash within the curtilage of defendant's home and defendant did not have a reasonable expectation of privacy in his discarded trash, when it had been set out for collection near the end of an asphalt parking area, against the curb line, and approximately 10 to 12 feet outside of a fence that surrounded his residence.

23.

The Kansas Wiretap Act requires prosecutors seeking to intercept telephonic communications to make a showing of necessity for this extraordinary investigative tool by including in the wiretap application a complete statement on whether other investigative procedures have been tried and failed or on why other methods reasonably appear to be dangerous or unlikely to succeed if tried.

24.

The purpose of the necessity requirement for a wiretap is to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose a crime and to prevent law enforcement from using wiretaps as a first step in an investigation.

25.

General allegations and boilerplate language fail to satisfy the necessity requirement for a wiretap. However, an appellate court employs a standard of reasonableness to evaluate the State's good-faith effort to use alternative investigative means or its failure to do so because of danger or a low probability of success. Law

enforcement officers are not required to exhaust every possible technique before resorting to a wiretap—they must instead demonstrate that wiretapping is not the first meaningful step in the investigation.

26.

In this case, general language in the State's wiretap application that the use of search warrants would not further the goals of the investigation did not violate the necessity requirement, where the application and supporting affidavit demonstrated that law enforcement made a reasonable good-faith effort to utilize other available normal and less intrusive investigative techniques before resorting to a wiretap, and a general statement regarding the ineffectiveness of search warrants was supported by particularized, case-specific information contained throughout the application and affidavit.

27.

In this case, the trial court did not abuse its discretion or violate the defendant's substantive rights under state or federal law in limiting voir dire on certain case-specific facts where the defendant had the opportunity to formulate his own case-specific questions in the juror questionnaire; the defense disclosed sensitive case-specific facts during small group voir dire and inquired whether such facts rendered panelists biased; defendant was allowed to question panelists during general voir dire on case-specific evidence anticipated at trial; and the district judge limited voir dire only when the questions required prospective jurors to prejudge the penalty issue based on a general description of case-specific facts.

28.

The heightened reliability standard applied in death penalty appeals does not bar the application of the invited error doctrine.

29.

In capital murder trials, a prospective juror may be excluded for cause because of his or her death penalty views if those views prevent or substantially impair the performance of his or her duties as a juror. The same standard applies whether the challenge is directed at death-leaning or life-leaning jurors.

30.

In this case, the trial court did not abuse its discretion in denying the defendant's challenges for cause of veniremembers who expressed support or favor for the death penalty. All of the veniremembers at issue professed their understanding of and fidelity to the law, and the district judge's rulings were fairly supported by the record.

31.

In this case, the trial court did not abuse its discretion in denying the defendant's challenges for cause of veniremembers who were allegedly biased by pretrial publicity. The record fairly supports the district judge's findings that the veniremembers at issue could set their opinions aside, adhere to the court's instructions, and render a verdict based on the evidence.

32.

In this case, the trial court did not apply a more lenient standard of qualification to jurors who supported the death penalty, in violation of defendant's substantive due process rights. The record confirms the district judge's rulings were supported by the voir dire testimony of the veniremembers at issue.

33.

When improper or prejudicial remarks are made by one veniremember and heard by other veniremembers during the jury selection process, the test of juror impartiality is whether those jurors actually seated can lay aside their impressions or opinions and render a verdict based on the evidence.

34.

The trial court did not abuse its discretion in this case in failing to strike all panelists on a small group panel exposed to a juror's inflammatory comments about the defendant when the juror's comments were isolated and not founded on any specialized knowledge; the defendant failed to pursue curative measures; and the only panelist to eventually serve on the jury declared his impartiality.

35.

The trial court did not abuse its discretion in this case in granting the State's challenge of a juror who expressed strong opposition to the death penalty when she consistently expressed uncertainty about her ability to fairly consider both sentencing options.

36.

An appellate court employs a two-part balancing test in analyzing the propriety of a district court's use of an anonymous jury identification system. First, there must be a reason to protect the jurors from identification, a decision left to the trial court's discretion. Second, the court must take reasonable precautions to minimize any prejudicial effects.

37.

In this case, the trial court did not abuse its discretion or violate the defendant's substantial rights by employing a juror numbering system to identify veniremembers and seated jurors when the district judge identified the potential for invasion of juror privacy by the media or other overzealous individuals, particularly in the absence of sequestration, as the reason for the system and expressly informed the jury that the procedure was unrelated to juror safety.

38.

To establish the existence of a common scheme or course of conduct pursuant to K.S.A. 21-3439(a)(6), the State must show that the alleged intentional and premeditated murders are related to one another in some way.

39.

In this case, evidence that the defendant lured his victims with promises of financial gain, employment, or travel; exploited them sexually or financially; used similar methods to murder them and dispose of their bodies; and used similar methods of deception to conceal the crimes was sufficient to support the jury's finding of the existence of a common scheme or course of conduct.

40.

In this case, the entirety of the defendant's course of conduct, which straddled the date of enactment of the capital murder statute, could be considered and was sufficient to support the defendant's convictions on the capital murder charges under K.S.A. 21-3439(a)(6) when at least one of the elements of the charged offense was not committed until after the enactment of the capital murder statute.

11

41.

When, as here, a defendant is charged and convicted of two counts of capital murder, those convictions are multiplicitous when the State alleged and proved that all of the murders were connected by the same common scheme or course of conduct and the State did not allege or prove the existence of a separate, distinct common scheme or course of conduct for each capital count.

42.

A conviction for first-degree murder of one of the victims included in a series of murders alleged under a separate charge of capital murder is multiplicitous with a conviction on the charge of capital murder.

43.

The State's complaint was not defective and did not fail to confer jurisdiction on the district court in this case because the complaint as a whole was clear what the charges were and that defendant was the person charged.

44.

The failure to lodge a contemporaneous objection to the admission of evidence typically forecloses subsequent challenge on appeal. However, in capital murder appeals, K.S.A. 21-4627(b), recodified as K.S.A. 2014 Supp. 21-6619(b), compels review of any issue raised in defendant's brief, even if not preserved below. Yet this statute does not require this court to treat the record other than as it is presented to us on appeal, and we approach such compulsory review mindful that the defendant bears the burden of demonstrating error on the record submitted.

45.

Accurate printouts of e-mails are akin to duplicate originals and deemed valid reproductions of electronically stored information for best evidence purposes under K.S.A. 60-467(a), even when messages have been forwarded or contain message strings.

46.

E-mail exhibits found in a defendant's possession or under his or her control and seized pursuant to a search warrant can be authenticated by law enforcement officers' testimony describing the circumstances in which the writings were seized.

47.

Testimony that merely suggests a defendant intended to commit a crime falls outside the scope of K.S.A. 60-455. The evidentiary restriction is triggered by evidence that a person actually committed a crime or civil wrong on a specified occasion, not by speculation.

48.

The trial court did not abuse its discretion in this case in allowing a detective to testify to the number of tools seized during the search of the defendant's property when the record establishes a logical connection between the tools, the defendant, and the capital murder charges.

49.

The trial court properly refused to grant a mistrial in this case after a witness' testimony deviated from the State's proffer when the district judge instructed the jury to disregard the testimony.

50.

The trial court did not abuse its discretion in this case in allowing a medical examiner to testify that a fracture to a victim's right ulna was consistent with a defensive injury when the evidence established the expert's qualifications to render such an opinion.

51.

In this case, the State offered sufficient evidence that the defendant took the victim named in the aggravated kidnapping charge by way of deception with the specific intent to inflict bodily injury upon her.

52.

Because the State's two theories as to how the defendant took the victim named in the aggravated kidnapping charge by deception could support but one conviction, the State did not rely on multiple acts in this case.

53.

The prosecutor erred in this case by suggesting a victim may have witnessed her mother's murder before her own demise, but the isolated remarks did not prejudice the defendant.

54.

The prosecutor erred in this case by asserting that the defendant ripped one victim's baby out of her arms, but the remark did not prejudice the defendant.

55.

The phrases "common scheme" and "course of conduct" are commonly understood and require no specific definition in jury instructions under K.S.A. 21-3439(a)(6). The

lack of a statutory definition for the phrases "common scheme" and "course of conduct" does not render the capital murder statute unconstitutionally vague.

56.

In this case, the trial court's instruction on venue was error, but the defendant failed to establish that the jury would have reached a different verdict had the instruction error not occurred.

57.

In this case, the cumulative effect of the identified guilt phase errors did not substantially prejudice defendant or deny him a right to a fair trial.

58.

In this case, there is no reasonable possibility that a juror's use of a Bible during penalty phase deliberations affected the jury's sentencing decision when the juror consulted the Bible only outside of deliberations, he did not use or read from the Bible in the jury room, he made an isolated remark about the Bible only after the jury's vote had confirmed its unanimity as to sentence, and the district judge delivered a curative instruction.

59.

In this case, the State's evidence demonstrated a nexus between defendant's killing of more than one person and the charged capital offenses and was sufficient to establish the existence of the multiple murder aggravating circumstance under K.S.A. 21-4625(2).

60.

The prosecutor's closing argument comment on the defendant's demeanor was error in this case, but it did not prejudice the defendant.

61.

The prosecutor's statement in this case that he would "bet" the victims' families would not agree that defendant posed a low risk of violence in prison was error, but it did not prejudice the defendant.

62.

In this case, the prosecutor's interrupted personalized attack of defense counsel's argument was error, but it did not prejudice the defendant.

63.

The penalty phase instructions in this case did not create an unreasonable risk that jurors would fail to recognize that they must find that aggravating factors outweighed mitigating factors beyond a reasonable doubt in order to impose a death sentence.

64.

The penalty phase instructions in this case made clear that mitigating circumstances were to be determined by each individual juror and did not need to be found by all members of the jury in order to be considered by an individual juror.

65.

The penalty phase instructions in this case did not encourage a death verdict.

66.

The penalty phase instructions in this case did not undermine the jury's historic nullification power or otherwise create a reasonable likelihood that jurors would have applied instructions in a way that prevented consideration of constitutionally relevant evidence.

67.

The defendant was not improperly sentenced under a void capital sentencing scheme under the facts in this case.

68.

In this case, the cumulative effect of the identified errors during the penalty phase did not substantially prejudice the defendant or deny him the right to a fair penalty phase proceeding.

69.

In this case, the trial court erred by designating Counts I through III as sexually motivated in the journal entry of judgment where the State did not seek such a designation and the district judge did not make supporting findings when pronouncing the sentence from the bench.

Appeal from Johnson District Court; JOHN ANDERSON III, judge. Opinion filed November 6, 2015. Affirmed in part, reversed in part, vacated in part, and remanded with directions.

*Paige A. Nichols*, of Lawrence, argued the cause, and *Joseph W. Luby*, of Death Penalty Litigation Clinic, of Kansas City, Missouri, was with her on the briefs for appellant/cross-appellee.

*Steven J. Obermeier*, senior deputy district attorney, and *Jacob M. Gontesky*, assistant district attorney, argued the cause, and *Christopher L. McMullin*, chief deputy district attorney, *Stephen M.*

*Howe*, district attorney, *Natalie Chalmers*, assistant solicitor general, *Kristafer Ailslieger*, deputy solicitor general, and *Derek Schmidt*, attorney general, were with them on the briefs for appellee/cross-appellant.

The opinion of the court was delivered by

STEGALL, J.: John E. Robinson, Sr., was charged with multiple offenses related to the murders of six women—killings that constituted parts of a common scheme or course of conduct whereby Robinson would lure women to Johnson County with offers of employment, travel, and other benefits; exploit them sexually, financially, or otherwise; kill them and dispose of their bodies in a similar manner; and engage in various acts of fraud, deceit, and manipulation to conceal his crimes. This common scheme or course of conduct began in the mid-1980s and continued until Robinson's arrest in June 2000.

The State charged Robinson with two counts of capital murder, one count for the intentional, premeditated murder of Suzette Marie Trouten (Count II) and the other for the intentional, premeditated murder of Izabela Lewicka (Count III). The State alleged, pursuant to K.S.A. 21-3439(a)(6), that the murders of Trouten and Lewicka were each part of a common scheme or course of conduct that also included the intentional, premeditated murders of Beverly J. Bonner, Sheila Faith, Debbie Faith, and Lisa Stasi.

The State also charged Robinson with aggravated kidnapping of Trouten (Count I), theft of Vicki Neufeld's property (Count IV), first-degree premeditated murder of Lisa Stasi (Count V), and aggravated interference with Stasi's parental custody (Count VI). The jury convicted Robinson on all counts.

Following the guilt phase trial, a separate sentencing proceeding was held pursuant to K.S.A. 21-4624(b). The penalty phase jury sentenced Robinson to death on each capital murder conviction and that sentence was imposed by the trial court. Additionally,

the trial court sentenced Robinson to 246 months in prison for the aggravated kidnapping of Trouten, 7 months for the theft of Neufeld's property, a life sentence with parole eligibility after 15 years for the first-degree premeditated murder of Stasi, and a pre-sentencing guidelines sentence of 5 to 20 years or a postsentencing guidelines sentence of 13 months for the aggravated interference with Stasi's parental custody.

On appeal, Robinson has raised 19 general claims of reversible error covering the entire proceeding below. Within these general claims, Robinson asserts a variety of sub-claims. For simplicity, we number the general issues consecutively and address all claims arising under each category. At the outset, we take the unusual step of noting that our review of this matter—given its size and complexity—has been assisted and facilitated by the diligence and professionalism of the trial judge, Judge Anderson, throughout the proceedings below. Moreover, the decision we announce today is in large part a product of Judge Anderson's conscientious commitment to Robinson's fair trial rights.

FACTUAL AND PROCEDURAL BACKGROUND – GUILT PHASE

Resolution of Robinson's claims on this appeal demands a comprehensive review of the disturbing facts underlying his convictions and sentences.

*John Robinson, Sr.*

Robinson was a self-employed, but not entirely successful, entrepreneur. In the 1970s, he formed Hydro-Gro, Inc., a company that produced hydroponic vegetables. In the 1980s, Robinson offered financial consulting services through his company Equi II. His operations were interrupted when he was convicted of a nonperson felony and incarcerated at the Western Missouri Correctional Center in Cameron, Missouri. Following his release in the 1990s until his arrest, Robinson published a mobile home

19

trade magazine called *Manufactured Modular Home Living* through his company Specialty Publications.

Robinson lived with his wife Nancy in a three-bedroom modular home in Olathe, inside Santa Barbara Estates—a large mobile home community. Robinson used computers and e-mail extensively and also utilized a cell phone and pager. Nancy began working as the on-site office manager at Santa Barbara Estates in 1997.

In the mid-1990s, Robinson acquired roughly 17 acres of property at a secluded Linn County location. He moved a trailer onto the property in July 1998 and installed two phone lines:  one for his landline and one for his computer.

Though married to Nancy since 1964, Robinson's infidelity was an ongoing issue in their marriage. In 1998, Nancy learned her husband was involved in bondage and discipline, dominance and submission, sadism, and masochism (BDS&M) activities after discovering fetish websites saved in his Internet browser history. Robinson shared stories of his BDS&M liaisons with Carlos Ibarra, a maintenance employee at Santa Barbara Estates, and showed him nude photographs of a girlfriend depicted in BDS&M poses.

*Robinson's Victims*

The State's capital murder theory in Counts II and III was that Robinson killed Suzette Trouten and Izabela Lewicka, along with Sheila and Debbie Faith, Beverly Bonner and Lisa Stasi, and that these killings were all connected, constituting parts of a common scheme or course of conduct characterized by:  (1) luring women with offers of employment, travel, and other benefits; (2) exploiting them financially, sexually, or otherwise; (3) killing them and disposing of their bodies in a similar manner; and (4) concealing the crimes through acts of deception and fraud. The State alleged Robinson

20

committed other crimes along the way, including the aggravated kidnapping of Trouten, theft of Neufeld's property, first-degree murder of Stasi, and aggravated interference with Stasi's parental custody.

1. *Suzette Marie Trouten*

Suzette Marie Trouten was the youngest of Carolyn and Harry Trouten's five children. She lived near her mother in the Monroe, Michigan, area. The two were extremely close and talked daily, even when Trouten was away.

Unbeknownst to her mother, Trouten was active in the BDS&M community. She frequented BDS&M websites and chat rooms, created her own BDS&M web page, and traveled out of state for BDS&M trysts.

In the mid-1990s, Trouten met Lore Remington, a Canadian resident who shared Trouten's interest in BDS&M role playing games. Remington trained Trouten as a "slave," the submissive partner in a BDS&M relationship, for these online games, and the two became close friends. Remington introduced Trouten to her friend, Tami Taylor, who also lived in Canada, shared an interest in BDS&M, and became another friend.

Trouten placed personal ads on BDS&M websites seeking a position as a "slave." At that point, Trouten and Robinson began communicating by e-mail. In summer 1999, Trouten told her mother that Robinson had offered her a job caring for his elderly father, "Papa John." Trouten said Robinson and his father were selling off several companies and Papa John needed nursing care as they traveled to various locations to close the deals. Trouten said the job would pay $60,000 annually and require extensive travel to places such as Switzerland and Belgium.

In October 1999, Trouten traveled to Kansas City, telling her mother she had an interview with Robinson. When she returned a few days later, Trouten told her mother she did not like the idea of being away from home but had decided to take the job for 1 year to earn enough money to return to school. Trouten took a second trip to Kansas in November, explaining she had to sign an employment contract and find a place to live.

Trouten shared the news of her employment opportunity with other friends and family. She told Taylor she would be working for a man named John, who needed someone to care for his elderly father, a wealthy businessman, while they traveled to Europe and other destinations throughout the United States. Trouten told Remington she would earn $6,500 per month and travel to places such as Australia and Hawaii working for Robinson. Trouten gave similar reports to her aunt, father, and employer in Michigan.

In late 1999 and early 2000, Trouten prepared for the move to Kansas and her upcoming travels. She researched colleges and other learning opportunities in Switzerland and Belgium, telling her mother that Robinson said they would be overseas long enough for her to take classes. Trouten completed a passport application. Just before Trouten left, her aunt, Marshalla Chidester, helped Trouten create a list of her friends' and family's contact information.

On or about February 12, 2000, Trouten left for Kansas, bringing along her two beloved Pekingese dogs, Peka and Harry, in the moving truck Robinson had rented for her. On February 14, Trouten arrived and checked into Room 216 at the Guesthouse Suites in Lenexa. Robinson had reserved this room for 7 nights under his company's name, Specialty Publications. The reservation was later extended for an additional week.

When Trouten checked into her room, hotel staff informed her of their no-pet policy. On February 16, Robinson brought two Pekingese dogs, one named Harry and the

other named Peka, for boarding at Ridgeview Animal Hospital in Olathe. Robinson said the dogs belonged to his employee. In completing check-in paperwork, Robinson indicated the dogs would be boarded through the end of February.

Once in Kansas, Trouten called her mother almost every day. Trouten told her mother she had decided to put her belongings in storage, rather than find an apartment immediately, because she and Robinson would be leaving on their trip soon. Trouten also said their itinerary had changed. Rather than travel to Switzerland as originally planned, they had decided to go to California, pick up Robinson's new yacht, and sail to Hawaii first, so Robinson could relax before resuming his meetings.

Trouten and Remington continued to communicate daily on ICQ, an instant messaging program on Yahoo. In these conversations, Trouten disclosed that she was in a sexual relationship with Robinson. At trial, Robinson conceded that he and Trouten had carried on a sexual, BDS&M relationship. The fact of this relationship was corroborated by other evidence at trial, including several e-mails in which they discussed BDS&M; a "slave" contract signed by Trouten, purportedly governing the terms of their master/slave relationship; and a videotape of the two engaging in BDS&M sex.

The timeline of events on March 1 implicated Robinson in Trouten's disappearance. Around 1 a.m. on March 1, Trouten called her mother at work and said she and Robinson were leaving on their trip later that morning. Carolyn Trouten never saw or spoke to her daughter again.

Trouten and Remington were also communicating via ICQ chat early that morning. Remington ended her chat session with Trouten at 12:51 a.m. Remington never saw or spoke to Trouten again.

At 11:43 a.m., a long-distance call was placed from Robinson's Linn County trailer to Nancy Robinson's work phone.

At 2:13 p.m., Robinson picked up Trouten's dogs at the animal clinic in Olathe. Employees said Robinson appeared to be agitated and in a hurry. He told one employee he was in a rush to get to the airport. Robinson placed the dogs in a small kennel and left. Trouten was not seen with Robinson or in his truck at the animal clinic.

At 2:24 p.m., Robinson's access code was used to gain entry through the security gates at his Olathe storage unit, and the code was used to exit the facility 6 minutes later.

At 2:35 p.m., Olathe animal control officer Rodney E. McClain was dispatched to Santa Barbara Estates after Robinson had instructed the office assistant to report two dogs on the loose. McClain arrived 10 minutes later and saw two Pekingese dogs inside a small-medium-sized carrying kennel located just outside the office. Both appeared to be in good condition. McClain transported them to the local shelter. Trouten never claimed her dogs.

Around 3 p.m., Isabel Clark, a housekeeper at the Guesthouse Suites, observed a man matching Robinson's general physical description loading Trouten's belongings from Room 216 into a truck matching the description of Robinson's vehicle in the hotel parking lot. When she cleaned the room, Clark noticed the linens and towels were stained with blood. However, she had observed similar blood stains when she cleaned the room throughout Trouten's stay. Trouten had an irregular menstrual cycle and would bleed heavily. Trouten told Remington that she was experiencing a particularly long and heavy period at the end of February.

24

Around 3:30 p.m., a hotel security camera captured Robinson checking out of Trouten's room. Hotel staff confirmed Robinson was the person who checked out of the room and paid the bill. Trouten was not with Robinson at the time, and hotel employees did not see her at all on March 1.

A few days after Trouten had supposedly left for California, Carolyn Trouten received a letter from her daughter. Its arrival was somewhat unusual, as Trouten typically called her mother and did not write letters. The letter arrived in a pink envelope postmarked from Kansas City on March 6, 2000. The envelope was addressed to Carolyn Trouten, and the return address said only "Suzette Trouten." The handwritten letter was dated February 28, 2000, and discussed Trouten's plans to leave for California with Robinson. Carolyn Trouten believed the handwriting on the envelope and letter was her daughter's. However, she found it unusual the envelope was postmarked Kansas City on March 6 because Trouten said they were leaving on March 1. Suzette's father, who lived in Florida, received a similar handwritten letter dated February 28, 2000, in an envelope postmarked Kansas City on March 6, 2000.

Suspicious of the postmark date, Carolyn Trouten called Robinson, who said Trouten had decided not to take the job. Robinson claimed she had met a man named Jim Turner and left town with him. Jim Turner was one of Robinson's aliases.

A few weeks after receiving the first handwritten letter, Carolyn Trouten received a second letter purportedly written by her daughter in an envelope postmarked from San Jose, California. This time, the letter was typewritten with Trouten's name signed in cursive at the bottom. Trouten's mother believed the signature was Trouten's. The letter opened with the statement: "Well, I'm off on an adventure of a lifetime." Carolyn Trouten was convinced Trouten did not draft the letter because the language, style, wording, and typewritten format were wholly inconsistent with her daughter's writing.

25

Just before her April 9 birthday, Trouten's grandmother received a birthday card purportedly written by Trouten. The card was in a green envelope postmarked San Jose, California, on March 27, 2000. Trouten's aunt, Chidester, believed the mailing address on the envelope was written in Trouten's handwriting but that the "S. Trouten" written in the return address section of the envelope was not. Trouten's father also received a similar typewritten letter in an envelope postmarked San Jose, California, March 27, 2000.

Unbeknownst to Trouten's family, Robinson had made arrangements in late March 2000 for Jean Glines to mail several letters for him from California. Glines was a former employee of Nancy Robinson, who maintained a long-distance relationship with Robinson by telephone and e-mail after she moved to California in 1997. Robinson asked Glines to mail some letters for him from California as a favor. Glines, who had grown tired of the relationship with Robinson, agreed to mail the letters if Robinson stopped calling her. Glines received a package containing three pastel-colored envelopes from Robinson on March 27. Glines noticed some of the letters were addressed to a person in "Minnesota or Michigan," and there was no return address, only the name "Sue," "Suzette," or the initials "ST." Glines mailed the letters that day from Milpitas, where all mail is sent to and postmarked San Jose, California.

Several weeks later, Trouten's family received a number of letters purportedly authored by Trouten in envelopes postmarked Veracruz, Mexico, on May 19, 2000. Trouten's aunt, Chidester, received one of these letters. She believed the address on the envelope was written by Trouten, but the return address was not. The letter was typewritten and dated May 5, 2000. It discussed Trouten's travels and was signed, "Love you, Suzette." Chidester believed Trouten signed the letter, but she was convinced Trouten did not draft it because the punctuation, style, and organization were not

characteristic of Trouten's writing. Trouten's niece, her grandmother, and her father received similar letters postmarked May 19 from Veracruz, Mexico.

Once again, unbeknownst to Trouten's family, Robinson had made arrangements for several letters to be mailed from Mexico in May 2000. Lidia Ponce lived in Veracruz, Mexico. Her son, Carlos Ibarra, was a maintenance employee at Santa Barbara Estates and did side jobs for Robinson. Ponce traveled to Olathe to visit her son at the beginning of May. Robinson asked Ibarra to have his mother mail several letters from a resort when she returned to Mexico. Robinson gave Ibarra several pastel-colored envelopes, which Ibarra gave to his mother. Ponce returned to Mexico around May 10 and mailed the letters from a hotel in Veracruz several days later after writing the sender's initials on the envelopes as Robinson had instructed. At trial, Ponce examined the envelopes Trouten's family had received and said they were consistent with the ones she had mailed from Veracruz and that the writing on the return address appeared to be her own.

When law enforcement officers searched Robinson's storage unit in Olathe, they found the contact list that Chidester helped Trouten create before moving to Kansas. This list included the mailing addresses and, for some, birthday information for Trouten's family members. The officers also seized a clear plastic folder containing 42 envelopes preaddressed to members of Trouten's family, along with 31 pieces of pastel-colored stationary with "Love you, Suzette" signed at the bottom. The officers also found over a dozen pastel-colored envelopes with enclosed greeting cards and envelopes inside a plastic Target sack. These envelopes were preaddressed to members of Trouten's family, with "S. Trouten" written in the return address and the individual's birthday written in the upper-right corner where postage is typically placed. There were also several letters with generic greetings such as "Hi, dad" or "Hi, mom" handwritten at the top of stationary, along with a number of blank envelopes, stationary, and greeting cards.

27

This was not the first time Robinson had prepared or coordinated deceptive letter writing campaigns. In fall 1997, Robinson met Aleisia Cox through a personal ad she placed in a local magazine. Sometime in 1998, Robinson offered Cox a job traveling with him on business trips to London, Paris, and Australia. Before their scheduled departure, he directed Cox to write letters to her mother and daughter as though she had already arrived at each of these destinations, explaining there would not be time to write family during the trips. Cox complied, crafting letters to her mother and daughter that were written as though she were in Paris, London, and Australia. The trips never materialized, and police found Cox's letters during the search of Robinson's Olathe residence 2 years later.

Robinson's concealment of Trouten's disappearance was not limited to written correspondence. On February 25, 2000, Robinson sent Trouten an e-mail message requesting login and password information for all of her e-mail accounts. Trouten provided the information in a reply e-mail. Robinson also had e-mail addresses for a number of Trouten's friends and family members.

On the morning of March 2, 2000, the day after Trouten's disappearance, Remington received an e-mail from Trouten's Hotmail account. The body of the message said Trouten and her dogs had left on "the adventure of a lifetime." Remington responded a few minutes later, sharing that she had ended the relationship with her former BDS&M "master." Remington received a reply from Trouten's Hotmail account, referring Remington to a new "master" at "eruditemaster@email.com." Remington contacted this new "master" and began communicating with a man she came to know as Jim Turner.

On March 24, 2000, an e-mail from Trouten's Hotmail account was sent to several members of Trouten's family, including her aunt, Chidester; her sister, Kim Padilla; her brother, Michael Trouten; and her father's girlfriend. The message said Trouten had

written to her mother, that she had left on her trip, that she would not have online access for some time, and that she would try to stay in touch when possible. Chidester was convinced Trouten did not write the e-mail because the word choices, style, and format were inconsistent with Trouten's writing. Chidester was also convinced Trouten would have called her, rather than sending an e-mail, before leaving on such a trip. When law enforcement officers searched Robinson's Olathe storage unit several weeks later, they found the e-mail addresses for all four recipients attached to the contact list Trouten had prepared with Chidester before moving to Kansas.

On April 27, 2000, Robinson, posing as Jim Turner, discussed Trouten's disappearance in an e-mail to Remington, claiming that Trouten had stolen his credit cards and that he had hired a private investigator to look into it. He also asked Remington for information on all of Trouten's previous BDS&M partners. After consulting with law enforcement, Remington provided the requested information via e-mail. Law enforcement officers found a printed copy of this e-mail chain in Robinson's possession during the search of his Olathe storage locker several weeks later.

Robinson used e-mail not only to conceal Trouten's disappearance, but also to lure Trouten's friends into new BDS&M relationships. In March 2000, Remington told Taylor she had been communicating with Jim Turner, who she initially believed to be a friend of Trouten's employer, Robinson. Taylor jokingly told Remington to ask Jim Turner whether he had any single friends interested in a BDS&M relationship. Remington did just that, and Robinson, posing as Turner, said Taylor should contact "Tom" at "preipo@usa.net."

Remington forwarded the name and e-mail address to Taylor, and Taylor sent "Tom" an e-mail discussing her interest in BDS&M. When law enforcement officers searched Robinson's Olathe residence, they found a note with the "preipo@usa.net" e-

mail address written on it. On March 17, 2000, Robinson, posing as Tom, responded to Taylor's e-mail, describing himself as a "very aggressive and hard working businessman" and outlining his ground rules for a BDS&M relationship. Taylor and Robinson, posing as "Tom," continued to communicate and discuss BDS&M topics via e-mail. Robinson also began calling Taylor. In one voicemail message, he told her he was changing his "preipo@usa.net" e-mail address to "bdsm@hotmail.com." "Tom" told Taylor that she would be well taken care of if she were his slave.

On May 28, 2000, Robinson, posing as "Tom," sent Taylor an e-mail from his new "bdsm" Hotmail account, asking her to visit him in Kansas City. Unlike his earlier e-mails, "Tom" signed this e-mail as "MASTER"—the same way this name/title appeared in Robinson's other e-mail communications, including Robinson's February 25 e-mail to Trouten and Jim Turner's April 27 e-mail to Remington.

Before committing to a visit, Taylor asked "Tom" for a reference from a past slave, and Robinson, still posing as "Tom," told Taylor she could contact one of his former slaves at "slavedancer@hotmail.com." Taylor e-mailed "slavedancer" seeking information about "Tom" as a master. On May 31, Taylor received a response from the "slavedancer" account, in which "Tom" was referred to as "MASTER" throughout. When law enforcement officers searched Robinson's Olathe residence 2 days later, they found a list of e-mail addresses and passwords, including "slavedancer@hotmail.com," written on a sheet of legal paper. They also found e-mails confirming Robinson's registration of the "slavedancer" name on several e-mail servers. Taylor received no further e-mail after Robinson's arrest on June 2.

2. *Izabela Lewicka*

Izabela Lewicka was born in Poland on April 11, 1978. She moved to West Lafayette, Indiana, with her family at the age of 11. She began studies at Purdue University in fall 1996. She was interested in the arts and was an avid drawer and painter. According to friends, Lewicka also had a strong interest in several alternative lifestyles, including paganism, goth, and BDS&M.

In spring 1997, Lewicka told her friend, Jennifer Hayes, that an international book agent in Kansas City had offered her a job doing secretarial work and had commissioned her to illustrate BDS&M manuscripts. Lewicka said she planned to move to the Kansas City area to be with this older, married man, who had also agreed to train her to become a "dominant" in BDS&M relationships. Lewicka told Hayes he wanted her to call him "master" and to maintain strict confidentiality. Lewicka seemed concerned when she inadvertently told Hayes her master was named John.

While attending Purdue, Lewicka became friends with Dawn Carter and often used her computer to access the Internet. Lewicka told Carter she had a job opportunity in Kansas City illustrating and editing books. Lewicka said that a man named John, whom she had met online, had a job and apartment for her and that they had plans to travel.

Lewicka told her parents she had a summer internship with a publishing company in Kansas City, and if it led to a job, she might stay longer, but she did not rule out the possibility of returning to Purdue for the fall 1997 semester. Lewicka said she would be living at 9280 Metcalf in Overland Park and could be reached by e-mail.

On June 8, 1997, Lewicka left for Kansas in her car filled with belongings. Lewicka's friends believed she moved to Kansas both for BDS&M training and work.

31

Once in Kansas, Robinson helped Lewicka establish herself. They leased a private mailbox at Mailboxes, Etc., located at 9280 Metcalf in Overland Park—the same address Lewicka had given her parents. Both Lewicka and Robinson were authorized to access mail at the box. In October 1997, Robinson had his insurance agent write a 2-year auto policy on Lewicka's vehicle, explaining she was an employee.

On November 14, Lewicka opened an account at Bank of America, where Robinson also held a business account for Specialty Publications.

In February 1998, Robinson contacted Jennifer Boniedot, a property manager for the Deerfield Apartment Complex in Olathe. Robinson said he needed a corporate apartment for employees he would train before they were transferred to positions out of state. In the rental application, Robinson identified himself and Lewicka as the prospective occupants. He told Boniedot that he met Lewicka at a graphics trade show, that she had been abused by her parents, and that he had adopted her. Robinson signed a 1-year rental agreement, from March 1, 1998, to February 28, 1999. Robinson paid rent with a Specialty Publications' check, and Lewicka occupied the apartment through the term of the lease.

In January 1999, just before the Deerfield Apartment lease expired, Robinson contacted Julie Brown, a manager for A.J. Lang Property Management, to find an apartment. Robinson said he was in the publication business and needed a corporate apartment for female employees he trained from across the country. Robinson executed a lease for a different apartment in Olathe (Edgebrook Apartment) for a term beginning January 15, 1999, through January 31, 2000. Lewicka occupied the Edgebrook Apartment, and Robinson paid the rent.

While in Kansas, Lewicka worked for Specialty Publications, handling advertising graphics for Robinson's magazine. In 1998, Robinson told his publishing broker, Karen Scott, he had hired his adopted daughter, Lewicka, as a graphic designer. Lewicka told Pam Sadewhite, who owned a graphic arts company that did work for Robinson, that Robinson was her uncle, but Sadewhite saw them flirting and touching one another in a manner that suggested otherwise.

Lewicka often held herself out as Robinson's wife. Lewicka registered for an introductory drafting class at Johnson County Community College under the name Izabela Lewicka-Robinson and told her instructor that she was married to an older man. She also identified herself as Izabela Robinson to employees of several local businesses.

Though not married, Lewicka and Robinson did share a BDS&M sexual relationship, as evidenced by a BDS&M "slave" contract signed by Lewicka, along with numerous nude photographs depicting her in BDS&M poses, seized from Robinson's Olathe storage unit. Nancy Robinson learned of her husband's relationship with Lewicka in 1997. She believed the relationship was different from Robinson's other affairs. In the past, when Nancy had learned of an affair, Robinson had ended it immediately. This time, the relationship continued, and Nancy thought Robinson would leave her for Lewicka.

However, Lewicka disappeared sometime in late summer or fall 1999. Earlier that summer, Robinson convinced another paramour, Barbara Sandre, to move from Canada to Kansas. On August 18, they executed a lease for an unfurnished duplex at Hunter's Pointe, located on Grant Street in Overland Park (Grant Street Duplex). Sandre needed furnishings for the duplex, and Robinson agreed to provide them. On August 23, Robinson hired a moving company to deliver household items from Lewicka's Edgebrook Apartment to Sandre's Grant Street Duplex. Over the next 2 weeks, Robinson brought

33

additional furnishings, including bedding and pillows, blankets, kitchen utensils, artwork, and hundreds of books. Many of these items were later identified as Lewicka's property.

Robinson had also rekindled his relationship with Aleisha Cox earlier in 1999. Later that year, Cox was unemployed and did not have permanent housing, so Robinson invited her to stay at Lewicka's Edgebrook Apartment. Cox testified the apartment was mostly vacant, but there were some boxes containing clothing and household items. Robinson told Cox the girl that had been living there quit her job and ran off with her boyfriend, leaving the clothes behind. Cox took some of the clothing, which was later identified as Lewicka's. Cox declined Robinson's offer to stay at the apartment.

In September 1999, with several months remaining on the lease, Robinson delivered September's rent for Lewicka's Edgebrook Apartment and notified the property manager, Brown, that he had vacated the premises. Brown later inspected the unit and found it to be mostly unkempt but noticed the two bedrooms had been cleaned meticulously.

Law enforcement officers searched Lewicka's Edgebrook Apartment on October 12, 2000. Detective Sally Lane, a forensic chemist with the Johnson County Crime Lab (JOCO Lab), found hundreds of small, reddish-brown spots on the wall of one bedroom that presumptively tested positive for blood. The blood spots were roughly circular and less than 1 millimeter in diameter. The pattern of stains ran from floor to ceiling and approximately 4 to 5 feet in width, from the middle of the south wall all the way to the east wall, with the highest concentration at waist to chest level. Lane took swabs from a representative sampling of the spots and submitted them to the Kansas City, Missouri, Regional Crime Lab (KCMO Lab) for further analysis, where Detective Frank Booth, a DNA analysist, confirmed the genetic profile from the samples matched Lewicka's DNA.

Other circumstantial evidence corroborated Lewicka's disappearance in late summer or early fall 1999 and Robinson's involvement. In September, Robinson called his publishing broker, Scott, looking for a new graphic designer. Robinson told Scott that Lewicka had been caught smoking marijuana and deported to Czechoslovakia. On September 1, a $500 check payable to Specialty Publications was drawn on Lewicka's account, leaving an available balance of $1. On September 3, the insurance policy Robinson placed on Lewicka's vehicle lapsed because of nonpayment of premium.

After fall 1999, Lewicka was never seen at the local establishments she patronized. During her time in Kansas, she shopped at A. Friendly's bookstore on 25 to 30 occasions. Lewicka stood out to the owner, Robert Meyers, because of her European accent and interest in books about witch trials, horror, vampires, and medicinal plants. Sometime before winter 1999, Lewicka came to A. Friendly's with a man Meyers believed to be Robinson. Lewicka told Meyers she was moving and Robinson would be buying her books after her move. Lewicka shopped there one more time prior to winter 1999, and Meyers never saw her again.

As with other victims, family members received suspicious correspondence after Lewicka disappeared. Lewicka's father exchanged 25 to 30 e-mails with his daughter after she moved to Kansas. Lewicka was spirited and fought with her parents for autonomy and control over her life. When Lewicka responded to the e-mails, her tone was consistently abrasive and short, asking her father, "What the hell do you want [?]" and telling him to leave her alone. However, on April 14, 2000, Lewicka's father received a different sort of e-mail from his daughter's account. The message said she and another person had spent the last 2 weeks traveling the countryside in China. Unlike previous e-mails, the tone of this message was respectful and polite. The final series of e-mails Lewicka's father received from his daughter's account said she was traveling to overseas locations.

3. *Lisa Stasi*

Lisa Stasi, formerly Lisa Elledge, was 18 years old when she began dating Carl Stasi sometime after June 1983. Lisa married Carl in August 1984. She was pregnant at the time. On September 3, 1984, Lisa Stasi gave birth to her first child, Tiffany Lynn, at Truman Medical Center in Kansas City, Missouri. After Tiffany's birth, Stasi's marriage crumbled and Carl reenlisted in the Navy. He reported for duty at Great Lakes Naval Base, outside Chicago, Illinois, in early January 1985.

Around the time Stasi began dating Carl, Robinson was looking for a private adoption opportunity for his younger brother, Donald Robinson, and Donald's wife, Helen, who lived in the Chicago area. At a family reunion in 1983, Donald and Helen told Robinson they were pursuing a private adoption. Robinson said he knew an adoption attorney, Doug Wood, and would handle the process for his younger brother. In fall 1984, Robinson told Donald and Helen a baby would be available in October. At Robinson's direction, Donald sent him a $2,500 cashier's check payable to Robinson's business, Equi II, allegedly to cover adoption-related fees. Robinson later said the birth mother had decided not to place the child for adoption.

In November 1984, Robinson contacted Karen Gaddis, a social worker at Truman Medical Center, and told her that he and several Johnson County businessmen had developed a program to provide housing, transportation, daycare, and job training for young mothers and their babies. Robinson said he needed referrals of Caucasian women because the program already had African-American participants and needed racial balance. Robinson was looking for a white woman in her teens or early 20s, who had a newborn child, was struggling or disadvantaged, and had no family support or ties. In January 1985, Robinson told Gaddis another organization, Hope House, had referred a

young lady to his program, and he had placed her at a motel in Kansas. Lisa Stasi's aunt, Karen Moore, testified that she had contacted Hope House and took Stasi to the organization just before January 1, 1985.

Family members last saw Stasi and Tiffany in early January 1985. Carl Stasi's sister, Kathy Klingensmith, babysat Tiffany often. On January 8, Stasi dropped Tiffany off at Klingensmith's home and told her she had met a man named John Osborne, who was going to help her get a job and finish her GED. Stasi said she might even get to travel as part of the job training program.

Stasi returned to Klingensmith's home to pick up Tiffany on January 9. When she arrived, Stasi said John Osborne had paid for her to stay in a room at the Roadway Inn in Overland Park. At approximately 2 p.m., Stasi called the front desk at the Roadway Inn and gave the hotel receptionist Klingensmith's phone number in case Osborne called. Osborne called Klingensmith's number soon thereafter and got directions to her home. The weather was treacherous because of a strong snowstorm, but Osborne arrived at Klingensmith's home at approximately 3 p.m. Stasi and Tiffany went with Osborne, leaving Stasi's car parked outside Klingensmith's home. Less than 1 hour later, Stasi called Klingensmith to tell her she had arrived safely at the motel. Klingensmith never saw or heard from Stasi or Tiffany again. Stasi never returned for her car. Klingensmith identified Robinson at trial as the man she knew as John Osborne.

Around 4:30 p.m., Stasi called her mother-in-law, Betty Stasi, in a panic, crying and hysterical. Stasi said "they" were claiming that Betty Stasi planned to take Tiffany away because Stasi was an unfit mother. Stasi's mother-in-law told her not to believe what "they" were saying because it was not true. Stasi said "they" wanted her to sign four blank sheets of paper. Betty Stasi told her not to sign anything. Stasi said "here they come," and she hung up.

Betty Stasi never spoke to or saw Stasi or Tiffany again. A few days later, Betty Stasi received a letter purportedly written by Stasi. It was typewritten and signed "Lisa" at the bottom and said Stasi had left town to start a new life with Tiffany.

Nancy Robinson testified that in early January 1985, the day of the terrible snowstorm, Robinson brought a baby to their home in Stanley. Robinson said that the baby's name was Tiffany and that he received her through a private adoption for his brother. Robinson called Donald and Helen and told them a baby was available immediately. He said the birth mother had decided against adoption after delivery, but the family did not support her decision, so she left the baby at a shelter and committed suicide.

Donald and Helen flew to Kansas City on January 10. Robinson picked them up at the airport in the late afternoon and drove them to the offices of Equi II in Overland Park, where they signed legal paperwork, including a Petition for Adoption. After signing the documents, Donald gave Robinson a $3,000 cashier's check payable to Doug Wood, allegedly for further adoption expenses. Donald and Helen named the baby Heather Tiffany Robinson. They returned to Chicago, along with the baby, the following day.

That same morning, Klingensmith called the Roadway Inn and learned Stasi's room had been reserved under a name other than John Osborne. On January 11, Klingensmith filed a missing persons report with the Overland Park Police Department.

Robinson's name surfaced early in the investigation. On February 1, 1985, Overland Park detectives interviewed Robinson, who told them he was starting a charitable organization to provide young mothers job training, food, and housing. Robinson admitted he had placed Stasi at the Roadway Inn as part of that program.

38

However, he said Stasi had recently come to his office to give him the motel key. Robinson said Stasi thanked him for the assistance and said she had made other arrangements. Robinson claimed that Stasi and Tiffany left with a young Caucasian male in an older model green car.

One week later, Robinson provided a similar story to his Missouri Parole and Probation Officer, Steve Haymes. Robinson told Haymes he had placed Stasi at the Roadway Inn, but on January 10, she and Tiffany came to his business with a man named Bill and said they planned to start a new life together in Colorado.

To corroborate this story, Robinson paid Cora Holmes $800 in exchange for her false statement to police. At Robinson's direction, Holmes told Overland Park detectives that she had recently babysat Tiffany and learned Stasi had left for Arkansas with a man named Bill Summers.

In July 1985, Donald and Helen received a package from Robinson containing final adoption paperwork, including a Petition for Adoption, Decree of Adoption, birth certificate, and other documents. The Petition appeared to be signed by attorney Douglas Wood, who had handled over 100 adoptions in his career. Wood testified that he did not prepare the document, that it deviated from his standard form, and that his signature had been forged. Wood confirmed that he had never represented Robinson or any member of his family in any adoption proceeding nor received payment from Robinson for such legal work.

The Decree appeared to contain the signature of attorney Ronald Wood, who had handled only three adoptions in his 23-year career. Ronald Wood testified that he never signed the Decree. He had represented Robinson in other matters, and Robinson had access to other examples of Wood's signature. The Decree also appeared to be signed by

Judge Michael H. Farley, but Judge Farley testified the decree was fraudulent and his signature had been forged.

Both the Petition and Decree appeared to be notarized by Evi Gresham, who had been in a BDS&M relationship with Robinson in the early to mid-1980s, but Gresham had never seen the documents, her name was misspelled, and she was never a notary public. Robinson had directed Gresham to sign numerous blank papers during their relationship. Neither the Petition nor the Decree was found in the district court clerk's official records.

After Robinson's arrest in 2000, Donald and Helen began to question the identity of Heather's birth mother. Law enforcement compared Heather's footprints to the known prints of Tiffany and found the prints matched, *i.e.*, Heather Tiffany Robinson was Tiffany, Stasi's biological daughter.

4. *Beverly Bonner*

Beverly Bonner lived in Cameron, Missouri, with her husband, Dr. William Bonner, and their two sons. In 1992 and 1993, Bonner worked as a prison librarian at the Western Missouri Correctional Center while Robinson was an inmate. William Bonner was a prison physician who treated Robinson and other inmates.

In November 1993, Bonner filed for divorce. Toward the end of their marriage, Bonner told her husband she was helping Robinson find property for a hydroponics project. Bonner also said she planned to take a job with a company in Chicago.

Bonner was not seen by her family after her final divorce proceeding in February 1994. Bonner's brother, Louell Heath, invited Bonner to his September 1995 wedding,

40

but she did not attend. Bonner's oldest son died in October 1995, but she did not attend his funeral.

After Bonner's disappearance, Robinson stole her alimony payments. In December 1993, Robinson, posing as Jim or James Turner, applied for a mailbox under Bonner's name at The Mail Room in Olathe. The owner, Colleen Davis, identified Robinson at trial as the person she knew as Turner. Robinson executed a lease for Box 182 under Bonner's name on January 1, 1994. Robinson presented Bonner's identification and told Davis he was collecting Bonner's mail while she worked in Australia. Davis never met Bonner and only saw Robinson access the mailbox.

William Bonner paid his ex-wife $1,000 in monthly alimony for 18 months. He timely mailed each alimony payment to Bonner's private mailbox in Olathe. Every alimony check was deposited into Robinson's Hydro-Gro, Inc., business account at Community Bank of Raymore, an account opened on February 1, 1994, with James A. Turner and Beverly J. Bonner as the authorized signatories. Three latent prints lifted from the original alimony checks matched Robinson's known prints.

Robinson attempted to conceal Bonner's disappearance with fraudulent communications to her family. In January 1994, Bonner's brother, Larry Heath, received a handwritten letter purportedly from Bonner that said she was starting a new career with an international corporation in Chicago and that she would be traveling extensively, both domestically and abroad. A few months later, Larry Heath received a typewritten letter purportedly from Bonner, which was unusual because Bonner had always written letters by hand. The letter said Bonner was working for "Jim Redmond" in the human resources department of a large international corporation. Larry Heath continued to receive similar typewritten letters every 3 to 4 months. Occasionally, he would respond, mailing correspondence to Bonner's private mailbox. During the same time period, Louell Heath

41

received roughly half a dozen letters, which arrived in envelopes postmarked Australia, France, the Netherlands, and Kansas City, Missouri. The letters were typewritten, often discussed Bonner's travel overseas, and were signed in what Bonner's brothers believed to be her handwriting.

In early 1997 the letters ceased. Bonner's family grew concerned and contacted authorities to report her disappearance. Detective Frank Booth examined nine of the envelopes mailed to Larry Heath. Eight of the envelopes had sufficient amylase to create a full DNA profile, and each profile matched Robinson's known DNA.

5. *Sheila Faith and Debbie Faith*

Sheila Faith married John Faith, and the couple had a baby girl named Debbie Lynn on October 17, 1978. Debbie was born with a number of birth defects, including cerebral palsy, which limited her ability to walk and control her bladder, forcing her to wear adult diapers later in life. Sheila's husband passed away in 1993, and Sheila moved with Debbie from California to Pueblo, Colorado, to be closer to her friend, Nancy Guerrero. Sheila and Debbie lived on Social Security and struggled financially.

According to Guerrero, Sheila was lonely and responded to personal ads in hopes of meeting a companion. On several occasions, Sheila talked to Guerrero about her interest in BDS&M but did not share details because Guerrero was uncomfortable with the subject. Sheila's sister also believed she was interested in BDS&M.

In spring 1994, Sheila told Guerrero she had met a man named "John" from Missouri. Sheila said "John" was a wealthy executive who promised to take her on a cruise and put Debbie in private school. Sheila told her sister, Cathy Norman, that she had met a man with a good job, that they planned to travel together, and that he planned

to buy Debbie a new wheelchair and accessible van. Norman said Shelia called him "Jim Turner" either in a letter or during their last telephone conversation.

Sheila told Guerrero that she and Debbie were going to visit John. They planned to be gone for about a month, spending a couple weeks with John in Missouri and then traveling to Texas to visit family. Guerrero expected Sheila to return within a few weeks because they had purchased tickets to the Colorado state fair, and Sheila planned to enter a cross-stitched angel into the fair competition. While Sheila packed, Guerrero noticed she did not take furniture, bedding, or other items one would need for an indefinite stay elsewhere.

Neither Guerrero nor Sheila's sisters saw or spoke to Sheila or Debbie again after they left Colorado to visit Robinson. Additionally, in 1995, Robinson gave one of his paramours, Sandra Shields, a cross-stitched angel as a gift. Guerrero identified the item as the piece Sheila Faith had made to enter into the state fair competition.

After Sheila and Debbie left, Sheila's sisters received letters purportedly written by Sheila. In December 1994, Norman received a typewritten letter purportedly from Sheila in an envelope postmarked Canada. The letter said Sheila had met a wonderful man named Jim. Norman was convinced the letter was a fraud because Sheila always wrote letters by hand and Sheila's signature appeared to be forged. Norman received another letter the following December. Again, she was convinced Sheila did not write it because of the typewritten format and the nature of the signature. Sheila's other sister, Michelle Fox, also received a letter in an envelope postmarked outside the country. Fox immediately suspected it was fraudulent because of the typed format, style, and unusual signatures.

43

For years following their disappearance, Robinson stole Sheila's and Debbie's social security benefit payments. In June 1994, just months after setting up a private mailbox under Bonner's name, Robinson, posing as James Turner, set up another private mailbox at the Mail Room—this time under the names Sheila and Debbie Faith. The owner saw Robinson come to the mailbox at least once a month to collect two government checks mailed to Sheila and Debbie Faith.

While the Faiths were living in Colorado, the Social Security Administration (SSA) had mailed Sheila's and Debbie's benefit checks to a Pueblo, Colorado, address. For the first half of 1994, these checks were often deposited into an account held at Colorado National Bank. In June 1994, SSA received notice that Sheila's and Debbie's mailing address had changed to the private mailbox in Olathe. SSA began mailing benefit checks to this new address the following month.

From July 1994 to September 1995, the checks were deposited into Robinson's Hydro-Gro, Inc., business account at Community Bank of Raymore—the same account Robinson used to deposit Bonner's alimony checks. In fall 1995, Community Bank of Raymore notified Robinson, a/k/a James Turner, that Social Security checks could not be deposited into a business account. Thereafter, Robinson deposited the checks into his Specialty Publications' accounts at other financial institutions.

Robinson also employed fraud and deceit to ensure Debbie's disability benefits would continue. In August 1994, SSA received a completed disability review form for Debbie, purportedly signed by Sheila Faith. Attached to the disability form was a medical report confirming Debbie's ongoing physical impairment. The report appeared to be signed by Dr. William Bonner, but he testified that he had never treated Debbie Faith, had not prepared the report, and had never had an office at the address identified in the document.

44

On June 7, 2000, law enforcement searched box 215 at The Mail Room and seized envelopes containing the June 2000 SSA benefit checks for Sheila and Debbie Faith. Lyla Thompson, a deputy with the JOCO Lab, developed several latent fingerprints from the other SSA checks that matched Robinson's known prints.

6. *Vickie Neufeld*

Vickie Neufeld lived in Texas. She lost her job as a geriatric therapist in March 2000, and her financial situation was dire. Neufeld placed personal ads on BDS&M websites and began e-mailing Robinson. Neufeld and Robinson discussed a potential BDS&M relationship, and he sent her a slave contract to review.

On April 23, 2000, Robinson asked Neufeld to visit him in Kansas. Robinson said he was a wealthy businessman with a history of helping other professional women get established in the area. He promised to support her and said they possibly could pursue a relationship.

Robinson arranged for Neufeld to stay at Extended Stay America in Overland Park. She arrived on April 23, 2000. As Robinson had requested, she brought her own sex toys along for the trip. Robinson and Neufeld engaged in sexual activity at various times during her stay. On the morning of April 26, Robinson told Neufeld he was leaving for a business trip in Israel and wanted to discuss a plan for her to move to Kansas. Robinson said his business would pay movers to bring her belongings to Kansas that weekend. Robinson asked Neufeld to leave her sex toys with him, explaining it would give her extra incentive to return. Neufeld left behind her rattan-type canes and a mesh bag full of sex toys, which she valued at $700.

Neufeld returned to Texas, but the movers never arrived. On May 22, 2000, Neufeld asked Robinson to return her sex toys, but he did not comply. Neufeld filed a police report, and law enforcement found Neufeld's sex toys several days later during the search of Robinson's Olathe storage locker.

*The Investigation*

On March 25, 2000, the Overland Park Police Department took a missing person's report regarding Trouten and transferred it to the Lenexa Police Department, which had jurisdiction. Lenexa police created a multijurisdictional task force that quickly focused its investigation on Robinson's activities. They employed numerous investigative techniques, including surveillance, trash hits, consent searches, pen registers, wiretaps, and search warrants, leading to Robinson's arrest on June 2, 2000.

On March 29 and 30, 2000, Deputy Daniel Rundle, a forensic chemist with the JOCO Lab, searched Trouten's room at the Guesthouse Suites in Lenexa. Although Rundle found several small bloodstains in the room, he admitted the search produced nothing of evidentiary value.

On March 31, 2000, the Lenexa Police Department began searching trash left at the curbside for collection at Robinson's Olathe residence. On April 4, officers found an invoice for a package Robinson sent to Glines in California—the woman who mailed letters postmarked from San Jose, California, at Robinson's request. On April 25, investigators used a Deffenbaugh trash truck with the company's permission and collected three bags of Robinson's trash. They recovered a telephone bill for service at Robinson's Linn County property, which documented a long-distance call placed from Robinson's trailer on the morning of Trouten's disappearance.

On May 22, 2000, law enforcement secured a court-ordered wiretap on Robinson's cell phone. Law enforcement later intercepted a call from Robinson to Remington's phone, which was answered by her minor son. During that call, Robinson identified himself as "Jim." Later that afternoon, law enforcement intercepted another telephone call from Robinson, posing as Jim Turner, to Remington. During this call, he said Trouten had stolen his credit cards and withdrawn money from his accounts, and that his private investigator had learned Trouten was in Mexico. He also said Carolyn Trouten had called one of his friends, inquiring about her daughter's whereabouts.

On the morning of June 2, 2000, law enforcement secured a warrant to search Robinson's Olathe residence and his Olathe storage unit. Robinson was arrested that morning just before officers executed the search warrants.

During the search of Robinson's residence, law enforcement officers seized a number of incriminating items, including books on creating false identities; a Home Depot credit card bearing the name "James A. Turner"; IRS Form 1099 statements for Sheila and Debbie Faith; Roadway Inn receipts with "Lisa Stasi" written on them, reflecting payment for lodging in January 1985; an IRS form signed by "Beverly J. Bonner"; documents identifying "James Turner" and "John Robinson" as affiliated with Equity Financial Group and Hydro-Gro, Inc.; papers and handwritten notes with e-mail addresses associated with the victims and their families; and e-mail communications between Trouten and Robinson.

During the search of Robinson's Olathe storage unit, law enforcement officers seized several items relevant to the disappearances of Trouten, Lewicka, and Sheila and Debbie Faith. First, several items were immediately identifiable as Trouten's, including her Social Security card, Michigan driver's license, birth certificate, high school diploma, Sam's Club membership card, American Red Cross certification card, passport

application, and prescription medication. Law enforcement officers also found numerous personal items that family members identified as Trouten's property, including her jewelry boxes, jewelry, collectible items, nursing textbooks, and a journal with the name "Suzette" inside. A number of items also evidenced Trouten's BDS&M relationship with Robinson, including a slave contract, a sex tape, nude photographs, and e-mails.

Several items were also immediately identifiable as Lewicka's, including her Polish passport, Kansas driver's license, Social Security card, resident alien card, Olathe Public Library card, high school diploma, Indiana vehicle registration, and a document appointing Robinson as her power of attorney. Law enforcement officers also found several personal items that family members later identified as Lewicka's.

Additionally, law enforcement officers seized 1998 IRS Form 1099 statements for Sheila and Debbie Faith, along with photocopies of their SSA benefit checks for September 1997. Finally, police found a slave contract Neufeld had signed, along with her sex toys.

On the morning of June 3, 2000, law enforcement officers secured a warrant from Johnson County District Judge Larry McClain to search Robinson's Linn County property. The search began that morning and continued for roughly 1 full week.

Around 1 p.m. on June 3, Johnson County Sheriff's Detective Herald Hughes learned a cadaver dog alerted on two yellow, metal barrels on the property. The barrels were located out in the open, just to the south of a wooden shed located several yards to the southwest of the trailer on the property. Hughes opened the barrels and confirmed each contained the remains of a human body.

The barrels were transported to the Shawnee County morgue, where Shawnee County Deputy Coroner Donald Pojman conducted autopsies on June 4. The body removed from the first barrel was that of Trouten. It was mildly decomposed, unclothed, and lying in a fetal position inside the barrel. There was a soft, nylon rope tied around the head with a piece of cloth underneath covering the nose and mouth, which Pojman believed to be a blindfold that had slipped below the eyes. There were two visible injuries: a tear to the skin near the left armpit inflicted postmortem and an oval-shaped defect on the left side of the head, which Pojman believed to be lethal. Pojman concluded the cause of death was a blow to the left side of the head with a hard object. Forensic odontologist Daniel Winter confirmed Trouten's identity with her known dental records.

Pojman then conducted the autopsy of the body in the second barrel, later identified as Lewicka. The body was moderately decomposed, lying in a fetal position, partially covered with a pillow, and clothed with a short-sleeve nightshirt. Inside the barrel, Pojman saw three pieces of gray or silver duct tape. He observed two blunt-force injuries to the skull, either of which could have been lethal. He noted the injuries were similar to Trouten's. Winter confirmed Lewicka's identity with her known dental records.

Back in Linn County, deputies from the JOCO Lab discovered a variety of incriminating trace evidence inside Robinson's trailer. First, Deputy Allen Hamm found a paper towel inside the kitchen sink with a reddish-brown stain that presumptively tested positive for blood. Detective Booth, KCMO Lab, determined the genetic profile from the blood on the paper towel matched Trouten's DNA profile. Booth testified that this genetic profile occurs in only 1 in 6 billion people.

Booth also found eight hair strands on the paper towel. Booth compared them to known samples from Trouten and Robinson and opined that they were common to Trouten and not Robinson. Booth admitted that, unlike DNA testing, comparative hair

analysis cannot yield a positive identification. However, he explained the methodology is still useful in excluding individuals or including them among a group of people that share similar hair characteristics. Additionally, Booth obtained a root from one of the hair samples and successfully acquired a genetic profile that produced a match to Trouten.

Hamm found reddish-brown stains on wallboard in the kitchen that presumptively tested positive for blood. Booth confirmed that the genetic profile from the wallboard stains matched Trouten's DNA. Booth also found two hairs in the samples, both of which were common to Trouten and not Robinson. Hamm also collected swabs of a stain on a long piece of trim board in the kitchen area of the trailer. Booth found two hairs and two fragments in these swabs that were common to Trouten and not Robinson.

Johnson County Sheriff's Deputy Andrew Guzman found a roll of duct tape inside a green plastic trash container in the south bedroom. The tape appeared to be similar to the strands of duct tape found inside the barrel containing Lewicka's body. Investigators saw a reddish-brown stain on the roll of duct tape, and Booth's subsequent testing confirmed the genetic profile produced a match to Lewicka's DNA. Deputy Thompson lifted one latent print from the roll of duct tape that did not match Robinson's known prints. Thompson compared the print to several crime scene investigators' known prints but found no match. Due to the state of decomposition of Lewicka's body, Thompson was unable to compare the print to Lewicka's. Thompson saw what appeared to be another partial print with some ridge detail on the roll of duct tape, but it was too incomplete to be of value.

In addition to trace evidence, law enforcement officers seized a number of Trouten's belongings from inside Robinson's trailer. In the living room area, Guzman found a box with an "EZ Set" label on it and a box with a "Big Boy" label on it that contained glassware, oil lamps, figurines, and other collectable items. Carolyn Trouten

50

confirmed that many of these items belonged to Suzette Trouten. Thompson developed a number of latent prints from items in the EZ Set box that matched Robinson's known prints.

On June 5, 2000, law enforcement officers executed a warrant to search a Raymore, Missouri, storage unit, rented by Robinson. In December 1993, Robinson had rented unit F-10 at Stor-Mor For Less in Raymore. He leased the unit under Beverly Bonner's name, claiming that Bonner was his sister and that he was storing her belongings while she worked in Australia. The leasing agent recalled Robinson saying Bonner worked for an agricultural company with "Hydro" in its name. Robinson leased this unit through the summer of 1996. In January 1994, Robinson leased a second unit, E-2, under Bonner's name and maintained that lease through the date of his arrest.

Law enforcement officers began searching unit E-2, and within 10 minutes, they smelled a foul odor that they associated with a decomposing body.

In the back of the locker, officers saw three barrels. The first was black and sealed with a gray lid. They opened the top and discovered a body inside. The two other barrels were located in front of the black barrel. They were covered with a large plastic sheet, and cat litter had been sprinkled around the outside of the barrels inside the plastic. Some of the litter appeared to have absorbed a dark fluid. The barrels were wrapped together with two additional pieces of plastic sheeting held up with pieces of duct tape. Thompson examined the plastic sheeting and duct tape and developed four latent prints of value. Three of the latent prints matched Robinson's known prints, and one was not identified. The officers did not open the second and third barrels but suspected they too contained human remains.

All three barrels were transported to the Jackson County Medical Examiner Thomas Young. Young conducted an autopsy on the body inside the first barrel, later identified as Beverly J. Bonner. The body was curled up inside the barrel and fully dressed for cold weather. Young believed the body had been stored for a long period of time because most external features were blurred and the internal organs were hard to distinguish. The body had substantial trauma to the head caused by multiple blows from a blunt object with a rounded surface, consistent with a hammer. Young opined that any number of these blows could have resulted in death. On June 7, 2000, forensic odontologist Ronald Grier confirmed the victim was Bonner.

Next, Young conducted an autopsy on the body contained one of the two barrels wrapped in plastic, later identified as Sheila Faith. The body was an adult female, fully clothed. Young believed the state of decomposition was consistent with the death having occurred 5 to 6 years prior but admitted no precise date of death could be determined. The body had multiple injuries to the head caused by blunt-force trauma consistent with infliction by a hammer. Young opined that any number of these blows could have been fatal. Young also observed a fracture of the right forearm, specifically the right ulna, which he testified to be consistent with a defensive wound. Grier confirmed the victim was Sheila Faith.

Finally, Young conducted the autopsy on the body found inside the third barrel, later identified as Debbie Faith. The body was fully clothed, and the subject was wearing an adult disposable diaper. Young believed the victim was a teenager because x-rays revealed that several growth discs had not closed. Again, Young testified that the state of decomposition was consistent with the death having occurred 5 to 6 years prior but admitted no precise date could be determined. The victim had sustained at least three blows to the head, each of which could have been fatal, inflicted by a blunt object with a

rounded surface, consistent with a hammer. Using known dental x-rays, Young opined the victim was Debbie Faith.

Lisa Stasi's body has never been found.

On June 9, law enforcement officers searched the Grant Street Duplex with Sandre's consent. They seized a number of items belonging to Lewicka, including two sets of bedding, an antique Polish coffee grinder, a Hungarian espresso machine, and a black journal with handwriting and sketches. Investigators noticed one of the sets of bedding matched the pattern on the pillowcase found inside the barrel containing Lewicka's body. The bedding also matched the pattern depicted in nude photographs of Lewicka found in Robinson's Olathe storage unit.

Hanging on the wall of the duplex was a framed oil painting with the signature "John '92" and the initials "JR" at the top. There were also two pencil drawings displayed in the spare bedroom signed "John 2000" and the initials "JR" underneath. Lewicka's friend Carter, who had cataloged Lewicka's artwork and was familiar with her paintings and drawings, recognized the framed painting as Lewicka's artwork. Lewicka's friend Hayes also identified the pencil drawings as Lewicka's work.

Law enforcement officers seized several books purchased from A. Friendly's, where Lewicka was a frequent patron. The owner, Meyers, specifically recalled selling two of the books to Lewicka.

*The Trial*

On June 2, 2000, the State filed its Complaint against Robinson, charging him with two counts of aggravated sexual battery and one count of theft. The State amended

its Complaint on June 13, adding one count of aggravated kidnapping and two counts of capital murder. The State filed its Second Amended Complaint on July 28, adding one charge of premeditated first-degree murder and one charge of aggravated interference with parental custody. On August 31, 2000, the State filed its Third Amended Complaint, supplementing allegations in the existing counts.

At preliminary hearing, the State put on evidence supporting the eight counts in the Third Amended Complaint. District Judge John Anderson III found probable cause lacking and dismissed Count IV, aggravated sexual battery of J.M. Judge Anderson renumbered the remaining seven counts, which were tried to the jury.

Jury selection began on September 16, 2002. Judge Anderson empanelled the jury on October 4, and trial commenced on October 7. At the close of the State's evidence, Judge Anderson granted defendant's motion for directed verdict on Count IV, aggravated sexual battery of Vicki Neufeld. On October 25, 2002, the defense rested. That same day, the State filed a Fourth Amended Complaint charging Robinson only with the counts from the Third Amended Complaint that survived Robinson's motion for directed verdict.

The following six counts were submitted to the jury on October 28, 2002: Count I, aggravated kidnapping of Suzette Trouten; Count II, capital murder of Suzette Trouten; Count III, capital murder of Izabela Lewicka; Count IV, felony theft of Vicki Neufeld's property; Count V, premeditated first-degree murder of Lisa Stasi; and Count VI, aggravated interference with Lisa Stasi's parental custody. On October 29, 2002, the jury returned a unanimous verdict convicting Robinson on all counts.

1. VENUE

Robinson argues pretrial publicity was so pervasive and prejudicial in Johnson County that it resulted in actual prejudice to his right to trial by a fair and impartial jury in violation of his rights under the Sixth and Fourteenth Amendments to the United States Constitution. He also claims Judge Anderson abused his discretion by refusing to transfer venue to another county pursuant to K.S.A. 22-2616(1).

*Additional Factual and Procedural Background*

1. *First Motion for Venue Change*

Robinson first moved for a change of venue on January 17, 2002. At the January 30, 2002, evidentiary hearing, defendant presented testimony from venue experts, along with the results of a venue study prepared by Lisa Dahl of Litigation Consultants, Inc.

The study was based on three telephone surveys:  one of 400 Johnson County residents, one of 200 Harvey County residents, and one of 200 Ellis County residents. Dahl selected Johnson County, which had a population of 464,083 at the time, because it was the venue of origin. She selected Harvey County, which had a population of 35,737, as one of the control groups because its county seat, Newton, was a bedroom community to Wichita, much like Olathe was a bedroom community to Kansas City. She selected Ellis County, which had a population of 28,731, as another control group because it was geographically removed from the venue of origin and other metropolitan areas, yet its demographic makeup and crime rates were comparable to Johnson County. Dahl testified the number of respondents in each county was statistically sufficient to extrapolate results

to the general population within a 5 percent margin of error in Johnson County and 7 to 8 percent margin in the control counties.

The surveys' results showed 94 percent of the respondents in Johnson County were aware of this case, compared to 80 percent in Harvey County and 64 percent in Ellis County. Further, 67 percent of those surveyed in Johnson County held an overall opinion that the defendant was "definitely guilty" or "probably guilty." In contrast, 50.5 percent of the Harvey County respondents and 35.5 percent of the Ellis County respondents held similar opinions. As to respondents' views of the strength of the evidence of defendant's guilt, 72.3 percent of the Johnson County respondents believed it to be "overwhelming" or "strong." Half of the respondents in Harvey County and only 35.5 percent of respondents in Ellis County believed likewise. Also, 68 percent of Johnson County respondents had knowledge of case facts beyond those presented in the survey, compared to only 23 percent in Harvey County and 27.3 percent in Ellis County.

Dahl testified that the surveys' results were generally statistically significant. However, in the three counties surveyed, there was no statistically reliable difference in sentencing opinions among respondents who recalled the case.

Dahl admitted she was not interested in exploring whether respondents could set aside preconceived opinions and serve as impartial jurors. In fact, none of the 38 questions in the surveys explored respondents' ability to assess the case impartially.

Robinson also called Ronald Dillehay, a professor of psychology at the University of Nevada-Reno with expertise in the design and analysis of venue studies and jury selection procedures. Dillehay testified that the design of Dahl's venue surveys was scientifically valid and conformed to generally accepted practices in the field. Dillehay also testified that the absence of questions exploring respondents' ability to serve as

impartial jurors did not invalidate the venue study. In support, he cited studies in the fields of psychology and social science that suggest humans struggle to set aside preconceived opinions but will confirm their ability to do so when asked. Thus, Dillehay said such questions produce a lack of response variance sought in reliable questionnaires.

Dillehay acknowledged the survey data showed a very high level of awareness and prejudgment of the case in Johnson County and then discussed possible options to counteract such prejudice, including: (1) change of venue; (2) importing jurors from outside Johnson County; (3) delay; (4) enhanced voir dire; (5) additional peremptory challenges; and (6) judicial instructions.

Dillehay believed delay and judicial instructions would be ineffective due to the high levels of awareness and prejudgment. As to the option of enhanced voir dire, Dillehay explained that the court could overcome juror minimization, which he described as a tendency on the part of jurors during voir dire to downplay what they learned from the media coverage and the impact it had on their prejudgment and/or impartiality, by allowing attorneys to ask prospective jurors extensive, probing voir dire questions. Dillehay explained that enhanced voir dire would require participation of attorneys, lots of questions, and small groups consisting of no more than four to six people, facilitating an environment where prospective jurors would be forthcoming. While effective, Dillehay believed enhanced voir dire would be too onerous from a logistical or administrative perspective, describing it as "very laborious and very time-consuming."

On the second day of the evidentiary hearing, continued to March 6, 2002, the defense played 2 hours of televised news coverage of the case broadcast within the first 2 weeks of the discovery of bodies on Robinson's Linn County property in June 2000. In the motion, defendant had also submitted articles about the case published by the Kansas City Star from June 6, 2000, to July 27, 2001. During this time period, the Kansas City

Star published 72 stories. More than half of them were published in the same month the story broke. Coverage gradually dissipated and was nearly nonexistent at the end of 2000 and early 2001. Thereafter, the majority of the coverage shifted from reports about Robinson and the crimes to trial coverage.

Judge Anderson denied the motion in a March 12, 2002, order, explaining:

"Despite the extraordinary amount of attention this case has received from the public and in the press thus far, the Court is not convinced that the defendant cannot obtain a fair trial. Johnson County is a large county with a sophisticated pool of potential jurors. The Court is confident that appropriate voir dire and jury selection methods will result in a fair and impartial jury that will decide the case on the evidence presented in court and on its merits. The presumption of innocence and the right to a fair trial are of the utmost importance to the rule of law in this country. The system simply does not function without it. If it becomes apparent during voir dire that an impartial jury cannot be found, the Court will not be reluctant to order a change of venue."

2. *Renewed Motion for Venue Change after Voir Dire*

On October 3, 2002, after completing voir dire, Robinson filed "Defendant's Renewed Motion for Change of Venue, or, in the Alternative, to Discharge the Jury Panel," arguing that voir dire had proven inadequate to overcome community bias.

At the outset of jury selection, roughly 1,200 Johnson County residents were issued summonses and ordered to appear in four groups of 300, but the district judge later released the final two panels. Veniremembers completed a juror questionnaire (questionnaire) prepared by the parties, eliciting their views on pretrial publicity, the death penalty, and other case-specific facts and issues.

58

With the agreement of the parties, the trial court conducted jury selection in four phases. In the first phase, Judge Anderson called prospective jurors in groups of 60 to explore and rule on hardship challenges.

In the second phase, Judge Anderson assigned jurors to six-member panels to conduct small group voir dire on pretrial publicity and death penalty topics. After the parties completed voir dire of each panel, the district judge ruled on challenges for cause. From September 18 to October 1, 2002, the parties examined 43 panels made up of 259 veniremembers. Nearly all had some knowledge of the case. Judge Anderson passed only 83 of the 259 panelists to the third phase of jury selection.

A majority of these disqualified panelists, 167 of 259 (64 percent), were excused for cause based on preconceived opinions of the case, firm death penalty opinions (both for and against), or both. Specifically, 74 of the 259 panelists (28.5 percent) were excused based solely on firm opinions due to exposure to pretrial publicity, 72 panelists (27.7 percent) were excused based solely on firm opinions regarding the death penalty, and 21 additional panelists (8.1 percent) were excused on both pretrial publicity and death penalty grounds. In total, 95 of the 259 panelists were excused, in whole or part, due to bias related to pretrial publicity and 93 panelists were excused, in whole or part, based on their disqualifying death penalty opinions. Judge Anderson liberally excused panelists holding preconceived opinions, granting 92 of the 100 challenges defendant asserted on this basis.

Nine of the 259 panelists (3.4 percent) were excused because of previously undisclosed hardships or grounds unrelated to pretrial publicity or the death penalty.

Of the 83 panelists passed to general voir dire, 52 were passed without any challenge for cause asserted by either party. The 31 other panelists were passed over the

objection of one of the parties—4 from the State and 27 from defendant. However, Robinson challenged 19 of these 27 based on death penalty views and 8 on grounds related to bias arising from exposure to media coverage.

During general voir dire, Judge Anderson passed 65 of the 83 panelists, excusing 18 on grounds unrelated to pretrial publicity. However, the district judge needed only 51 panelists to seat a jury of 12 with 5 alternates. The parties agreed to release the 14 jurors with the highest assigned juror numbers. Juror 440, whom Robinson had previously challenged unsuccessfully on pretrial publicity grounds, was 1 of the 14 panelists released. This left only 7 prospective jurors on the final panel that defendant had challenged unsuccessfully on grounds of bias arising from exposure to pretrial publicity.

In the final phase of jury selection, the parties exercised peremptory challenges. Among those jurors seated, 11 of 12 were passed by the parties without any objection based on preconceived opinions of guilt, and all jurors confirmed their ability to serve impartially. Defendant had challenged only one of the seated jurors, Juror 39, on grounds of bias related to pretrial publicity. Eight of the 12 jurors were passed for cause without challenge from either party (Jurors 87, 92, 131, 147, 214, 246, 302, and 309).

At the start of the eighth day of trial, Juror 214 was excused because of an emergency medical hardship in her family and was replaced by Alternate Juror 340. The parties had passed Juror 340 without challenge.

While every seated juror was familiar with the case, most had limited exposure to the media's coverage. All but two members of the jury characterized their exposure to pretrial publicity as minimal, passing, or light; and several members said they saw coverage when the story first broke 2 years earlier and their recollection of the reported facts had diminished over time.

After hearing argument on the renewed motion for venue change on October 4, 2002, the trial judge denied the motion, finding the jury selection process had yielded a fair and impartial jury.

### 3. *Second Renewed Motion for Venue Change*

On October 7, 2002, just before opening statements, defendant renewed his motion to change venue for a second time. Defense counsel explained that earlier that morning, he entered Judge Anderson's chambers and noticed a copy of that morning's Olathe Daily News sitting in the reception area. The front page of the newspaper contained Robinson's photograph, and the newspaper's banner headline read "Robinson to face his jury" and the subheading read "Defense says trial should be moved." Defense counsel explained that when he emerged from chambers, the jury walked past him, coming within 2 feet of the paper, which was face up on the reception counter. The defense believed jurors could have seen the headlines, warranting a venue change.

The trial court denied the second renewed motion for venue change, finding that he had "no idea" whether any jurors saw the newspaper, but even if they did, there was no prejudice in light of the content and given the media's extensive reporting on defendant's motion to change venue earlier that spring.

### 4. *Third Renewed Motion for Venue Change*

Defendant renewed his motion to change venue for a third time on October 9, 2002, explaining that a local radio personality had been giving away T-shirts outside the courthouse as a publicity stunt that morning. The front of the T-shirts read "Roll Out the Barrels! Of Evidence," and the back read "John E. Robinson Trial 2002."

Judge Anderson found that none of the jurors were exposed to the publicity stunt or T-shirts because of safeguards the court had taken, including bringing jurors into the courthouse through a secluded entry away from the incident. Judge Anderson denied the motion, concluding the incident did not affect jurors "in any way, shape or form."

*Legal Framework and Standard of Review*

Robinson argues the district judge's denial of his change of venue motions violated his constitutional right to an impartial jury.

The Sixth Amendment guarantees an accused "[i]n all criminal prosecutions" the right to a trial by "an impartial jury." U.S. Const. amend VI. This protection is incorporated into and made applicable to the States through the due process provision of the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 153-58, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (1968).

A constitution-based claim for venue change can arise under a theory of presumed or actual Sixth Amendment prejudice. *State v. Longoria*, 301 Kan. 489, 506, 343 P.3d 1128 (2015). "'[A]ctual prejudice,' occurs 'where the effect of pretrial publicity manifested at jury selection is so substantial as to taint the entire jury pool.'" *State v. Carr*, 300 Kan. 1, 57, 331 P.3d 544 (2014) (quoting *Goss v. Nelson*, 439 F.3d 621, 628-29 [10th Cir. 2006]), *cert. granted in part* 135 S. Ct. 1698 (2015). "'In cases of actual prejudice, "the voir dire testimony and the record of publicity [must] reveal the kind of wave of public passion that would have made a fair trial unlikely by the jury that was impaneled as a whole." [Citations omitted.]'" 300 Kan. at 57.

"Jury selection is a task 'particularly within the province of the trial judge.'" *Carr*, 300 Kan. at 75 (quoting *Ristaino v. Ross*, 424 U.S. 589, 594-95, 96 S. Ct. 1017, 47 L. Ed.

2d 258 [1976]). A district judge's ruling on juror impartiality "is entitled to special deference." 300 Kan. at 75. Accordingly, we review claims of actual prejudice under the abuse of discretion standard. 300 Kan. at 75. "An abuse of discretion can occur in one of three ways—when the trial court makes an error of law; bases its decision on facts not supported by the evidence; or makes an arbitrary, fanciful, or unreasonable decision." *Longoria*, 301 Kan. at 509.

Defendant also challenges Judge Anderson's rulings under the Kansas change of venue statute, K.S.A. 22-2616(1). As with claims of actual prejudice, we review the trial court's ruling under the statute for abuse of discretion. *Longoria*, 301 Kan. at 509.

*Actual Prejudice*

Robinson advances five arguments in support of his actual prejudice challenge, arguing that the trial court abused its discretion by: (1) failing to acknowledge uncontroverted social science evidence that individuals cannot set aside preconceived opinions; (2) applying K.S.A. 22-2616 contrary to the Sixth Amendment; (3) finding voir dire eliminated those with bias; (4) failing to acknowledge the media's interference with proceedings; and (5) failing to acknowledge jurors' failure to abide by admonitions.

1. *Did the trial court's findings ignore social science research?*

Robinson argues the district judge erroneously denied the venue change motion in light of uncontroverted expert witness testimony describing social science studies that suggest people struggle to genuinely set aside preconceived beliefs. Given this testimony, Robinson believes Judge Anderson's finding that voir dire could overcome community bias is unsupported by record evidence.

There are several problems with Robinson's argument. First, it fails to place the expert witness' testimony in its proper context. During the evidentiary hearing, the defense asked its expert witness, Dillehay, whether Dahl's venue questionnaire was valid even though it failed to explore respondents' ability to set aside their opinions of the case. Dillehay opined that such questions were properly excluded from the surveys because they do not produce reliable survey data. In support of this opinion, Dillehay identified several studies suggesting humans' struggle to genuinely set aside preconceived beliefs yet will attest to their ability to do so. Dillehay did not attempt to extrapolate these findings as support for the broader proposition that Robinson advances here—that anyone who forms an opinion of the case is thereafter unalterably tainted and rendered unqualified to serve as a juror. In fact, the Supreme Court has observed that empirical studies support the opposite conclusion. *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1054-55, 111 S. Ct. 2720, 115 L. Ed. 2d 888 (1991) ("Empirical research suggests that in the few instances when jurors have been exposed to extensive and prejudicial publicity, they are able to disregard it and base their verdict upon the evidence presented in court.").

More importantly, Dillehay later testified that this phenomenon, which he called "juror minimization," could be overcome by employing enhanced voir dire techniques. Dillehay opined that enhanced voir dire would facilitate open, genuine responses from veniremembers, enabling the district judge to identify and remove those rendered unqualified to serve due to preconceived opinions of guilt. This testimony provides record support for Judge Anderson's finding that "appropriate voir dire and jury selection methods will result in a fair and impartial jury." For these reasons, the ruling is supported by substantial, competent evidence and does not constitute an abuse of discretion. See *State v. McCullough*, 293 Kan. 970, 980-81, 270 P.3d 1142 (2012) (trial court abuses discretion where substantial competent evidence does not support a finding upon which a legal conclusion rests).

## 2. *Did the trial court apply an incorrect legal standard?*

Robinson next argues the trial court applied an "impossibility of fair trial" standard under K.S.A. 22-2616(1) rather than the Sixth Amendment "reasonable likelihood" of an unfair trial standard embraced by the Supreme Court. See *Sheppard v. Maxwell*, 384 U.S. 333, 363, 86 S. Ct. 1507, 16 L. Ed. 2d 600 (1966) ("But where there is a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial, the judge should . . . transfer it to another county not so permeated with publicity.").

Robinson relies on language from the trial court's order denying the first venue change motion, which concluded that "[d]espite the extraordinary amount of attention this case has received from the public and in the press thus far, the Court is not convinced that the defendant *cannot* obtain a fair trial." (Emphasis added.) Robinson believes the use of the term "cannot" proves the district judge employed an "impossibility" standard to defendant's venue change motion.

However, this language merely tracks the venue change statute itself, which compels the court to transfer venue where prejudice against defendant is so great that he or she "*cannot* obtain a fair and impartial trial in that county." (Emphasis added.) K.S.A. 22-2616(1).

We disposed of a substantively similar challenge in *Carr*, where defendant argued Kansas' venue change statute improperly elevated the standard of proof from "reasonable likelihood" of an unfair trial to an "absolute certainty" of an unfair trial by compelling a venue change only when defendant *cannot* obtain a fair trial. 300 Kan. at 80. However, we observed in *Carr* that Kansas courts consistently apply a "reasonable certainty" standard of proof (*i.e.*, "'reasonable certainty' that the defendant cannot obtain a fair trial in the ordinary venue") to challenges under Kansas' venue change statute and found this

65

standard to be wholly consistent with the Supreme Court's "reasonable likelihood" standard. 300 Kan. at 80-81. *Carr* disposes of Robinson's challenge because it is founded on Judge Anderson's reference to the same statutory language at issue there.

Defendant also contends Judge Anderson's order is erroneous because it fails to address the constitutionally based venue challenge apart from his statutory challenge. However, the trial court's memorandum decision addressed the motion to change venue under "K.S.A. 22-2616, § 10 of the Kansas Constitution's Bill of Rights, and the Sixth and Fourteenth Amendments to the United States Constitution." While the order does not make separate findings between the statutory and constitutionally based theories in the motion, "defendant[ ] never sought a more complete recitation or writing to explain Judge [Anderson's] venue rulings; and, if [he] thought the findings were insufficient for appellate review, [he] had an obligation to do so." *Carr*, 300 Kan. at 65. Robinson's failure to do so forecloses his challenge. See *Longoria*, 301 Kan. at 506 (Where defendant fails to "object to the adequacy of the trial court's factual findings, we assume that the trial court made the findings necessary to deny the change of venue.").

3. *Did voir dire prove ineffective to overcome prejudice?*

In his third actual prejudice argument, Robinson claims the trial court erred by failing to recognize that jury selection only confirmed the need to change venue. This challenge goes to the heart of the question of actual Sixth Amendment prejudice.

> "When faced with a claim of actual prejudice, a trial court must 'review the media coverage and the substance of the jurors' statements at voir dire to determine whether a community-wide sentiment exists against the defendant. Negative media coverage by itself is insufficient to establish actual prejudice.'" *Longoria*, 301 Kan. at 508 (quoting *Carr*, 300 Kan. 1, Syl. ¶ 6).

66

In reviewing a claim of actual prejudice, we examine """whether the judge had a reasonable basis for concluding that the jurors selected could be impartial.""" *Carr*, 300 Kan. at 74-75.

Robinson first argues the character and composition of the jury panel, as well as the members of his jury, demonstrate actual prejudice. To the contrary, Judge Anderson's jury selection procedures proved to be successful in identifying bias and removing those veniremembers adversely affected by pretrial publicity.

During the second phase of jury selection, the district judge, consistent with the recommendation of Robinson's expert, Dillehay, assigned veniremembers to small group panels consisting of six members and allowed counsel for the parties to question them extensively on pretrial publicity and death penalty topics. Through this process, Judge Anderson excused 95 of the 259 panelists, roughly 37 percent, in whole or in part, because of firm opinions of guilt arising from exposure to pretrial publicity. Of the 83 panelists passed to the third phase of jury selection, general voir dire, Robinson had challenged only 8 unsuccessfully on grounds related to pretrial publicity or preconceived opinions of guilt.

Robinson argues 52 of the 83 panelists (nearly 63 percent) passed to the third phase were biased. However, this calculation includes jurors who merely expressed a belief in capital punishment, even if they had not formed opinions about the case as a result of exposure to pretrial publicity. Robinson's selection criteria were also overly broad, including jurors who expressed a belief or a "leaning" toward the belief that Robinson was guilty or made statements Robinson believed to be "suggestive of such a belief" either during voir dire or merely in their questionnaire responses. Robinson claims 28 of the 83 panelists held opinions of guilt (either exclusively or in addition to views in support of capital punishment). Yet, he challenged only 8 of the 83 panelists on such

grounds. The discrepancy between Robinson's calculation and his actual challenges for cause highlights the unreliability of defendant's calculations.

Moreover, the members of defendant's jury were well qualified. The jury consisted of 11 members who entered the box without preconceived opinions of the case, and all confirmed their ability to set aside personal views and decide the case on the evidence at trial. Most jurors had minimal exposure to the media's coverage of the case, and none expressed community hostility toward Robinson.

Defendant argues that 8 of the 12 members of the jury were biased. However, defendant's count suffers the same methodological flaws identified above—it includes jurors based solely on their death penalty views unrelated to pretrial publicity and the selection criteria were overly broad. Excluding those jurors defendant counted based solely on their alleged opinion regarding sentence, Robinson identified only four jurors (Jurors 39, 87, 246, and 302) who purportedly held preconceived opinions of guilt. However, a review of their voir dire testimony confirms their impartiality.

Juror 39 agreed there had been a lot of media coverage, mostly adverse to Robinson. When defense counsel asked whether the coverage had caused her to form any opinions about defendant's guilt, Juror 39 said, "Well, from what I've read, it seems that the crimes that were committed were committed by him. Again, that's just based on what I've read and what I've heard on the news." Even so, Juror 39 confirmed her ability to set these facts and opinions aside and committed to holding the State to its burden of proof at trial. When questioned on the subject again during general voir dire, Juror 39 understood she would have to disregard all media facts and start with a clean slate at trial and confirmed her willingness and ability to presume defendant innocent.

68

Juror 87 testified that she had formed no opinion of guilt and could set aside all media reported facts in response to questioning from both parties. In the questionnaire, she said that the published reports did not look good for defendant but shared that people only get half the story in the paper and those reports are unbalanced and one-sided. She also clarified that she had not personally decided Robinson was guilty and would set aside media information and render a verdict based on the evidence. Defendant did not challenge Juror 87 for cause.

Juror 246, in questionnaire responses, said that she had no idea about Robinson's guilt or innocence, that if he did commit the crimes he was very sick, and that based solely on the media's coverage it appeared there was a probability of guilt. Even so, Juror 246 confirmed in response to questioning that she remained unsure as to defendant's guilt or innocence. Juror 246 said her memory of media reported facts had faded over time. Even if the evidence at trial refreshed her recollection of media facts, Juror 246 said she would not consider them or allow them to influence her decision. She understood the applicable burden of proof and confirmed she would acquit Robinson if the State failed to meet its burden. Defendant did not challenge Juror 246 for cause.

Juror 302 said she was unsure as to Robinson's guilt or innocence in questionnaire responses. She felt the media had portrayed Robinson as guilty but clarified this was not necessarily her view. Juror 302 was confident she could set aside media-reported facts and decide the case on the evidence. Defendant did not challenge Juror 302 for cause.

Based on his extensive jury selection procedures and the voir dire testimony of seated jurors, Judge Anderson had a reasonable basis for concluding that the jurors selected could be impartial. *State v. Ruebke*, 240 Kan. 493, 500-01, 731 P.2d 842 ("Unless we are to assume that (1) the jurors selected to try the defendant violated their oath when they swore that they could give the defendant a fair trial or (2) an individual

69

can commit a crime so heinous that news coverage generated by that act will not allow the perpetrator to be brought to trial, the defendant has not established substantial prejudice."), *cert. denied* 483 U.S. 1024 (1987); see *Gardner v. Galetka*, 568 F.3d 862, 890 (10th Cir. 2009) (holding that there was no actual prejudice even though 55 percent of prospective jurors had formed an opinion about guilt, and 4 of 12 impaneled jurors indicated that they thought defendant was guilty, where all indicated they could decide the case on the evidence alone); *Hale v. Gibson*, 227 F.3d 1298, 1320 (10th Cir. 2000) (defendant must show more than that the juror had a preconceived notion of guilt; he must show that the juror had such a fixed opinion that he or she could not judge impartially).

Robinson suggests the jurors' declarations of impartiality were unreliable in light of the extensive and unfavorable media attention. However, we have emphasized that "[n]egative media coverage by itself is insufficient to establish actual prejudice." *Carr*, 300 Kan. 1, Syl. ¶ 6. Only in rare and extreme cases will the court disregard juror declarations of impartiality in favor of a finding of actual prejudice.

For example, in *Irvin v. Dowd*, 366 U.S. 717, 722-23, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961), the media unleashed a barrage of newspaper headlines, articles, cartoons, and pictures against defendant leading up to trial. These stories examined defendant's prior convictions, announced his identification in a police lineup, reported that he had been placed at the scene of the crime, and explained that "the six murders were solved but petitioner refused to confess." 366 U.S. at 725. On the day before trial, the media reported that Irvin had admitted to the murder of the victim in the case, as well as other murders. The press also reported that defendant offered to plead guilty to avoid the death penalty. The trial court excused 268 of the 430 veniremembers (62 percent) based on their bias, and 8 of 12 jurors entered the box with preconceived opinions of guilt. Given

70

these circumstances, the Supreme Court found it improper to rely on juror representations of impartiality. 366 U.S. at 727-28.

Since *Irvin*, the Supreme Court has twice considered and rejected claims that juror declarations of impartiality should be set aside. See *Patton v. Yount*, 467 U.S. 1025, 1029-30, 1033-34, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984) (although 77 percent of veniremembers admitted they carried opinions of guilt and 8 of the 14 jurors and alternates admitted the same, declarations of impartiality were reliable because passage of time had minimized jurors' conviction in opinions); *Murphy v. Florida*, 421 U.S. 794, 800-01, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975) (refusing to set aside the jurors' declarations of impartiality where the voir dire testimony did not reflect the wave of community hostility present in *Irvin*).

In *Carr*, we considered but declined the invitation to second-guess jurors' assurances of impartiality under facts comparable to Robinson's:

> "The jury pool here was far less polluted by preconceptions on guilt; in *Irvin*, 90 percent of potential jurors believed the defendant was guilty. Here, [the trial judge] was not forced to excuse 60 percent of the jury pool at the outset. The number of jurors ultimately seated who had to set aside their earlier opinions was half of that who would have had to do so in *Irvin*; and none of them expressed community outrage. We also are reassured here by the protective measures taken by [the trial judge], including use of jury questionnaires and individual voir dire." 300 Kan. at 78-79.

As in *Carr*, *Irvin* is distinguishable on the facts. In *Irvin*, the trial court dismissed 62 percent of the entire venire based on firmly held opinions of guilt. Here, the figure was 37 percent. Only a small percentage of the 83 panelists passed to general voir dire had been challenged based on preconceived opinions of guilt. Nearly all, 11 of 12 jurors, entered the box having formed no such opinion of defendant, a vast improvement over

71

*Irvin*, where 8 of 12 jurors held preconceived opinions of guilt, and even better than in *Carr*, where 4 of 12 held preconceived opinions. With few exceptions, jurors did not actively follow the media coverage, and media facts did not contain the "smoking-gun" reports of particular concern in *Irvin*, such as confessions, results of lie-detector tests, and offers to plead guilty to avoid the death penalty. Judge Anderson seated jurors who had formed no opinions, "who had forgotten or would need to be persuaded again." *Patton*, 467 U.S. at 1034.

In sum, Judge Anderson exercised great care in designing an enhanced jury selection process. As defendant's expert, Dillehay, predicted, the process proved to be a highly effective tool for combating the impact of potentially prejudicial pretrial publicity—one that yielded a qualified and impartial jury. As such, Judge Anderson had reasonable grounds to accept jurors' declarations of impartiality in this case, and Robinson has failed to demonstrate actual prejudice. See *Gardner*, 568 F.3d at 887-90 (finding no Sixth Amendment prejudice where four jurors had formed opinions of guilt, protective measures trial court implemented during jury selection added credibility to the juror's declarations of impartiality); *Hale*, 227 F.3d at 1332-33 (refusing to set aside declarations of impartiality where half of jurors entered box with opinions of guilt, but voir dire did not uncover "an atmosphere of hostility toward the defendant, nor did the trial court have a difficult time in seating the jury").

4. *Did media interference demonstrate actual prejudice?*

Robinson argues the media's interference with courtroom proceedings necessitated a finding of actual prejudice.

First, he suggests media saturation hit the courthouse steps when a local radio station conducted a publicity stunt by handing out "Roll out the Barrels of Evidence" T-

shirts outside the courthouse during trial—the incident giving rise to the third renewed venue change motion. However, Robinson does not dispute Judge Anderson's factual finding that the jury was not exposed to this incident, and that, therefore, it could not have affected the jurors' impartiality. We defer to the district judge's findings and concur with his legal conclusion. See *State v. Anderson*, 291 Kan. 849, 855, 249 P.3d 425 (2011) (applying deference to trial court factual findings in motion to withdraw plea).

Second, Robinson suggests the media coverage reached the court's chambers on October 7, 2002, when jurors had the opportunity to view the front page of that morning's copy of the Olathe Daily News—the incident giving rise to the second renewed venue change motion. Defendant failed to establish that any juror actually saw the article, and even if a juror or jurors had, we have no basis in the record to disagree with Judge Anderson's finding that the content was not prejudicial. See *State v. Bible*, 175 Ariz. 549, 566-67, 858 P.2d 1152 (1993) (finding no error in denying motion to change venue where appellant failed to demonstrate publicity resulted in actual prejudice).

Finally, Robinson suggests media coverage spilled into the courtroom itself when jurors were exposed to prejudicial comments during voir dire. Robinson explains that during questioning of one small group panel, a veniremember said she sensed that she was "in the presence of evil" around Robinson. Defendant acknowledges this prospective juror was excused but argues Juror 298, who served on the jury, was subjected to the comment. Of course, the statement in question was made by a prospective juror, not publicized by the media, and Juror 298's voir dire responses confirmed she had formed no opinion of guilt and was committed to deciding the case based on the evidence. Not surprisingly, defendant did not challenge Juror 298 as biased by pretrial publicity.

Similarly, defendant argues that Juror 184, who served on the jury, heard a fellow panelist describe Robinson as a "predator." Again, this comment was made by a fellow

veniremember, not publicized by the media. Juror 184 entered the box without any preconceived opinion of Robinson's guilt, and defendant did not challenge this juror for cause on grounds related to bias or exposure to pretrial publicity.

Robinson offers no further examples of media interference during court proceedings, and none are apparent from the record. Robinson fails to demonstrate actual prejudice.

5. *Did jurors ignore admonitions, demonstrating actual prejudice?*

Finally, Robinson suggests veniremembers' refusal to abide by the district judge's admonitions to avoid media coverage necessitated a finding of actual prejudice. Defendant believes prospective jurors did not follow this admonishment because several panelists knew they would not be sequestered, a fact allegedly reported in the media, before the district judge made the announcement.

The record does not support defendant's deduction-based argument. Judge Anderson expressly found that court administrators informed several veniremembers of the fact they would not be sequestered before the district judge made the announcement. Robinson does not dispute this finding. Moreover, defendant fails to establish that any member of his jury actually failed to comply with the district judge's admonitions. While it is concerning that some prospective jurors may have learned the trial court's position on sequestration from media sources, this does not establish actual prejudice, given the extensive protective measures Judge Anderson implemented throughout jury selection and the character and composition of jurors ultimately seated.

*Statutory Venue Challenge*

Independently, Robinson argues Judge Anderson abused his discretion in denying his motions under Kansas' venue change statute.

K.S.A. 22-2616(1) compels a venue change where the district judge "is satisfied that there exists in the county where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that county." The burden falls on defendant to show prejudice in the community, not as a matter of speculation but as a demonstrable reality. *State v. McBroom*, 299 Kan. 731, 746, 325 P.3d 1174 (2014).

A court considers nine factors in deciding whether community prejudice has reached levels warranting a change of venue under K.S.A. 22-2616(1):

> "[1] the particular degree to which the publicity circulated throughout the community; [2] the degree to which the publicity or that of a like nature circulated to other areas to which venue could be changed; [3] the length of time which elapsed from the dissemination of the publicity to the date of trial; [4] the care exercised and the ease encountered in the selection of the jury; [5] the familiarity with the publicity complained of and its resultant effects, if any, upon the prospective jurors or the trial jurors; [6] the challenges exercised by the defendant in the selection of the jury, both peremptory and for cause; [7] the connection of government officials with the release of the publicity; [8] the severity of the offense charged; and [9] the particular size of the area from which the venire is drawn." *State v. Higgenbotham*, 271 Kan. 582, 592, 23 P.3d 874 (2001).

On the record before the court, the first, second, fifth, and eighth factors favored transfer of venue out of Johnson County at the time Judge Anderson ruled on the motions. The first factor weighed in favor of venue change because Dahl's surveys evidenced widespread circulation of the pretrial publicity throughout the community. The

second factor weighed slightly in favor of changing venue as the surveys demonstrated that case recognition was not as extensive in Harvey and Ellis Counties. Even so, recognition of the case outside the venue of origin was extremely high, with 80 percent of Harvey County residents and 64 percent of Ellis County residents expressing recognition of the case. Thus, the weight of this factor in the overall analysis is diminished. As to the fifth factor, Dahl's venue study suggests media coverage had an effect on prospective jurors because 67 percent of respondents believed defendant was "probably" or "definitely" guilty. Regarding the eighth factor, Robinson was charged with two counts of capital murder and one count of first-degree murder. "[T]he most serious charged offenses could not have been more severe or their potential consequences more irreversible." *Carr*, 300 Kan. at 82.

Five factors, including the third, fourth, sixth, seventh, and ninth, favored denial of each of defendant's motions for venue change. The third factor weighed against a change of venue as more than 2 years had lapsed between the time the story first broke in June 2000, when media coverage was at its height, and Robinson's trial in October 2002, when coverage had dissipated. The fourth factor weighed heavily against a change of venue because Judge Anderson took great care in designing and implementing his four-phase jury selection process. The sixth factor, challenges exercised, weighed in favor of denying a venue change. Judge Anderson granted 92 of defendant's 100 challenges asserted on pretrial publicity grounds. Of those jurors unsuccessfully challenged, all but one, Juror 39, was removed by peremptory challenge. Regarding the seventh factor, the media coverage was not materially connected to government officials. Robinson suggests that the prosecutor participated in press conferences, but none of the media-published facts defendant contends to be uniquely prejudicial were connected to the prosecution. Finally, the ninth factor weighed against a venue change because Johnson County had one of the largest population bases in the state from which to draw the venire.

The statutory venue challenge in *Carr* provides a useful comparison because there the same expert witness produced nearly identical survey results in a capital murder trial situated in one of the largest metropolitan areas in the state. In every relevant category (case recognition, opinion of guilt, and strength of evidence), the survey responses in *Carr* revealed case recognition and prejudgment at levels higher than or equal to those in this case. 300 Kan. at 49. Even so, the majority held that Judge Paul Clark did not abuse his discretion under K.S.A. 22-2616 in denying defendants' motions for venue change. 300 Kan. at 82. Given the similarity between the two cases, *Carr* offers compelling support for Judge Anderson's rulings.

In fact, the rulings are all the more defensible here because, unlike *Carr*, Robinson's venue expert, Dillehay, opined that enhanced voir dire could effectively inoculate the effects of extensive pretrial publicity. While Dillehay believed "enhanced voir dire" would be infeasible from an administrative perspective, Judge Anderson was undaunted, implementing the very type of voir dire process Dillehay described. The process was lengthy but, in hindsight, proved highly effective in identifying and removing those rendered unqualified by their exposure to pretrial publicity.

Our other case precedents offer additional support for Judge Anderson's rulings. See *State v. Longoria*, 301 Kan. 489, 510-12, 348 P.3d 1128 (2015) (reasonable person could have agreed with denial of motion to change venue despite fact that 97 percent of respondents recognized the case and some panelists held strong opinions of guilt); *McBroom*, 299 Kan. at 750-52 (no error in denial of venue change where nearly 70 percent of respondents believed defendant "probably" or "definitely" guilty); *State v. Verge*, 272 Kan. 501, 505-08, 34 P.3d 449 (2001) (no error in denying venue change where 96.7 percent of Dickinson County residents recalled the case; 71.7 percent had talked about the case; and 64 percent believed Verge was "definitely" or "probably" guilty); *Higgenbotham*, 271 Kan. at 593-95 (no error in denial of venue change where

77

95.7 percent of Harvey County respondents recalled the case, 60.6 percent believed defendant was guilty, and 53 percent believed there was evidence of guilt); *State v. Jackson*, 262 Kan. 119, 129-32, 936 P.2d 761 (1997) (finding no error in denial of venue change where 89.7 percent of respondents recalled the case and 60 percent had formed opinion of guilt); *State v. Anthony*, 257 Kan. 1003, 1007, 1014-15, 898 P.2d 1109 (1995) (affirming denial of motion to change venue where 97 percent of Salina residents had heard of case, 63.8 percent felt evidence of guilt was strong or overwhelming, and more than half unsure of impartiality); *State v. Swafford*, 257 Kan. 1023, 1035-36, 897 P.2d 1027 (1995) (companion case to *Anthony*).

Given the mix of evidence on the nine factors relevant to K.S.A. 22-2616(1) and recognizing that some factors weighed in favor of venue change, while others weighed against such relief, we conclude that reasonable judges could have agreed with Judge Anderson's decision to deny the requested motions to change venue under the statute. See *Longoria*, 301 Kan. at 512; *Carr*, 300 Kan. at 84. Thus, we find no abuse of discretion.

*Presumed Prejudice*

On appeal, defendant advanced only two theories supporting his venue challenge: actual prejudice under the Sixth Amendment and abuse of discretion under Kansas' venue change statute. However Robinson's first motion to change venue on Sixth Amendment grounds was pursued prior to voir dire—a point at which a claim of actual prejudice under the Sixth Amendment was premature. Defendant's supporting memorandum relied, in part, on a presumed prejudice theory. Furthermore, in a Rule 6.09 (2014 Kan. Ct. R. Annot. 52) letter to this court, defendant cites the United States Supreme Court's most recent opinion addressing presumed prejudice, *Skilling v. United States*, 561 U.S. 358, 381-85, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010).

"[Because this is a death penalty case, this court is empowered to notice and discuss unassigned potential errors under K.S.A. 201[4] Supp. 21-6619(b)." *Carr*, 300 Kan. at 16. Independently, the Kansas statute compels the court, with regard to sentence, to determine "[w]hether the sentence of death was imposed under the influence of passion, prejudice or any other arbitrary factor." K.S.A. 2014 Supp. 21-6619(c)(1). In the interests of justice, we consider presumed prejudice as a potential unassigned error on appeal.

Presumed prejudice occurs "'where the pretrial publicity is so pervasive and prejudicial that we cannot expect to find an unbiased jury pool in the community. We "presume prejudice" before trial in those cases, and a venue change is necessary.'" *Carr*, 300 Kan. at 57.

In deciding whether to presume prejudice, courts consider seven factors enunciated in *Skilling*, 561 U.S. at 381-85:

> "(1) media interference with courtroom proceedings; (2) the magnitude and tone of the coverage; (3) the size and characteristics of the community in which the crime occurred; (4) the amount of time that elapsed between the crime and the trial; (5) the jury's verdict; (6) the impact of the crime on the community; and (7) the effect, if any, of a codefendant's publicized decision to plead guilty." *Carr*, 300 Kan. at 62

In reviewing presumed prejudice claims, "we apply a mixed standard of review, examining the trial court's findings of fact for substantial competent evidence and the ultimate legal conclusion drawn from the facts—whether to presume prejudice—de novo." *Longoria*, 301 Kan. at 506.

Turning to the first *Skilling* factor, defendant argued in his second and third renewed motions to change venue that a media circus spilled into the courtroom.

However, as set forth in defendant's actual prejudice challenge, defendant failed to demonstrate any prejudice from the T-shirt and Olathe Daily News incidents giving rise to these motions.

As to the second *Skilling* factor, Robinson argues the media reported prejudicial facts that were inadmissible at trial, such as Robinson's white-collar criminal history; his connection to other missing persons; his involvement with other women; and his prosecution for fraud and murder in Missouri. However, the presumed prejudice doctrine "cannot be made to stand for the proposition that juror exposure to information about a state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." *Murphy*, 421 U.S. at 799. The pretrial publicity included in the record was predominantly fact-based reporting. See *Longoria*, 301 Kan. at 507 (factor weighs against venue change where reporting is more fact based than inflammatory). There were no "smoking-gun" reports, such as confessions of defendant, results of lie detector testing, or defendant's offer to plead guilty to avoid the death penalty. See *Skilling*, 561 U.S. at 382-83 (the lack of "evidence of the smoking-gun variety" weighed against a finding of presumed prejudice). Moreover, Dahl's venue study suggested that some of these media facts were not widely recognized by the community or the level of recognition was similar to that in other venues.

The third *Skilling* factor—the size and characteristics of the community—weighed against a finding of presumed prejudice because Johnson County is one of the largest counties in the state, with close to half a million residents.

Regarding the fourth *Skilling* factor, more than 2 years had elapsed from the time the story first broke and the start of trial. Even so, survey results more than 1 year after Robinson's arrest showed a high degree of case recognition. This factor is inconclusive or

weighed slightly against a finding of presumed prejudice. See *Longoria*, 301 Kan. at 507-08 (factor weighed against venue change where case recognition high but memory of details had faded); *Carr*, 300 Kan. at 68 (factor inconclusive where substantial time elapsed but evidence of juror recollection remained high at voir dire).

The fifth *Skilling* factor, the jury's verdict, was unknown at the time the district judge ruled and carries no weight in the analysis. See *Longoria*, 301 Kan. at 508.

On the sixth *Skilling* factor, none of the publicity of record clearly addresses the impact of the crimes on the community. The record includes two articles warning of the dangers of online dating in the aftermath of the crimes, but these reports reflect opinions of a law enforcement officer and a journalist rather than community-wide sentiment. On the other hand, Dahl's venue study revealed a high level of case recognition, suggesting the crimes generated interest and were followed by members of the community. Thus this factor may have weighed slightly in favor of a finding of presumed prejudice.

The seventh and final *Skilling* factor—publicized confession of a codefendant—does not factor into the analysis because Robinson alone was charged with the offenses in this action and the State never charged any codefendant. *Cf. Carr*, 300 Kan. at 69.

In the end, only the sixth *Skilling* factor weighed in favor of a finding of presumed prejudice. The fifth and seventh factors were not relevant to the analysis, and the fourth factor was inconclusive at best. The first, second, and third *Skilling* factors weighed against a finding of presumed prejudice at the time Judge Anderson ruled on each motion.

"The bar facing the defendant wishing to prove presumed prejudice from pretrial publicity is extremely high." *United States v. McVeigh*, 153 F.3d 1166, 1182 (10th Cir. 1998), *disapproved on other grounds by Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999).

Relief is granted only in those rare cases "where publicity 'created either a circus atmosphere in the court room or a lynch mob mentality such that it would be impossible to receive a fair trial.'" *Goss v. Nelson*, 439 F.3d 621, 628 (10th Cir. 2006) (quoting *Hale v. Gibson*, 227 F.3d 1298, 1332 [10th Cir. 2000]). Based on our de novo review, and considering the *Skilling* factors in light of the evidence, the record does not establish that "an irrepressibly hostile attitude pervaded the community." *Stafford v. Saffle*, 34 F.3d 1557, 1567 (10th Cir. 1994). Thus Judge Anderson did not err in failing to presume prejudice under the Sixth Amendment. See *Longoria*, 301 Kan. at 508; *Carr*, 300 Kan. at 65-70.

## 2. CONTINUANCE

Defendant next challenges the trial court's denials of his continuance motions. He believes Judge Anderson denied them to penalize him for exercising his right to counsel of choice. Independently, Robinson argues the rulings constitute an abuse of discretion.

*Additional Factual and Procedural Background*

On June 14, 2000, Judge Anderson appointed Kansas' Death Penalty Defense Unit (DPDU) to represent Robinson. The State filed its notice to pursue a death penalty phase sentencing proceeding, along with its alleged aggravating circumstance on March 2, 2001. The DPDU actively litigated the case for 13 months, investigating the charges, filing 39 substantive motions, and defending Robinson at preliminary hearing.

1. *Substitution of Counsel*

On July 18, 2001, attorney Bob L. Thomas entered his appearance as attorney of record for Robinson. Later that day, the DPDU filed a motion to withdraw. At the July 23, 2001 hearing, Judge Anderson made inquiry regarding Thomas' qualifications.

Thomas had practiced as a licensed attorney for about 1 year before entering his appearance in this case. In the year, he had served as lead counsel on two noncapital jury trials. Thomas had hired a private investigator and planned to add several legal assistants but confirmed he would be the only attorney on the defense team.

Judge Anderson observed that Thomas did not meet Kansas Board of Indigents' Defense Services' qualification standards for appointment to a capital case and that Robinson's Sixth Amendment right to representation by counsel of choice had to be tempered by his right to competent and effective counsel. To balance these competing interests, the district judge explored the possibility of having the DPDU remain in the case as cocounsel. Thomas and defendant were willing to consent to such an arrangement, with the understanding that Thomas would serve as lead counsel. The DPDU declined, arguing that the arrangement was unworkable and that Robinson was no longer eligible for DPDU assistance.

At a continued hearing on July 27, 2001, Judge Anderson granted the DPDU's motion to withdraw and announced his intention to appoint capital defense qualified cocounsel to assist Thomas. Neither Robinson nor Thomas objected.

On August 2, the trial court entered orders appointing Patrick Berrigan and Sean O'Brien, both of whom had extensive capital defense litigation experience, as cocounsel in this case for the purpose of representing Robinson "[d]uring the prosecution and trial of said felony defendant, including sentencing." No party objected to these orders. Judge Anderson set the matter over for 1 month to give the newly formed defense team time to review motions and to give Berrigan time to recover from heart bypass surgery. O'Brien's associate attorney, Joseph Luby, and Berrigan's associate attorney, Jason Billam, also served as members of Robinson's defense team.

## 2. *First Motion for Continuance*

On September 20, 2001, Robinson filed his first motion to continue trial, citing extensive discovery, cocounsel's commitment in other cases, and the need to develop a mitigation case—including gathering mitigation evidence; investigating the State's aggravating circumstance; considering the possibility of psychological and neurological evaluations; interviewing defendant's family for testimony in the sentencing phase; and conducting a thorough background investigation of Robinson's educational, medical, employment, and criminal histories—in support of the requested relief. Defense counsel claimed it needed "as much as a year to adequately prepare this case for trial" and requested the setting be moved from January 14 to September 16, 2002.

At the September 21, 2001, hearing, Judge Anderson emphasized that if he granted the continuance, the new trial date would be a firm setting and no further continuance would be granted absent "extraordinary" circumstances. After confirming that defense counsel had evaluated their schedules and understood any new trial date would be firm, Judge Anderson granted the motion and reset trial for September 16, 2002.

## 3. *Thomas' Withdrawal and Second Motion for Continuance*

On February 21, 2002, Thomas filed a motion to withdraw after receiving the State's February 13 supplemental discovery, which included documents indicating Marvin Ray, Thomas' former client, had offered to be a cooperating witness for the State.

Later that same day, Robinson filed his second motion for continuance, arguing that counsel Berrigan and O'Brien (appointed counsel) and Thomas (retained counsel) had an agreement as to the division of labor in the case, whereby retained counsel was handling the guilt phase and appointed counsel the penalty phase. Robinson argued

Thomas' withdrawal, combined with appointed counsels' obligations in other cases, made it impossible to prepare Robinson's defense before the September 16, 2002, trial setting. Appointed counsel requested a 4-month continuance.

After confirming with Robinson that he was discharging Thomas as counsel of record, Judge Anderson granted Thomas' motion to withdraw and denied the continuance motion during a February 28 hearing.

4. *Robinson's Third Request for Continuance*

On July 18, 2002, Robinson filed a third motion for continuance, alleging that discovery complications made it impossible to prepare Robinson's guilt phase defense before the September trial setting. On July 25, the trial court held an evidentiary hearing.

a. *Discovery Delays*

Phil Gibson, an investigator for the defense team, testified that it would take substantial time to complete witness interviews because of the State's massive endorsed witness list, which included roughly 600 witnesses, 79 of whom had been endorsed after the February 2001 preliminary hearing. However, the State had later provided a "will call" list that narrowed down those most likely to testify to around 200.

Dean Stettler, Robinson's DNA expert, testified to delays related to the State's DNA disclosures. Stettler was engaged to evaluate law enforcement's DNA testing procedures and advise the defense on the need for independent testing. On March 22, 2002, he received three, 4-inch binders containing well in excess of 100 pages of law enforcement lab reports. The documents were in Bates-stamp order, but Stettler thought the Bates-stamp order was random. He said it took him 3 weeks to organize the documents in a logical order.

85

Once the reports were organized, Stettler met with members of the JOCO Lab and found 46 reports that had not been included in the State's disclosures. District Attorney Paul Morrison testified that the DNA testing was handled exclusively by the KCMO Lab and he did not give Stettler the 46 reports from the JOCO Lab because they pertained to hair analysis, tire track impression work, and latent print examinations, not DNA testing. Nevertheless, Stettler felt the reports might be useful and received copies the same day Stettler learned of the reports' existence.

Stettler also reviewed the KCMO Lab's case file and confirmed the State had produced all reports. However, Stettler wanted to review the supporting data and requested the same. The KCMO Lab voluntarily produced this data on CD-ROM. Stettler did not maintain a current version of the software necessary to view the material electronically however, and it took him a month to find an independent lab to print the material for him.

Stettler admitted he had a complete copy of the files maintained by both crime labs within a few weeks of receiving the State's disclosures. At the time of the hearing, Stettler had been in possession of the files for nearly 3 months and the CD-ROM for more than 10 weeks. Stettler said he could complete his work and advise the defense team on the need for independent testing within 3 to 4 weeks.

On September 5, 2002, defense counsel informed the district judge that DNA samples had been sent to a lab for independent testing. No results were introduced at trial; nor are they included in the record on appeal.

### b. *Delay Related to the Division-of-Labor Agreement*

Thomas offered testimony regarding the need for continuance in light of defense counsels' division-of-labor agreement. He confirmed that the defense team had agreed he would handle the guilt phase, while appointed counsel, Berrigan and O'Brien, would handle the penalty phase. Thomas said the defense conducted work consistent with this division of labor agreement and committed to the September trial setting in reliance on it.

Thomas also testified to the events giving rise to his withdrawal or discharge. Thomas had represented Marvin Ray in another matter before entering his appearance as Robinson's counsel in the summer of 2001. Shortly thereafter, he asked prosecutor Morrison whether the State had any "jail-house snitches," specifically mentioning Ray. Morrison said a few inmates, including Ray, had contacted his office, but Morrison believed Ray lacked credibility and the State was not interested in his testimony. The State made no further mention of Ray until February 2002, when it produced a letter Ray had written and other documents.

Morrison testified the Ray letter and documents were disclosed with sufficient time to prepare Robinson's defense. Ray first contacted his office, offering to testify against Robinson, around July 2001. On October 4, the prosecution subpoenaed documents from Ray, and in response, correctional officials searched Ray's cell and found documents responsive to the subpoena. Among these documents, they found a letter in which Ray described how he and two other people allegedly transported two female bodies to a farm near LaCygne and placed them in barrels in exchange for drugs. Morrison disclosed the Ray documents 7 months in advance of trial and confirmed that the prosecution had no intention of calling Ray or introducing the documents at trial. Neither party, in fact, called Ray or introduced his documents at trial.

87

The court denied the motion for continuance.

5. *Robinson's Fourth Motion to Continue Trial*

On August 30, 2002, nearly 2 weeks before trial, defense counsel filed a motion for continuance or, alternatively, for leave to withdraw, arguing that several discovery problems continued to delay preparations. Defense counsel also claimed to need additional time to develop Robinson's penalty phase defense, explaining they had hired a forensic social worker in January 2002 to conduct an investigation of Robinson's background and social history but learned in late July that the expert had made no progress because of a disabling back injury suffered in a car accident.

Defense counsel hired a new mitigation expert, Scarlet Nerad. Although she had already commenced work, defense counsel argued there was insufficient time for her to complete it before trial. Robinson requested an 8-month continuance to complete a social history report and a comprehensive mental evaluation.

At the September 5 hearing, Robinson offered Nerad's affidavit under seal, which the district judge reviewed in camera over the State's objection. In the affidavit, Nerad claimed that her preliminary investigation suggested Robinson had endured chronic and life-threatening violence, abandonment, and neglect at the hands of his caretakers. When Robinson was 5 years old, his mother began assaulting him several times a week, without provocation—beating him severely, threatening to kill him, and telling him she wished he were dead or never born. As a small child, Robinson grew deeply attached to his infant brother. The child fell ill and died, and Robinson's mother blamed him for the death. Robinson was devastated by the loss of his brother and shattered by the false accusations lodged by his mother. As Robinson grew older, the abuse escalated, often leaving him unconscious or bedridden, and his mother isolated him from other family members.

According to Nerad, such suspected abuse left Robinson vulnerable to psychiatric diseases such as posttraumatic stress disorder (PTSD). In fact, she claimed Robinson met the criteria for PTSD. Nerad also believed Robinson exhibited symptoms of dissociative and mood disorders, evidenced by bouts of psychosis, extreme mood fluctuations, flat affect, and episodes of mania. Nerad's affidavit did not establish her qualifications to diagnose such conditions.

Nerad made clear that her findings were preliminary and that she needed to complete substantial additional investigation to verify and document the abuse and its effect on Robinson before she could deliver a completed background and social history report. She said she could not complete it in time for the September trial setting. She also noted that other medical professionals would need her report to complete Robinson's comprehensive mental assessment.

The continuance was denied.

6. *Request for Continuance at the Outset of the Penalty Phase*

On September 12, 2002, the defense filed a motion to transport Robinson to the University of Kansas Medical Center (KU Medical Center) for MRI and PET scans. The defense argued the testing was necessary for its expert, Dr. Dorothy O. Lewis, a professor of psychiatry at New York University School of Medicine, to conduct a psychiatric evaluation of Robinson.

Defense counsel offered the affidavit of Lewis under seal in support of the motion. Lewis declared that, based on her preliminary review, there was reason to believe Robinson suffered from "a bipolar mood disorder"; he "was severely physically and

emotionally abused throughout childhood"; "as a result of this maltreatment, he experiences episodic dissociative states"; "as many as four generations of family members may have suffered" similar mental illness; a 1991 MRI revealed brain abnormalities, "allegedly a result of transient ischemic attacks"; and "Robinson . . . cannot appreciate the nature and strength of the evidence" against him.

Lewis also said that, in order to make a credible diagnosis, she needed time to complete additional testing and evaluation, including psychiatric interviews; an MRI to assess possible brain changes over time; a PET scan to assess frontal lobe function; a neurologic evaluation; a comprehensive neuropsychological test battery; and a review of Robinson's background and social history. Without such information, Lewis asserted, it would be impossible to render an opinion regarding Robinson's mental functioning.

The trial court granted the motion during a September 12 status conference.

On October 31, after the jury had convicted Robinson on all charges, defendant moved for continuance of the penalty phase. Appointed counsel explained that they had decided not to have Robinson transported to KU Medical Center for an MRI and PET scan because there was simply insufficient time for experts to complete the testing and evaluation needed to render a qualified opinion regarding Robinson's mental functioning.

The court denied the continuance.

*Constitutional Challenge*

Robinson argues the district judge refused to continue the trial as punishment or in retaliation for his decision to hire Thomas and discharge the DPDU, violating his right to due process. Although the argument is less than clear from the briefing, Robinson also

90

appears to suggest the trial court unconstitutionally burdened his Sixth Amendment right to counsel of choice by having him bear the risk that counsel would be unprepared.

### 1. *Legal Framework and Standard of Review*

Robinson's challenge is founded on the Sixth Amendment right to counsel—a fundamental right guaranteed to all criminal defendants. *Kimmelman v. Morrison*, 477 U.S. 365, 374, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986). "It is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice." *Powell v. Alabama*, 287 U.S. 45, 53, 53 S. Ct. 55, 77 L. Ed. 158 (1932); see *State v. Anthony*, 257 Kan. 1003, 1018, 898 P.2d 1109 (1995) ("An essential element of the Sixth Amendment's protection of the right to counsel is that a defendant must be afforded a reasonable opportunity to secure counsel of his or her choosing.").

Not only is a defendant vested with the constitutional right to counsel of choice, but also due process prevents States from punishing or retaliating against a defendant for exercising this constitutional right. *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S. Ct. 663, 54 L. Ed. 2d 604 (1978) ("To punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort.").

However, "[n]ot every restriction on counsel's time or opportunity to investigate or to consult with his client or otherwise to prepare for trial violates a defendant's Sixth Amendment right to counsel." *Morris v. Slappy*, 461 U.S. 1, 11, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983). The Supreme Court has explained:

> "Trial judges necessarily require a great deal of latitude in scheduling trials. Not the least of their problems is that of assembling the witnesses, lawyers, and jurors at the same place at the same time, and this burden counsels against continuances except for

compelling reasons. Consequently, broad discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel. *Ungar v. Sarafite*, 376 U.S. 575, 589[, 84 S. Ct. 841, 11 L. Ed. 2d 921] (1964)." *Morris*, 461 U.S. at 11-12.

We have recognized that a defendant's right to counsel of choice "cannot be manipulated to impede the efficient administration of justice." *Anthony*, 257 Kan. at 1019.

Where defendants allege the deprivation of rights under the Constitution, our court reviews such challenges de novo. See *State v. Chamberlain*, 280 Kan. 241, 255, 120 P.3d 319 (2005) (determination of whether a statute violates the Constitution is a question of law over which we have unlimited de novo review); see also *United States v. Hopkins*, 509 Fed. Appx. 765, 770 (10th Cir. 2013) (unpublished opinion) (reviewing de novo whether judicial action violated Sixth Amendment right to counsel of choice).

## 2. *The Due Process Challenge*

Robinson first contends that Judge Anderson's rulings were intended to punish defendant for the delay that resulted when he retained Thomas in place of the DPDU.

The argument ignores and is entirely inconsistent with the fact that Judge Anderson accepted Thomas' entry of appearance and subsequently granted him a lengthy continuance. Thomas' filing of his entry of appearance provided Judge Anderson with a direct and immediate opportunity to subvert Robinson's right to counsel of choice. Thomas lacked the experience and resources to handle a capital defense alone, and Judge Anderson could have denied the entry of appearance altogether. See, *e.g.*, *United States v. Collins*, 920 F.2d 619, 626 (10th Cir. 1990) (district court may deny a defendant's

92

counsel of choice where attorney unable to provide competent representation). Instead, he gave effect to both of Robinson's Sixth Amendment interests—the right to counsel of choice and the right to competent counsel—by accepting Thomas' entry of appearance and appointing qualified cocounsel.

Once Thomas was granted entry, Judge Anderson had a second opportunity to "punish" Robinson for retaining private counsel by denying his first motion for continuance. Instead, Judge Anderson granted the continuance, providing defense counsel roughly 1 full year to prepare for trial.

Robinson makes no mention of these rulings. Instead, he focuses on the district judge's denial of subsequent motions for a second continuance. In these rulings, Judge Anderson mentions that the DPDU handled the case and was on track for a trial setting in early 2002, that Robinson discharged the DPDU by hiring Thomas, that the court appointed qualified cocounsel, and that the result was further delay. Robinson believes these comments evidence Judge Anderson's retaliatory motive.

The argument lacks merit. When read in context, it is apparent that Judge Anderson referenced the DPDU and Robinson's decision to hire Thomas, not to blame Robinson for any delay resulting from that decision, but to summarize the sequence and timeline of events, highlight the purpose and scope of the appointment of cocounsel, and emphasize that Thomas and appointed counsel had the benefit of more than a year's worth of the DPDU's work on the case. The district judge's reference to the delay that followed Thomas' entry of appearance and the appointment of cocounsel was an accurate account. It also served to highlight that the district judge had granted a previous, lengthy continuance, a relevant factor in assessing whether defendant has established good cause for a subsequent continuance under K.S.A. 22-3401. See *State v. Snodgrass*, 252 Kan. 253, 264, 843 P.2d 720 (1992) (trial court did not abuse discretion in denying

continuance where a prior continuance had been granted on eve of trial); *United States v. Sharrak*, 527 Fed. Appx. 383, 388 (6th Cir. 2013) (unpublished opinion) (whether court has granted previous continuances is an appropriate factor in analyzing subsequent motions).

In each ruling, after outlining previous relevant events, Judge Anderson addressed the specific grounds asserted for the requested continuance and/or made findings and conclusions as to why defendant had failed to establish good cause. In the end, Judge Anderson denied each request for a second continuance because he believed there was adequate time to prepare the defense, especially considering the resources of the defense team and the fact that a lengthy continuance had been granted previously. The rulings were an appropriate exercise of lawful discretion and cannot be construed as retaliatory. See *Anthony*, 257 Kan. at 1019-20 (trial court did not abuse discretion or otherwise interfere with counsel of choice where it did not attempt to restrain counsel from entering the case and only declined the request to continue trial to allow new counsel time to prepare).

### 3. *The Sixth Amendment Challenge*

Robinson next argues the district judge relied on a number of factual errors in denying his motions for continuance. While this argument sounds more akin to an abuse of discretion challenge, Robinson seems to suggest the trial court's alleged factual errors effectively placed an unconstitutional burden on his right to counsel of choice.

Specifically, Robinson contends the district judge erred in fact, thereby burdening the right to counsel of choice, by: (1) finding that Robinson had discharged the DPDU; (2) minimizing the burden defense counsel experienced in managing discovery; and (3)

failing to account for the delay caused by the State's tardy and disorganized DNA testing disclosures.

First, Robinson argues the district judge erroneously found that Robinson had discharged the DPDU. In the July 25, 2002 ruling denying defendant's third motion to continue trial, Judge Anderson said, "When Mr. Thomas got in this case, he got in it because the defendant discharged, *essentially through hiring Mr. Thomas*, the capital defense team and retained an attorney of his own choice." (Emphasis added.) Likewise, in the October 31, 2002, ruling denying defendant's motion to continue the penalty phase, Judge Anderson explained that "in the summer of 2001 Mr. Robinson *chose to discharge the capital defense team* provided to him by the State of Kansas. . . . *and did so by retaining counsel*, *Mr. Thomas*, who undertook to represent him at that time." (Emphasis added.)

Judge Anderson's rulings indicate that Robinson *effectively* discharged the DPDU by retaining Thomas. The record supports this finding. During a July 23, 2001, in-camera proceeding, Judge Anderson discussed the status of defendant's representation in the presence of Robinson, the DPDU, and Thomas. During the proceeding, Judge Anderson confirmed that it was Robinson's desire to remove DPDU counsel and substitute Thomas as counsel in their place.

More importantly, whether the trial court characterized the DPDU's exit as a "discharge" or a "withdrawal" is a factual distinction without a legal difference. Judge Anderson did not deny any of defendant's motions based on a finding that the DPDU exited the case as a result of discharge, as opposed to withdrawal. *Cf. State v. Nelson*, 296 Kan. 692, 694, 294 P.3d 323 (2013) ("Judicial discretion is abused if judicial action . . . is based on an error of fact, *i.e.*, if substantial competent evidence does not support a factual finding on which a prerequisite conclusion of law or the exercise of discretion is based.").

Moreover, it is unclear how the characterization of the DPDU's exit as a discharge instead of a withdrawal could or would have placed any additional burden on Robinson's Sixth Amendment right to counsel of choice.

Second, Robinson argues Judge Anderson improperly "minimized" testimony regarding the delay created by the number of witnesses endorsed by the State. Judge Anderson addressed this issue specifically in denying the third motion for continuance, finding that Kansas law compelled the prosecution to endorse all potential witnesses regardless of the extent of their knowledge and that the defense team's resources, including four attorneys, an investigator, and six legal interns, were sufficient to overcome the discovery complications and complete preparations in the time allotted for trial. These findings were supported by substantial competent evidence in the record, and we cannot say that no reasonable judge would have agreed with Judge Anderson's ruling. Robinson's real complaint is that Judge Anderson did not assign his evidence the weight he believed it deserved. Such a dispute does not establish grounds for error. See *In re Estate of Farr*, 274 Kan. 51, 68, 49 P.3d 415 (2002) ("It is the factfinder's function to determine the weight and credibility of the witnesses. Appellate courts will not pass upon the credibility of witnesses or reweigh conflicting evidence.").

Finally, Robinson believes Judge Anderson minimized the prejudice occasioned by the State's tardy and disorganized disclosures to defendant's DNA expert. Again, Judge Anderson addressed this issue specifically in denying the third motion for continuance, explaining that any delay the expert experienced did not prevent appointed counsel from continuing to work on other aspects of Robinson's defense. On appeal, Robinson admits the expert's delay did not impede counsel's ability to prepare for trial but argues it prevented the defense from completing an independent DNA analysis.

We find the argument unavailing. The defense team did not pursue independent testing until after the State completed and disclosed its DNA lab reports. Thereafter, much of the delay Stettler experienced was the result of his decisions on time management. We have found no error in the denial of continuance under similar circumstances. See *State v. Lewis*, 299 Kan. 828, 846-48, 326 P.3d 387 (2014); *Snodgrass*, 252 Kan. at 264.

Moreover, during the July 25 evidentiary hearing, Stettler admitted he could complete his work and advise the defense within 3 to 4 weeks—leaving adequate time before trial. On September 5, defense counsel informed Judge Anderson that samples had been sent to a lab for independent analysis, but the results of that testing were never introduced at trial or included in the record on appeal. Thus the district judge had no basis upon which to make a finding of good cause warranting a continuance. See *State v. Daigle*, 220 Kan. 639, 643-44, 556 P.2d 400 (1976) (affirming denial of continuance where defendant failed to show relief would result in favorable evidence from a completed fracture analysis), *cert. denied* 430 U.S. 983 (1977); see also *Coy v. Renico*, 414 F. Supp. 2d 744, 777 (E.D. Mich. 2006) (continuance properly denied where petitioner failed to show independent DNA testing would yield exculpatory evidence). Nothing in the record supports Robinson's claim that discovery complications foreclosed independent DNA testing or use of the results of such testing at trial. In fact, the evidence strongly suggests otherwise.

In the end, we hold that the denial of continuance did not violate Robinson's due process or Sixth Amendment rights.

*Statutory Challenge*

In addition to his constitutional challenges, Robinson argues the trial court abused its discretion in denying his requests for continuance. For purposes of clarity, the challenge is divided into two subissues: (1) whether the trial court abused its discretion in denying a continuance to allow counsel additional time to prepare the guilt phase defense; and (2) whether the trial court abused its discretion in denying a continuance to allow counsel additional time to prepare the penalty phase defense.

1. *Legal Framework and Standard of Review*

K.S.A. 22-3401 provides that "[c]ontinuances may be granted to either party for good cause shown." "In a criminal case, the decision to continue a case lies within the sound discretion of the district court." *State v. Haney*, 299 Kan. 256, 259, 323 P.3d 164 (2014). Thus, we review a denial of continuance for abuse of discretion. *State v. Burnett*, 300 Kan. 419, 436, 329 P.3d 1169 (2014). Judicial discretion is abused where judicial action is arbitrary, or based on an error of law or fact. *State v. Warrior*, 294 Kan. 484, 505, 277 P.3d 1111 (2012). The party asserting abuse of judicial discretion has the burden to prove an abuse of discretion on appeal. *State v. Smith-Parker*, 301 Kan. 132, 161, 340 P.3d 485 (2014). Additionally, where a defendant claims the denial of continuance interfered with his or her ability to present a defense, we review the question de novo. *Lewis*, 299 Kan. at 846.

The legal standard for granting a continuance is "good cause" shown. K.S.A. 22-3401; *State v. Carter*, 284 Kan. 312, 318, 160 P.3d 457 (2007). However, where a continuance is sought to retain new counsel, we consider the following five factors:

"(1) whether a continuance would inconvenience witnesses, the court, counsel, or the parties; (2) whether other continuances have been granted; (3) whether legitimate reasons

98

exist for the delay; (4) whether the delay is the fault of the defendant; and (5) whether denial of a continuance would prejudice the defendant." *Anthony*, 257 Kan. at 1019.

Robinson argues the *Anthony* factors should apply to his challenge. However, *Anthony* applies in situations where defendant seeks a continuance for the purpose of retaining new counsel, thereby placing the defendant's Sixth Amendment right to counsel of choice in competition with the court's discretionary power to deny continuances. 257 Kan. at 1019. At the time the court denied the defendant's second continuance motion, appointed counsel, Berrigan and O'Brien, had served as counsel to Robinson for nearly 7 months. Robinson never requested or retained new counsel after Thomas' discharge, and appointed counsel represented him throughout both phases of trial. As such, Robinson's Sixth Amendment right to counsel of choice was never implicated and *Anthony*'s five-factor test does not apply. See *State v. Ly*, 277 Kan. 386, 391, 85 P.3d 1200 (five-factor test did not apply where defendant "did not request a continuance so he could retain new counsel"), *cert. denied* 541 U.S. 1090 (2004).

## 2. *Continuance to Provide Additional Time to Prepare Guilt Phase*

Robinson argues the trial court erred in denying his requests for a second continuance in the face of evidence establishing: (1) the division‑of‑labor agreement, whereby retained counsel, Thomas, was to prepare the guilt phase defense and appointed counsel, Berrigan and O'Brien, the penalty phase defense; (2) the unexpected discharge or withdrawal of Thomas; and (3) the impact of Thomas' withdrawal on trial preparations.

The record includes competing evidence regarding the propriety of a continuance notwithstanding Robinson's arguments. Although defense counsel took it upon themselves to divide the labor, Judge Anderson was unaware of this decision. His orders appointing counsel specified that Berrigan and O'Brien were to represent defendant at trial and through sentencing. Judge Anderson found the division‑of‑labor agreement

frustrated the purpose of his orders. Also, as Judge Anderson explained, conflicts and other matters giving rise to the withdrawal of counsel are not unforeseeable, casting further doubt on the reasonableness of defense counsels' reliance on this division of labor. There is also reason to question how strictly counsel adhered to the arrangement. Soon after their appointment, Berrigan and O'Brien signed pleadings and motions, played a leading role at motions hearings and status conferences, and handled the examination of witnesses and argument at the January 2002 evidentiary hearing on the venue motion. All of these events were part of the guilt phase of the case.

The record also provides direct support for Judge Anderson's findings and conclusions. While Thomas' withdrawal certainly increased appointed counsel's workload and responsibility, they were not starting from scratch. Berrigan and O'Brien had served as counsel to Robinson for roughly 7 months prior to Thomas' withdrawal, and they had another 7 months to prepare thereafter, thanks to Judge Anderson's order granting Robinson's first continuance motion. Appointed counsel also had the benefit of the preparation Thomas and the DPDU had done over the course of nearly 2 years. After Thomas' withdrawal, O'Brien's associate attorney Luby entered his appearance for the defense, and Robinson never sought appointment of new counsel.

We have not previously reviewed the denial of a continuance under the particular facts presented here. Even so, *Anthony* provides some useful parallels under similar facts. There, defendant moved for a 2-month continuance 18 days before trial so that defendant's counsel of choice, Charles Atwell, could have adequate time to become involved in the case and prepare for trial. Atwell informed the court he could not accept appointment without a continuance. Defendant had already received a previous continuance. The trial court granted defendant leave to substitute Atwell as counsel but denied the continuance. We found no abuse of discretion in the ruling. 257 Kan. at 1019-20.

Authority from other jurisdictions lends more direct support for Judge Anderson's rulings. See *United States v. Messervey*, 317 F.3d 457, 462 (5th Cir. 2002) (no error in denying 4-month continuance after withdrawal; court had granted previous continuances giving counsel a full year to prepare and new counsel benefitted from predecessor's preparation); *People v. Johnson*, 205 Ill. 2d 381, 406-07, 275 Ill. Dec. 820, 793 N.E.2d 591 (2002) (no error in denial of continuance to allow counsel additional time to prepare defense in capital murder prosecution where trial court had granted previous continuances totaling 55 days and public defender already had prepared for 3 months); *Flinn v. State*, 563 N.E.2d 536, 543 (Ind. 1990) (no error in denial of continuance to give new counsel more preparation time; new counsel had benefit of predecessor's 16 months of preparation); *State v. Sanders*, 92 Ohio St. 3d 245, 276, 750 N.E.2d 90 (2001) (no error in denial of continuance to allow new lead counsel time to prepare defense in capital murder prosecution; newly appointed counsel had 2 full months to prepare and cocounsel had been on the case for 15 months); *State v. Hester*, 324 S.W.3d 1, 35-36 (Tenn. 2010) (no error in denial of continuance in capital murder case where one of defendant's two lawyers withdrew; remaining attorney had served as lead counsel for almost 3 years; case had encountered lengthy delays).

In light of the record here, we conclude a reasonable factfinder could have agreed with Judge Anderson's rulings. Therefore, we hold that the district judge properly exercised his lawful discretion by refusing requests for a second continuance to prepare the guilt phase defense.

3. *Continuance to Provide Additional Time to Prepare Penalty Phase*

Robinson also contends he was entitled to a continuance so counsel could fully develop his mitigation defense.

101

The problem with Robinson's challenge is he failed to make an adequate proffer as to what mitigation evidence would have been developed had Judge Anderson granted a second continuance. We discussed the movant's duty to make such a proffer in *Burnett*, 300 Kan. 419, where defendant requested a continuance in order to prepare a redacted and admissible version of the videotaped recording of his police interview. Defendant argued the district court's refusal to grant a continuance denied him a defense at trial because without the video recording, he was unable to impeach law enforcement testimony regarding the interview. However, defendant did not specify "how [law enforcement officer's] testimony was inconsistent with the statements recorded on the video or even explain how [law enforcement officer's] testimony could have been impeached by the video." 300 Kan. at 438. We held that "[w]ithout specific references to how the video would have bolstered his defense or impeached [law enforcement officer's] testimony, Burnett ha[d] failed to show that 'good cause' supported his request for a continuance to prepare a redacted version of the video." 300 Kan. at 438.

The same principle holds true in the context of sentencing. In *State v. Beaman*, 295 Kan. 853, 286 P.3d 876 (2012), defendant sought a sentencing continuance to research an Eighth Amendment argument under Jessica's Law that might have applied at sentencing. In affirming the denial of continuance, we explained: "[S]imply arguing that there 'may' be an issue worthy of another motion is insufficient to justify a continuance. Mere speculation that with more time something favorable may happen for the defendant does not constitute good cause. [Citation omitted.]" 295 Kan. at 864.

We thus conclude it would be unacceptably speculative to presume their preliminary findings would be consistent with those produced in a final analysis. Here, Robinson offered the affidavits of Nerad and Lewis in support of their motions for continuance to develop mitigation evidence. Both speculated, based on their initial

102

reviews, that Robinson may have suffered abuse as a child and impairment to his mental functioning. Nevertheless, these findings were preliminary. Both Nerad and Lewis made clear that they could not render qualified and reliable opinions on the subjects absent further investigation. Defense counsel implicitly acknowledged the unreliability of these experts' preliminary findings during posttrial argument, explaining the defense did not call Nerad or Lewis as witnesses because a "half-baked" mitigation defense would have been worse than no defense at all.

Counsel conceded at oral argument that defendant failed to make a proffer of the evidence that would have been introduced in the event of a continuance. We cannot find fault in Judge Anderson's decisions in the absence of such a showing. See *People v. Doolin*, 45 Cal. 4th 390, 451, 87 Cal. Rptr. 3d 209, 198 P.3d 11 (2009) (trial court did not err in denying penalty phase continuance to allow defendant to develop childhood abuse issues; defendant "made no showing that he could produce specific, relevant mitigating evidence within a reasonable time"); *People v. Jenkins*, 22 Cal. 4th 900, 1038, 95 Cal. Rptr. 2d 377, 997 P.2d 1044 (2000) (court within its discretion to refuse continuance to allow penalty phase consultant time to undertake investigation of character and background where defendant did not demonstrate it would produce specific relevant mitigation evidence); *People v. Chapman*, 194 Ill. 2d 186, 241-42, 743 N.E.2d 48 (2000) (trial court did not abuse discretion in denying 60-day continuance 3 weeks before trial to allow penalty phase expert to develop mitigation case where previous continuance had been granted and defendant failed to show how expert testimony would have added to the mitigation evidence); *State v. Rimmer*, 250 S.W.3d 12, 41 (Tenn. 2008) (no error in denying continuance to allow expert to develop mitigation evidence where defendant failed to show what, if any, mitigation evidence would have been uncovered had continuance been granted).

Robinson, relying on *Haney*, 299 Kan. 256, suggests the mere possibility that a continuance might yield fruitful mitigation evidence establishes good cause for relief. In *Haney*, defendant negotiated an opportunity to pursue a durational sentencing departure in exchange for his nolo contendere plea to various sex offenses. Prior to sentencing, defendant sought a 1-month continuance to compensate for delays in funding for a sex offender evaluation expert. The trial court denied the motion, erroneously finding that such an evaluation was not relevant and that defendant could testify to the aberrational nature of his crimes without expert testimony. The Court of Appeals held that the district court abused its discretion but found the error harmless because defendant did not offer any evidence in support of the durational departure. We reversed, unable to "declare that the lost opportunity to present evidence in mitigation of punishment was harmless in this case." 299 Kan. at 262.

Robinson's reliance on *Haney* is misplaced. There, the district court's denial of continuance was founded on legally erroneous findings, and the Court of Appeal's declaration that the error was harmless would have deprived defendant of the very benefit that induced him to enter his plea agreement—the opportunity to pursue a durational departure. No such facts are present here, and *Haney* does not alter Robinson's duty to make a proffer of the mitigation evidence he would have developed and presented had he been granted a continuance.

### 3. MOTIONS TO SUPPRESS

Defendant raises five issues related to the district court's denial of his motions to suppress evidence obtained pursuant to pen registers, wiretaps, search warrants, and warrantless trash searches. Specifically, Robinson contends: (1) District Judge Larry McClain was not neutral and detached; (2) he lacked jurisdiction to issue extraterritorial search warrants; (3) law enforcement officers exceeded their territorial jurisdiction; (4)

law enforcement officers' trash searches violated defendant's reasonable expectation of privacy; and (5) wiretap orders were issued without a sufficient showing of necessity.

*Additional Factual and Procedural Background*

      1. *Judge McClain's Former Prosecution of Robinson*

In the mid-1980s, McClain was a prosecutor in the Johnson County District Attorney's office. In 1984, he investigated a consumer complaint filed by the owners of Back Care Systems, International (Back Care), alleging Robinson defrauded Back Care through a bogus invoicing scheme through his company, Equi-plus.

In hopes of avoiding criminal prosecution, Robinson prepared four sham affidavits, all purportedly authored by vendors claiming the invoices were genuine. One affidavit appeared to be signed by Paula Godfrey, one of several missing persons connected to Robinson. After reviewing the affidavits, McClain told Robinson's attorney, Ronald Wood, that Robinson was the "master of the copying machine."

On March 29, 1985, McClain filed a criminal complaint, along with a supporting affidavit, charging Robinson with one count of felony theft by deception. McClain handled the Back Care case through preliminary hearing on May 29, 1985. On June 10, McClain was appointed to the District Court bench in Johnson County. Steven J. Obermeier assumed the prosecution of the Back Care case from that point forward. Obermeier endorsed Godfrey as a witness because she had purportedly signed one of the sham affidavits. At the time, Obermeier did not know Robinson was a suspect in Godfrey's disappearance.

Obermeier tried the Back Care case in January 1986. The State called Judge McClain as a witness to establish that the affidavits were shams and to lay foundation to

admit them into evidence. The trial judge, however, limited Judge McClain's testimony to foundation issues only, and Judge McClain did not testify beyond that boundary. The jury convicted Robinson on the theft by deception count.

Just after Robinson's conviction, Obermeier prosecuted a second case against him, the Kuti case, which arose from a phony land deal Robinson concocted to defraud investors. Judge McClain was endorsed as a witness in the Kuti case because Obermeier believed Robinson's failure to disclose the Back Care prosecution constituted a material omission, an essential element of the securities fraud count pled in that case. Judge McClain had no other involvement in the prosecution of the Kuti case.

Robinson entered a plea agreement in the Kuti case, and the trial judge joined the Back Care and Kuti cases for purposes of sentencing. In his sentencing brief, Obermeier made reference to the fact that Robinson was the last person seen with Stasi before her disappearance, but Obermeier had not received this information from Judge McClain.

In September 1987, when Robinson first became eligible, Obermeier filed a recommendation to deny parole. Obermeier attached then-prosecutor McClain's affidavit from the Back Care case in support of the recommendation. Judge McClain had no involvement in preparing Obermeier's recommendation.

At the suppression hearing, the parties stipulated that (1) during his tenure with the District Attorney's office, McClain had no knowledge that Robinson was a suspect in any homicides or abductions; (2) upon assuming the bench in June 1985, Judge McClain exclusively handled a civil docket, with the exception of presiding over various applications for search warrants, wiretaps, and pen registers; and (3) once appointed, Judge McClain disengaged from all law enforcement-related activities.

106

## 2. *Prosecution's Pursuit of Inquisition, Pen Registers, and Wiretaps*

The Johnson County District Attorney's office regularly submitted wiretap and pen register applications to an administrative or civil judge. After the retirement of the civil judge who had historically handled these matters, Judge McClain began receiving the applications because he was a civil judge who had familiarity with criminal law.

On March 30, 2000, prosecutor Morrison approached Judge McClain and secured an order to open an inquisition. Although it was unusual to approach a civil judge for an inquisition, Morrison felt there was a strong possibility he would later request pen registers and wiretaps, so he wanted to begin proceedings with the wiretap judge.

In April 2000, the prosecution secured orders from Judge McClain for pen registers on Robinson's phones.

On May 19, the prosecution submitted a wiretap application to Judge McClain. Lenexa Police Detective Dave Brown offered a 31-page supporting affidavit containing hundreds of averments set forth in 78 separate paragraphs.

The affidavit detailed law enforcement's extensive investigation of Robinson and described facts uncovered through the use of a variety of traditional investigatory techniques, including surveillance of witnesses and the defendant, warrantless trash searches, consensual searches, investigatory interviews, inquisitional subpoenas, and analysis of pen register data.

Specifically, the affidavit outlined Robinson's relationship with Trouten, his likely involvement in her recent disappearance, and his attempts to conceal the same. It identified facts suggesting Robinson had targeted new potential victims in the BDS&M

107

community, including Trouten's friends, Remington and Taylor, as well as J.M. and V.N. It also summarized law enforcement's analysis of pen register data and inquisition subpoenas, which demonstrated that Robinson was dependent on cellular and telephone communications to develop these relationships and further his criminal conduct.

The affidavit also touched on a few facts that were similar or common to both the Back Care case and the Robinson investigation. First, Brown made a passing reference to Robinson's convictions in the Back Care and Kuti cases, the former of which Judge McClain handled through the preliminary hearing. Brown also made brief reference to two companies connected to Robinson, Equi II and Equruz II, that utilized a name similar to Equi-plus, Robinson's company implicated in the Back Care case. Finally, the affidavit included averments describing Robinson's connection to and possible involvement in the disappearance of Paula Godfrey, who allegedly signed one of the sham affidavits in the Back Care case.

When prosecutors Morrison and Sara Welch, along with Brown, approached Judge McClain for the wiretap, the judge said he had prosecuted Robinson in a financial crimes case in the early to mid-1980s. Morrison testified that Judge McClain said something to the effect that he "knew the defendant as a, quote, con man or, quote, shyster," but characterized his comments as very brief and benign. Brown testified that Judge McClain said only that he had prosecuted Robinson for some financial crimes in the past. Judge McClain did not discuss any specific details about the Back Care case, the witnesses involved, or any other criminal complaints against Robinson.

3. *Search Warrants*

As the investigation progressed, prosecutors approached Judge McClain for search warrants. On June 2, 2000, law enforcement officers secured warrants to search

Robinson's Olathe residence and storage locker. The following morning, prosecutors secured a warrant to search Robinson's Linn County property.

The application to search the Linn County property was supported by Brown's affidavit, which contained dozens of averments set forth in 35 separate paragraphs covering 10 single-spaced pages. The affidavits for all three search warrants were nearly identical. The first 20 paragraphs described Robinson's connection to Trouten, her disappearance, and Robinson's probable involvement in it. In paragraphs 21-30, Brown explained how Robinson had targeted new women in the BDS&M community. The affidavit also included averments establishing probable cause that evidence of Robinson's crimes would be found at each location.

As with the wiretap affidavit, Brown made reference to Robinson's prior convictions in the Back Care and Kuti cases, identified businesses tied to Robinson that used a name similar to Equi-plus, and disclosed Robinson's possible connection to the disappearance of Godfrey.

On June 2, 2000, Lenexa police officials contacted Linn County Sheriff Marvin Stites to discuss plans for executing a search warrant for Robinson's Linn County property. After securing the warrant, Linn County Sheriff's Deputy Kevin Danciak arrived at Robinson's Linn County property around 9:30 a.m., just as officers from Lenexa and Overland Park were arriving. Danciak reviewed and executed a written request for assistance document drafted by Lenexa police. The document memorialized Linn County's request to Lenexa and other agencies for assistance in executing the search warrant. Law enforcement officers began the search after Danciak signed the document.

4. *Warrantless Searches of Robinson's Trash*

Before obtaining search warrants, law enforcement officers employed a variety of investigatory techniques, including searching Robinson's trash placed outside for collection at his Olathe residence. Lenexa Police Detective Michael Bussell drove by Robinson's residence 50 to 60 times from March to June 2000, exploring the location, developing strategies for collecting Robinson's trash, and coordinating trash pulls on collection days. Lenexa police did not disclose their activities to Olathe police.

Robinson lived inside Santa Barbara Estates, a private mobile home community that maintained its own streets, sidewalks, and lighting. A private trash company, Deffenbaugh, regularly entered the community to collect residents' trash. At the community's main entrance, there was a "Santa Barbara Estates" sign on the south side of the road. Several yards beyond this sign, there was a "Speed Limit 20" sign. Just below the speed limit sign, affixed to the same post, was a smaller sign captioned, "Private Property No Soliciting." There were no "no trespassing" signs posted within the community. Santa Barbara Estates was not a gated community, and there was no physical barrier impeding access into the area. Only transporters hauling mobile homes into or out of the community were required to check in before entering. If a person wanted to visit a resident, he or she was free to drive into the community, walk up to a resident's home, and knock on the resident's door. Olathe police freely entered the community to execute warrants and handle other police business.

Robinson's residence was located 1/4 to 1/2 mile beyond the entrance to Santa Barbara Estates. The residence could not be seen, or views of it were limited, from any street outside Santa Barbara Estates.

Each time a law enforcement officer pulled Robinson's trash, it had been set out for collection in a container placed toward the end of an asphalt parking area, near or against the curb line, where the parking pad intersected the roadway, approximately 10 to 12 feet outside of the fence that surrounded the residence. When Bussell saw the trash container placed in this location, he would radio another officer to collect it from the container. However, on other occasions, a law enforcement officer, after making arrangements with a security officer at Deffenbaugh, would ride on the trash truck and collect the trash directly or would supervise Deffenbaugh's collection and arrange to pick it up at a location away from Santa Barbara Estates.

*Neutral and Detached Magistrate Challenge*

Robinson argues the evidence seized pursuant to, or as a result of, the four pen registers, one wiretap order, and four search warrants Judge McClain issued in this case should have been suppressed because he was not a neutral and detached magistrate.

1. *Legal Framework and Standard of Review*

Our standard of review for motions to suppress evidence is well established:

> "An appellate court reviews a district court's decision on a motion to suppress using a bifurcated standard. Without reweighing the evidence, the district court's findings of fact are reviewed to determine whether they are supported by substantial competent evidence. A de novo standard of review is then used to review the ultimate legal conclusion regarding the suppression of evidence." *State v. Garza*, 295 Kan. 326, 330-31, 286 P.3d 554 (2012).

The Fourth Amendment to the United States Constitution, along with Section 15 of the Kansas Constitution Bill of Rights protects individuals against unreasonable

government searches and seizures. See *State v. Daniel*, 291 Kan. 490, 498, 242 P.3d 1186 (2010) (Section 15 of the Kansas Constitution Bill of Rights provides "the same protection from unlawful government searches and seizures as the Fourth Amendment to the federal Constitution."), *cert. denied* 131 S. Ct. 2114 (2011). While not expressly contained in the text of the amendment, the United States Supreme Court first recognized a neutral and detached magistrate requirement in *Johnson v. United States*, 333 U.S. 10, 13-14, 68 S. Ct. 367, 92 L. Ed. 436 (1948) ("The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."). Since *Johnson*, the neutral and detached magistrate requirement has evolved into a firmly established cornerstone of Fourth Amendment law. *State v. Fremont*, 749 N.W.2d 234, 237-38 (Iowa 2008).

Throughout the judicial refinement of the doctrine, the Supreme Court has recognized at least two circumstances in which a magistrate fails to satisfy the neutral and detached requirement. First, a magistrate involved in or who exercises law enforcement powers of the executive branch lacks neutrality and detachment. "Whatever else neutrality and detachment might entail, it is clear that they require severance and disengagement from activities of law enforcement." *Shadwick v. City of Tampa*, 407 U.S. 345, 350, 92 S. Ct. 2119, 32 L. Ed. 2d 783 (1972). Second, a magistrate with a direct pecuniary interest in the outcome of the warrant proceedings also lacks neutrality and detachment. *Connally v. Georgia*, 429 U.S. 245, 250-51, 97 S. Ct. 546, 50 L. Ed. 2d 444 (1977).

*Connally* expanded the scope of the neutral and detached magistrate requirement beyond separation of powers principles and into the realm of judicial bias, *i.e.*, direct

pecuniary interests, by applying due process principles to the Fourth Amendment analysis. Specifically, *Connally* adopted the due process test articulated in *Tumey v. Ohio*, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927), and *Ward v. Village of Monroeville*, 409 U.S. 57, 93 S. Ct. 80, 34 L. Ed. 2d 267 (1972). 429 U.S. at 247-50. Thus a magistrate lacks neutrality and detachment where the circumstances offer "'a possible temptation to the average man [or woman] as a judge . . . or which might lead him [or her] not to hold the balance nice, clear and true between the State and the accused.'" 429 U.S. at 250. In applying this standard, we conduct an individualized and contextual inquiry in light of the totality of the circumstances. See *United States v. Bowling*, 619 F.3d 1175, 1186 (10th Cir. 2010).

Robinson argues the court should apply an "appearance of bias" standard, borrowed from recusal statutes and judicial codes of conduct. While judicial bias and recusal precedent may inform the Fourth Amendment analysis, the appearance of bias standard is inconsistent with the objective test employed by the Supreme Court. See *United States v. Heffington*, 952 F.2d 275, 279-80 (9th Cir. 1991) (urging caution in the application of an appearance of partiality standard to Fourth Amendment neutral and detached magistrate challenges); *State v. McCann*, 391 N.J. Super. 542, 554, 919 A.2d 136 (2007) (mere appearance of bias alone is insufficient, objectively reasonable partiality must be established); *O'Connor v. Madera County Superior Court*, 76 Cal. Rptr. 2d 138, 148 (1998) (appearance of partiality, "without more, is not enough to render [magistrate] constitutionally disqualified to act or to implicate the exclusionary rule under the Fourth Amendment"), *rev. denied and ordered not officially published* 65 Cal. App. 4th 113 (October 14, 1998). It is also inconsistent with the standard we have applied to due process challenges founded on allegations of judicial bias. See *State v. Hurd*, 298 Kan. 555, 570, 316 P.3d 696 (2013) ("Recusal is required under the Fourteenth Amendment's Due Process Clause when the judge is actually biased or there is a

constitutionally intolerable probability of actual bias. [Citation omitted.]"); *State v. Sawyer*, 297 Kan. 902, 909-10, 305 P.3d 608 (2013) (same).

2. *Did Judge McClain lack neutrality and detachment?*

In ruling on Robinson's challenge, the district judge found:

"In this case, McClain investigated Robinson and filed criminal charges against him for theft on March 29, 1985 in what was referred to at the hearing as the *Back Care* case (Case No. K48573). As Chief Deputy to the District Attorney at the time, McClain assigned himself the case and handled the matter through the preliminary hearing. Shortly after the preliminary hearing, on June 10, 1985, McClain was appointed to the bench. Another prosecutor, Assistant District Attorney Steve Obermeier, took over the case and tried it in Judge McClain's stead. Judge McClain was later called as a witness in the *Back Care* case to testify as to the delivery of certain affidavits to him from Ron Wood and at the behest of Robinson. A review of the transcripts of those earlier proceedings indicates that McClain was nothing more than a foundation witness to show the chain of custody for the documents in question. McClain testified as to the delivery of the documents only. It was Obermeier that obtained that conviction, handled the sentencing of defendant, opposed defendant's parole, and later filed the charges against Robinson in the *Kuti* case (Case No. K51711). The parties have stipulated that Judge McClain 'had no knowledge whatsoever concerning the defendant's suspected involvement in any homicides or abductions' and that 'since assuming the bench in June of 1985, Judge McClain has handled a civil docket exclusively and has disengaged from any law enforcement related activities, other than presiding over various applications for search warrants, wiretaps, and pen registers.'"

The district judge's factual findings are supported by substantial competent evidence, and Robinson does not challenge them on appeal. Thus our analysis focuses on Judge Anderson's legal conclusion that Judge McClain was neutral and detached.

114

We have not previously addressed a neutral and detached magistrate challenge under these particular facts. But see generally *State v. Schoonover*, 281 Kan. 453, 517, 133 P.3d 48 (2006) ("'The requirement that a warrant must be issued by a neutral and detached magistrate does not equate to a constitutional mandate requiring that a judge have no contact with or knowledge of the case or the defendant.'") Nor has the Supreme Court decided whether a magistrate's former prosecution of a defendant violates the neutral and detached magistrate requirement. As such, we turn to other persuasive authority for guidance.

The Fifth Circuit Court of Appeals issued the seminal decision on "magistrate-as-former-prosecutor" challenges in *United States v. Outler*, 659 F.2d 1306 (5th Cir. 1981). In *Outler*, the magistrate, who had prosecuted defendant for prescribing scheduled drugs without a license 3 years prior, issued a warrant in his capacity as a judicial officer to search defendant's medical office in a later investigation of defendant's practice. The search warrant was "based on information gathered exclusively during the second investigation." 659 F.2d at 1312. The Fifth Circuit found no Fourth Amendment violation, reasoning the search warrant contained sufficient evidence to indicate probable cause and the details therein were independent of the events involved in the magistrate's former prosecution of the defendant. 659 F.2d at 1312.

The Eighth Circuit Court of Appeals rejected a similar challenge in *United States v. DeLuna*, 763 F.2d 897 (8th Cir. 1985), where jointly charged codefendants argued the issuing magistrate's former prosecution of certain defendants violated the neutral and detached magistrate requirement. The Eighth Circuit rejected the challenge because the evidence failed to demonstrate that the current investigation was related to the matter handled previously by the magistrate or that the magistrate was still employed as a prosecutor at the time the current investigation began. 763 F.2d at 908.

More recently, the Tenth Circuit Court of Appeals reached the same holding in *United States v. Freerksen*, 457 Fed. Appx. 769 (10th Cir.) (unpublished opinion), *cert. denied* 132 S. Ct. 2788 (2012). There, defendant was convicted of five counts of producing child pornography after law enforcement executed a search warrant uncovering digital images depicting the sexual abuse of an 11-year-old child. The search warrants were issued by Special District Judge Don Work. Prior to his appointment to the bench, Judge Work was an assistant district attorney. In that capacity, he prosecuted defendant for assault and battery in 2007 and for lewd molestation in 2008. Work had also sought to accelerate a deferred sentence defendant received in a 2005 case for child stealing. The Tenth Circuit held that Judge Work's former prosecution of defendant on cases involving sex crimes and abuse of children, which were unrelated to the incident giving rise to the pending child pornography investigation, failed to demonstrate a violation of the Fourth Amendment's neutral and detached magistrate requirement. 457 Fed. Appx. at 772; see *United States v. Waters*, 786 F. Supp. 1111, 1117 (N.D.N.Y. 1992) ("Absent concrete evidence that [the magistrate judge] was involved in his prior capacity as Assistant United States Attorney in an investigation of defendant as an open criminal file to which he was assigned, there is no basis upon which to invalidate the . . . search warrant. [Citation omitted.]"; *cf. United States v. Harris*, 566 F.3d 422, 434 (5th Cir. 2009) (finding "no reason to question the neutrality and detachment of a magistrate who happened to have represented the defendant in an unrelated criminal matter 6 years prior"); *Heffington*, 952 F.2d at 279-80 (magistrate's prior representation of defendant in previous drug case was not the same matter at issue when warrants issued); *Bowling*, 619 F.3d at 1186 (magistrate who represented bank in adversarial proceedings against defendant 10 years before the warrant application did not violate neutral and detached requirement).

Robinson suggests these decisions stand for the proposition that a magistrate lacks neutrality and detachment where *any* facts between the former prosecution and current

investigation overlap. He then argues Detective Brown's supporting affidavits disclosed three overlapping or common facts between the Back Care case and the capital murder investigation, including reference to Robinson's conviction in the Back Care case, his possible involvement in the disappearance of Paula Godfrey, and businesses tied to Robinson that used a name similar to Equi-plus.

However, a careful review of *Outler*, *DeLuna*, and other "magistrate-as-former-prosecutor" cases reveals the pivotal question is not whether there are *any* facts common between the two cases, but instead whether they arose from a common investigation or single transaction or event. *Outler*, 659 F.2d at 1312 (affidavit established probable cause and significant facts in affidavit, such as agents, dates, and drugs in question, were wholly independent of the events at issue in the prior prosecution); *cf. Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363, 1375 (7th Cir. 1994) (en banc) (recusal not required in a murder trial where judge had prosecuted defendant 14 years earlier on a different murder charge); *In re K.E.M.*, 89 S.W.3d 814, 826 (Tex. App. 2002) (judge is not disqualified by mere fact that he personally prosecuted defendant for past crimes).

The judge's former prosecution of Robinson and the current capital murder investigation most certainly did not arise from a common investigation or single transaction or event. Then-prosecutor McClain investigated and prosecuted Robinson on a theft by deception charge related to his fraudulent invoicing practices that defrauded the owners of Back Care. In stark contrast, this case involved the investigation and prosecution of Robinson 15 years later for kidnapping, sexual battery, and the murders of six female victims.

Robinson does not dispute that the averments in the supporting affidavits established probable cause for issuance of the pen registers, wiretap orders, and search warrants; and none of the allegedly overlapping facts in the affidavits were material to

Judge McClain's probable cause determinations. The most significant overlapping fact was the affidavits' brief reference to Robinson's convictions in the Back Care and Kuti cases. Detective Brown testified that he referenced these cases to bolster other averments describing Robinson's attempts to conceal his crimes by fabricating letters on behalf of the victims. The element of fraudulent concealment may have been common to both the Back Care case and the capital murder investigation, but, as Judge Anderson found, the fact that a perpetrator took steps to cover up the crimes is a fact common to most all criminal cases.

Amongst the dozens of averments in the affidavits, the isolated reference to the Back Care case bore little weight in the overall assessment of probable cause. The other allegedly overlapping facts are even more benign. It is unclear how Godfrey's signature on a sham affidavit in a financial crimes prosecution would adversely influence Judge McClain's probable cause assessment in this capital murder investigation. The same holds true for the fleeting references to Robinson's companies using the Equi title.

Robinson relies on *Sincavage v. Superior Court*, 42 Cal. App. 4th 224, 49 Cal. Rptr. 2d 615 (1996), and *Goines v. State*, 708 So. 2d 656 (Fla. Dist. App. 1998), in support of his challenge. Both cases involved a judge who formerly prosecuted and secured convictions against the defendant, and these convictions were or could have been relevant to the enhancements sought at a current sentencing. In this regard, the judge's former prosecution and the enhancements sought at sentencing arose from the same acts or transactions. Thus the authority is distinguishable.

To the extent facts or circumstances were common to both cases here, they were not sufficient to cause a reasonable person to question Judge McClain's ability to fairly assess the probable cause issue in the various applications for pen registers, wiretap orders, and search warrants. See *Schoonover*, 281 Kan. at 517; see also *DeLuna*, 763 F.2d

118

at 908 (magistrate's knowledge from prior investigation of defendant would not cause a reasonable person to believe he was unable to impartially assess the existence of probable cause); *People v. Curkendall*, 12 A.D.3d 710, 714, 783 N.Y.S.2d 707 (no merit in claim that judge's former prosecution of defendant 14 years earlier on similar offense violated due process), *leave to appeal denied* 4 N.Y.3d 743 (2004).

In addition to Judge McClain's former prosecution of defendant in the Back Care case, Robinson contends that the magistrate's stray comments evidenced his lack of neutrality and detachment. Specifically, Robinson highlights McClain's comment that Robinson was a "master of the copying machine" and that he knew defendant as a "con man or shyster."

The first comment was made to Robinson's defense counsel in the Back Care case more than 15 years before Judge McClain issued the pen registers, wiretap orders, and search warrants in this case and before he was appointed to the bench. The comment was also reasonably grounded in fact, as Robinson had provided fraudulent affidavits in hopes of avoiding prosecution. The comment does not evidence a lack of neutrality and detachment.

The "con man or shyster" comment is more troubling when viewed in isolation. However, Judge McClain made this comment while disclosing his previous investigation and prosecution of Robinson in a financial crimes case. Viewed in context, Judge McClain's comment appears to be an inartful description of the nature of the crimes he prosecuted rather than a pejorative statement regarding Robinson's character.

The parties stipulated that Judge McClain had completely disengaged from law enforcement upon taking the bench in 1985, had had no involvement in any subsequent investigation or prosecution of Robinson, and had no knowledge of Robinson's possible

119

involvement in other missing persons' investigations. Nothing in the record suggests Judge McClain considered any information outside the four corners of the applications and supporting affidavits, in this case, which provided ample independent support for his probable cause determinations. The comments highlighted by Robinson fail to establish a violation of the neutral and detached magistrate requirement. See *Hurd*, 298 Kan. at 571 (trial judge comments that defendant was "'a violent man,'" the "'best place for [him] is in prison,'" and that he showed a "'complete inability to . . . follow the rules'" did not establish due process violation when made in reference to his extensive criminal history); *Schoonover*, 281 Kan. at 516-17 (magistrate who formerly represented defendant and called him a "low life" was neutral and detached where he did not rely on information outside the affidavit, which clearly established probable cause); *State v. Griffen*, 241 Kan. 68, 71-72, 734 P.2d 1089 (1987) (district judge referring to defendant as a "'mean mother,'" when explaining the case background to new defense counsel, while ill-advised, did not demonstrate bias and prejudice).

Robinson, relying on *State v. Alderson*, 260 Kan. 445, 468-69, 922 P.2d 435 (1996), argues Judge McClain's comments should be construed as evidence of bias because the judge was the victim of Robinson's fraud, *i.e.*, he received Robinson's sham affidavits in the mid-1980s. In *Alderson*, we held that a reasonable person would question the trial judge's impartiality where defendant was prosecuted for stealing a car owned by the trial judge's brother. 260 Kan. at 469. Unlike the situation in *Alderson*, neither Judge McClain nor any member of his family suffered injury or financial loss from Robinson's sham affidavits. Robinson delivered the affidavits in hopes of avoiding prosecution, not to defraud Judge McClain financially. Robinson's efforts proved unsuccessful and did not impede then-prosecutor McClain's filing of criminal charges. In fact, the sham affidavits bolstered the State's case in the Back Care prosecution. Robinson's reliance on *Alderson* is misplaced.

Based on the foregoing analysis, we agree with Judge Anderson's legal conclusion that Judge McClain was a neutral and detached magistrate.

*Jurisdiction to Issue Extraterritorial Search Warrant*

In his second suppression issue, Robinson claims Judge McClain exceeded his territorial jurisdiction, as defined by Kansas statutes, by issuing the warrant to search Robinson's property in Linn County, rendering the warrant void *ab initio*.

1. *Standard of Review*

As set forth above, in considering the denial of a motion to suppress, we review factual findings for substantial competent evidence and legal conclusions de novo. *State v. Schultz*, 289 Kan. 334, 340, 212 P.3d 150 (2009). Defendant's challenge also requires the court to interpret various statutes defining the powers of district judges. "The interpretation of statutes is a question of law over which an appellate court exercises unlimited review." *State v. Arnett*, 290 Kan. 41, Syl. ¶ 1, 223 P.3d 780 (2010).

2. *Can district judges issue extraterritorial search warrants?*

Resolution of this challenge requires the court to analyze competing statutory interpretations regarding a district judge's authority to issue extraterritorial search warrants. To do so, we first outline the relevant constitutional and statutory framework.

The Kansas Constitution created the district courts of Kansas and provided that they "shall have such jurisdiction in their respective districts as may be provided by law." Kan. Const. art. 3, § 6(a) and (b). The legislature, in turn, has provided that district judges "provided for in the Kansas constitution shall have and exercise the full judicial power and authority of a district court." K.S.A. 20-302. The legislature later created two classes

of "judges of the district courts"—district magistrate judges and district judges. K.S.A. 20-301a. A "'judge of the district court' means any of such judges." K.S.A. 20-301a.

The legislature has defined the general powers and authority of "judges of the district court" at K.S.A. 20-301a:

> "Such judges shall have the jurisdiction, powers and duties prescribed by this act and otherwise prescribed by law. The judicial power and authority of a judge of the district court in each judicial district may be exercised anywhere within such judicial district and may be exercised anywhere within any other judicial district when assigned to hear any proceeding or try any cause in such judicial district, as provided in K.S.A. 20-319 and amendments thereto."

These provisions serve as a general limitation on judges of the district court, requiring that they exercise powers from within the territorial boundaries of their judicial districts. *Verdigris Conservancy District v. Objectors*, 131 Kan. 214, 218, 289 P. 966 (1930) ("judicial business is to be done in judicial districts, by district courts and district judges acting within and for their respective districts").

Beyond these general grants of authority, the legislature has specifically defined a judicial officer's authority to issue search warrants. The legislature has provided that search warrants shall be issued by a "magistrate." K.S.A. 22-2502(a). A "'magistrate'" includes "judges of district courts," which includes both district magistrate judges and district judges. K.S.A. 22-2202(14); K.S.A. 20-301a. However, the legislature has placed territorial limits on the execution of search warrants issued by a district magistrate judge.

> "Search warrants issued by a district magistrate judge may be executed only within the judicial district in which said judge resides or within the judicial district to which said judge has been assigned pursuant to K.S.A. 20-319." K.S.A. 22-2503.

122

Importantly, the legislature placed no such territorial limitation on search warrants issued by district judges. See K.S.A. 22-2502 and 22-2503.

Judge McClain was a district judge in Johnson County, the lone county in the Tenth Judicial District. He issued a warrant from within the territorial boundaries of the Tenth Judicial District to search Robinson's Linn County property, located in the Sixth Judicial District. In his motion to suppress and on appeal, Robinson argues K.S.A. 20-301a, which permits a "judge of the district court" to exercise judicial powers anywhere within the territorial boundaries of the judicial district, prevented Judge McClain from issuing the extraterritorial search warrant. Judge Anderson denied defendant's motion to suppress, finding the legislature intended to grant district judges authority to issue search warrants executable statewide under K.S.A. 22-2503 by placing territorial limits on search warrants issued by district magistrate judges only.

The resolution of these competing statutory interpretations lies within the history of the pertinent statutes. We begin with the search warrant statutes, which predate the legislature's enactment of K.S.A. 20-301a. K.S.A. 22-2502 and 22-2503 authorize judges of the district court to issue search warrants, but K.S.A. 22-2503 places territorial limits on the execution of warrants issued by district magistrate judges. This was not always the case. K.S.A. 62-1830 (Corrick), the predecessor to K.S.A. 22-2502 and 22-2503, formerly provided:

> "'A warrant shall issue upon affidavit or upon oral testimony given under oath and recorded before the magistrate or judge. *If the magistrate or judge* is satisfied that there is probable cause for the issuance of a warrant, he shall issue such warrant describing the property to be searched for and seized and naming or describing the person, place or means of conveyance to be searched. *The warrant shall be directed to any peace officer of the state of Kansas*, or one of its governmental subdivisions who is

authorized to enforce or assist in enforcing any law thereof. It shall state the grounds for its issuance, and shall command the officer to search the person, place, thing, or means of conveyance named for the property specified, and to seize such property and hold the same in accordance with the law.'" (Emphasis added.) *State v. Lamb*, 209 Kan. 453, 468-69, 497 P.2d 275 (1972) (quoting K.S.A. 62-1830), *overruled on other grounds by State v. Jacques*, 225 Kan. 38, 587 P.2d 861 (1978).

In *Lamb*, the defendant challenged a Johnson County magistrate's jurisdiction to issue an extraterritorial search warrant. Rejecting the challenge, *Lamb* held that K.S.A. 62-1830 granted both magistrates and judges the authority to issue search warrants executable statewide. *Lamb* reasoned that by directing a magistrate or judge to deliver the warrant to any peace officer of the state of Kansas, the statute implied that "a search warrant issued by a magistrate within the confines of his [or her] jurisdiction, can be served anywhere within the state of Kansas." 209 Kan. at 469.

In 1970, the legislature repealed K.S.A. 62-1830 and enacted K.S.A. 22-2503 as part of the codification of the Kansas Criminal Code. L. 1970, ch. 129, sec. 22-2503. Unlike former K.S.A. 62-1830, K.S.A. 22-2503 expressly provided that "[s]earch warrants issued by courts of limited jurisdiction may be executed only within the territorial limits of the county in which the court is located." L. 1970, ch. 129, sec. 22-2503. As discussed below, this statute was later amended to specifically apply the territorial restriction to district magistrate judges only.

However, the legislature did not wholly abandon the language in K.S.A. 62-1830 from which *Lamb* inferred the authority to issue extraterritorial warrants, *i.e.*, that warrants be "directed to any peace officer of the state of Kansas." Instead, it incorporated substantially similar language into new section 2505, providing that "[a] search warrant shall be issued in duplicate and shall be *directed for execution to all law enforcement*

124

*officers of the state*, or to any law enforcement officer specifically named therein." (Emphasis added.) L. 1970, ch. 129, sec. 22-2505.

Through these 1970 amendments, the legislature eliminated the authority of courts of limited jurisdiction to issue extraterritorial search warrants; it imposed no similar limitation on district judges; and it retained in K.S.A. 22-2505, the language from which *Lamb* inferred the authority of judges to issue extraterritorial warrants. Viewed together, these amendments provide persuasive support for the view that the legislature intended to grant district judges authority to issue search warrants executable statewide.

The 1970 amendments alone do not explain the legislature's subsequent enactment of K.S.A. 20-301a in 1976. But, the legislative history surrounding this enactment suggests strongly that it was never intended to restrict district judges' authority to issue extraterritorial search warrants.

On April 14, 1976, the legislature approved House Bill 2729, resulting in the enactment of K.S.A. 20-301a. L. 1976, ch. 146, sec. 10. In this bill, the legislature defined "judges of the district court" to include district judges and district magistrate judges and granted them authority to exercise their powers from anywhere within their judicial districts.

Eight days later, on April 22, 1976, the legislature passed House Bill 3186, amending K.S.A. 22-2503 as follows:

> "Search warrants issued by ~~courts of limited jurisdiction~~ *a district magistrate judge* may be executed only within the territorial limits of the county in which ~~the court is located~~ *said judge resides*." L. 1976, ch. 163, sec. 3.

125

The legislature's 1976 amendment to K.S.A. 22-2503 was a response to its earlier approval of K.S.A. 20-301a, which created district magistrate judges as one of two classes of judges of the district court. The amendment to K.S.A. 22-2503 reflected this new classification by substituting "a district magistrate judge" in place of "courts of limited jurisdiction." Had the legislature intended K.S.A. 20-301a to limit a district judge's authority to issue extraterritorial search warrants, it would have included all classes of "judges of the district court" in its amendment of K.S.A. 22-2503 or repealed this section altogether. Instead, it chose to place the territorial limitation on the execution of search warrants issued by "a district magistrate judge" only.

Three years later, the legislature adopted House Bill 2046, which amended K.S.A. 22-2503 to clarify that search warrants issued by a district magistrate judge were executable within the "judicial district" rather than the "territorial limits of the county" in which the judge resides. L. 1979, ch. 96, sec. 1. Once again, such an amendment would have been wholly unnecessary had the legislature intended K.S.A. 20-301a to limit the authority of judges of the district courts to issue extraterritorial search warrants altogether.

Robinson's construction of K.S.A. 20-301a as a limitation on district judges' authority to issue extraterritorial warrants would render the legislature's 1976 adoption of House Bill 3186 and 1979 adoption of House Bill 2046 meaningless. In fact, it would render the entirety of K.S.A. 22-2503 altogether superfluous. See *State v. LaGrange*, 294 Kan. 623, Syl. ¶ 1, 279 P.3d 105 (2012) (courts shall "presume that the legislature does not intend to enact useless, superfluous, or meaningless legislation").

The defendant's construction of K.S.A. 20-301a also fails to give meaning to other provisions within Article 25 of the Kansas Code of Criminal Procedure. For example, the

126

statute authorizing installation or use of pen registers or trap and trace devices expressly limits a judge's ability to issue extraterritorial orders authorizing the use of such monitoring devices. K.S.A. 22-2527(1). The legislature enacted this statute in 1988, subsequent to the 1976 enactment of K.S.A. 20-301a. L. 1988, ch. 117, sec. 8. Likewise, the wiretap statute limits a judge's ability to issue extraterritorial orders authorizing electronic interception of communications. K.S.A. 22-2516(3). Once again, had the legislature intended K.S.A. 20-301a to serve as a general limitation on a district judge's jurisdiction to issue orders and warrants to be executed outside the judge's home district, then the express provisions doing so under the pen register and wiretap statutes would have been unnecessary.

When K.S.A. 22-2503 and 22-2505 are read together and considered against the history and developments subsequent to the 1970 codification, it is evident the legislature intended for district judges to retain their pre-code authority to issue search warrants executable statewide, while simultaneously revoking district magistrate judges' pre-codification authority to do so. See *State v. Van Hoet*, 277 Kan. 815, Syl. ¶ 2, 89 P.3d 606 (2004) ("Where the face of the statute leaves its construction uncertain, the court may look to the historical background of the enactment, the circumstances attending its passage, the purpose to be accomplished, and the effect the statute may have under the various constructions suggested.").

The Court of Appeals panel in *State v. Englund*, 50 Kan. App. 2d 123, 135, 329 P.3d 502 (2014), reached the same conclusion:

> "When we consider K.S.A. 22-2503 and K.S.A. 22-2505 together, two statutes enacted at the same time K.S.A. 62-1830 (Corrick 1964) was repealed, the legislature's intent is clear:  district magistrates may no longer issue search warrants outside their home judicial district, but district judges can."

127

See also *State v. Adams*, 2 Kan. App. 2d 135, 138, 576 P.2d 242 (unlike electronic eavesdropping statute, nothing in the search and seizure statutes limits power of district judges to issue warrants within territorial jurisdiction), *rev. denied* 225 Kan. 845 (1978).

The United States District Court for the District of Kansas also has embraced this construction of the search warrant statutes. See *United States v. Aikman*, No. 09-10097-01-JTM, 2010 WL 420063, at *6 (D. Kan. 2010) (unpublished opinion) (no territorial limit on search warrant issued by district judge under K.S.A. 22-2503); *Lord v. City of Leavenworth*, No. 08-2171-JWL, 2009 WL 129367, at *4 (D. Kan. 2009) (unpublished opinion) (in 42 U.S.C. § 1983 constitutional tort claim, finding that district judge properly issued extraterritorial warrant under K.S.A. 22-2503; limitation on territorial jurisdiction applies to district magistrate judges only).

This construction provides meaning to K.S.A. 22-2503 and 22-2505, as well as K.S.A. 20-301a. K.S.A. 20-301a requires judges of the district court to exercise their powers within the territorial boundaries of their judicial districts. Applied here, K.S.A. 20-301a required Judge McClain to issue the search warrant from a location within Johnson County. More generally, K.S.A. 20-301a continues to prevent judges of the district courts from trying cases or conducting judicial proceedings outside the boundaries of their judicial districts, absent proper assignment under K.S.A. 20-319.

Robinson argues K.S.A. 20-301a, as the more recent legislative act, controls over *Lamb* and K.S.A. 22-2503 and 22-2505. See *Farmers State Bank & Trust Co. of Hays v. City of Yates Center*, 229 Kan. 330, 338, 624 P.2d 971 (1981) ("Where there is a conflict between the provisions of two or more statutory sections, the latest legislative expression controls."). However, as discussed above, 1 week after the legislature approved the bill resulting in the enactment of K.S.A. 20-301a, it adopted amendments to K.S.A. 22-2503,

128

clarifying that only district magistrate judges are precluded from issuing extraterritorial warrants. Defendant's argument fails to account for this sensible pattern of legislative action.

Furthermore, as explained in *Englund*, "here we have a conflict between a general principle of law (K.S.A. 20-301a) and a more specific enactment dealing not with the overall jurisdiction of judges, but their specific jurisdiction in issuing search warrants (K.S.A. 22-2505). In this situation, the more specific statute controls." 50 Kan. App. 2d at 135. Also, because K.S.A. 22-2503 and 22-2505 were enacted together, address the same subject, and are contained in Article 25, Search and Seizure, of the Kansas Code of Criminal Procedure, they are in pari materia and must be construed together and brought into harmony. See *In re Tax Appeal of LaFarge Midwest*, 293 Kan. 1039, 1045, 271 P.3d 732 (2012) ("when construing statutes to determine legislative intent, appellate courts must consider various provisions of an act in pari materia with a view of reconciling and bringing the provisions into workable harmony if possible").

Robinson also points to the arrest warrant and subpoena statutes, which expressly grant district judges authority to issue extraterritorial warrants and orders, as support for his construction. See K.S.A. 22-2305(2); K.S.A. 22-3214. Defendant suggests this language would be unnecessary if district judges had authority to act beyond the territorial limits set out by K.S.A. 20-301a. However, Robinson's argument fails to account for the fact that the legislature enacted the arrest warrant and subpoena statutes in 1970, prior to the 1976 enactment of K.S.A. 20-301a. The argument also begs the question whether the legislature intended to grant district judges the same extraterritorial authority for *search* warrants when it repealed K.S.A. 62-1830 and enacted K.S.A. 22-2502, 22-2503, and 22-2505.

Robinson also cites *State v. Sodders*, 255 Kan. 79, 872 P.2d 736 (1994), as support for his construction. There, defendant argued city police officers exceeded their authority by executing a search warrant beyond their territorial boundaries defined in K.S.A. 22-2401a. The State argued K.S.A. 22-2505 gave law enforcement officers power to execute warrants outside their jurisdiction, creating an exception to a law enforcement officer's territorial limitation under K.S.A. 22-2401a. We held that K.S.A. 22-2505 was a general statute providing that search warrants shall be executed by law enforcement officers and had nothing to do with their territorial jurisdiction. 255 Kan. at 84. Based on this rationale, Robinson argues that the territorial limits on district judges in K.S.A. 22-301a, like the territorial limits on law enforcement officers in K.S.A. 22-2401a, prohibit extraterritorial search warrants, and just as K.S.A. 22-2505 has nothing to do with the territorial jurisdiction of officers, it likewise has nothing to do with the territorial jurisdiction of district judges.

However, *Sodders* examined the statutory scheme governing *law enforcement officers'* territorial jurisdiction, not judges of the district courts. Furthermore, contrary to Robinson's assertion, *Lamb* held that language substantially similar to K.S.A. 22-2505 was relevant to defining a judge's authority to issue extraterritorial warrants. 209 Kan. at 469. In fact, in his dissenting opinion in *Sodders*, Justice Lockett agreed with our construction of K.S.A. 22-2503 in dicta, acknowledging the territorial limitation on extraterritorial search warrants applied to district magistrate judges only. 255 Kan. at 87 (Lockett, J., dissenting). *Sodders* is inapposite.

We likewise agree with the construction adopted by the panel of the Court of Appeals in *Englund*, which is more consistent with the legislative background and history and better harmonizes the relevant statutory scheme.See *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010); *Van Hoet*, 277 Kan. 815, Syl. ¶ 2. Accordingly, we find no error in Judge Anderson's denial of defendant's motion to suppress on these grounds.

*Exercise of Law Enforcement Powers beyond Territorial Jurisdiction*

Robinson next argues law enforcement officers exercised police powers beyond their territorial jurisdiction, in violation of K.S.A. 22-2401a, and Judge Anderson erred in refusing to suppress evidence derived from such activity. In particular, defendant contends Lenexa and/or Overland Park police exceeded their territorial jurisdiction by: (1) conducting warrantless trash searches at his Olathe residence; (2) executing the warrant to search his Linn County property; and (3) executing warrants to search his Olathe residence and storage units.

As set forth in the previous section, we review Judge Anderson's factual findings for substantial competent evidence and his legal conclusions de novo.

1. *Did the trash searches violate K.S.A. 22-2401a?*

On numerous occasions, members of the Lenexa Police Department (LPD) traveled beyond the Lenexa city limits to conduct warrantless searches and seizures of trash left for collection outside Robinson's Olathe residence. Because LPD conducted this investigative work beyond its territorial jurisdiction, Robinson believes evidence derived from the trash pulls should have been suppressed.

K.S.A. 22-2401a provides, in relevant part:

"(2) Law enforcement officers employed by any city *may exercise their powers as law enforcement officers*:
(a) Anywhere within the city limits of the city employing them and outside of such city when on property owned or under the control of such city. "

The statute includes several exceptions, none of which are applicable to law enforcement's trash pulls. A "law enforcement officer" is "any person who by virtue of office or public employment is vested by law with a duty to maintain public order or to make arrests for violation of the laws of the state of Kansas or ordinances of any municipality . . . ." See K.S.A. 22-2202(13); K.S.A. 22-2401a(10)(a).

There is no dispute that LPD officers conducted trash searches beyond their territorial jurisdiction. The question is whether they were exercising their powers as law enforcement officers in doing so. Judge Anderson found LPD officers were not acting under the color of office and this activity fell beyond the scope of K.S.A. 22-2401a. We disagree.

LPD officers were not acting as private citizens when they conducted the trash pulls. They contacted the private trash hauler's security officer to obtain the company's cooperation and assistance. They commandeered the company's trash truck to collect defendant's trash and/or made arrangements for the private hauler to segregate defendant's trash and meet LPD officers at an agreed location to deliver it. The powers of a law enforcement officer include those "necessary to permit the city officer to meet his or her common-law duty to the public to preserve the peace." *State v. Vrabel*, 301 Kan. 797, 803-04, 347 P.3d 201 (2015). Here, LPD officers utilized their status as law enforcement officers to facilitate the cooperation and assistance of the private trash hauler, and they did so in furtherance of their duty to preserve the peace by building a case against Robinson—a person they believed was involved in multiple murders and posed a continuing threat to the community. *Cf. Vrabel*, 301 Kan. at 803-05 (officers' organized and planned controlled drug buy with confidential informant to build case against defendant in furtherance of duty to preserve the peace fell within scope of K.S.A. 22-2401a).

132

We understand that, in most instances, private citizens may freely search garbage left on or at the side of a public street. *California v. Greenwood*, 486 U.S. 35, 40, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988) ("It is common knowledge that plastic garbage bags left on or at the side of a public street are readily accessible to animals, children, scavengers, snoops, and other members of the public."). However, we doubt seriously they could wield sufficient influence to secure the cooperation and assistance of a private trash contractor in such endeavors for weeks on end. See *State v. Martin*, No. 102,639, 2010 WL 1253752, at *7 (Kan. App. 2010) (unpublished opinion) (private citizen's trash pulls carried out with prior knowledge and acquiescence of law enforcement to further investigative efforts could not be deemed private action); *Rodgers v. Waste Industries, Inc.*, No. 4:12-CV-294-FL, 2013 WL 4460265, at *5 (E.D.N.C. 2013) (where plaintiff alleged private trash hauler removed trash at behest of law enforcement, complaint sufficiently alleged action under color of law sufficient to state a claim under 42 U.S.C. § 1983), *aff'd* 553 Fed. Appx. 332 (4th Cir. 2014) (unpublished opinion).

Based on LPD officers' planning and coordination with the private trash contractor, along with their collaborative efforts to successfully complete these trash pulls over the course of several weeks, we conclude LPD officers were not acting exclusively as private citizens but, instead, exercised "powers as law enforcement officers" under these particular facts. See K.S.A. 22-2401a.

Acknowledging a violation of K.S.A. 22-2401a, the question turns to the appropriate remedy, if any. In *Sodders*, 255 Kan. at 84, despite the absence of any federal or state constitutional violation, the court affirmed the suppression of evidence where Overland Park police officers exceeded their territorial jurisdiction by executing a search warrant within the municipal boundaries of Lenexa.

However, the *Sodders* majority did not specifically analyze or address the remedies available under K.S.A. 22-2401a. More recently, in *Vrabel*, 301 Kan. at 808-14, we explored what, if any, remedy was available to defendant under K.S.A. 22-2401a. There, city law enforcement officers violated the statute by organizing and carrying out a controlled drug buy outside their municipal boundaries. Neither the exclusionary rule, applicable to unconstitutional searches or seizures, nor the statutory provision for suppressing illegally seized evidence, K.S.A. 22-3216, applied because officers did not conduct an illegal search or seizure. *Vrabel*, 301 Kan. at 810-11. Therefore we considered whether suppression was an individual remedy available under K.S.A. 22-2401a. 301 Kan. at 811-14. Distinguishing *Sodders* based on the absence of any search or seizure, we held that suppression is generally not required where city officers exercise police powers—"other than search and seizure"—outside their municipal jurisdiction. *Vrabel*, 301 Kan. at 813-14.

Unlike *Vrabel*, LPD officers' conduct did involve searches and seizures carried out in violation of K.S.A. 22-2401a. Yet defendant's challenge is based on a violation of state statute, not the Fourth Amendment to the United States Constitution or § 15 of the Kansas Constitution Bill of Rights. Thus, application of the exclusionary rule does not inevitably follow unless the legislature has enacted such a compulsory remedy. See *United States v. Green*, 178 F.3d 1099 (10th Cir. 1999) (search conducted in violation of K.S.A. 22-2401a did not warrant application of exclusionary rule); 2 LaFave, Israel, King & Kerr, Criminal Procedure § 3.1(e), pp. 30-32 (3d ed. 2007) (searches invalid on state law grounds do not invariably require suppression of evidence).

Kansas statute provides a vehicle for defendants to move for the suppression of evidence seized in violation of law. K.S.A. 22-3216(1) provides that a defendant "aggrieved by an unlawful search and seizure may move . . . to suppress as evidence anything so obtained." However, it does not compel the trial court to grant that remedy

for any search conducted in violation of state statute in particular. Compare K.S.A. 22-3216(1) with Tex. Crim. Proc. Code Ann. art. 38.23 (West 2005) ("No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.").

In the absence of the statutory equivalent to the federal exclusionary rule, we consider whether the legislature intended to create individual rights or remedies under K.S.A. 22-2401a. See 1 LaFave, Search & Seizure, A Treatise on the Fourth Amendment § 1.5(b), pp. 210-12 (5th ed. 2012) (where search challenged on state law grounds, courts examine underlying state statute and legislative intent to determine if suppression is an available remedy); 2 LaFave, Israel, King & Kerr, Criminal Procedure § 3.1(e), pp. 30-32 (exclusion may be an available remedy for search that violates state law where remedy is provided by statute or statute confers a substantial right, especially one related to Fourth Amendment protections).

We addressed this question in *Vrabel* and found the purpose of K.S.A. 2014 Supp. 22-2401a was to protect local autonomy, not to create individual rights.

> "[I]t is apparent that the statutory limitations on the jurisdiction of city officers was put in place to protect the local autonomy of neighboring cities and counties, rather than to create an individual right, assuring that a person could only be caught breaking the law by an officer of the jurisdiction within which the crime was being committed." 301 Kan. at 813.

Because the statute does not vest defendant with any substantive right, it logically follows that suppression of evidence is not an individual remedy available to defendant. Nor can Robinson reasonably claim he suffered injury to any substantial right based on the fact that LPD officers, rather than Olathe police, conducted the otherwise lawful trash pulls.

135

We hold that suppression of the evidence seized during LPD officers' trash pulls is not a remedy available to Robinson. See *Vrabel*, 301 Kan. at 813-14 (suppression of evidence not a remedy under K.S.A. 2014 Supp. 22-2401a, "especially . . . in circumstances . . . where the defendant has not been prejudiced in the least by" the exercise of law enforcement powers). In so holding, we do not suggest exclusion of evidence is never a remedy available for a search or seizure conducted in violation of state law. However, where a search is conducted in violation of state statute only and the statute violated does not vest defendant with an individual right, does not contemplate exclusion of evidence as a remedy, and the violation results in no cognizable injury to defendant's substantial rights, such a remedy is unavailable.

2. *Did the Linn County search violate K.S.A. 22-2401a?*

Under the same statutory authority, Robinson argues LPD officers exceeded their jurisdiction by executing the warrant to search Robinson's property in Linn County.

The relevant facts are not in dispute. The LPD was in charge of the investigation and secured a warrant from a Johnson County district judge to search Robinson's property in Linn County. Before obtaining the warrant, LPD discussed the search with the Linn County Sheriff's Department (LCSD). Before commencing the search, a LCSD deputy signed a document memorializing LCSD's request for assistance from LPD and other agencies in executing the warrant.

Kansas statute requires city police officers to exercise their police powers within the territorial boundaries of their employing municipality. K.S.A. 22-2401a(2)(a). However, this general rule is subject to an exception where law enforcement officers receive a request for assistance from another jurisdiction:

136

"(2) Law enforcement officers employed by any city may exercise their powers as law enforcement officers:

(a) Anywhere within the city limits of the city employing them . . .; and

(b) in any other place when a request for assistance has been made by law enforcement officers from that place . . . ." K.S.A. 22-2401a(2).

Robinson argues this exception does not apply because LCSD's request for assistance was not genuine, evidenced by the fact that LCSD did not draft the written request, did not secure the search warrant, had no prior involvement in the investigation, and did not play a lead role during the search. We disagree.

On its face, K.S.A. 22-2401a(2)(b) requires only that law enforcement officers from the host jurisdiction make a request for assistance. See *Zimmerman v. Board of Wabaunsee County Comm'rs*, 289 Kan. 926, Syl. ¶ 3, 218 P.3d 400 (2009) ("An appellate court merely interprets the language as it appears; it is not free to speculate and cannot read into the statute language not readily found there."). We have rejected the view that K.S.A. 22-2401a(2)(b) includes any genuineness requirement in *State v. Ross*, 247 Kan. 191, 194, 795 P.2d 937 (1990) (nothing in the statute suggests legislature intended to require a request arise from an actual need for assistance). Instead, we held that a request for assistance alone satisfies the technical requirements of the statutory exception, regardless of the surrounding facts and extraneous circumstances. 247 Kan. at 195 ("[i]t is not necessary to establish that the need existed . . . only that the request for assistance was made"). *Ross* confirms that the written request LCSD executed satisfied the requirements of K.S.A. 22-2401a and LPD had jurisdiction to execute the search warrant in Linn County.

Robinson cites *State v. Hennessee*, 232 Kan. 807, 658 P.2d 1034 (1983), *Sodders*, 255 Kan. 79, and *State v. Rowe*, 18 Kan. App. 2d 572, 856 P.2d 1340, *rev. denied* 253

137

Kan. 863 (1993), in support of his position. However, unlike the situation here, in those cases law enforcement from the foreign jurisdiction never received a request for assistance from the host jurisdiction. Moreover, nothing in *Hennessee*, *Sodders*, or *Rowe* suggests that there must be a genuine need for the requested assistance or that, if the request is reduced to writing, it must be drafted by the host jurisdiction. In contrast, *Ross* makes clear that the plain language of K.S.A. 22-2401a(2)(b) imposes no such requirements.

3. *Did Johnson County searches violate K.S.A. 22-2401a ?*

Finally, Robinson contends the LPD and Overland Park Police Department (OPPD) lacked territorial jurisdiction to execute the warrants to search Robinson's residence and storage unit located within the territorial boundaries of the city of Olathe.

However, in 1994, the legislature approved Senate Bill 742, which amended K.S.A. 22-2401a (Ensley 1988) to expand the territorial jurisdiction of law enforcement officers in Johnson County when executing arrest and search warrants. L. 1994, ch. 286, sec 1. As enacted, the expanded statute of jurisdiction provides:

> "(5) In addition to the areas where law enforcement officers may exercise their powers pursuant to subsection (2), *law enforcement officers of any jurisdiction within Johnson* or Sedgwick *county may exercise their powers as law enforcement officers in any area within the respective county when executing a valid arrest warrant or search warrant*, *to the extent necessary to execute such warrants*." (Emphasis added.) K.S.A. 22-2401a(5).

Robinson argues the phrase "to the extent necessary to execute such warrants" requires the State to prove Olathe police had a genuine need for LPD's and OPPD's involvement in the execution of these warrants. Absent proof that the Olathe Police

Department lacked the ability or capacity to execute the warrants independently, Robinson believes the statutory exception cannot apply.

Robinson's construction is inconsistent with the plain meaning of K.S.A. 22-2401a(5). The subsection begins with a legislative grant of jurisdiction to law enforcement officers in Johnson County, allowing them to execute warrants countywide. The legislature's use of the phrase "*when* executing a valid . . . search warrant" demonstrates this grant of jurisdiction is not subject to any condition precedent. The phrase "to the extent required to execute such warrants" modifies and limits the type of police powers officers may exercise "when" executing warrants outside their municipal boundaries, *i.e.*, those powers incidental to the execution of the warrants. K.S.A. 22-2401a(5). The phrase does not limit the officers' jurisdiction to execute the warrants in the first instance.

This plain meaning is consistent with the history and context that gave rise to the legislature's enactment of K.S.A. 22-2401a(5). In *Sodders*, the court held that OPPD officers lacked territorial jurisdiction to execute a search warrant within Lenexa city limits, and the mere presence of LPD officers, even at the request of OPPD, did not satisfy the request for assistance exception. 255 Kan. at 84. Only 10 days later, the legislature enacted Senate Bill 742, enacting K.S.A. 22-2401a(5). L. 1994, ch. 286, sec. 1. The amendment was a legislative response to *Sodders* designed "to allow law enforcement officers of any jurisdiction within Johnson County or Sedgwick County to exercise their powers as law enforcement officers in any area within the respective county when executing a search warrant." *Vrabel*, 301 Kan. at 807; see *State v. Mendez*, 275 Kan. 412, 419, 66 P.3d 811 (2003) (1994 legislative amendment "clearly authorize[s]" city police officers in Johnson County to execute search warrants countywide). Thus, even if interpretation of the statute's plain meaning were not possible

139

and we needed to turn to construction, Robinson's construction is inconsistent with this legislative purpose.

Based on the plain language of K.S.A. 22-2401a(5), consistent with the context and history giving rise to the 1994 amendment creating this subsection, LPD and OPPD officers had territorial jurisdiction to execute the search warrants in Olathe. We find no error in Judge Anderson's denial of defendant's motion to suppress on these grounds.

*Fourth Amendment Challenge to LPD Officers' Trash Pulls*

In addition to challenging LPD officers' trash searches under K.S.A. 22-2401a, Robinson believes this investigatory conduct violated his rights under the Fourth Amendment.

We apply a two-part analysis to Fourth Amendment challenges to law enforcement's trash pulls, considering: (1) whether trash was seized within the curtilage of defendant's home; and (2) whether defendant held a reasonable expectation of privacy in the trash. *State v. Fisher*, 283 Kan. 272, 282-83, 154 P.3d 455 (2007).

1. *Was the trash located within the curtilage of the residence?*

The Supreme Court considers the following four factors to determine whether a search was conducted within the curtilage of defendant's residence:

"the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *United States v. Dunn*, 480 U.S. 294, 301, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987).

140

As to the first factor, Robinson placed his trash container at curbside, near the end of his asphalt parking pad at the outer edge of his property. Robinson's challenge necessarily, but incorrectly, presumes the curtilage extended to the four corners of his entire property. Second, the trash container was located 10 to 12 feet beyond the exterior fence that encircled the perimeter of the mobile home. Third, the record confirms this area was utilized to discard trash, but there is scant evidence suggesting the area was put to other uses. Finally, Robinson took no affirmative steps to protect this area from observation by people passing by.

Based on the totality of these circumstances, LPD officers seized Robinson's trash beyond the curtilage of his residence. See *United States v. Long*, 176 F.3d 1304, 1308 (10th Cir. 1999) (trash bags placed on top of trailer parked inside property line, approximately 3 feet from alley and 7 feet from attached garage, but not shielded from public view, beyond curtilage); *United States v. Redding*, 540 F. Supp. 2d 1184, 1187 (D. Kan. 2008) (trash bags located at curbside of defendant's front yard outside front fence beyond curtilage); *State v. Alexander*, 26 Kan. App. 2d 192, 196-97, 981 P.2d 761 (trash inside dumpster at end of driveway near property line, with no fence or barrier around home, beyond curtilage), *rev. denied* 268 Kan. 848 (1999); *United States v. Martinez*, No. 99-2044, 1999 WL 910029, at *2 (10th Cir. 1999) (unpublished opinion) (trash located outside chain-link fence of trailer home beyond curtilage); *United States v. Cianciarulo*, No. 10-40041-01-SAC, 2010 WL 2653423, at *3 (D. Kan. 2010) (unpublished opinion) (trash placed at the end of the driveway as if awaiting regular pickup not within curtilage).

Defendant cites *Robinson v. Com.*, 45 Va. App. 592, 612 S.E.2d 751 (2005), for the proposition that a driveway lies within the curtilage because it is an area where people wash cars, unload groceries, etc. There, however, family members testified their

driveway was actually put to such uses. No similar testimony is included in our record. Also, the driveway in that Virginia case was expansive, splitting into two divergent paths that encircled an area of land in front of the home. The Virginia Court of Appeals found the portion of the driveway located next to landscaping adjacent to the home, where police observed evidence of the crime, was located within the curtilage of defendant's residence, not the entire driveway. 45 Va. App. at 606-07. In contrast, Robinson set trash out for collection at the farthest edge of his parking pad, located at his property line and exposed to other members of the public. Defendant's cited authority is distinguishable.

2. *Was there a reasonable expectation of privacy?*

"Even if the trash bags were in the curtilage, the defendant must show that he had a reasonable expectation of privacy in them." *Redding*, 540 F. Supp. 2d at 1187; see *Fisher*, 283 Kan. at 290-91.

Under nearly identical facts, Kansas courts have found no reasonable expectation of privacy in trash set out for collection at the edge of defendant's property in close proximity to the curb, even if located within the curtilage. *Long*, 176 F.3d at 1308-09 (once defendant put trash on the trailer adjacent to a public thoroughfare for collection, he defeated any reasonable expectation of privacy); *Redding*, 540 F. Supp. 2d at 1187 (defendant did not have reasonable expectation of privacy in trash placed on front curb, outside the front fence, for collection); *State v. Kimberlin*, 267 Kan. 659, 666, 984 P.2d 141 (1999) (placement of trash out for collection near road, even if located on property, defeated any reasonable expectation of privacy); *Alexander*, 26 Kan. App. 2d at 200 (no expectation of privacy in trash placed in dumpster 1 1/2 feet from street and clearly accessible to the public); *Cianciarulo*, 2010 WL 2653423, at *3 ("Society does not recognize a reasonable expectation of privacy in 'trash left for collection in an area accessible to the public.'"); *United States v. Hamilton*, No. 03-10114-01-WEB, 2003 WL

22462511, at *2 (D. Kan. 2003) (unpublished opinion) (no reasonable expectation of privacy in trash bags left out within a few feet of an alley on collection day); *Martinez*, 1999 WL 910029, at *2-3 (no reasonable expectation of privacy in trash placed outside fence near curb); *State v. Baskas*, No. 109,760, 2014 WL 3843088, at *7 (Kan. App. 2014) (unpublished opinion) (law enforcement could search trash bags set out at curbside for collection), *rev. denied* 302 Kan. ___ (July 21, 2015).

The fact Robinson resided within a private mobile home community does not alter our conclusion. Robinson's trash was exposed to fellow residents of the 500-unit mobile home community. The trash also was exposed to members of the public who were free to enter the community provided they did not solicit while there. See *Barekman v. State*, 200 P.3d 802, 805-06 (Wyo. 2009) (no reasonable expectation of privacy in curbside trash accessible to others, even though defendant resided in private mobile home park); *cf. United States v. Harris*, 6 Fed. Appx. 304, 307-08 (6th Cir. 2001) (unpublished opinion) (curbside trash not protected by Fourth Amendment simply because defendant lived in gated community).

*Showing of Necessity for Wiretap Orders*

In his final suppression challenge, Robinson argues that the application for wiretap failed to satisfy a statutory requirement to show a need for this extraordinary investigatory tool, a standard dubbed the "necessity requirement." See *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001).

1. *Legal Framework and Standard of Review*

The Kansas Wiretap Act provides:

143

"(1) Each application for an order authorizing the interception of a wire, oral or electronic communication shall be made in writing, upon oath or affirmation, to a judge of competent jurisdiction, and shall state the applicant's authority to make such application. Each application shall include the following information:

. . . .

"(c) *A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous*." (Emphasis added.) K.S.A. 22-2516(1)(c).

The federal act contains identical language. See 18 U.S.C. § 2518(1)(c) (2012). This is not surprising because the Kansas act largely mirrors the federal provisions, and therefore wiretap applications are subject to both the state and federal requirements. *State v. Bruce*, 295 Kan. 1036, 1040, 287 P.3d 919 (2012). Accordingly, federal decisions interpreting 18 U.S.C. § 2518 are persuasive. See *Fredricks v. Foltz*, 221 Kan. 28, 30, 557 P.2d 1252 (1976); *cf. Davis v. State*, 426 Md. 211, 223, 43 A.3d 1044 (2012).

The purpose of the necessity requirement is "to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime," *United States v. Kahn*, 415 U.S. 143, 153 n.12, 94 S. Ct. 977, 39 L. Ed. 2d 225 (1974), and to prevent law enforcement from employing wiretaps as "the initial step in criminal investigation." *United States v. Giordano*, 416 U.S. 505, 515, 94 S. Ct. 1820, 40 L. Ed. 2d 341 (1974).

The statute requires the applicant to provide "a full and complete statement of specific allegations indicating why normal investigative procedures failed or would fail in the particular case." *Blackmon*, 273 F.3d at 1207. General allegations and boilerplate language fail to satisfy the necessity requirement. 273 F.3d at 1210. However, courts "have adopted a 'common sense approach' in which the reviewing court uses a standard of reasonableness to evaluate the government's good faith effort to use alternative

144

investigative means or its failure to do so because of danger or low probability of success. [Citation omitted.]" 273 F.3d at 1207. As such, law enforcement officers are not required to exhaust every possible technique before resorting to a wiretap—they must instead demonstrate that wiretapping is not the first meaningful step in the investigation. *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1113 (9th Cir. 2005), *amended and reh. denied* 437 F.3d 854 (9th Cir. 2006).

To the extent Robinson's challenge requires us to construe state or federal versions of the necessity requirement, we apply ordinary rules of statutory interpretation and construction and de novo review. *Bruce*, 295 Kan. at 1038-39. To the extent the challenge requires the court to assess Judge Anderson's denial of Robinson's motion to suppress wiretap evidence, we apply the traditional standard applicable to such motions. 295 Kan. at 1039 (factual findings reviewed for substantial competent evidence, legal conclusions de novo).

2. *Did the application and affidavit satisfy the necessity requirement?*

In Section VIII of the wiretap application, prosecutor Morrison and Detective Brown (Applicants) set forth allegations to satisfy the necessity requirement. The application describes with particularity reasons why infiltration by undercover agents was unlikely to succeed and was too dangerous, given Robinson's desire to solicit women to serve as "slaves" in BDS&M relationships and his connection to the disappearance of other missing women. Applicants explained how the use of informants was likely to be unsuccessful because they knew of no informants, other than women who were already involved with Robinson and could not be trusted to maintain confidences. The applicants also explained that continued surveillance would confirm overt acts but was unlikely to yield physical evidence or disclose coconspirator involvement, Robinson's modus operandi, or the specific nature of Robinson's relationship with the women he recruited.

145

Applicants warned that further use of interviews and inquisitional subpoenas might alert Robinson to the investigation. Applicants believed more pen register data could document Robinson's contacts but would not reveal the content of his communications.

As for search warrants, applicants stated that they "would not provide sufficient evidence . . . to accomplish the goals of this investigation." Applicants defined those goals to include:

"a.    [G]athering sufficient evidence to successfully prosecute John E. Robinson and others yet unknown for the murder and kidnapping of Suzette Trouten.

"b.    Identify[ing] future kidnapping victims targeted by John Robinson and gather[ing] sufficient information to intervene and prevent harm to any future victims."

The application also incorporated by reference the averments set forth in Detective Brown's 31-page supporting affidavit. This affidavit set out findings uncovered through law enforcement's witness interviews, inquisitional subpoenas, extensive surveillance, trash pulls, analysis of pen register data, public record searches, consent searches, and other investigative practices.

In particular, Brown explained Robinson had been implicated in the disappearance of several women dating back to the mid-1980s; he enticed them into sexual relationships, often involving BDS&M, and lured them to Johnson County with offers of employment, travel, and financial gain; he had done the same with Suzette Trouten; and since her disappearance had targeted new women using a similar modus operandi. Brown explained that Robinson used his cell phone extensively and it was instrumental in his efforts to solicit and maintain relationships with these women—a conclusion supported by findings from LPD officers' extensive surveillance, use of inquisitional subpoenas, and analysis of pen register data. See *United States v. Nguyen*, 46 F.3d 781, 783 (8th Cir.

146

1995) (necessity requirement satisfied where affidavit showed targets of investigation were dangerous, difficult to infiltrate, and conducted most of their crimes over the telephone; and government had tried using pen registers, confidential informants, surveillance, and garbage searches before pursuing wiretap).

Robinson does not dispute that applicants satisfied the necessity requirement in discussing several traditional investigative techniques. However, he suggests the applicants' boilerplate statement that search warrants would not effectively advance the goals of the investigation was insufficient and invalidates the wiretap order. We disagree.

The majority of courts have not construed the necessity requirement in such a strict, technical fashion. The statute "does not impose upon the government an exhaustion requirement but rather requires the government to establish that it first made a 'reasonable good faith effort' to utilize other available normal and less intrusive investigative techniques before resorting to a wiretap. [Citation omitted.]" *United States v. Melendez-Santiago*, 447 F. Supp. 2d 144, 149 (D.P.R. 2006), *aff'd* 644 F.3d 54 (1st Cir. 2011). Wiretap applicants satisfy the necessity requirement by supplying a detailed overview of the investigation to date, concrete reasons why a wiretap was necessary, and explanations of how a range of traditional investigative techniques were proving, or were expected to prove, unlikely to succeed or too dangerous. *United States v. Yeje-Cabrera*, 430 F.3d 1, 9 (1st Cir. 2005); see *United States v. Maynard*, 615 F.3d 544, 550 (D.C. Cir. 2010) (law enforcement engaged in an adequate range of investigative endeavors; government not required to enumerate every technique or opportunity missed or overlooked), *aff'd in part sub nom. United States v. Jones*, 565 U.S. ___, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012); *United States v. Stewart*, 306 F.3d 295, 305 (6th Cir. 2002) ("In endeavoring to secure a wiretap warrant, the government need not prove the impossibility of other means of obtaining information."). Here, the application and affidavit did just that, establishing law enforcement's need for a wiretap and confirming that it was not an option of first resort.

Independently, the applicants' general statement regarding the ineffectiveness of search warrants in accomplishing the goals of the investigation was supported by particularized, case-specific information contained within the four corners of the application and affidavit. The affidavit detailed how traditional investigatory techniques had revealed that defendant's criminal scheme involved soliciting and maintaining relationships with women and that he was highly dependent on his cell phone to perpetuate this scheme. Law enforcement officers had already issued subpoenas to defendant's telephone carriers and analyzed pen register data tracking calls from his home and cellular phone, but they needed to ascertain the substance of Robinson's conversations with the women he targeted to advance the goals of the investigation. From these averments one can reasonably infer that resort to search warrants, like other alternative investigatory methods described in the application, would not have produced this evidence.

Viewed together, the averments set forth in the application and affidavit supported the boilerplate language regarding the ineffectiveness of search warrants, thereby satisfying the necessity requirement. See *United States v. Sobamowo*, 892 F.2d 90, 93 (D.C. Cir. 1989) (conclusory language cannot rationally be separated from preceding detailed descriptions of investigative events); *United States v. Carneiro*, 861 F.2d 1171, 1177 (9th Cir. 1988) ("While it is true that some of the statements in the affidavit are mere conclusions, the facts set forth in the affidavit meet the necessity requirement when examined as a whole and in a common-sense fashion."); *United States v. Brone*, 792 F.2d 1504, 1506 (9th Cir. 1986) ("the affidavit made somewhat conclusory assertions about the difficulties of prosecuting the case, but these assertions were in the context of an affidavit that was sufficiently specific in all other respects"); *United States v. Sims*, 508 Fed. Appx. 452, 457 (6th Cir. 2012) (unpublished opinion) (boilerplate language was not fatal to application where it also contained particular facts demonstrating wiretaps were

not being used routinely as the initial step in criminal investigation), *cert. denied* 133 S. Ct. 1847 (2013); *United States v. Flores-Velasquez*, Crim. No. 06-310(2) ADM/JJG, 2006 WL 3544927, at *3-4 (D. Minn. 2006) (unpublished opinion) (despite boilerplate language, application as a whole established need for wiretap).

Robinson relies on *United States v. Ramirez-Encarnacion*, 291 F.3d 1219 (10th Cir. 2002), in support of the proposition that boilerplate language describing the effectiveness of search warrants is legally insufficient. There, the Tenth Circuit took the position that the statute requires applicants to describe all traditional investigatory techniques, including use of search warrants, with particularity. 291 F.3d at 1222.

Robinson's reliance on *Ramirez-Encarnacion* is unpersuasive. The Tenth Circuit stands alone in requiring applicants to address all traditional investigatory techniques with particularity. *United States v. Mesa-Rincon*, 911 F.2d 1433, 1444 (10th Cir. 1990) (recognizing other circuits require only a discussion of techniques employed and explanation as to why a range of investigation methods would be ineffective or dangerous), *modified on other grounds by United States v. Castillo-Garcia,* 117 F.3d 1179 (10th Cir. 1997).

In addition, even under its more stringent framework, the Tenth Circuit reviews the totality of the information and considers whether boilerplate language is adequately supported within the four corners of the application. *Ramirez-Encarnacion*, 291 F.3d at 1222 (court must consider all facts and circumstances in assessing showing of necessity); *Castillo-Garcia*, 117 F.3d at 1188 (court will overlook failure to adequately explain one or more specified categories of normal investigative techniques where recitation of facts makes explanation unnecessary), *overruled on other grounds by Ramirez-Encarnacion* 291 F.3d at 1222 n.1.

Here, the general language describing the ineffectiveness of search warrants was adequately supported by the averments contained in the four corners of the application and supporting affidavit. *United States v. Segura*, 318 Fed. Appx. 706, 709-10 (10th Cir. 2009) (unpublished opinion) (necessity requirement met where boilerplate statement regarding effectiveness of search warrants supported by facts in affidavit). We find no error in Judge Anderson's ruling.

## 4. JURY SELECTION

Defendant raises eight different issues related to the jury selection process, including: (1) whether Judge Anderson improperly curtailed voir dire questioning; (2) whether he erroneously denied defense challenges for cause; (3) whether he made disparate rulings on similarly situated challenges for cause; (4) whether he improperly denied a motion to strike a small group voir dire panel exposed to Juror 173's inflammatory remarks; (5) whether he improperly retained five panelists in light of alleged juror-specific bias; (6) whether he erred by excusing Juror 253 based on her opposition to the death penalty; (7) whether jury selection was tainted by alleged prosecutorial misconduct; and (8) whether the anonymous jury selection procedure was unlawful. We address each challenge in turn.

*Scope of Voir Dire*

### 1. *Standard of Review and Legal Framework*

Robinson argues Judge Anderson improperly curtailed the scope of voir dire in four respects, each of which he characterizes as separate claims. First, he contends Judge Anderson violated Kansas law by prohibiting case-specific questions regarding panelists' ability to consider a life sentence. Second, he argues the same limitation violated his constitutional rights. Third, he believes this limitation impaired his ability to identify

150

mitigation-impaired jurors, violating state and federal law. Finally, he claims Judge Anderson improperly limited questioning on his prior terms of incarceration.

We apply the following standard of review to scope of voir dire challenges:

"Generally the nature and scope of the voir dire examination is entrusted to the sound discretion of the trial court. *Manning*, 270 Kan. at 691. However, "'[i]n determining whether the trial court has taken sufficient measures to assure that the accused is tried by an impartial jury free from outside influences, appellate tribunals have the duty to make an independent evaluation of the circumstances."' *State v. Aikins*, 261 Kan. 346, 366, 932 P.2d 408 (1997)." *State v. Hayden*, 281 Kan. 112, 128-29, 130 P.3d 24 (2006).

See *State v. Reyna*, 290 Kan. 666, 686, 234 P.3d 761(same), *cert. denied* 131 S. Ct. 532 (2010).

The trial court's discretion is not without constitutional limit. The Sixth Amendment to the United States Constitution guarantees the accused "[i]n all criminal prosecutions" the right to a trial by "an impartial jury." "Principles of Fifth Amendment due process also guarantee a defendant an impartial jury." *Ristaino v. Ross*, 424 U.S. 589, 595 n.6, 96 S. Ct. 1017, 47 L. Ed. 2d 258 (1976). The Supreme Court has acknowledged that an adequate voir dire is essential to the realization of these due process protections. *Morgan v. Illinois*, 504 U.S. 719, 729-30, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992) (noting that part of guarantee of defendant's right to impartial jury is an adequate voir dire; without it, the trial judge cannot fulfill his or her responsibility to remove those who cannot impartially follow instructions and evaluate the evidence).

We "will find an abuse of discretion if the court unconstitutionally restricted [a capital defendant's] questioning during voir dire." *United States v. McVeigh*, 153 F.3d

1166, 1205 (10th Cir. 1998), *disapproved on other grounds by Hooks v. Ward*, 184 F.3d 1206 (10th Cir. 1999).

2. *Did scope of voir dire rulings violate Kansas law?*

Robinson argues the trial court consistently denied counsel's efforts to utilize case-specific questioning to detect and disqualify panelists who would not realistically consider a life sentence in violation of K.S.A. 22-3408, 22-3410, 22-3412, and the holding in *State v. Kleypas*, 272 Kan. 894, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), *overruled on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). To frame the issue properly, it is important to understand Judge Anderson's rulings pertaining to the scope of voir dire and the events giving rise to them.

At the outset of the second phase of jury selection, small group voir dire, defense counsel injected case-specific facts into his line of questioning, specifically disclosing that Robinson had been charged with capital murder involving the killings of six women, including two 19 year olds, one of whom was in a wheelchair. The State objected, arguing defense counsel was improperly staking out jurors ("staking" jurors is the practice of asking case-specific questions designed to commit prospective jurors to a particular vote or to disclose how they would vote when faced with certain case-specific facts). Judge Anderson overruled the objection, explaining defense counsel was entitled to go into the factual basis of the charges to the extent it was consistent with the anticipated trial evidence or reported media facts. However, Judge Anderson cautioned defense counsel not to phrase such questions in a manner intended to elicit a commitment or promise from prospective jurors.

Defense counsel continued to disclose case-specific facts and incorporate them into questioning throughout the first 2 days of the second phase of jury selection, where the parties examined prospective jurors in panels of six on topics of pretrial publicity and the death penalty. During this time, defense counsel also began to incorporate case-specific facts into questions about how prospective jurors would decide the sentencing issue. For example, Robinson's counsel began to ask how much weight jurors would assign to a defendant's background and whether this type of mitigation evidence would be sufficient to warrant a life sentence.

Judge Anderson grew increasingly concerned that Robinson's line of questioning was staking out the jury—a concern compounded by the fact that jurors were answering these questions devoid of any knowledge of the law governing the sentencing decision. On the morning of September 20, 2002, after completing 2 full days of small group voir dire, Judge Anderson established new guidelines for handling case-specific questions. He made clear that defense counsel could continue to disclose potentially inflammatory case-specific facts, including information regarding the victims, to determine whether they rendered potential jurors biased. However, Judge Anderson believed the case-specific questioning should be compartmentalized, raising those facts during questions about bias rather than sentencing. Defense counsel objected, saying several veniremembers had expressed in questionnaire responses that a person who committed crimes involving certain case-specific facts deserved to die. Thus the defense believed that inflammatory case-specific facts were "inextricably intertwined" with the sentencing issue.

Judge Anderson clarified:

> "I want to make it very clear. I am not prohibiting the defense from going into the basic sketch of the factual allegations in the fashion that [defense counsel] gave the other day. *I am requiring that that not be rolled into and brought up in the midst of a comparison between the aggravating and mitigating circumstances*, because I do believe

153

that the fashion which it's been raised during the last session Wednesday is tantamount to testing the jury to determine whether the specific, albeit very brief, factual allegations of the State would be weighed by the jury against the very generic mitigating circumstance without the factual comparison which we can't do because we are essentially getting into taking a vote on death penalty issues when we start doing that which would produce a juror that essentially would vote favorably for the defense and we are staking out the jury when we get to that point.

"*I want you both to thoroughly explore the attitudes of the jury under* Witherspoon. *But I don't want to get into a determination during voir dire as to what this individual juror's position is on it and how they would vote on it and how much weight they would attach and whether that's over the threshold of overcoming the aggravating circumstance which is what I think you were getting into the other day.* That's why I'm requiring that that factual basis be brought up during the portion of the voir dire. They're entitled to know it and you said to almost all of them, 'Do you know what the factual allegations are?' The process that we went through the other day did produce numbers of jurors who said they just didn't think there was anything that was going to convince them not to vote for the death penalty because of the factual allegations of the case.

"The defendant's voir dire has been effective in determining those jurors who cannot do this process of giving meaningful consideration to mitigating circumstances, and I do not believe this is contrary to the Constitution or to the case law counsel is citing. I stand by my ruling in that regard." (Emphasis added.)

After the district judge ruled, defense counsel continued to inform prospective jurors of the alleged case-specific facts they believed to be most inflammatory or which had the greatest potential to create bias among members of the venire, including the fact that multiple people were murdered, along with the gender, age, and disability status of the victims. After disclosing the case-specific allegations, defense counsel consistently asked prospective jurors whether they could remain impartial.

In several instances, defense counsel asked these case-specific questions in the context of sentencing. For example, defense counsel asked Juror 283 whether she could

154

realistically consider a life sentence knowing the victims in this case were women, after her questionnaire responses expressed that people who prey on innocent women are sick and evil. Similarly, Juror 177 disclosed in questionnaire responses his belief that people who prey on weaker victims should be punished severely. Defense counsel explored the possibility that this view would control his sentencing decision given that all of Robinson's alleged victims were women, including one confined to a wheelchair. While exploring death penalty views with Juror 542, Robinson's counsel asked whether as a father of a young daughter, this juror could serve impartially, knowing Robinson was charged with killing young, teenage women. Defense counsel asked Juror 484 whether her work counseling sex abuse victims would prevent her from serving impartially, given the State's allegations of Robinson's violence against women and his participation in BDS&M activity. Defense counsel asked Juror 398 whether he could vote for a life sentence in a case involving a serial killer based on his questionnaire responses suggesting that life imprisonment would not be an appropriate punishment in that instance. Defense counsel employed similar lines of questioning with Jurors 463, 398, and 366.

Judge Anderson also allowed the defense to utilize case-specific questioning during the third phase of jury selection, general voir dire. During this phase, Robinson's counsel asked panel members whether certain case-specific facts, including violence against women, BDS&M activity, adultery, gruesome photographs, and other case-specific evidence anticipated at trial would render them incapable of serving as impartial jurors.

Robinson identifies only two instances relevant to this claim where the trial court enforced its ruling and limited the scope of inquiry. The first occurred during defense counsel's questioning of prospective Juror 205, and the second occurred during defense counsel's questioning of Juror 246. A review of the transcript confirms that in both

instances, defense counsel's questions invited these panelists to compare the various theories or categories of aggravation and mitigation that were likely to be at issue in the case and discuss how such evidence would affect their sentencing decision, *i.e.*, staked out the jury.

Short of such a line of inquiry, Judge Anderson did not substantially limit Robinson's case-specific inquiry during voir dire. He allowed the defense to inform prospective jurors of sensitive case-specific allegations during small group voir dire; explore potential juror bias related to such facts; examine whether case-specific facts prevented jurors from realistically considering a life sentence, particularly when questionnaire responses indicated potential case-specific bias; and discuss potential bias in response to case-specific evidence during general voir dire. Contrary to Robinson's assertion, Judge Anderson's rulings did not categorically prohibit case-specific questioning. Nor did they limit case-specific questioning in the context of sentencing. Instead, the rulings limited case-specific questioning only to the extent such questions called on prospective jurors to assign weight to case-specific facts under Kansas' weighing equation and to disclose their likely sentencing decision in light of such facts.

With a clearer understanding of Judge Anderson's rulings, we return to the analysis of Robinson's claim that they violated Kansas' voir dire statute, which provides:

> "The prosecuting attorney and the defendant or his attorney shall conduct the examination of prospective jurors. The court may conduct an additional examination. The court may limit the examination by the defendant, his attorney or the prosecuting attorney if the court believes such examination to be harassment, is causing unnecessary delay or serves no useful purpose." K.S.A. 22-3408(3).

By limiting case-specific questioning that required prospective jurors to assign weight to aggravating or mitigating circumstances and provisionally decide the sentence

in light of such facts, Judge Anderson's rulings can be construed reasonably from the record as an attempt to avoid "unnecessary delay" on a subject that served "no useful purpose," *i.e.*, staking out the jury. As such, the rulings reflect a permissible exercise of lawful discretion under Kansas' voir dire statute.

For the same reasons, Robinson's arguments under K.S.A. 22-3410 and K.S.A. 22-3412 are equally unavailing. K.S.A. 22-3410 entitles parties to "challenge any prospective juror for cause." K.S.A. 22-3412 provides that defendants "charged with an off-grid felony . . . shall be allowed 12 peremptory challenges." Robinson argues Judge Anderson's rulings "prevented counsel from eliciting biases that would give rise to challenges for cause" and "impaired the defense's use of peremptory challenges." This argument is founded on the assumption that Judge Anderson categorically denied Robinson opportunity to explore juror bias related to case-specific factual allegations. This clearly was not the case.

Robinson cites to several state court decisions from other jurisdictions that stand for the general proposition that jurors in capital proceedings who cannot consider both available sentencing options are not qualified to serve. Robinson also cites *State v. Jackson*, 107 Ohio St. 3d 53, 836 N.E.2d 1173 (2005), and *United States v. Flores*, 63 F.3d 1342 (5th Cir. 1995), for the corollary proposition that defendants should be informed of inflammatory case-specific facts (a 3-year-old victim and a victim who was a known drug dealer in those cases) in order to discern potential bias. In his Rule 6.09 letter, Robinson also cites to *State v. Clark*, 981 S.W.2d 143, 147 (Mo. 1998), for a similar proposition.

These holdings arose from a trial court's categorical refusal to allow defendants any opportunity to disclose or question jurors on case-specific facts during voir dire. As discussed above, Judge Anderson's rulings did not bar such inquiry. Defense counsel

157

freely informed prospective jurors of inflammatory case-specific facts and inquired whether such facts rendered them partial.

Finally, Robinson argues Judge Anderson's rulings violated the holding of *Kleypas*. There the capital defendant argued "the trial court erred in denying his request for a separate sentencing jury," resulting in prejudice "because the same jury that heard his guilt phase also heard the penalty phase argument." 272 Kan. at 994. More specifically, defendant argued that the failure to provide a separate sentencing jury placed him in the "untenable position of being unable to voir dire the jury as to its bias regarding certain aggravating circumstances, such as his prior record, for fear of prejudicing the jury in the guilt phase." 272 Kan. at 995. However, we rejected this argument because Kleypas failed to take advantage of provisions within the capital sentencing scheme allowing him to question jurors about his criminal record and remove those biased at the start of the penalty phase:

> "K.S.A. 21-4624(b) provides a method for the defendant in every capital-murder case to remove biased jurors during the penalty phase. The defendant is entitled to ask questions during voir dire before the sentencing phase of the trial begins. Here, Kleypas chose not to voir dire the jurors concerning the binding effect of his prior murder conviction or any of the aggravating circumstances. However, that procedure existed as a method of removing potentially biased jurors for cause." 272 Kan. at 995.

Robinson believes the above-cited language in *Kleypas* squarely authorizes case-specific questions regarding a panelist's willingness and ability to consider a life sentence. To the contrary, *Kleypas* did not address the permissible scope of voir dire in a capital proceeding. Even if it had, Judge Anderson's ruling did not preclude counsel from exploring whether case-specific facts rendered prospective jurors unqualified for service. And, like the defendant in *Kleypas*, Robinson did not request a separate opportunity to

158

voir dire the jury after conviction and before the start of the penalty phase. See 272 Kan. at 995. Judge Anderson's rulings are not inconsistent with our holding in *Kleypas*.

3. *Did scope of voir dire rulings violate constitutional rights?*

Robinson also argues Judge Anderson's voir dire rulings violated his federal constitutional rights under the Sixth, Eighth, and Fourteenth Amendments.

Any question concerning the constitutionally permissible scope of voir dire in capital proceedings necessarily begins with a discussion of *Morgan v. Illinois*, 504 U.S. 719, 729-30, 112 S. Ct. 2222, 119 L. Ed. 2d 492 (1992), where the Supreme Court recognized a capital defendant's constitutional right to a "life-qualified" jury and the concomitant right to remove for cause on the ground of bias any prospective juror who will automatically vote for the death penalty irrespective of the facts or the trial court's instructions of law. *Morgan* recognized that a capital defendant must be afforded a reasonable opportunity to voir dire prospective jurors to effectively remove those who are not "life-qualified." 504 U.S. at 733-34. *Morgan* ultimately held the petitioner "was entitled, upon his request, to inquiry discerning those jurors who, even prior to the State's case in chief, had predetermined the terminating issue of his trial, that being whether to impose the death penalty." 504 U.S. at 736.

Robinson claims Judge Anderson imposed a categorical prohibition on case-specific voir dire questioning in violation of his constitutional rights. The argument is legally and factually suspect. First, since *Morgan*, the majority of federal appellate courts have rejected the notion that the Constitution mandates case-specific questioning during voir dire in capital proceedings. Foremost among this authority is *McVeigh*, 153 F.3d 1166, the appeal of the defendant convicted of bombing the Murrah Federal Building in Oklahoma City, Oklahoma. There, defendant challenged the trial court's limitation on

case-specific questioning during voir dire. The Tenth Circuit first identified two categories of *Morgan*-related inquiries advanced by the defense: (1) "'general *Morgan* questions'" that inquired whether the juror would automatically impose the death penalty if a defendant were convicted of a capital offense; and (2) "'specific *Morgan* questions'" that inquired whether the facts of the bombing, as revealed through pretrial publicity, had predisposed prospective jurors toward automatically imposing the death penalty on anyone convicted. 153 F.3d at 1206. The Tenth Circuit found the trial court had not limited any of the properly phrased "general *Morgan* questions," but it had precluded "specific *Morgan* questions." 153 F.3d at 1207-08.

Even so, the Tenth Circuit found no abuse of discretion, reasoning that defendant's case-specific inquiry exceeded constitutional requirements under *Morgan*:

> "Essentially, the questions were designed to ascertain whether the jurors felt that the circumstances of the bombing were so aggravating that no mitigating factor could compensate. Thus, these were case-specific questions seeking to determine what prospective jurors thought of the death penalty in regards to this particular case, rather than the jurors' core value system regarding imposition of the death penalty. *Morgan*, however, is designed to illuminate a juror's basic beliefs 'regardless of the facts and circumstances of conviction,' *Morgan*, 504 U.S. at 735, 112 S. Ct. 2222, not to allow defendants to pre-determine jurors' views of the appropriate punishment for the particular crime charged. *Morgan* does not require that the questions at issue be asked." 153 F.3d at 1208.

The Tenth Circuit was satisfied that the district court's safeguards—including use of a jury questionnaire; appropriate instructions; and abstract life-qualifying questions— provided defendant adequate opportunity to identify juror bias. 153 F.3d at 1208-09.

The majority of federal circuits addressing the issue have adopted the same rationale. See *Oken v. Corcoran*, 220 F.3d 259, 266 (4th Cir. 2000) (state court's finding

that abstract voir dire questions addressing prospective jurors' ability to consider life sentence were constitutionally adequate and neither contrary to nor an unreasonable application of *Morgan*); *Trevino v. Johnson*, 168 F.3d 173, 183 (5th Cir. 1999) (state trial court's refusal to allow voir dire inquiry on "youth" as a mitigating factor did not give rise to a constitutional violation; *Morgan* only requires jurors be asked whether they would automatically impose the death penalty upon conviction); *McQueen v. Scroggy*, 99 F.3d 1302, 1330 (6th Cir. 1996) (abstract, life-and-death qualification questions were sufficient to satisfy constitutional rigor), *overruled on other grounds by In re Abdur'Rahman*, 392 F.3d 174 (6th Cir. 2004).

Several state courts have followed suit. See *Hagood v. Alabama*, 777 So. 2d 162, 177 (Ala. Crim. App. 1998) ("'"[T]he use of hypothetical questions is of doubtful propriety certainly where one aspect of the putative evidence is singled out to probe for a sympathetic commitment as much as to explore for an impartial mind." [Citation omitted.]. . . On voir dire, "[a] party may not . . . solicit a promise to return a particular verdict."' [Citations omitted.]"); *Lucas v. State*, 274 Ga. 640, 646, 555 S.E.2d 440 (2001) ("'improper to require the juror to enumerate hypothetical circumstances in which she might or might not vote to impose the death penalty'"); *State v. Ball*, 824 So. 2d 1089, 1110 (La. 2002) ("[V]oir dire does not encompass unlimited inquiry by defendant into all possible prejudices of prospective jurors, including their opinions on evidence, or its weight, hypothetical questions, or questions of law that call for any prejudgment of supposed facts in the case."); *State v. Stanko*, 376 S.C. 571, 576-77, 658 S.E.2d 94 (2008) (limiting case-specific voir dire not an abuse of discretion where questionnaire explored potential impartiality and trial court used abstract questions to life qualify jurors); *State v. Moeller*, 616 N.W.2d 424, 442 (S.D. 2000) ("It was proper for State to use the hypothetical concept of a mental defect or a 15-year-old person to explain the concept of a mitigating factor. However, it would have been improper for it to then ask the potential juror whether he would impose a life sentence or death based upon that hypothetical,

especially if those were truly the facts of the case. Such a question would be akin to 'staking out' the potential juror's responses, and that is not permitted."); *Schmitt v. Commonwealth*, 262 Va. 127, 141, 547 S.E.2d 186 (2001) (no abuse of discretion where trial court prevented defense from asking prospective jurors to speculate as to "whether they would automatically impose a death sentence for certain types of killings or under certain hypothetical circumstances").

Again, the very premise of Robinson's argument that Judge Anderson categorically prohibited case-specific questioning is unsupported by the record. As set forth above, Judge Anderson permitted defense counsel to disclose case-specific facts and to inquire whether those facts rendered prospective jurors unable to be impartial or prevented them from meaningfully considering mitigation evidence or a life sentence.

Even the minority of courts that have found case-specific questioning to be required under certain circumstances would not take issue with Judge Anderson's rulings. These courts have adopted a balancing approach, finding it improper to categorically deny case-specific questioning but also recognizing that such questioning is not without limits and cannot be used to stake out jurors. These courts have found constitutional requirements to be satisfied as long as prospective jurors are informed of potentially inflammatory case-specific facts and/or the defense is allowed to explore whether such facts render prospective jurors unable to be impartial. See *United States v. Wilson*, 493 F. Supp. 2d 402, 405 (E.D.N.Y. 2006); *United States v. Fell*, 372 F. Supp. 2d 766, 769-71 (D. Vt. 2005); *United States v. Johnson* , 366 F. Supp. 2d 822, 848-49 (N.D. Iowa 2005); *People v. Carasi*, 44 Cal. 4th 1263, 1285-87, 190 P.3d 616 (2008); *People v. Coffman and Marlow*, 34 Cal. 4th 1, 46-47, 17 Cal. Rptr. 3d 710, 96 P.3d 30, 82 Cal. Rptr. 3d 265 (2004); *Ellington v. State*, 292 Ga. 109, 127-28, 735 S.E.2d 736 (2012). Robinson was able to do just that notwithstanding Judge Anderson's rulings.

Robinson again cites *Jackson*, 107 Ohio St. 3d 53, where the Ohio Supreme Court held that the trial judge should have informed jurors the victim was a 3-year-old child, which would have elicited more informed responses to abstract questions regarding their impartiality. 107 Ohio St. 3d at 62-65. Judge Anderson not only allowed the defense to inform prospective jurors of case-specific facts, but also gave counsel leeway to explore panelists' impartiality and ability to consider both sentencing options notwithstanding these facts. *Jackson* does not alter our conclusion.

Robinson also relies on *Uttecth v. Brown*, 551 U.S. 1, 127 S. Ct. 2218, 167 L. Ed. 2d 1014 (2007). However, *Uttecth* considered whether a trial court properly excused a juror who expressed uncertainty as to his ability to impose a sentence of death. The proper scope of voir dire and the permissibility of case-specific questioning were not issues before the Supreme Court. *Uttecth* is inapposite.

Robinson had the opportunity to formulate his own questions regarding case-specific facts in the questionnaire. During small group voir dire, the defense disclosed sensitive case-specific allegations and probed jurors for potential bias, both in general and specific to sentencing, in response to such facts. Judge Anderson's rulings limited inquiry only when it required prospective jurors to prejudge the penalty issue based on a general description of case-specific facts. Defendant had ample opportunity to identify those unqualified to serve. See *People v. Sanders*, 11 Cal. 4th 475, 539, 46 Cal. Rptr. 2d 751, 905 P.2d 420 (1995) (no error in trial court's limiting hypothetical questions requiring jurors to provide advisory opinion based on preview of evidence). We find no constitutional violation in Judge Anderson's rulings.

4. *Did scope of voir dire rulings conceal mitigation impairment?*

Robinson believes Judge Anderson imposed a "blanket prohibition" on case-specific mitigation inquiry, preventing the defense from identifying panelists who were mitigation-impaired, in violation of the Eighth Amendment and Sections 1, 5, 9 and 10 of the Kansas Constitution Bill of Rights.

Robinson does not suggest the Kansas Constitution affords him protections beyond those provided under the United States Constitution, and we have so far held that these state constitutional provisions are generally subject to the same analysis as their federal counterparts. See *State v. Scott*, 265 Kan. 1, Syl. ¶ 1, 961 P.2d 667 (1998) (Eighth Amendment and Section 9 of the Kansas Constitution Bill of Rights are nearly identical and construed similarly); *State ex rel. Tomasic v. City of Kansas City*, 237 Kan. 572, 583, 701 P.2d 1314 (1985) (Section 1 of the Kansas Constitution Bill of Rights given same effect as the Equal Protection Clause of the Fourteenth Amendment); *State v. Next Door Cinema Corp.*, 225 Kan. 112, 115, 587 P.2d 326 (1978) (Fourteenth Amendment due process standard applies to state due process challenge under Section 10 of the Kansas Constitution Bill of Rights). As such, we find federal authority on the subject persuasive.

Robinson's claim is both legally and factually suspect. First, the majority of federal courts have rejected the view that defendants have a constitutional right to case-specific mitigation questioning during voir dire. *United States v. Tipton*, 90 F.3d 861, 879 (4th Cir. 1996) (no error in refusing to allow detailed questioning during voir dire concerning specific mitigating factors), *cert. denied* 520 U.S. 1253 (1997); *United States v. McCullah*, 76 F.3d 1087, 1113-14 (10th Cir. 1996) (*Morgan* requires questioning during voir dire regarding whether jurors would automatically impose the death penalty and does not require specific questioning regarding mitigating factors), *cert. denied* 520 U.S. 1213 (1997); *Wilson*, 493 F. Supp. 2d at 405 (allowing voir dire on specific types of mitigation

or aggravation evidence does "not serve the goal of uncovering impermissible bias, but only beg[s] follow-up questions that trend toward stake-out or pre-commitment questions").

Numerous state courts have adopted the same view. *People v. Jackson*, 182 Ill. 2d 30, 61-62, 695 N.E.2d 391 (1998) (trial court properly refused to ask case-specific questions regarding aggravating and mitigating circumstances; abstract questions regarding jurors' ability to consider both sentencing options satisfied constitutional scrutiny); *Evans v. State*, 333 Md. 660, 675-77, 637 A.2d 117 (1994) (refusal to allow case-specific questioning on aggravating circumstances consistent with *Morgan*); *Holland v. State*, 705 So. 2d 307, 338-39 (Miss. 1997) (jurors cannot be asked to give weight to aggravators during voir dire); *Witter v. State*, 112 Nev. 908, 915-16, 921 P.2d 886 (1996) (case-specific questions regarding statutory aggravator would have improperly staked out jurors and were not required under *Morgan* or *Witherspoon v. Illinois*, 391 U.S. 510, 519-23, 88 S. Ct. 1770, 20 L. Ed. 2d 776 [1968]), *cert. denied* 520 U.S. 1217 (1997), *abrogated on other grounds by Nunnery v. State*, 127 Nev. Adv. Op. 69, 263 P.3d 235 (2011); *State v. Fletcher*, 500 S.E.2d 668, 679 (N.C. 1998) (voir dire questions comparing aggravating and mitigating circumstances improper); *State v. Wilson*, 74 Ohio St. 3d 381, 386-87, 659 N.E.2d 292 (1996) (*Morgan* does not require voir dire on specific mitigating circumstances), *cert. denied* 519 U.S. 845 (1996); *Plantz v. State*, 1994 OK CR 33, 876 P.2d 268, 279 (Okla. Crim. App. 1994) (trial court properly limited the defense's voir dire on what jurors would consider as mitigation); *State v. Hill*, 331 S.C. 94, 103-04, 501 S.E.2d 122 (1998) (*Morgan* does not require voir dire on specific mitigating circumstances).

Second, Robinson's characterization of Judge Anderson's rulings as a blanket prohibition on case-specific mitigation questioning is unsupported factually. Robinson highlights Judge Anderson's rulings sustaining the State's objections to defense counsel's

165

questioning of Jurors 115 and 271. In both instances, the district judge prevented defense counsel from asking whether certain types of mitigation would outweigh aggravating circumstances and warrant a life sentence, *i.e.*, staking out the jurors. Judge Anderson clarified that it was appropriate to ask panelists whether they would meaningfully consider a defendant's background, for example, as mitigation, but when defense counsel also asked the prospective juror to compare it to aggravating circumstances and decide whether the mitigation evidence would warrant a life sentence, the inquiry improperly staked out the panelists.

These rulings are consistent with the majority of federal and state authority. They also survive scrutiny under the minority view that disclosure of and limited questioning on highly inflammatory case-specific facts may be necessary to identify mitigation-impaired jurors. See, *e.g.*, *Carasi*, 44 Cal. 4th at 1285-87 (Constitutional requirements satisfied where trial court discloses case-specific facts to jurors before asking if they would automatically vote for life or death.). Judge Anderson allowed the defense to ask panelists if they would consider certain categories of mitigation, and he also allowed the defense to disclose case-specific facts to panelists and inquire if they would still consider mitigation evidence in light of such facts.

Robinson relies on *United States v. Fell*, 372 F. Supp. 2d 766 (D. Vt. 2005), in support of his claim of constitutional error. However, *Fell* merely recognized that "rather than reject all case-specific questions, a trial court should allow such questions to be asked when they are reasonably directed toward discovering juror bias." 372 F. Supp. 2d at 771. Here, Judge Anderson did not reject all case-specific questions, and nothing in *Fell* suggests the balance Judge Anderson struck in his rulings violated Robinson's rights under state or federal law. See *State v. Kreutzer*, 928 S.W.2d 854, 864-65 (Mo. 1996) (court properly limited questioning on specific facts that sought a commitment from jurors).

In addition to challenging the rulings on prospective Jurors 115 and 271, Robinson claims the trial court improperly limited inquiry into the weight jurors would assign particular categories of mitigation. Judge Anderson allowed defense counsel to ask prospective jurors if they would meaningfully "consider" certain types of mitigation, but he did not allow them to ask how much weight they would assign to such evidence. Robinson believes such questioning was necessary because those who would assign little to no weight to specific types of mitigation were unqualified to serve.

The Eighth Amendment requires "the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). However, Robinson's argument is premised incorrectly on the assumption that jurors must be willing to assign some weight to all evidence offered in mitigation to satisfy the Eighth Amendment protections defined in *Lockett*. To the contrary, while *Lockett* proscribes conduct that cuts off the sentencer's consideration of mitigation evidence in an absolute manner, "[i]t does not prohibit a capital sentencing jury from assessing the weight of mitigating evidence 'and find[ing] it wanting as a matter of fact[.]'" *State v. Cheever*, 295 Kan. 229, 269, 284 P.3d 1007 (2012) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 113, 102 S. Ct. 869, 71 L. Ed. 2d 1 [1982]), *vacated and remanded on other grounds* 571 U.S. ___, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013). In other words, jurors may assign zero weight to a particular piece of evidence without making an error of law. We see no error in the district judge's limitation on such questioning.

167

5. *Was voir dire on prior incarcerations limited improperly?*

Finally, Robinson contends the trial court erred by prohibiting voir dire on his prior terms of incarceration and violating his right to trial by a fair and impartial jury under the Sixth and Fourteenth Amendments; Sections 5, 7, and 10 of the Kansas Constitution Bill of Rights; and K.S.A. 22-3408 and K.S.A. 22-3410.

To frame the issue properly, it is important to understand the procedural history giving rise to the challenge. On May 31, 2002, the State filed a motion to determine the admissibility of other crimes or civil wrongs evidence pursuant to K.S.A. 60-455. As part of this effort, the State did not seek to introduce or admit any evidence that would have disclosed the fact of Robinson's prior convictions or terms of incarceration. The trial court granted the State's motion at an August 2002 hearing.

After Judge Anderson announced his ruling on the motion, the State mentioned it was developing a strategy for introducing evidence of Robinson's relationship with Beverly Bonner "without alerting the jury" that defendant met the victim, a prison librarian, while incarcerated. Judge Anderson told the State to "[w]ork at it real hard, be creative. There's ways around these problems. If you adequately address the issue with your witnesses, you can avoid those." These comments reflected Judge Anderson's position to exclude any evidence of Robinson's prior incarcerations. Robinson's counsel made no comment and never expressed a desire to inject this issue into the guilt phase.

The parties proceeded to jury selection and completed the first (hardship inquiry) and second (small group voir dire) phases without making any reference to Robinson's prior convictions or terms of incarceration. On October 2, 2002, the district judge began the third phase of jury selection by dividing the 83 remaining veniremembers into two separate panels for general voir dire. During general voir dire of the first panel, defense

168

counsel disclosed that Robinson had previously been incarcerated. The State objected, believing the defense was trying to poison the panel. Defense counsel argued that the line was needed because it was possible such evidence could inadvertently spill over into trial. The defense did not express any design or plan to introduce the subject deliberately during the guilt phase. Judge Anderson expressed his displeasure with the surprise maneuver, noting he had made it clear that this information was not going to be disclosed to jurors. The district judge provided a curative instruction to the panel members and made inquiry to confirm their impartiality. Consistent with Judge Anderson's direction, defense counsel did not raise the subject during general voir dire of the second panel.

During trial, Judge Anderson took steps to ensure that evidence of Robinson's prior convictions or terms of incarceration was not admitted. For example, before direct examination of Robinson's parole officer, Steve Haymes, the district judge confirmed with prosecutors that they would not elicit testimony regarding Haymes' job title, the nature of his relationship with Robinson, or his knowledge of Robinson's past convictions. Consistent with Judge Anderson's position, Haymes testified only to Robinson's admissions regarding his involvement with Lisa Stasi.

On October 23, 2002, 13 days into trial, the State called Beverly Bonner's former husband, Dr. William Bonner. Though William Bonner worked as the prison doctor at the Western Missouri Correctional Center in Cameron, Missouri, and treated Robinson as a patient while Robinson was incarcerated at this facility, the State did not elicit this testimony. Before cross-examination, the defense informed Judge Anderson that counsel intended to elicit this testimony from the witness. Robinson's counsel said that it was quite probable the case would proceed to a penalty phase, during which the defense would introduce evidence of Robinson's prior incarcerations to prove defendant was not prone to violence in a prison setting. Defense counsel believed the failure to disclose this

169

information during the guilt phase would undermine the credibility of this evidence during the penalty phase:

> "We want to get that evidence that he's been in the penitentiary in front of the jury at the very first opportunity, otherwise it looks to the jury—otherwise, we've been hiding that from them. And to have any credibility in the second part of the trial, we're going to introduce this kind of testimony. I don't want jurors sitting up there thinking why didn't you tell us that before [Defense Counsel] went through the whole trial with regard to Dr. Bonner working in Cameron. He sees John Robinson—nothing, says nothing about Robinson being an inmate.
>
> "Now, it's coming in in the penalty phase of the trial. That hurts the credibility of the defense attorneys who have had the responsibility of trying to convince this jury to spare Mr. Robinson's life. So that's the reasoning behind my intention to elicit this testimony."

Judge Anderson confirmed that the defense was making a tactical decision in anticipation of a conviction and subsequent penalty phase proceeding. The defense conceded that the testimony regarding Robinson's prior incarceration would have no effect on the juror's decision on guilt or innocence and again maintained that the failure to disclose it at this juncture could undermine their credibility during the penalty phase. Judge Anderson granted the request, and the defense elicited testimony from Dr. Bonner that Robinson served time at the Missouri prison for a nonperson felony conviction.

Now Robinson argues that Judge Anderson deprived him of the right to a fair and impartial jury by limiting voir dire on the topic of his prior incarcerations. Robinson cites no authority directly supporting his claim of a legal right to question veniremembers on his criminal history or prior terms of incarceration, let alone in a situation where the trial court had made clear that such evidence would not be allowed during the guilt phase. The few courts that have addressed similar challenges have rejected the notion that due process compels the court to permit voir dire on the subject. *Richmond v. Polk*, 375 F.3d

170

309, 329-31 (4th Cir. 2004) (*Morgan*, 504 U.S. at 729-30, does not require trial court to allow defendant an opportunity to ask prospective jurors if they would still consider mitigating factors and impose a life sentence once informed of his prior conviction for first-degree murder.); *Witter*, 112 Nev. at 915 (trial court properly denied defendant's request to voir dire jurors regarding prior conviction involving use or threat of violence, a statutory aggravator; such questioning improperly inquired into the verdict a juror would return), *abrogated on other grounds by Nunnery v. State*, 127 Nev. Adv. Op. 69.

Aside from other jurisdictions' treatment of this issue, we also note that Robinson invited the alleged error. "'A party may not invite error and then complain of that error on appeal.'" *Thoroughbred Assocs. v. Kansas City Royalty Co.*, 297 Kan. 1193, 1204, 308 P.3d 1238 (2013) (quoting *Butler County R.W.D. No. 8 v. Yates*, 275 Kan. 291, 296, 64 P.3d 357 [2003]). Well before jury selection commenced, the district judge had made clear that he would not allow jurors to be exposed to any evidence disclosing Robinson's prior terms of incarceration. The State acknowledged the district judge's position and took affirmative steps to comply with it. Robinson never objected to the district judge's position. Defense counsel disclosed the fact of Robinson's prior incarceration to the first panel during general voir dire, but he did so out of concern that these facts might bleed into the proceedings inadvertently—not because the defense had a calculated strategy to introduce the subject during the guilt phase. Judge Anderson's curative instruction and follow-up inquiry confirmed this panel nevertheless remained impartial. See *State v. Dixon*, 289 Kan. 46, 53, 209 P.3d 675 (2009) (court's independent inquiry of jurors confirming impartiality cured potential due process concerns after juror observed defendant in leg shackles). The district judge's limitation on the scope of voir dire became an issue only after the defense changed course midstream and made a tactical decision on the thirteenth day of trial to inject the fact of Robinson's previous incarcerations into the proceedings. By that point, the defense had recognized the likelihood of conviction and was positioning Robinson for the penalty phase. Before that moment, any error qualified

as invited. See *Powell v. Commonwealth*, 267 Va. 107, 144, 590 S.E.2d 537 (2004) (trial court did not err in refusing to allow defendant to voir dire jurors on subject of his prior conviction; jurors exposed to this information were not subject to automatic exclusion where defense counsel disclosed prior conviction; challenge barred by invited error doctrine).

The fact that we apply a heightened reliability standard in death penalty appeals does not necessarily bar application of this doctrine. See, *e.g.*, *Nichols v. Heidle*, 725 F.3d 516, 556 n.34 (6th Cir. 2013) (invited error applied to capital defendant's issue); *United States v. Chandler*, 996 F.2d 1073, 1084 (11th Cir. 1993) (applying invited error to capital defendant's claim); *Rogers v. State*, 630 So. 2d 78, 84 (Ala. Crim. App. 1991) ("The invited error rule has been applied equally in capital cases and noncapital cases."), *rev'd on other grounds* 630 So. 2d 88 (Ala. 1992); *People v. Cummings*, 4 Cal. 4th 1233, 1326, 18 Cal. Rptr. 2d 796, 850 P.2d 1 (1993) (applying invited error), *cert. denied* 511 U.S. 1046 (1994); *Rogers v. State*, 282 Ga. 659, 662, 653 S.E.2d 31 (2007) (same); *State v. McPhail*, 329 N.C. 636, 643-44, 406 S.E.2d 591 (1991) (applying invited error to alleged instructional error); *State v. Campbell*, 90 Ohio St. 3d 320, 324-26, 738 N.E.2d 1178 (2000) (applying doctrines of invited error, waiver, and harmless error to capital sentencing issues); *Tucker v. State*, 771 S.W.2d 523, 534 (Tex. Crim. App. 1988) (applying invited error), *cert. denied* 492 U.S. 912 (1989).

We also regard it as significant that Robinson made no effort to voir dire the jurors on this subject prior to the start of the penalty phase, further undermining his appellate challenge. See *State v. Kleypas*, 272 Kan. 894, 995, 40 P.3d 139 (2001) (suggesting defendant's failure to voir dire jury prior to penalty phase undermined claim that prior murder conviction could have biasing effect on jurors), *cert. denied* 537 U.S. 834 (2002), *overruled on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006).

While we find no error, it is also worth noting that defense counsel admitted during trial that evidence of Robinson's prior convictions would have no adverse influence on the jurors' verdict on guilt, which demonstrates the harmlessness of the asserted error. Based on the foregoing, Judge Anderson's ruling was a proper exercise of lawful discretion.

*Denial of Defense Challenges for Cause*

Robinson next claims the district judge erred by failing to excuse veniremembers who were leaning toward death, unable to presume a life sentence, and biased by exposure to pretrial publicity.

1. *Legal Framework and Standard of Review*

K.S.A. 22-3410(2)(i) provides that a prospective juror may be removed for cause where "[h]is [or her] state of mind with reference to the case or any of the parties is such that the court determines there is doubt that he [or she] can act impartially and without prejudice to the substantial rights of any party."

"The trial judge is in a better position than an appellate court to view the demeanor of prospective jurors as they are questioned." *State v. Manning*, 270 Kan. 674, 691, 19 P.3d 84 (2001), *disapproved on other grounds by State v. King*, 288 Kan. 333, 204 P.3d 585 (2009). "Challenges for cause, therefore, are reviewed on appeal under an abuse of discretion standard of review." *Manning*, 270 Kan. at 691. A trial court abuses its discretion where:  "(1) no reasonable person would take the view adopted by the judge; (2) a ruling is based on an error of law; or (3) substantial competent evidence does not support a finding of fact on which the exercise of discretion is based." *State v. Bowen*, 299 Kan. 339, 348, 323 P.3d 853 (2014).

Additionally, in capital cases, the Supreme Court's decision in *Wainwright v. Witt*, 469 U.S. 412, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985),

> "clarified the standard for determining when a prospective juror may be excluded for cause because of his or her views on the death penalty. The Court stated that a prospective juror may be excluded for cause because of his or her views on capital punishment where 'the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."'" *Kleypas*, 272 Kan. at 991 (quoting *Witt*, 469 U.S. at 424).

The same standard applies whether the challenge was directed at death-leaning or life-leaning jurors. *State v. Carr*, 300 Kan. 1, Syl. ¶ 20, 331 P.3d 544 (2014), *cert. granted in part* 135 S. Ct. 1698 (2015).

Under this standard, a juror's bias need not be proved with "'"unmistakable clarity."'" *Kleypas*, 272 Kan. at 991 (quoting *Witt*, 469 U.S. at 424). Given the deference owed to the trial court, the controlling question on appeal is not whether we agree with the district judge's ruling on the challenge for cause but, instead, whether it is fairly supported by the record. *Carr*, 300 Kan. at 114.

2. *Did the trial court retain jurors who would impose a death sentence automatically upon conviction?*

Robinson claims Judge Anderson erred in denying his challenge to Jurors 33, 39, 63, and 271 because they would vote automatically for death upon conviction.

174

a. *Juror 33*

Robinson argues Juror 33 testified that he would sentence a defendant to death if convicted of capital murder. However, this testimony was offered in response to a far more specific question that assumed the fact of a capital murder conviction, plus evidence of the multiple murder aggravating circumstance and no suggestion of any mitigating circumstances. Viewed in context, the response reflected an acceptable assessment of the evidence under Kansas' statutory weighing equation in K.S.A. 21-4624(e).

Moreover, during the State's questioning, prospective Juror 33 shared his belief that capital punishment was not appropriate in all cases and confirmed that he would consider both aggravating and mitigating circumstances in arriving at a sentencing decision. Juror 33 confirmed he would consider any mitigation offered by the defense and assign it the weight he felt it deserved.

In denying Robinson's motion to strike, Judge Anderson emphasized that he was "considering the totality of the response" and, in doing so, it was clear Juror 33 was qualified and lacked substantial impairment. Judge Anderson further observed that Juror 33 "adequately clarified" to his satisfaction "any individual remark within the totality of the voir dire" that might "seem to indicate otherwise."

Based on the foregoing, Judge Anderson's ruling is fairly supported by the record. See *Carr*, 300 Kan. at 121 (no error in denying challenge of allegedly mitigation-impaired jurors; "selected passages from the questionnaire and voir dire responses of these [challenged] prospective jurors yield cause for concern," but they "eventually professed understanding of and fidelity to the law").

b. *Juror 39*

Robinson challenges Judge Anderson's ruling on Juror 39 based largely on questionnaire responses where she expressed a personal belief that death would be the appropriate punishment for a person convicted of capital murder.

However, after defense counsel provided a more detailed explanation of the penalty phase process and the jury's duty to weigh aggravating and mitigating circumstances, Juror 39 confirmed she would consider defendant's mitigating circumstances, including his character and background, in arriving at a sentencing decision. Juror 39 admitted that some of those circumstances might not outweigh the aggravators in all instances, but she would consider them, assign them the weight she felt they deserved, and balance them against any aggravators.

Robinson believes this testimony should be disregarded because prospective Juror 39 did not say she would assign some weight to all mitigation evidence. Robinson's argument is premised incorrectly on the assumption that jurors must assign some weight to all evidence offered in mitigation. See *Cheever*, 295 Kan. at 268-70 (juror free to assign any weight to mitigation evidence or find it wanting altogether); see *Eddings v. Oklahoma*, 455 U.S. 104, 114-15, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) ("The sentencer . . . may determine the weight to be given relevant mitigating evidence.").

Judge Anderson acknowledged Juror 39's support of the death penalty in questionnaire responses but explained he would not "consider the questionnaire to be a Malaysian tiger trap" and that veniremembers were not "experts in this arena, and they need[ed] to know a little bit about the situation before their answers can truly reflect what they're capable of doing as jurors." In light of the totality of the responses, Judge

176

Anderson decided Juror 39 satisfied the test as set forth in *Kleypas*. The ruling is fairly supported by the record and consistent with the *Witt-Witherspoon* framework.

### c. *Juror 63*

Robinson argues the district judge erroneously denied his challenge of Juror 63, who he believed would be a certain vote for a sentence of death upon conviction.

Defense counsel asked Juror 63 if he would consider "background" in mitigation of punishment. He said he would "definitely" consider the mitigation evidence but thought it would not outweigh aggravating circumstances under the facts assumed in the hypothetical question, which presumed a conviction for capital murder, the existence of an aggravating circumstance, and a vague reference to "background" as mitigation. Viewed in context, Juror 63's response reflects an acceptable consideration of the evidence under Kansas' statutory weighing equation rather than a propensity to vote for death. See K.S.A. 21-4624(e); *United States v. Hall*, 152 F.3d 381, 410 (5th Cir. 1998) (juror's comments about leaning toward death penalty even when presented with hypothetical evidence in mitigation did not demonstrate substantial impairment; comments merely reflected her assignment of little weight to such mitigation). Moreover, in follow-up questioning from the State, Juror 63 confirmed that, notwithstanding his personal views, he would consider aggravating and mitigating circumstances in arriving at a sentencing decision.

Judge Anderson decided Juror 63's opinions on the death penalty were not firmly held and the totality of his responses showed he was not substantially impaired. The trial court's ruling is fairly supported by the record.

d. *Juror 271*

Robinson argues Judge Anderson erroneously denied his motion to strike Juror 271 because the juror could not envision any mitigating circumstances justifying a life sentence.

The defense presented Juror 271 a hypothetical presuming the jury had convicted a defendant of capital murder and was considering aggravating and mitigating circumstances. Based on the hypothetical, Juror 271was asked if he could realistically consider a life sentence. He said, "Depends on the mitigating circumstances." The defense then asked if he would be leaning toward death after conviction. Juror 271 said, "That's a hypothetical I don't know. I don't lean—the statement about capital punishment, life in prison pretty much speaks for itself. If I felt there were no mitigating circumstances that outweighed the aggravating circumstances, I would vote for the capital punishment, for death." The defense then asked him to identify mitigation evidence that would assure a life sentence. Juror 271 was unable to do so at the time.

Judge Anderson recognized that Juror 271's response was susceptible to two possible interpretations:  (1) The prospective juror believed no mitigating circumstances could ever outweigh aggravating circumstances; or (2) the prospective juror would meaningfully consider mitigating circumstances but struggled under the pressure of the situation to identify specific examples that would guarantee a life sentence under the hypothetical. Judge Anderson noted that he had dismissed jurors who provided similar responses after construing their testimony in the former category. However, based largely on Juror 271's demeanor and his collective responses during voir dire, Judge Anderson construed his testimony as falling in the latter category.

178

Robinson argues the ruling violates *Kleypas*, 272 Kan. 894. There the trial judge struck a prospective juror who admitted that she was substantially impaired because she could not vote for the death penalty, except under exceptional circumstances that she was unable to identify. We affirmed the trial court's ruling, reasoning that the juror's ability to follow instructions on the law was dependent on whether the case satisfied one of her "'very few exceptions,' a standard she was unable to articulate." 272 Kan. at 992.

The logic of *Kleypas* does suggest that jurors who would consider evidence in mitigation only in the rarest and most exceptional circumstances are substantially impaired. However, Judge Anderson did not construe Juror 271's testimony in this fashion. Instead, relying largely on Juror 271's demeanor, the district judge found the juror would consider all mitigation evidence but struggled under the pressure of the situation to identify specific examples that would guarantee a life sentence under the hypothetical. From a cold reading of the record, one might construe Juror 271's testimony differently. However, Judge Anderson was in the best position to interpret Juror 271's responses, and his interpretation is fairly supported by the record and entitled to deference. See *Carr*, 300 Kan. at 75 (reviewing courts properly resistant to second-guessing impartiality where trial judge's appraisal influenced by demeanor and other factors not apparent from the transcript); *Skilling v. United States*, 561 U.S. 358, 386-87, 130 S. Ct. 2896, 177 L. Ed. 2d 619 (2010) (same). *Kleypas* is distinguishable, and we hold there was no error in this instance.

2. *Did the trial court retain jurors who were unable to presume a life sentence?*

In a similar vein, Defendant next challenges Judge Anderson's refusal to strike jurors who allegedly leaned toward a death sentence upon conviction.

Robinson argues the Kansas Death Penalty Act, including K.S.A. 21-4624(e), creates a presumption for life, see *Kansas v. Marsh*, 548 U.S. 163, 178-79, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006) ("the Kansas capital sentencing system is dominated by the presumption that life imprisonment is the appropriate sentence for a capital conviction"), and therefore, those veniremembers who would not presume a life sentence upon conviction for capital murder were not qualified to serve.

Since *Marsh*, we have clarified that Kansas' statutory scheme does not include a true evidentiary presumption in favor of a life sentence, but instead places the burden on the State at every turn in its attempt to secure a sentence of death. *State v. Scott*, 286 Kan. 54, 99, 183 P.3d 801 (2008). Thus the relevant inquiry is whether these challenged jurors expressed a willingness and ability to hold the State to its burden of proof.

At the same time, the court remains mindful that "'[j]urors are not expected to know the law prior to being properly instructed.'" *Hall*, 152 F.3d at 410 (quoting *Chandler*, 996 F.2d at 1103). And, a juror's response to a single inquiry, "[l]ike a single stroke on a canvas, or one mosaic tile on a wall," is a "small part of a larger picture." *Bowling v. Haeberlin*, No. Civ. 03-28-ART, 2012 WL 4498647, at *27 (E.D. Ky. 2012), *reconsidered in part on other grounds* No. Civ. 03-28-ART, 2013 WL 1182515 (E.D. Ky. 2013). It is the larger picture that determines a capital juror's qualification, and, on review, the question is not whether we agree with the trial court's ruling, but instead whether it is fairly supported by the totality of the prospective juror's responses. *Carr*, 300 Kan. at 114.

a. *Juror 14*

Robinson argues Judge Anderson erred by denying his challenge of Juror 14 because this panelist said a person convicted of capital murder forfeits his or her rights

180

and that a life sentence is never justified because the victim was not shown the same mercy.

These comments were personal views expressed in Juror 14's questionnaire responses, completed weeks before the veniremember was informed of the mechanics of Kansas' capital sentencing scheme and long before the trial court instructed the jury. See *Lockhart v. McCree*, 476 U.S. 162, 176, 106 S. Ct. 1758, 90 L. Ed. 2d 137 (1986) (those with deeply held death penalty beliefs may serve as capital jurors if "they are willing to temporarily set aside their own beliefs in deference to the rule of law").

During defense counsel's voir dire, Juror 14 was asked if he could realistically consider a life sentence following a capital murder conviction. Juror 14 responded:

> "I think I could. I think I'd be open to whatever facts were presented and base my final conclusion on that. I don't think I have anything—any preconceived conclusion of what the penalty should be or what the verdict should be or anything like that. So I do believe I can do that."

Defense counsel told Juror 14 that his questionnaire responses suggested he would automatically vote for the death penalty upon conviction, but Juror 14 disagreed, "I don't . . . think I'm 100 percent settled on punishment. I do think that life in prison is . . . definitely a harsh punishment, also. I would say that I have not 100 percent locked on one punishment over another punishment at this time."

Defense counsel later inquired of Juror 14's sentencing position in light of a hypothetical that assumed a conviction under certain case-specific facts. Juror 14 admitted that evidence of six murders would weigh heavily in his sentencing decision and that it would be difficult to consider other sentences in light of such evidence. Of course,

181

defense counsel's questions presumed the fact of six murders, evidence which directly supported the existence of the multiple murder statutory aggravating circumstance. K.S.A. 21-4625(2) (defining purposeful killing of more than one person as statutory aggravating circumstance). Defense counsel's hypothetical did not include any competing description of mitigating circumstances. Viewed from this perspective, Juror 14's answers reflected an acceptable consideration and weighing of the aggravating circumstance rather than an inability to hold the State to its burden of proof at sentencing. K.S.A. 21-4624(e) (defendant shall be sentenced to death if existence of aggravating circumstances is not outweighed by mitigating circumstances); see *Pruett v. Commonwealth*, 232 Va. 266, 281, 351 S.E.2d 1 (1986) (juror's leaning toward the death penalty did not demonstrate substantial impairment when response made "against the backdrop of the worst possible scenario under circumstances which likely would prompt a similar statement from other prospective jurors").

Juror 14 confirmed he would consider mitigation evidence and weigh it against aggravating circumstances when questioned by the State, and he confirmed that he would consider a defendant's background specifically in response to defense questioning. After having been exposed to the rules governing capital sentencing process, Juror 14 never expressed an inability to follow instructions or suggested he would shift the sentencing burden to the defense.

Judge Anderson decided Juror 14 adequately explained his questionnaire responses and demonstrated his fidelity to the law. The ruling is fairly supported by the record.

b. *Juror 33*

Defendant again challenges the ruling on Juror 33 (challenged above as one who would automatically vote for death), claiming he would lean toward a sentence of death upon conviction. Robinson again relies on Juror 33's response to a hypothetical question assuming the fact of a capital murder conviction plus evidence of the multiple murder aggravating circumstance and no suggestion of any mitigating circumstances. As discussed in the previous challenge, his responses reflected a proper consideration of the evidence under the statutory weighing equation.

Moreover, in follow-up questioning, the prosecution detected "some confusion" amongst the six panel members and provided an overview of the capital sentencing scheme, including the legal obligation of jurors to consider mitigating circumstances and assign them whatever weight they believed they deserve. With this clarification, Juror 33 confirmed he would consider mitigation in arriving at a sentencing decision. On balance, Juror 33 expressed his impartiality and willingness to follow the law as instructed. We see no error in Judge Anderson's ruling.

c. *Juror 39*

Robinson again challenges the ruling on Juror 39 (challenged above as one who would automatically vote for death), claiming she leaned toward a death sentence upon conviction.

Robinson once again relies on Juror 39's questionnaire responses that reflected her personal belief that capital murder warrants a death sentence. As discussed in the previous challenge, Juror 39 expressed her willingness to consider mitigating circumstances after the parties explained the statutory capital sentencing process to her.

She also confirmed her fidelity to the trial court's instructions, including instructions to meaningfully consider mitigation evidence. The ruling is fairly supported by the record.

### d. *Juror 63*

Robinson again challenges the ruling on Juror 63 (challenged above as one who would automatically vote for death), claiming he leaned toward a death sentence upon conviction. Defendant cites the same testimony he relied upon in the previous challenge of this veniremember. Juror 63 confirmed he would hold the State to its burden of proof at trial. For this reason and the others set forth in the analysis of the previous challenge, we hold Judge Anderson's ruling was fairly supported by the record.

### e. *Juror 69*

Defendant argues Judge Anderson erred in denying his challenge for cause of Juror 69 because the veniremember was unable to hold the State to its burden of proof.

Once again, Robinson relies on Juror 69's response when asked if he could consider a life sentence under a hypothetical scenario. While defense counsel may have intended to ask the hypothetical question in the context of any capital murder conviction, Juror 69 assumed it was specific to this case, and he explained the burden would be on defendant to give him a reason not to impose a sentence of death, given that multiple victims were murdered. Later, Juror 69 confirmed he would lean toward a death sentence based on facts in this case but would consider any mitigation.

By emphasizing the significance of six murders, Juror 69's responses revealed the weight he would assign the multiple murder aggravator, requiring the defense to produce substantial evidence of mitigation to warrant a life sentence. Viewed in context, the

responses reflect a proper consideration of the facts under the statutory weighing equation, not improper shifting of the State's burden to the defense.

Moreover, during the State's questioning, Juror 69 said he would not automatically sentence a defendant to death and would consider mitigation. He also confirmed that his personal views regarding sentence would yield to the judge's instructions on the law.

Based on the foregoing, we hold there was no abuse of discretion in Judge Anderson's ruling.

### f. *Juror 115*

Robinson argues the trial court erred in denying his challenge for cause of Juror 115 because the juror's questionnaire and voir dire responses showed the defense would have to dissuade him from voting for a death sentence.

In questionnaire responses, Juror 115 expressed his belief that a life sentence for capital murder is only appropriate in jurisdictions without the death penalty. However, after defense counsel outlined the mechanics of the capital sentencing scheme, Juror 115 said he would not automatically impose a death sentence upon conviction and would consider mitigating circumstances. Defense counsel continued to approach the same question from different angles, but Juror 115 stayed firm in his position, confirming that a person's background and other mitigation would be relevant to his sentencing decision. During the State's questioning, Juror 115 said his sentencing decision would not be automatic and he would consider and weigh aggravating and mitigating circumstances.

During follow-up questioning from defense counsel, Juror 115 agreed he would lean toward death upon conviction, even though he was willing to listen to and consider

185

mitigation evidence. It is unclear from the record whether Juror 115 answered these hypothetical questions assuming a conviction for capital murder in the abstract, or specific to this case, where the evidence would support multiple murders, arguably establishing the existence of a statutory aggravating circumstance.

While certain responses may have suggested Juror 115's beliefs on the death penalty rendered him substantially impaired, when viewed in their totality and with appropriate deference to the district judge's ability to view demeanor and nonverbal communication, we hold that Judge Anderson did not err. See *State v. Carr*, 300 Kan. 1, 121-22, 331 P.3d 544 (2014) (no error in denial of challenge of jurors who said they would lean toward death upon conviction where balance of record reflected jurors' willingness to consider mitigation and both sentencing options), *cert. granted in part* 135 S. Ct. 1698 (2015); see also *United States v. Umana*, 750 F.3d 320, 342-43 (4th Cir. 2014) (no error in denial of challenge of juror who would lean heavily toward death penalty upon conviction where she later agreed to consider both sentencing options and was not irrevocably committed to death sentence); *Ramsey v. Bowersox*, 149 F.3d 749, 758 (8th Cir. 1998) (jurors who leaned toward death upon conviction not substantially impaired where capable of voting for either sentencing option); *Gardner v. Norris*, 949 F. Supp. 1359, 1370 (E.D. Ark. 1996) ("defense cannot strike for cause jurors who simply may lean toward the death penalty, especially when those jurors state that they will put aside personal opinions and follow the law"); *McMillan v. State*, 139 So. 3d 184, 255-56 (Ala. Crim. App. 2010) (preference for death sentence does not constitute substantial impairment where juror could consider both sentencing options); *McNabb v. State*, 887 So. 2d 929, 952 (Ala. Crim. App. 2001) (no abuse of discretion in denying challenge of juror leaning toward death upon conviction where totality of responses indicated she could set aside preference and follow the law), *aff'd sub nom. Ex parte McNabb*, 887 So. 2d 998 (Ala. 2004); *People v. Lucas*, 60 Cal. 4th 153, 260, 177 Cal. Rptr. 3d 378, 333 P.3d 587 (2014) (trial court did not err in denying challenge of juror leaning strongly in

favor of death sentence but willing to consider mitigation); *Spivey v. State*, 253 Ga. 187, 193-94, 319 S.E.2d 420 (1984) (same); *State v. Sepulvado*, 672 So. 2d 158, 164 (La. 1996) (same); *Eaton v. Commonwealth*, 240 Va. 236, 248, 397 S.E.2d 385 (1990) (same).

### g. *Juror 149*

Robinson claims Judge Anderson abused his discretion by denying the challenge for cause of Juror 149, who allegedly leaned toward a sentence of death.

Juror 149 agreed his questionnaire responses suggested he would lean toward death upon conviction, but he explained that he answered the questionnaire without knowledge of the statutory weighing equation or the role of mitigation in the sentencing decision. With this knowledge, he said he was confident he could realistically consider a life sentence. He also noted his personal views would be subject to and limited by further instructions from the court. Moreover, after the parties explained the burden of proof and presumption of innocence, Juror 149 expressed his willingness to follow the law, presume the defendant innocent, and place the burden of proof on the State.

During defense questioning, Juror 149 was asked if Robinson would have the burden to justify a life sentence upon conviction. Juror 149 said he was not familiar with the process and did not know if that was how the process worked at that stage of the proceedings. At that point, defense counsel interrupted and cut off the response. When asked how strong the mitigation evidence needed to be to vote for life, Juror 149 said it depended on the court's instructions. Juror 149 also confirmed that, having been informed of the process, he would set aside his opinions and serve impartially.

Juror 149's responses evidenced his adherence to the law and did not establish substantial impairment based on a refusal or inability to hold the State to its burden of proof at sentencing. Judge Anderson's ruling is fairly supported by the record.

h. *Juror 184*

Robinson contends Judge Anderson abused his discretion in denying the challenge of Juror 184, who would allegedly shift the burden to the defense upon conviction.

Defense counsel acknowledged that Juror 184's death penalty beliefs were middle of the road. When asked whether he could realistically consider a life sentence for intentional, premeditated, "special circumstances murder," Juror 184 said that it depended on the trial judge's instructions on the law and that he could "go either way." Juror 184 later said he would probably lean toward the death penalty following a conviction for "this particular capital murder," which presumed a conviction for capital murder, along with multiple murders, without any competing mitigation. As with other jurors required to respond to this particular hypothetical, the response reflects an acceptable consideration of the facts under the statutory weighing equation rather than disregard of applicable evidentiary burdens. Juror 184 later confirmed he would consider both sentencing options.

Robinson highlights one of Juror 184's responses where he appeared to qualify his ability to be impartial, saying he would "possibly" be open-minded. Yet, Juror 184 followed up, saying that he would "absolutely" give consideration to mitigating circumstances, he was committed to impartiality, and that he "would be fair and honest in [his] decision."

Robinson also highlight's Juror 184's statement that he expected the defense to put on mitigation evidence. Defense counsel asked, "[W]ould you *expect* me to present some evidence to you . . . ?" (Emphasis added.) Juror 184 responded, "Well, yes, sir. That would be your job; wouldn't it?" Defense counsel responded, "Well, yeah, I suppose." This panelist's question can be read fairly to reflect a reasonable belief that counsel would zealously represent the defendant. Viewed in context, the comment was benign.

In light of the totality of Juror 184's responses, we hold Judge Anderson's ruling to be fairly supported by the record.

### i. *Juror 202*

Robinson next challenges the district judge's ruling on Juror 202 because he held a "mild preference" for the death penalty in the event of conviction.

Juror 202 said he could realistically consider a life sentence but expressed his own "mild preference" and slight favor for the death penalty. Robinson's counsel did not inquire whether Juror 202 could set these personal beliefs aside. Defendant believes the district court ruling was erroneous because Juror 202 did not affirmatively disavow this personal belief on the record. However, as noted above, a venireperson is not rendered substantially impaired merely because he or she holds personal opinions regarding the death penalty. *Carr*, 300 Kan. at 113-14. As the moving party, defendant had the burden to establish substantial impairment. See, *e.g.*, *State v. Hamilton*, 74 Kan. 461, 466, 87 P. 363 (1906) ("The presumption is in favor of the competency of the juror, and the burden of showing that good cause exists for the challenge rests upon the one who makes the challenge."). Robinson failed to meet this burden.

189

Juror 202 said he had no firmly held opinions and confirmed his willingness to consider mitigation evidence and both sentencing options. We see no error.

j. *Juror 229*

Defendant believes Judge Anderson erred in denying his challenge of Juror 229 because she believed that death is the proper sentence upon conviction and that a wrongful conviction could be corrected by appeal or clemency.

In questionnaire responses, Juror 229 shared her personal belief that death is an appropriate sentence for those convicted of capital murder. However, after the parties explained the jurors' role in a capital proceeding, Juror 229 said her views had changed and she would realistically consider both sentences.

In questionnaire responses, Juror 229 also shared her belief that a wrongly imposed death sentence could be corrected on appeal or through clemency. If firmly held, such an opinion provides a possible basis for disqualification. See *Caldwell v. Mississippi*, 472 U.S. 320, 328-29, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985) (death sentence invalid where imposed by a person led to believe the ultimate responsibility for sentence rests elsewhere). However, Juror 229 confirmed her ability to set these views aside and reach a sentencing decision based on aggravating and mitigating circumstances.

Based on the foregoing, Judge Anderson's ruling is fairly supported by the record.

k. *Juror 271*

Robinson again challenges Juror 271, claiming he would fail to honor the statutory presumption for a life sentence. Defendant relies on the same testimony cited in support

190

of his challenge of Juror 271 on grounds that he would automatically vote for a sentence of death. For the same reasons set forth in the analysis of this previous challenge, we hold there was no error in Judge Anderson's ruling.

l. *Juror 298*

Robinson argues Judge Anderson erred by denying the challenge of Juror 298 based on her comment that a defendant must be remorseful to justify a life sentence.

In questionnaire responses, Juror 298 said life imprisonment might be preferable if the person "is really remorseful . . . and can be rehabilitated." Juror 298 did not foreclose the possibility of a life sentence absent such evidence, however. In response to defense questioning, Juror 298 said that her ability to vote for a life sentence depended on the evidence and that she would not automatically impose either sentence. During the State's questioning, Juror 298 confirmed her willingness to consider aggravating and mitigating factors, follow the court's instructions, and realistically consider both sentencing options. During follow-up questioning from the defense, Juror 298 said evidence of remorse and/or rehabilitation could be helpful to a mitigation case but was not required, and she would consider both sentences, even in the absence of such evidence.

We hold Judge Anderson's ruling to be fairly supported by the record.

m. *Juror 336*

Robinson argues the district judge erred by denying the challenge of Juror 336 because she believed a life sentence should not include the possibility of parole.

191

Juror 336 shared her belief that a life sentence is a proper punishment, assuming the defendant remained incarcerated for his entire life. However, when the prosecutor asked if the possibility of parole after 25 or 50 years would cause her to disregard the court's instructions and allow it to influence her sentencing decision, she said, "[T]here are rules of law to follow. That's why we have them." When asked if she could commit herself to follow those rules, Juror 336 said, "I would think so." In follow-up questioning, defense counsel asked if she still had difficulty with the fact that Kansas law did not offer life without parole. Juror 336 said, "It would make it difficult, but there are rules to follow." Asked whether she would consider the possibility of parole in arriving at a sentencing decision, Juror 336 said, "I would still weigh the circumstances and there are rules to follow. So that is what I hope that I would base it on, yes."

The prospective juror's responses appear less than unequivocal at times. However, Judge Anderson, who was best positioned to observe demeanor and nonverbal communication, found no substantial impairment from the totality of her responses. We find no error, particularly given the deference owed to the district judge's findings. See *Wainwright v. Witt*, 469 U.S. 412, 425-26, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985) (At times a venireperson's answers will leave a lack of clarity or ambiguity in the printed record as to his or her impartiality, and in these situations, "deference must be paid to the trial judge who sees and hears the juror.").

3. *Did the trial court retain panelists biased by pretrial publicity?*

Robinson argues the trial court erred by failing to strike Jurors 23, 39, 69, 202, 271, and 324 because their exposure to pretrial publicity rendered them unqualified.

Neither a juror's knowledge of the facts of the case nor preconceived opinions of guilt/innocence warrant certain removal on due process grounds. *State v. Kleypas*, 272

Kan. 894, 974-75, 40 P.3d 139 (2001), *cert denied* 537 U.S. 834 (2002), *overruled on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006). Instead, "[t]he Supreme Court has held that the test of juror impartiality is whether 'the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" *United States v. Wacker*, 72 F.3d 1453, 1467 (10th Cir. 1995) (quoting *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S. Ct. 1639, 6 L. Ed. 2d 751 [1961]). With this standard in mind, we turn to the analysis of each challenge.

a. *Juror 23*

Robinson contends the district judge erroneously denied his challenge of Juror 23 because pretrial publicity would cause him to shift the burden of proof to Robinson.

During defense questioning, Juror 23 said he had not formed any opinion of guilt, though he would lean toward guilt if he had to decide based on the media coverage. Once defense counsel explained the burden of proof, Juror 23 agreed that the State would have to provide the evidence and that he would comply with the trial court's instructions. Juror 23 later disclosed that he was an attorney and, therefore, understood the presumption of innocence and would acquit if the State failed to meet its burden. While Juror 23 said he was interested in hearing any evidence the defense could provide to explain certain media-reported facts, he confirmed that he would comply with the trial judge's instructions.

Based on the foregoing, Judge Anderson's ruling is fairly supported by the record.

b. *Juror 39*

Robinson argues Juror 39 should have been excused because she never said she could entirely ignore her previous knowledge of the case or presume defendant innocent.

Juror 39 said that the media coverage made it seem "the crimes that were committed were committed by [Robinson]." Yet, she emphasized, "[T]hat's just based on what I've read and what I've heard on the news."

Defense counsel frequently used a football analogy to gauge the veniremembers' exposure to pretrial publicity and opinions formed from it. Robinson's counsel would explain that the 50-yard line represented a person who had no exposure and formed no opinions based on the coverage. The goal lines represented individuals who had been exposed to coverage and either had formed an opinion of guilt, on one end zone, or of innocence, on the other. Juror 39 indicated that she would be on the 20-yard line toward the guilt end zone in light of the media coverage and agreed that defendant would need to present some information to get her back to the 50-yard line.

However, when defense counsel initially described the football analogy, Juror 39 inquired, "Are you asking if I would be open-minded?" Defense counsel said, "No." Defense counsel never asked if Juror 39 could set aside information obtained from the media, presume Robinson innocent, and decide the case on the evidence. After the prosecutor explained the burden of proof, Juror 39 confirmed she would acquit Robinson if the State failed to meet its burden.

Robinson claims Juror 39's later assurances of impartiality cannot overcome her initial statements of bias under *State v. Yurk*, 230 Kan. 516, 638 P.2d 516 (1982). In *Yurk*, some jury members were exposed to a newspaper report published during trial that

194

disclosed defendant's three prior convictions for crimes similar to those charged. One juror was bothered by the information and did not know how it would affect his deliberations but eventually expressed his willingness to decide the case on the evidence. Under its particular facts, the *Yurk* court held that the juror's later declaration of impartiality was not controlling and that his exposure to such a uniquely prejudicial media report during trial warranted a mistrial. 230 Kan. at 523-24.

Here, defendant failed to show Juror 39 was exposed to or affected by the type of uniquely prejudicial information at issue in *Yurk*. See *State v. Bowen*, 254 Kan. 618, 627, 867 P.2d 1024 (1994) (distinguishing *Yurk* where record did not establish extent of juror's exposure to media or similarly prejudicial content). Also, the fact that Juror 39 was exposed to media coverage before the trial, not during it, is significant. We have made clear that pretrial publicity alone will not established prejudice per se. *State v. Deiterman*, 271 Kan. 975, 979, 29 P.3d 411 (2001). In fact, in analyzing Robinson's venue challenge, we held that the published reports did not warrant a finding of presumed prejudice throughout the venire. Thus, *Yurk* is distinguishable.

Instead, we find the facts more comparable to those cases where we have affirmed a district court's denial of a challenge for cause based on a party's successful rehabilitation of a prospective juror. See, *e.g.*, *Carr*, 300 Kan. at 121-22 (no error in denying challenges of prospective jurors whose voir dire responses yielded cause for concern, but all eventually professed understanding of and fidelity to the law); *State v. Ransom*, 289 Kan. 373, 389-90, 212 P.3d 203 (2009) (no error in refusing to strike prospective juror who admitted she "might have trouble" presuming defendant innocent; prospective juror merely acknowledged difficulty in applying presumption, not inability to do so; deference owed to trial judge); see also *Stevens v. Beard*, 701 F. Supp. 2d 671, 723-24 (W.D. Penn. 2010) (no error in denial of challenge of prospective juror in capital

prosecution who expressed preference for death sentence but later declared fidelity to law as instructed; deference owed to trial judge).

We find no error in Judge Anderson's ruling.

### c. *Juror 69*

Robinson argues Judge Anderson erred in denying his challenge of Juror 69, who allegedly presumed defendant's guilt and shifted the burden of proof to defendant.

In responding to defense counsel's football field analogy, Juror 69 said he was just on the other side of the 50-yard line toward the guilt end zone based on the media's coverage and would need to hear evidence from the defense to move back to midfield. However, after the State explained the presumption of innocence and burden of proof, Juror 69 identified "impartiality" as the most important trait of a juror and confirmed he could set aside any preconceived opinions and remain fair and impartial. He acknowledged the State's burden of proof and confirmed he would acquit defendant if the State failed to meet it.

Judge Anderson's ruling is fairly supported by the record.

### d. *Juror 202*

Robinson argues the trial court erred in denying his challenge of Juror 202 because he expressed an inability to abide by the presumption of innocence.

During defense questioning, Juror 202 said media coverage had not caused him to form any opinions because his memory of reported facts had faded over the 2 years that

196

had passed since the story broke. Juror 202 also said he believed in defendant's right to be presumed innocent.

Based on the totality of Juror 202's responses, Judge Anderson's ruling is fairly supported by the record.

### e. *Juror 271*

Defendant argues the trial court improperly denied the challenge of Juror 271 because his responses showed he would shift the burden of proof from the State to the defense.

In response to defense counsel's football field analogy, Juror 271 said he could not quantify where he stood on the field but confirmed it would be toward the guilt side of the field based on the media's coverage. As defense counsel continued to focus on his football field analogy, Juror 271 offered the following unsolicited remarks:

> "I just think I could be impartial. I realize, and I understand that all I've heard is negative information, I understand that; so going into a trial, I take that into consideration. I know that I have to just pay attention to what goes on in the trial and not what I've heard before. I think I can do that."

In response to this unsolicited comment, defense counsel suggested Juror 271 would still expect the defense to put on evidence. Juror 271 simply responded, "I just say I can be impartial come trial time."

We have no hesitation affirming Judge Anderson's ruling in light of these remarks and responses.

f. *Juror 324*

Robinson argues the trial court erroneously denied his challenge of Juror 324 because she could not set aside her strong opinion of guilt.

Juror 324 expressed a personal belief that Robinson was likely to be guilty based on the pretrial coverage of the case. However, Juror 324 expressed confidence in her ability to set aside her opinion and serve impartially. She expressed no concern with her ability to presume Robinson innocent. In response to the State's questions, Juror 324 confirmed her ability to set aside her personal view and decide the case on the evidence, follow the court's instructions, and acquit Robinson if the State failed to carry its burden of proof.

There was some confusion when the State asked Juror 324 whether she would "feel comfortable" basing her decision on information from inside the courtroom, even if the State did a poor job presenting the case, and Juror 324 responded, "No. If what I learn in the trial would sway me that way, I would have a hard time doing that." However, Judge Anderson's subsequent independent inquiry confirmed that she had misunderstood the question and that she would not let media coverage influence her decision.

Judge Anderson's ruling is fairly supported by the record.

*Disparate Rulings on Challenges for Cause*

Robinson claims Judge Anderson applied a more lenient standard to the State's challenges for cause, in violation of his due process rights.

198

1. *Legal Framework and Standard of Review*

"Each party may challenge any prospective juror for cause." K.S.A. 22-3410(1). In death penalty cases, prospective jurors may be excluded if their death penalty views substantially impair their ability to comply with the law. *State v. Kleypas*, 272 Kan. 894, 991, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), *overruled on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 12d 429 (2006).

The Due Process Clause, which includes procedural and substantive protections, applies to the states under the Fourteenth Amendment. *Barbier v. Connolly*, 113 U.S. 27, 31, 5 S. Ct. 357, 28 L. Ed. 923 (1884). Substantive due process protects individuals from arbitrary state action. See *Darling v. Kansas Water Office*, 245 Kan. 45, 51-52, 774 P.2d 941 (1989). Such protections apply to all state actors, including the judiciary. See *Bouie v. City of Columbia*, 378 U.S. 347, 354, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964) (applying Due Process Clause to state court's unforeseen retroactive application of law). To satisfy substantive due process requirements, a statute must not be applied to parties in an arbitrary or capricious manner. *Wesley Medical Center v. McCain*, 226 Kan. 263, 266, 597 P.2d 1088 (1979). The standard applied in reviewing substantive due process claims is one of reasonableness. *Darling*, 245 Kan. at 51.

2. *Did Judge Anderson's rulings violate due process?*

Robinson's substantive due process challenge is premised on the district judge's rulings on the parties' challenges for cause of Jurors 185 and 271. Specifically, Robinson argues that Judge Anderson's use of a more lenient standard for the State's challenges is evidenced by the fact that Juror 185, who strongly opposed the death penalty, was excused, but Juror 271, who strongly supported the death penalty, was retained. Robinson oversimplifies the underlying facts.

During defense questioning, Juror 185 expressed uncertainty about her ability to impose a sentence of death. Attempting to rehabilitate Juror 185, defense counsel asked whether she could impose a death sentence if aggravators outweighed mitigators. Juror 185 said, "I'd have to say no today." In her final remarks, Juror 185 said it would be "impossible" for her to vote for the death penalty. In granting the State's challenge, Judge Anderson found that "when finally put to the test, [Juror 185] couldn't do it [realistically consider both sentencing options]. The Court finds that this juror meets the test of *Witherspoon*." See *Witherspoon v. Illinois*, 391 U.S. 510, 519-23, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968). The finding is fairly supported by the record.

Juror 271, in contrast, consistently said he would consider mitigating circumstances, and when "put to the test," he was willing to impose a life sentence in lieu of the death penalty. When defense counsel asked him to identify specific types of mitigation that would guarantee a life sentence under a hypothetical scenario, Juror 271 could not think of any examples. Based largely on the prospective juror's demeanor, Judge Anderson construed this response to mean that he could not do so on the spot, not that he believed mitigation could never result in a life sentence. This finding is fairly supported by the record and entitled to deference. See *Carr*, 300 Kan. at 75.

The record confirms Jurors 271 and 185 were not similarly situated because the former testified he could consider both sentencing options and the latter testified she could not. Judge Anderson reached different conclusions on the challenges of these jurors based on their voir dire responses, not because he applied the *Witt-Witherspoon* framework inconsistently. We hold there was no substantive due process violation. See *People v. Cahill*, 2 N.Y.3d 14, 140-41, 777 N.Y.S.2d 312, 809 N.E.2d 561 (2003) ("The trial court did not apply different standards to each party's for-cause challenge; applying the same standard, [the court] reasonably reached different conclusions about each prospective juror's credibility and ability to deliberate impartially."); *State v. Frazier*, 73

200

Ohio St. 3d 323, 329-30, 652 N.E.2d 1000 (1995) (trial court did not apply different standards in ruling on defense challenges for cause; jurors dismissed could not set aside personal feelings on death penalty, whereas jurors passed for cause would apply the law as instructed by trial judge); *Hogue v. State*, 711 S.W.2d 9, 17 (Tex. Crim. App. 1986) (no due process violation where record fairly supports the basis of comparative rulings on challenges for cause.).

*Refusal to Strike Entire Panel Exposed to Juror 173's Comments*

Robinson next argues the district judge erred by denying his motion to strike the small group panel exposed to Juror 173's inflammatory comments.

1. *Additional Factual and Procedural Background*

The seventeenth panel during the second phase of jury selection, small group voir dire, included Jurors 173, 177, 180, 184, 185, and 186. During questioning from defense counsel, Juror 173 made the following comments:

> "I teach at Olathe North High School, okay. We've had two former students that were tied
> up with Mr. Robinson, one of them is Ms. Stasi who he's on trial for first degree murder
> and the second is Paula Godfrey. He should be on trial, first degree murder and both of
> these were young women. I just think the man's a predator. That's as I said, this is a
> pattern that's gone on for years. This is not something—."

Defense counsel cut off Juror 173 and moved to strike the panel, arguing the comments tainted all panelists because Paula Godfrey was not one of the victims identified in the Complaint and evidence of Robinson's involvement in her disappearance would be inadmissible at trial. The State opposed the motion, noting Paula Godfrey's name was in the questionnaire, the media had reported Robinson's connection to her, and the defense had explored similar issues during voir dire.

201

Judge Anderson agreed the comments were "troubling" but did not believe they were "going to be a factor with" the other panel members. He recommended defense counsel question the remaining panelists to assess what, if any, impact Juror 173's comments had had on them. Defense counsel said he could not ask them specific questions about the comments without calling attention to them but said he could make inquiry in a more "general fashion." Judge Anderson said he would not compel defense counsel to explore the impact of the comments with the other panelists but shared his belief that counsel could do so without making matters worse. The district judge denied the motion to strike the panel, finding that while Juror 173 had communicated a strongly held personal belief, it was not unlike others the parties had explored in previous panels. Judge Anderson said Juror 173's comments "came close" but did not actually taint the entire panel.

After the ruling, the defense continued its voir dire of the panel. Though granted the opportunity, defense counsel did not ask any further questions—either general or specific to Juror 173's comments—exploring panelists' impartiality. Instead he shifted the questioning to death penalty topics. Then the prosecution fully explored topics of bias, pretrial publicity, and the death penalty with the panel members. During follow-up questioning, the defense again limited its inquiry to death penalty topics and did not explore bias, in general, or related to Juror 173's comments, in particular.

At the end of questioning, the defense renewed its motion to strike the panel. Judge Anderson denied the motion, finding the panelists' responses remained candid, suggesting they were unaffected by Juror 173's comments.

The trial court excused Juror 173 and entertained challenges against the remaining panelists. Judge Anderson granted the parties' challenges of Jurors 177, 180, 185, and

202

186. Robinson challenged Juror 184 based solely on his death penalty views. Judge Anderson denied the challenge, in the process observing that Juror 184 held no preconceived opinions and gave no credence to media coverage of the case. Robinson did not exercise a peremptory challenge to remove Juror 184, who served as a petit juror in this case.

## 2. *Legal Framework and Standard of Review*

"It is generally recognized that even though individual jurors on the panel may have indicated prejudice or bias that is not sufficient ground for a successful challenge to the entire panel." *State v. Ferguson, Washington & Tucker*, 228 Kan. 522, 530, 618 P.2d 1186 (1980).

> "When improper or prejudicial remarks are made by one venireperson and heard by other venirepersons during the jury selection process, we have held that 'the test of juror impartiality is whether the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'" *United States v. Lacey*, 86 F.3d 956, 969 (10th Cir. 1996) (quoting *United States v. Wacker*, 72 F.3d 1453, 1467 [10th Cir. 1995]).

Where defendant seeks to discharge the entire panel, we review a trial court's ruling for abuse of discretion. *State v. Ji*, 251 Kan. 3, 9, 832 P.2d 1176 (1992) (reviewing decision on untimely motion to discharge panel under K.S.A. 22-3407 for abuse of discretion); see *United States v. Tegzes*, 715 F.2d 505, 507 (11th Cir. 1983) (reviewing ruling on motion to discharge panel for abuse of discretion). Deference is owed to the district court's exercise of discretion based on its unique position to evaluate demeanor and other factors that are not apparent from the record. *United States v. Simmons*, 961 F.2d 183, 184 (11th Cir. 1992).

### 3. *Did Judge Anderson err in refusing to strike the entire panel?*

Robinson believes Juror 173's comments about the uncharged homicide of Paula Godfrey and his characterization of Robinson as a "predator" tainted the entire panel. At this stage, however, the analysis necessarily focuses on the partiality of Juror 184, who was the only member of the panel to serve on the jury. See *Lacey*, 86 F.3d at 969 (in reviewing denial of motion to strike panel, "the partiality of the . . . jury is evaluated in light of those persons ultimately empaneled and sworn, not those who are excused").

Prior to Juror 173's comments, Juror 184 testified that he had not followed the coverage closely, and what he did follow he viewed with skepticism. The defense chose not to explore Juror 184's impartiality after Juror 173's comments. The prosecution did and confirmed he held no firm opinion of guilt. See *State v. Stanphill*, 206 Kan. 612, 619, 481 P.2d 998 (1971) ("When some of the jurors are not qualified, but the entire panel is not affected, a motion to quash the entire panel will not lie. The court may simply purge the panel by discharging those individuals not qualified.").

Because Judge Anderson believed Juror 173's comments came close to tainting the entire panel, we are of the opinion that the more expedient course of action would have been to grant defendant's motion. However, this difference of opinion does not equate to a finding of an abuse of discretion, particularly in light of the diligence and thoroughness Judge Anderson exercised in the design and implementation of his effective four-part jury selection process.

In the end, we conclude that a reasonable jurist could agree with Judge Anderson's ruling in light of the isolated nature of Juror 173's comments; the defense's failure to pursue curative measures, including general or specific inquiry of the panelists to assess the impact of the comments on their impartiality; and defendant's failure to make an

affirmative showing that Juror 184 was affected by the comments, especially considering his consistent declarations of impartiality. See *State v. Betancourt*, 299 Kan. 131, 146, 322 P.3d 353 (2014) (no error in denying mistrial where panelist's comment regarding defendant's gang affiliation was isolated and defense failed to explore potential bias with panelists or request safeguards to inoculate against it); *State v. McCorgary*, 224 Kan. 677, 687, 585 P.2d 1024 (1978) (no abuse of discretion in denial of motion for mistrial after "a prospective juror . . . expressed a strong feeling in front of other prospective jurors that what she had read in the paper about these murders was true"; prospective juror excused, trial court admonished remaining prospective jurors, and defendant failed to make an affirmative showing of substantial prejudice), *disapproved on other grounds by State v. Reid*, 286 Kan. 494, 186 P.3d 713 (2008); *cf. State v. Plaskett*, 271 Kan. 995, 1027, 27 P.3d 890 (2001) (no error in denying request for individual voir dire of panel after one panelist said defendant had been accused by more than one person of sexual abuse of a child; comments not based on specialized knowledge of case).

Robinson relies on *Mach v. Stewart*, 137 F.3d 630 (9th Cir. 1997), in support of a finding of prejudicial error. There, defendant was charged with sex crimes against an 8-year-old girl. During voir dire of the panel, prospective juror Bodkin, a social worker with the State of Arizona, said sexual assault had been confirmed in every reported case assigned to her. Bodkin explained repeatedly that a child had never lied about sexual abuse in her 3 years on the job. The Ninth Circuit found the district court erred in denying defendant's motion for mistrial because the prosecution's theory was dependent on the victim's testimony and Bodkin essentially vouched for this witness' credibility based on her knowledge, training, and expertise. 137 F.3d at 633-34.

*Mach* is distinguishable. Unlike the expert who repeatedly vouched for the credibility of the victim, Juror 173 made only one comment regarding his belief that Robinson was involved in Godfrey's disappearance. His opinion was speculative and not

based on any specialized knowledge or expertise. Other courts, including the Ninth Circuit itself, have distinguished *Mach* on similar grounds. See *United States v. Guzman*, 450 F.3d 627, 631-32 (6th Cir. 2006) ("Critical to the ruling in *Mach* was the 'expert-like' nature of the statements and the fact that the potential juror-'expert' vouched for the credibility of the prosecution's key witness," factors not present in this case.); *United States v. Uriarte-Perez,* No. 97-50579, 1998 WL 704102, at *1 (9th Cir. 1998) (unpublished opinion) (declining to presume taint under *Mach* where prospective juror's comments were not based on particularized expertise and uttered on only one occasion); *Middlebrook v. Curtin*, No. 1:07-CV-1242, 2010 WL 3222519, at *4 (W.D. Mich. 2010) (unpublished opinion) (same), *aff'd sub nom. Middlebrook v. Napel*, 698 F.3d 906 (6th Cir. 2012), *cert. denied* 133 S. Ct. 2811 (2013); *State v. Ploof*, 141 P.3d 764, 774-75 (Ariz. App. 2006) (distinguishing *Mach* where veniremembers were not experts and statements did not go to heart of credibility of complaining witness), *rev. denied and ordered depublished* 213 Ariz. 598 (2006); *State v. Sanders*, 92 Ohio St. 3d 245, 248, 750 N.E.2d 90 (2001) (unlike *Mach* situation, veniremember expressed only personal opinions, did not speak at length, and was immediately excused for cause); *Pavatt v. State*, 159 P.3d 272, 283-84 & n.8 (Okla. Crim. App. 2007) (*Mach* distinguished where comments isolated, not based on specialized knowledge, and State's case not dependent on credibility of victim); *People v. Arellano*, No. B164562, 2004 WL 33463, at *13 (Cal. App. 2004) (unpublished opinion) (finding *Mach* distinguishable on several grounds, including the fact that venireperson in that case had repeated comments numerous times); *People v. Shupp*, No. F037676, 2002 WL 31839361, at *1 (Cal. App. 2002) (unpublished opinion) (statements at issue in *Mach* went to the heart of the credibility of the complaining witness and were made by a person who was an expert in the field; "[n]othing of the sort appears in this record.").

Robinson also relies on *Breakiron v. Horn*, 642 F.3d 126, 141 (3d Cir. 2011). There, a habeas petitioner argued defense counsel was ineffective for failing to take

corrective action after a prospective juror in a robbery case said petitioner used to "'do a lot of robbing'" as a child. 642 F.3d at 141. The Third Circuit granted habeas relief because the district court committed legal error by applying a subjective standard of prejudice, examining whether the jury was actually prejudiced by the comments rather than applying the objective prejudice standard applicable to claims of ineffective assistance of counsel. 642 F.3d at 146. However, the subjective standard is appropriate here, as the court considers whether the juror can actually serve impartially, and the objective standard of prejudice applied to ineffective assistance claims is inapplicable. *Breakiron* is legally inapposite.

*Denial of Challenges for Juror-Specific Reasons*

Robinson also contends the trial court erred in denying his challenge of five veniremembers (Jurors 184, 298, 316, 14, and 147) on grounds of juror-specific bias unrelated to pretrial publicity or their death penalty views. As set forth above, we review a district judge's denial of a challenge for cause for abuse of discretion. *State v. McCullough*, 293 Kan. 970, 996, 270 P.3d 1142 (2012).

1. *Juror 184*

Robinson suggests Juror 184 held numerous disqualifying biases, including: (1) leaning toward the death penalty; (2) close affiliation with law enforcement; (3) exposure to Juror 173's prejudicial comments; and (4) affiliation with the prosecutor. We addressed the first and third grounds above and focus the following analysis on the remaining challenges.

During general voir dire, Juror 184 revealed that upon his retirement, he volunteered in the crime analysis unit of the Overland Park Police Department from April 1997 to August 1999, months before law enforcement began its investigation of

207

Robinson and nearly 3 years before trial. As a volunteer, he ran copies, distributed mail, and performed other small tasks. On one occasion, Juror 184 had lunch with Officer B.J. Hohnholt, who was on the State's witness list but did not testify at trial. Juror 184 also recognized the name Bill Batt, another officer on the State's witness list who did not testify at trial.

Juror 184 maintained no contact with the department after resigning from his volunteer position. Nor did he communicate with anyone in law enforcement about this case. Juror 184 confirmed that his connection to law enforcement would not affect his ability to assess police officer testimony just as he would any lay witness testimony. Juror 184 also disclosed that his son was a police sergeant in Kansas City, Kansas. While holding a favorable impression of his son, Juror 184 confirmed he would not project that same impression on law enforcement officers in general.

Also, prosecutor Morrison thought he recognized Juror 184 as a participant of a weekend marriage seminar the prosecutor and his wife taught more than a decade prior. When the prosecutor mentioned this to Juror 184, it refreshed his memory and he confirmed he had attended the seminar. This was the only contact Juror 184 had had with the prosecutor, and he characterized their relationship as not even rising to the level of "acquaintances." Juror 184 confirmed this would not impact his duties as a juror.

The court denied Robinson's challenge for cause, which was advanced solely on the ground of Juror 184's affiliation with the Overland Park Police Department. On appeal, Robinson acknowledges Juror 184 "denied any bias in favor of law enforcement or the prosecutor" but argues that all of these circumstances "suggest the distinct *possibility* of such bias." (Emphasis added.) Such speculation is insufficient to demonstrate error. *McCullough*, 293 Kan. at 996 (party asserting abuse of discretion in

208

ruling on juror impartiality bears the burden of establishing it). Judge Anderson's ruling is supported by the record, and we hold that no error exists.

### 2. *Juror 298*

Robinson suggests Juror 298's preference to hear evidence of remorse violated his Fifth Amendment right to silence. We addressed the same remarks in connection with Robinson's claim that this prospective juror should have been excused due to her inability to presume a life sentence. Her statements about remorse and rehabilitation were largely rhetorical, and she confirmed her willingness and ability to realistically consider mitigating circumstances and both sentencing options, even in the absence of evidence of rehabilitation or remorse. This testimony also demonstrates that Judge Anderson's ruling did not violate Robinson's Fifth Amendment right to silence.

### 3. *Juror 316*

Robinson believes Judge Anderson erred in denying the challenge of Juror 316, who expressed the view that the justice system is corrupted by defense lawyers who represent clients they know to be guilty.

The questionnaire asked jurors to identify the three biggest problems with the criminal justice system. Juror 316's response identified delay, loopholes, and lawyers who represent clients they know to be guilty. When asked to elaborate, Juror 316 said he felt that, regardless of the facts, there is an attorney waiting to take any case. Juror 316 said he had no viable solutions but shared in his questionnaire the belief that the appeals process should be streamlined. The defense did not ask Juror 316 whether he could set aside these personal views. Juror 316 expressed no firm opinion of guilt. He confirmed that his sentencing decision would not be automatic, that he would consider mitigating circumstances and a life sentence, and that he would comply with the court's instructions.

In denying the challenge, Judge Anderson found the totality of Juror 316's responses demonstrated that his personal beliefs would yield to the court's instructions on the law and that he would serve impartially. These findings are fairly supported by the record, and we hold there is no error. See *Goss v. Nelson*, 439 F.3d 621, 627 (10th Cir. 2006) (jurors qualified where they can set aside personal opinions and decide on evidence).

### 4. *Juror 14*

Robinson argues the trial court erroneously denied his challenge to Juror 14, who expressed bias in favor of law enforcement witnesses.

"When a venireman expresses a partiality toward police officer testimony per se—as a generic class—the bias of credibility contrary to the interest of the complainant-litigant disqualifies service as a juror." *State v. Draper*, 675 S.W.2d 863, 865 (Mo. 1984). However,

> "[b]ias cannot be presumed solely because a prospective juror believes a police officer's training and experience in observing and recounting events might make the officer's account more accurate than that of an ordinary witness, provided the prospective juror does not ignore differing circumstances of observation, experience, and bias which may be disclosed by the evidence." *O'Dell v. Commonwealth*, 234 Va. 672, 694, 364 S.E.2d 491 (1988).

In response to defense counsel's voir dire, Juror 14 said that "without any further information to weigh," he would tend to weigh a police officer's testimony more favorably than that of a lay witness. Defense counsel attempted to cut off Juror 14 at this point, but the following exchange continued:

210

"VENIREPERSON 14:      But, I'd be willing to look at, you know, other—

"[DEFENSE COUNSEL]:      You'd try to keep an open mind?

"VENIREPERSON 14:      Yes.

"[DEFENSE COUNSEL]:      But when it comes to police officer versus not a police officer—

"VENIREPERSON 14:      *Without anything else to weigh*—

"[DEFENSE COUNSEL]:      —police officer has the edge?

"VENIREPERSON 14:      A slight edge, yes, sir." (Emphasis added.)

Juror 14's statement that he would give a "slight edge" to law enforcement testimony over lay witness testimony, without any further information to weigh, fails to persuade us of his bias in this case. When viewed in their entirety, Juror 14's responses indicated a willingness to keep an open mind and consider factors relevant to assessing the credibility of both law enforcement and lay witness testimony. In short, he expressed willingness and ability to set any bias aside. His overall statements did not reflect blind adherence to the testimony of law enforcement officers over lay witnesses. As such, Judge Anderson's ruling is fairly supported by the record, and we hold there is no error.

5. *Juror 147*

Finally, Robinson argues Juror 147 should never have been seated because he was excused for cause on the first day of jury selection for failing to appear. A summary of the procedural and factual background demonstrates that this challenge is without merit.

211

Judge Anderson conducted jury selection in four separate phases. Phase one was devoted to hardship issues and began on September 16, 2002. During this phase, Judge Anderson called prospective jurors in panels of 60 to identify those asserting hardship. Nearly 300 jurors were ordered to appear on day one, and a number of veniremembers summoned that day were deferred to a later date. After completing hardship inquiries on the first panel of 60 veniremembers, the defense moved to strike those jurors who failed to appear. The district judge granted the motion and ordered those jurors excused, "with the proviso that that does not relieve them from the obligation on the summons . . . ." Neither Robinson, in his motion, nor Judge Anderson, in his ruling, specifically identified Juror 147 as one of those excused for failure to appear.

At the start of the proceedings the following day, September 17, Juror 147 appeared in response to his summons. Judge Anderson commented, "Apparently I missed that," explaining he had Juror 147 down as a failure to appear when he should have been a deferral. Defense counsel merely responded, "Okay."

Juror 147 did not assert any hardship, so Judge Anderson passed him to the second phase of jury selection and assigned him to the seventh panel for small group voir dire on the topics of pretrial publicity, bias, and the death penalty. On October 20, 2002, Judge Anderson called the seventh panel and observed that Juror 147 was present, explaining that this prospective juror had been deferred to the second day of hardship inquiry. Defense counsel asked what had happened, believing Juror 147 was one of the veniremembers who had been excused for failing to appear on the first day of jury selection. Judge Anderson explained that Juror 147 had been deferred on the first day due to Yom Kippur, but that he appeared on the second day and was assigned to the current panel for small group voir dire. Once again, defense counsel responded, "Okay."

212

Both parties proceeded to examine Juror 147 extensively on the topics of pretrial publicity, bias, and the death penalty, and both parties passed him to the third phase of jury selection, general voir dire. During general voir dire, neither Robinson nor the State challenged him. Robinson did not exercise a peremptory challenge to remove Juror 147, and he was impaneled and sworn in as a member of Robinson's jury.

Robinson fails to establish any specific grounds for error. The record does not establish with any degree of clarity that Juror 147 was dismissed for failing to appear. Instead, it suggests he had been deferred and appeared as ordered on the second day of jury selection. Robinson did not object to Juror 147's continued participation in the jury selection process and passed him for cause. "All challenges for cause must be made before the jury is sworn to try the case." K.S.A. 22-3410(3). Robinson's failure to do so with Juror 147 undermines his claim of error on appeal. See *State v. Paxton*, 201 Kan. 353, 359, 440 P.2d 650 (1968); *State v. Burden*, 30 Kan. App. 2d 690, 697, 46 P.3d 570, *rev'd on other grounds* 275 Kan. 934, 69 P.3d 1120 (2002).

Robinson argues that after being sworn, Juror 147 allegedly committed juror misconduct by bringing a Bible into the penalty phase deliberations. The question of juror misconduct will either stand or fall on its own merits, and we consider this challenge later in the opinion. However, Juror 147's subsequent conduct as a juror does not establish that he lacked qualification to serve at the time he was impaneled. We find no error in the district judge's seating of a juror who was subjected to voir dire, passed for cause by the parties, and impaneled as a juror without objection.

*Strike of Veniremember Opposed to Death Penalty*

Robinson argues the trial court improperly granted the State's challenge of Juror 253 based solely on her general opposition to the death penalty.

213

1. *Legal Framework and Standard of Review*

Prospective jurors cannot be excused simply because they voice general objection to the death penalty. *Wainwright v. Witt*, 469 U.S. 412, 424, 105 S. Ct. 844, 83 L. Ed. 2d 841 (1985). Yet such jurors are unqualified when their views prevent or substantially impair their ability to apply the law as instructed. 469 U.S. at 424. We review a district court's ruling on such challenges for abuse of discretion. *State v. Kleypas*, 272 Kan. 894, 991, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), *overruled on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006).

2. *Was Juror 253 excused improperly?*

The one constant in Juror 253's testimony was uncertainty. On a number of occasions, Juror 253 commented that after weeks of thoughtful deliberation, she simply did not know whether she could fairly consider both sentencing options. Based on prospective Juror 253's ambiguous, uncertain, and vacillating responses, we find no error in excusing this juror. See *Kleypas*, 272 Kan. at 992 (affirming trial court's decision to strike prospective juror who could not unequivocally confirm ability to impose a sentence of death); see also *United States v. Snarr*, 704 F.3d 368, 381 (5th Cir. 2013) (no error in striking juror who could vote for death penalty if she "'heard enough bad evidence from the government'"; juror repeatedly expressed uncertainty in ability to vote for death penalty), *cert. denied* 134 S. Ct. 1274 (2014); *People v. Manibusan*, 58 Cal. 4th 40, 60, 165 Cal. Rptr. 3d 1, 314 P.3d 1 (2013) (no error in dismissal of juror who expressed uncertainty or who held opinion that vacillated as to ability to vote for death sentence); *People v. Souza*, 54 Cal. 4th 90, 123-25, 141 Cal. Rptr. 3d 419, 277 P.3d 118 (2012) (record fairly supported trial court's finding of substantial impairment where juror was unsure whether she could impose a penalty of death), *cert. denied* 133 S. Ct. 1499 (2013); *Com. v. DeHart*, 512 Pa. 235, 251-52, 516 A.2d 656 (1986) ("We reject the notion that

214

the exclusion of jurors expressing uncertainty as to their ability to impose the death penalty results in the impanelling of a jury biased in favor of the prosecution."), *cert. denied* 483 U.S. 1010 (1987).

Robinson cites *Hance v. Zant*, 696 F.2d 940 (11th Cir. 1983), *overruled in part on other grounds by Brooks v. Kemp*, 762 F.2d 1383 (11th Cir. 1985), in support of his claim of error. In *Zant*, the Eleventh Circuit held that the trial court erred in excluding prospective jurors where their death penalty views did not prevent them from imposing a death sentence under all conceivable circumstances. 696 F.2d at 955. The Eleventh Circuit based its holding on *Witherspoon*'s footnote 21, see 391 U.S. at 522-23 n.21, which suggested that a juror is rendered unqualified for service based on his or her death penalty views only when such views result in an automatic and unequivocal sentencing result. 696 F.2d at 955.

However, *Zant* predated *Witt*, where the Supreme Court rejected footnote 21 of *Witherspoon* as dicta. *Witt*, 469 U.S. at 421-22. *Witt* clarified that the appropriate standard for excusal included instances where a juror's views substantially impaired his or her ability to serve impartially, even if it did not prevent it outright. See *State v. Carr*, 300 Kan. 1, 113, 331 P.3d 544 (2014) (quoting *Witt*, 469 U.S. at 424), *cert. granted in part* 135 S. Ct. 1698 (2015). Since *Witt*, the Supreme Court has deferred to the trial court's finding of substantial impairment, even in situations where the challenged juror at times expressed a willingness to impose a sentence of death. See, *e.g.*, *Uttecht v. Brown*, 551 U.S. 1, 18, 127 S. Ct. 2218, 167 L. Ed. 2d 1014 (2007) ("Juror Z's assurances that he would consider imposing the death penalty and would follow the law do not overcome the reasonable inference from his other statements that in fact he would be substantially impaired in this case . . . ."). As such, Robinson's reliance on *Zant* is misplaced. *State v. Gregory*, 158 Wash. 2d 759, 813 n.26, 147 P.3d 1201 (2006) (Defendant's reliance on *Zant* misplaced because "it was decided before the *Witt* Court clarified that jurors may be

excused even if they are not unmistakably clear."), *overruled on other grounds by State v. W.R.*, 181 Wash. 2d 757, 336 P.3d 1134 (2014); *State v. Yates*, 161 Wash. 2d 714, 742 n.9, 168 P.3d 359 (2007) (same).

Robinson also cites to *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000), in support of his position. There the trial court excused a juror based solely on ambiguous questionnaire responses regarding her ability to impose a sentence of death, even though the prospective juror's voir dire responses evidenced no similar ambiguity and she was not asked whether she would realistically consider a death sentence. The Tenth Circuit held the juror was excused improperly. 230 F.3d at 1270-72. Here Judge Anderson did not base his ruling solely on Juror 253's questionnaire responses, and she repeatedly expressed uncertainty as to her ability to impose a death sentence during voir dire. *Chanthadara* is distinguishable.

*Alleged Prosecutorial Misconduct Enhancing Jury Selection Errors*

Robinson argues the prosecutor interfered with his exercise of peremptory challenges by infecting several small group panels with misstatements of law. He contends the alleged misconduct exacerbated the trial court's other jury selection errors.

1. *Standard of Review*

"Appellate review of an allegation of prosecutorial misconduct requires a two-step analysis. First, an appellate court decides whether the comments were outside the wide latitude that a prosecutor is allowed in discussing the evidence. Second, if misconduct is found, an appellate court must determine whether the improper comments prejudiced the jury against the defendant and denied the defendant a fair trial." *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 (2012).

We have held that this two-part test applies to "allegations of improper prosecutorial comments during voir dire." *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009).

2. *Did prosecutorial misconduct prejudice the jury selection process?*

Robinson contends the prosecutor committed misconduct by defining mitigating circumstances improperly, confusing guilt and penalty phase facts, commenting on defendant's future dangerousness, implying jurors could consider nonstatutory aggravating circumstances, and misstating the proper role of jurors.

a. *Definition of Mitigating Circumstances*

Robinson believes the prosecution committed misconduct by suggesting mitigating circumstances must reduce defendant's culpability for the offense.

While questioning the second small group panel, prosecutor Morrison asked Juror 23 whether he would "be able to consider factors that tend to lessen one's guilt when it comes to that stage?" The defense objected to this description of mitigating circumstances, and the district judge instructed the prosecutor to rephrase. The prosecutor complied, defining mitigating circumstances in a manner that drew no further objection.

Mitigating circumstances are those that lessen or diminish the moral culpability or blame of defendant or otherwise warrant a life sentence, and we have cautioned prosecutors not to argue that certain circumstances should not be considered mitigating simply because they do not excuse or justify the crime. *Kleypas*, 272 Kan. at 1103. Here, the prosecutor made no such argument. Nor is it evidence he intended to offer a precise, legal definition of the term in his questioning. Instead, he was attempting to gauge

217

veniremembers' ability to consider both sentencing options. The isolated nature of the prosecutor's statement and his immediate corrective action demonstrate that the conduct, even if improper, was not gross and flagrant or the product of ill will. See *State v. Albright*, 283 Kan. 418, 426-27, 153 P.3d 497 (2007) (prosecutor's inadvertent and isolated violation of order in limine was not gross and flagrant or the product of ill will).

Moreover, none of the six veniremembers on the second small group panel served as a member of defendant's jury, and the district judge properly defined mitigating circumstances in his ultimate instructions. Therefore the prosecutor's statement did not constitute prejudicial misconduct. See *State v. Phillips*, 295 Kan. 929, 945-46, 287 P.3d 245 (2012) (Misstatement of law on completion of robbery was not reversible misconduct where jurors properly instructed, and remarks were isolated and devoid of ill will.).

### b. *Mixing Guilt Phase Facts with Penalty Phase Facts*

Robinson suggests the prosecutor committed misconduct before another small group panel, composed of Jurors 82, 85, 87, 90, 92, and 95, when he asked Juror 82, "And if I gave you a scenario of a hundred homicides, we'd be able to find differences in the facts and circumstances of all of them, right?" Robinson's counsel objected, claiming the prosecutor was attempting to inject guilt phase facts into a discussion of mitigating and aggravating circumstances. Judge Anderson overruled the objection, noting that it "presupposes that [the prosecutor's] question, which references the different homicides . . . deal[s] only with the elements of the crime but not the mitigating factors and the aggravating factors . . . ." The record provides no basis to construe the comments differently from the district judge's construction, and we perceive no misconduct in the form of the question.

c. *Comments on Future Dangerousness*

Robinson argues the prosecutor inquired improperly about future dangerousness in prison. Indeed, while questioning the first small group panel, the prosecutor said that just because somebody goes to prison does not mean that he or she is no longer dangerous.

While reasonable minds might dispute the reasonableness of the prosecutor's observation, there is no need to do so here because Judge Anderson excused the entire panel based on the prosecutor's comment. None of the panelists could have affected Robinson's peremptory challenges or his fair trial rights.

d. *Nonstatutory Aggravating Circumstances*

Robinson argues the prosecutor suggested that the jury could consider defendant's bad character as an aggravating circumstance. While questioning the small group panel consisting of Jurors 34, 312, 336, 337, 342, and 344, the prosecutor said:

> "Even every murder is different. People do different things for different reasons; don't they? Some defendants might be more conniving than others, right? Some might be smarter than others. Some might be slower than others. Some might be acting under the influence of somebody else."

Robinson's counsel objected, arguing that the circumstances the prosecutor had identified were not all valid, statutory aggravating circumstances. The court sustained the objection on different grounds, finding that the form of the prosecutor's question was sending a "mixed message" and instructed the panel members to disregard the prosecutor's comments. Judge Anderson denied defendant's motion to strike the panel, believing any confusion could be cured. The prosecutor then rephrased without objection.

219

Robinson cites no authority suggesting the prosecutor's statements were error. Also, we presume prospective jurors followed the district judge's instruction, and we agree with Judge Anderson that the remarks were not of the type or character immune to such curative measures. See *State v. Race*, 293 Kan. 69, 77, 259 P.3d 707 (2011) (we presume jurors comply with instructions of the court). As such, the prosecutor's comments did not adversely impact defendant's peremptory challenges or his fair trial rights.

e. *Role of Jury in Sentencing*

Finally, Robinson argues the prosecutor made comments that minimized the role of jurors in the sentencing process, in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 331-34, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985), and *Romano v. Oklahoma*, 512 U.S. 1, 9, 114 S. Ct. 2004, 129 L. Ed. 2d 1 (1994).

In *Caldwell*, the prosecutor told the jury that its sentencing decision was not final because it was subject to appellate review. The plurality of the Supreme Court concluded that such remarks, combined with the trial judge's validation of them, impermissibly "minimize[d] the jury's sense of responsibility for determining the appropriateness of death." 472 U.S. at 341. Such a diminution of the jury's sense of responsibility, according to the plurality, prevented the jury from making an individualized determination of the appropriateness of the death penalty in violation of the Eighth Amendment. 472 U.S. at 330-31, 340-41. *Romano* clarified that *Caldwell* proscribes "'certain types of comment— those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.'" *Romano*, 512 U.S. at 9 (quoting *Darden v. Wainwright*, 477 U.S. 168, 184 n.15, 106 S. Ct. 2464, 91 L. Ed. 2d 144 [1986]).

(i). *Comments before the Ninth Panel*

Robinson argues two prosecutorial comments during voir dire of the ninth small group panel, consisting of Jurors 312, 337, 336, 342, 344, and 347, violated *Caldwell*.

First, while explaining a capital sentencing jury's duty to consider and weigh aggravating and mitigating circumstances, prosecutor Morrison commented, "Because under Kansas law, the death penalty can only be *recommended* by the jury if the aggravating factor or factors outweigh any mitigating factors that are found to exist." (Emphasis added.) The second comment concerns the following statement that Robinson attributes to Morrison: "If a person is found guilty, he receives the death penalty, sentence has been carried out with the death penalty on appeal to provide a safety net so we don't have wrongful kinds of things." The defense lodged no objections.

As discussed below, the prosecutor's use of the term "recommended" is consistent with the statutory language used to describe a capital jury's sentencing decision. Also, the isolated statement, made weeks before the jury was instructed on the capital sentencing process, was not gross and flagrant or the product of ill will. See *State v. Williams*, 299 Kan. 509, 540, 324 P.3d 1078 (2014). As to the second challenged statement, a careful reading of the record suggests prosecutor Morrison, who was questioning Juror 344 at the time, was actually reading or summarizing the veniremember's questionnaire response, not explaining the sentencing process to veniremembers. In other words, the challenged statement is not properly attributed to the prosecutor. These remarks did not affect Robinson's peremptory challenges or fair trial rights.

(ii). *Comments before the Seventeenth Panel*

Robinson also highlights comments the prosecutor made while examining the seventeenth panel. Before questioning these five veniremembers on their death penalty views, prosecutor Morrison provided them with an overview of the sentencing process, explaining that the jury arrives at a sentencing decision by "considering aggravating circumstances" and "mitigating circumstances . . . and weighing those and after considering those making a *recommendation* of whether the defendant should get the death penalty or whether the defendant should serve life . . . ." (Emphasis added.)

Defense counsel objected to the prosecutor's use of the term "recommendation" to describe the jury's sentencing decision, arguing it violated *Caldwell*. The district judge denied defendant's motion to strike the panel but instructed panel members to disregard the prosecutor's comments. The prosecutor rephrased, clarifying that the jury would decide the sentence, either a life term or death.

The prosecutor's use of the term "recommendation" does not violate *Caldwell* or constitute an improper statement of the law in this instance. In *Caldwell*, the prosecutor's comments "were quite focused, unambiguous, and strong." 472 U.S. at 340. In contrast, Morrison used one purportedly objectionable word, "recommendation," on a single occasion before this small group panel. The prosecutor's use of the term "recommendation" did not unambiguously and forcefully diminish the jury's role in the sentencing decision. *Ingram v. State*, 779 So. 2d 1225, 1276 (Ala. Crim. App. 1999) (trial court's reference to jury's capital sentencing verdict as a "recommendation" did not violate *Caldwell*), *aff'd sub nom. Ex parte Ingram*, 779 So. 2d 1283 (Ala. 2000). In fact, the Kansas Legislature used the same word to describe the jury's sentencing verdict under our capital sentencing scheme. K.S.A. 21-4624(e) ("The jury, if its verdict is a unanimous *recommendation* of a sentence of death, shall designate in writing . . . the statutory

aggravating circumstances which it found beyond a reasonable doubt."). The legislature's use of the term "recommendation" accurately describes the jury's sentencing verdict because K.S.A. 21-4624(f) requires the trial court to review any jury verdict imposing a sentence of death to decide whether the sentence is supported by the evidence. See *Hicks v. Collins*, 384 F.3d 204, 223 (6th Cir. 2004) (Because Ohio law "requires a separate, post-recommendation finding by the trial judge confirming the jury's sentence, this court has held that casting the jury's decision as a 'recommendation' is not an inaccurate statement of Ohio law and therefore does not violate *Caldwell*.").

Even if the comments had been improper, the district judge's curative instruction and the prosecutor's clarification of the jurors' role prevented interference with defendant's right to exercise peremptory challenges and ruled out prejudice to his fair trial rights. See *Romano*, 512 U.S. at 9 (instructions that "emphasized the importance of the jury's role" diminished the type of prejudice created in *Caldwell*).

(iii). *Comments before the Twenty-seventh Panel*

Prosecutor Morrison used the word "recommend" in describing the sentencing decision of the jury in comments made to the twenty-seventh small group panel. Robinson objected immediately, and Morrison said, "Judge, honest misstatement. I'll be happy to rephrase." The trial judge delivered the following curative instruction:

> "Members of the panel, Mr. Morrison, in his questions, used the word 'recommend.' I want to make it clear to the panel that it will be the jury's determination what the sentence is, and it will not be a recommendation."

After the instruction, the prosecutor commented, "Thank you Judge. I apologize. I misspoke. It is not a recommendation. It is for you to determine. When we get to that phase, jury determines death penalty or life sentence. Everybody with me?" None of the

panelists expressed any uncertainty or confusion. For the same reasons outlined above, Morrison's use of the term "recommend" did not violate *Caldwell* in this instance.

In the end, the prosecutor's voir dire comments did not interfere with defendant's right to exercise peremptory challenges or otherwise prejudice his fair trial rights.

*Trial Court's Use of an Anonymous Jury Selection Procedure*

Robinson next contends that Judge Anderson's use of a juror numbering system to identify veniremembers and those seated as jurors was unlawful and unconstitutional.

1. *Additional Factual and Procedural Background*

In June 2002, Judge Anderson entered a written order outlining the court's rules for handling juror questionnaires. Therein, he ordered that the "identities and addresses of the jurors" be maintained in strict confidence among the parties and that "[a]ll jurors will be assigned a unique number which will be used to identify them throughout voir dire and the course of the trial." While prospective jurors were identified only by number to the public, their identities were known to the parties, and each prospective juror's name and address was disclosed in the questionnaire.

Robinson did not object to the use of juror numbers. In fact, he was a proponent of the system. In opposing Judge Anderson's initial decision to sequester the jury for the duration of trial, Robinson argued, in part, that other measures, including a juror numbering system, could accomplish the same objectives with less intrusion. At a September 2002 motions hearing, both parties agreed that it was unnecessary to sequester the jury in light of these less intrusive measures. Based on the parties' agreement, Judge Anderson ordered the jury sequestered during deliberations only.

After selecting the jury, Judge Anderson delivered admonitions and explained why jurors would be identified by number:

> "Now, I want to explain to you a little bit about procedurally how we're going to . . . handle things. Even though you're not going to be sequestered, we're going to be helping you in following these admonitions; and you've all gotten the numbers, and we've been using numbers rather than names.
>
> "I want to assure you that you should not be concerned for your safety. That's not the reason that we're using the numbers, okay? The reason that we're using the numbers is that we want to make sure that your integrity is preserved while you're serving as jurors on this case and to help in these admonitions so that we don't have to sequester you in the evening hours and on the weekends."

Judge Anderson continued:

> "Now, this is designed to prevent you from being exposed inadvertently or against your will by anyone that might want to impose themselves upon you during the pendency of the case with respect to the admonition issues; overzealous media persons, for example, and I don't mean to single out the media, but that's just an example. Overzealous anybody that might try to give you their views of the case. And we want to try to avoid that. Does everybody understand that's why we're doing these things?"

No juror expressed confusion as to the purpose of the juror numbering system.

### 2. *Legal Framework and Standard of Review*

We have identified a two-part balancing test for analyzing the propriety of a district court's use of an anonymous jury identification system.

> "First, there must be a reason to protect the jurors from identification. This decision will be left to the trial court's discretion. Second, the court must take reasonable precautions to minimize any prejudicial effects on the defendant. A neutral explanation should be given,

225

and the jury should be instructed that the use of numbers instead of names should in no way be interpreted as a reflection of the defendant's guilt or innocence." *State v. Brown*, 280 Kan. 65, 74, 118 P.3d 1273 (2005).

### 3. *Was Judge Anderson's juror numbering system improper?*

Robinson contends the anonymous jury selection procedure violated Kansas law and his due process right to the presumption of innocence. As a preliminary matter, it should be clarified that Judge Anderson did not use an anonymous jury selection procedure in the true sense of that word, where juror identities are withheld from the public and parties alike. Both the district judge and the parties knew the identity of each prospective juror. See *State v. Yates*, No. 89,938, 2004 WL 795906, at *3 (Kan. App. 2004) (unpublished opinion) (jury selection not truly anonymous where jurors names included on questionnaires but kept confidential to public), *rev. denied* 278 Kan. 852 (2004); see also *United States v. Johnson*, 354 F. Supp. 2d 939, 956 (N.D. Iowa 2005) (where jurors' identities known by parties, procedure "might be described as 'innominate,' rather than 'anonymous'"), *aff'd in part* 495 F.3d 951 (8th Cir. 2007).

The distinction is important because where, as here, the identity of jurors is known to the parties, but withheld from the public, defendant cannot claim the procedure interfered with a meaningful opportunity to voir dire the venire. See *Brown*, 280 Kan. at 72-75. However, "there remains the concern that the trial court's order negatively impacted [defendant's] constitutional right to the presumption of innocence." 280 Kan. at 72-73. To determine whether the juror number system appropriately balanced the court's interest in protecting jurors' identities with defendant's right to a fair trial, we apply the *Brown* balancing test, considering whether Judge Anderson had "a reason to protect the jurors from identification" and whether he took "reasonable precautions to minimize any prejudicial effects on the defendant." 280 Kan. at 74.

## a. *Reason to Protect Jurors from Identification*

While safety concerns motivated the trial court's decision to use a juror number system in *Brown*, we also recognized that several other factors could justify use of such procedures, including that extensive publicity "'could enhance the possibility that jurors' names would become public and expose them to intimidation and harassment.'" 280 Kan. at 72 (identifying five common factors, including invasion of privacy from media); *United States v. Krout*, 66 F.3d 1420, 1427 (5th Cir. 1995) (same).

Judge Anderson identified the potential for invasion of juror privacy by the media or other overzealous individuals with an interest in the outcome of the proceedings, particularly in the absence of sequestration, as the reason for using the juror numbering system. The concern for juror privacy was well founded. Defendant's own venue study confirmed the media's coverage of the case was probably unprecedented in Johnson County. Judge Anderson's concern for juror privacy was also genuine. He initially ordered the jury to be sequestered for the duration of trial to protect jurors from such intrusions. At the defense's urging, the district judge ultimately utilized the juror numbering system and other protective measures in lieu of sequestration. The record confirms Judge Anderson's concerns about invasion of juror privacy were reasonably supported by the totality of the circumstances. The trial court asserted a proper reason for using a juror numbering system, satisfying the first prong of *Brown's* two-part balancing test. See *Johnson*, 354 F. Supp. 2d at 956 (extensive media publicity justified use of juror numbers to protect jurors' privacy and limit their exposure to extrajudicial information).

Robinson suggests there was no evidence jurors needed such protection. The argument is wholly unpersuasive in light of the appellant's venue study, venue challenge on appeal, and the arguments the defense advanced at trial in opposition to sequestration, including its support for the juror numbering system in lieu of sequestration. We defer to

227

the trial court's discretion regarding the need to protect juror privacy in this case. See *Brown*, 280 Kan. at 74 (whether reasons exist to protect juror identity is an issue "left to the trial court's discretion"); see also *United States v. Peoples*, 250 F.3d 630, 635 (8th Cir. 2001) (district court has wide discretion to require use of numbers for identification in any case).

b. *Reasonable Precautions to Minimize Prejudice*

As to the second prong of the *Brown* balancing test, it is clear Judge Anderson was cognizant of and took steps to avoid prejudicial inferences associated with the use of juror numbers. He provided jurors with a neutral explanation for the numbering system, explaining that it protected jurors from corrupting influences that could result from public disclosure of juror identities. Also, he expressly informed jurors that the procedure was unrelated to any security threat or juror safety. This explanation adequately protected Robinson's due process rights. See *United States v. Paccione*, 949 F.2d 1183, 1193 (2d Cir. 1991) (no prejudice from juror numbers where court instructed jury at outset of trial that precautions designed to protect jury from contact by the media); *United States v. Thomas*, 757 F.2d 1359, 1365 (2d Cir. 1985) ("the explanation that jurors were not to reveal their names to protect them from the press substantially avoided any risk of aspersions on the defendants"); *State v. Flournoy*, 535 N.W.2d 354, 362 (Minn. 1995) (trial court minimized prejudicial inferences by informing jurors that purpose of anonymity was to guard against extensive trial publicity), *cert. denied* 516 U.S. 1140 (1996).

We recognize Judge Anderson did not affirmatively instruct jurors to draw no adverse inferences of guilt or innocence based on the use of juror numbers. In *Brown*, we found such an instruction was necessary under the facts because the defendant's tactics of fear and intimidation were a predominant theme throughout the State's case and served as

the impetus for the use of juror numbers in the first instance. 280 Kan. at 67-70, 74. Here the facts did not necessitate such instruction. Judge Anderson's neutral explanation for the use of the procedure combined with his express statement that it was unrelated to any concern for juror safety properly balanced jurors' interest in privacy against defendant's due process interests. See *United States v. Darden*, 70 F.3d 1507, 1533 (8th Cir. 1995) (no violation of fair trial rights where court "told the venirepersons that they were being identified by numbers rather than their names so that members of the media would not ask them questions"; explanation provided a reasonable safeguard against undue prejudice); *Perez v. People*, 302 P.3d 222, 226 (Colo.) (use of juror numbers did not undermine presumption of innocence where intended to protect privacy and nothing suggested defendant's guilt or dangerousness), *cert. denied* 134 S. Ct. 256 (2013); *People v. Williams*, 241 Mich. App. 519, 524, 616 N.W.2d 710 (2000) (use of juror numbers did not undermine presumption of innocence where nothing suggested practice was unique to defendant); *cf. State v. Bowles*, 530 N.W.2d 521, 529-31 (Minn. 1995) (use of juror numbers does not inherently create inference of guilt contrary to the constitutional presumption of innocence).

The record supports Judge Anderson's use of a juror numbering system under the two-part *Brown* balancing test, and we find no error.

5. SUFFICIENCY OF EVIDENCE OF COMMON SCHEME OR COURSE OF CONDUCT

Under Counts II and III of the Fourth Amended Complaint, Robinson was charged with and tried for capital murder under K.S.A. 21-3439(a)(6), which defines the offense to include the "intentional and premeditated killing of more than one person as a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct." The counts were identical in charging the murder of a principal victim as "one of multiple acts or transactions

constituting parts of a common scheme or course of conduct in which other human beings were killed in a premeditated and intentional manner, to-wit: Beverly J. Bonner, Sheila Faith, Debbie Faith and Lisa Stasi." Count II charged Suzette Trouten as the principal victim and Count III charged Izabela Lewicka as the principal victim.

*Standard of Review*

Robinson advances two arguments challenging the sufficiency of the evidence supporting his capital murder convictions. First, he contends the evidence failed to establish a "common scheme or course of conduct" as the phrase should be construed under K.S.A. 21-3439(a)(6). Second, he argues the State cannot rely on murders that occurred prior to the effective date of the capital murder statute to prove the multiple murders required under K.S.A. 21-3439(a)(6).

To the extent Robinson's arguments compel us to construe K.S.A. 21-3439(a)(6), we exercise unlimited review. *State v. Ortega-Cadelan*, 287 Kan. 157, 164, 194 P.3d 1195 (2008). In assessing whether sufficient evidence supported his convictions under a proper construction of this section, we determine "whether, after review of all the evidence, examined in the light most favorable to the prosecution, the appellate court is convinced a rational factfinder could have found the defendant guilty beyond a reasonable doubt. [Citations omitted.]" *State v. Scott*, 285 Kan. 366, 372, 171 P.3d 639 (2007).

*Did the State's evidence establish a common scheme or course of conduct?*

Robinson argues the State was obligated to prove that every killing alleged in each capital count was part of that count's common scheme or course of conduct and that the State's evidence failed to do so as a matter of law under his interpretation of that phrase. To resolve the challenge, we must construe the meaning of the phrase "common scheme

230

or course of conduct" under K.S.A. 21-3439(a)(6) and decide if the State's evidence was sufficient to establish the same.

In an effort to define common scheme or course of conduct, Robinson examines characteristics or factors present in other cases found to satisfy the requirements of K.S.A. 21-3439(a)(6) and attributes to them the status of legal requirements prerequisite to such a finding. For example, Robinson cites *State v. Harris*, 284 Kan. 560, 162 P.3d 28 (2007), where we discussed the "common scheme or course of conduct" requirement in analyzing the unit of prosecution for multiplicity purposes under K.S.A. 21-3439(a)(6). In interpreting the unit of prosecution for capital murder, we stated:

> "The plain and unambiguous language of K.S.A. 21-3439(a)(6) defines capital murder as multiple first-degree murders, *i.e.*, the 'intentional and premeditated killing of more than one person.' The statute also requires that the multiple killings *be related to one another in some way*, that they occur 'as a part of the same act or transaction,' or 'in two or more acts . . . connected together or constituting parts of a common scheme or course of conduct.' K.S.A. 21-3439(a)(6)." (Emphasis added.) 284 Kan. at 572.

We found the circumstances demonstrated the existence of a common scheme or course of conduct, finding:

> "Defendant's conduct certainly satisfies this statutory definition. The stipulated facts demonstrate that he was complicit in four intentional and premeditated killings, despite the ultimate dismissal of one capital count. The three murders on which he stands convicted were connected together and constituted parts of a single course of conduct. The evidence demonstrates that *they all occurred within a short span of time* and *were designed to avenge* an earlier battery of [his codefendant's] mother." (Emphasis added.) 284 Kan. at 572.

Robinson seizes upon this language and the court's reliance on the "short span of time" and common revenge motive to argue that *Harris* dictates against finding a common scheme or a course of conduct in the absence of such evidence.

The argument is logically flawed. *Harris* does not *require* a short time span or a common motive to establish a common scheme or course of conduct. The only requirement *Harris* recognizes is that the murders be "related to one another in some way." The common motive and short time between criminal acts merely happened to be the factors showing the relatedness of the murders in *Harris*. They were not conditions precedent for the existence of a common scheme or course of conduct in any case charged under K.S.A. 21-3439(a)(6).

Employing similarly flawed logic, Robinson reviews other cases in which our court has examined the terms "common scheme" or "course of conduct" in other contexts, distinguishing those cases factually from his own, and arguing the specific factual characteristics of those cases established prerequisites for the legal conclusion. For instance, he relies on *State v. Spain*, 263 Kan. 708, 953 P.2d 1004 (1998), to argue that a course of conduct cannot encompass crimes separated by several hours.

In *Spain*, we examined whether the facts supported the existence of the aggravating circumstance alleged by the State, which required proof that defendant knowingly or purposely created a great risk of death to more than one person. We determined that the statutory aggravator required a *direct* relationship between the great risk of death thrust upon the second victim and the homicide of the first victim. 263 Kan. at 718. We reversed the district court, stating:

> "The risk need not be contemporaneous with the homicide, but it must occur in the course of committing the charged murder. In the present case, a period of time that included

232

Spain's escaping from jail, shooting Powell, and kidnapping Briles might more precisely be termed a series of discrete transactions or events than one *course of conduct*. Although the events were loosely connected in that each figured in Spain's escape, they are too remote from one another in time, distance, and nature to be characterized as a *course of conduct*. The murder of Powell was completed long before Briles was kidnapped in Colorado. Thus, the trial court erred in finding that the risk of death to Briles was an aggravating circumstance in the murder of Powell." (Emphasis added.) 263 Kan. at 718.

Robinson relies on *Spain* to argue that a course of conduct cannot include acts that are "remote from one another in time, distance, and nature." Again, Robinson's argument is flawed. First, the aggravating circumstance at issue required a direct relationship between the murder and the risk of death to another. *Harris*, on the other hand, provides that K.S.A. 21-3439(a)(6) requires only that the multiple murders "be related to each other in some way." Second, in *Spain* we did not define "course of conduct." We merely used the phrase in the process of determining the meaning of the statutory aggravating circumstance.

Likewise, Robinson relies on authority construing Kansas' joinder statute, which allows the State to join offenses in a single complaint under a variety of circumstances, including where the crimes are based on "two or more acts or transactions connected together or constituting parts of a common scheme or plan," K.S.A. 22-3202(1), to argue the phrase "common scheme" requires the crimes be motivated by a single identifiable goal. See *State v. Woods*, 250 Kan. 109, 117-18, 825 P.2d 514 (district court did not err in joining two separate complaints into one where there were "factual relationships" between the charges), *cert. denied* 506 U.S. 850 (1992); *State v. Hanks*, 236 Kan. 524, 533, 694 P.2d 407 (1985) (charges arising from two separate sexual attacks on the victim in her home, one in July and one in November, could be joined properly where they involved same victim, same defendant, occurred in same locale, and acts charged were of similar character), *superseded by statute on other grounds as stated in State v. Borthwick*,

255 Kan. 899, 916, 880 P.2d 1261 (1994). However, neither *Woods* nor *Hanks* held that a single identifiable goal or motive of the defendant was a prerequisite to finding a common scheme. In fact, *Hanks* identifies a number of other characteristics such as the same victim, the same jurisdiction, and similar acts and crimes to further its conclusion that the crimes were related.

While we have not expressly defined "common scheme or course of conduct" under K.S.A. 21-3439(a)(6), we have examined its meaning. In *State v. Gleason*, 299 Kan. 1127, 329 P.3d 1102 (2014), *cert. denied* 135 S. Ct. 1698 (2015), defendant argued there was insufficient evidence of a common scheme or course of conduct to support his capital murder conviction. Reiterating the *Harris* standard, we stated:

> "Here, the State was required to prove beyond a reasonable doubt . . . the killings were part of the same act or transaction or two or more connected transactions. . . .
> "This element 'requires that the multiple killings be related to one another in some way, that they occur "as a part of the same act or transaction," or "in two or more acts . . . connected together or constituting parts of a common scheme or course of conduct."' *State v. Harris,* 284 Kan. 560, 572, 162 P.3d 28 (2007) (quoting K.S.A. 21-3439[a][6]). Although Gleason's argument as to this issue is murky, he seems to suggest that there is no evidence the murders are related because there is no evidence he and Thompson talked about killing Wornkey or that Thompson knew Gleason intended to kill Wornkey, and no evidence he and Thompson talked about killing Martinez on the way to Great Bend or that Gleason knew Thompson intended to shoot Martinez.
> "But this argument ignores our standard of review, which requires us to view the evidence in the light most favorable to the State. Here, the State presented evidence that Gleason and Thompson armed themselves and drove to Great Bend to 'bring some intimidation' to Martinez based on their mutual belief Martinez had talked to police about the Elliott robbery—a robbery in which Thompson and Gleason participated. Thompson parked across the street from Martinez' house; and when Martinez and Wornkey arrived home, Thompson watched as Gleason approached Wornkey's Jeep and shot and killed Wornkey, wounding Martinez. Gleason and Thompson then kidnapped Martinez and

234

took her to a rural location where Thompson strangled, shot, and killed her. Viewing this evidence in the light most favorable to the State, we are convinced a rational jury could have found beyond a reasonable doubt that the murders of Martinez and Wornkey were sufficiently related to support the capital murder charge." *Gleason*, 299 Kan. at 1150-51.

Contrary to Robinson's attempts to narrow and compartmentalize the meaning and scope of a common scheme or course of conduct under K.S.A. 21-3439(a)(6), in *Gleason*, we again required only that the multiple murders be related to one another in some way.

Moreover, in reviewing the evidence in *Gleason*, we did not point to any particular characteristics of the murders, *i.e.*, common motive, short span of time, or similar modus operandi, in concluding that a rational jury could have found the murders sufficiently related to satisfy the statutory element. In fact, we rejected defendant's argument that the two murderers must have conspired to commit both murders for them to be sufficiently related to establish a common scheme or course of conduct.

Robinson fails to show a legal definition of the terms that would justify taking the issue from the jury. The State presented ample evidence that Robinson lured his victims with promises of financial gain, employment, or travel; exploited them sexually or financially; used similar methods to murder and dispose of their bodies; and used deception to conceal the crimes, including phony letters and e-mails to victims' friends and family members. While no two of the victims or their murders were identical, they are not required to be. Simply put, there was ample evidence from which the jurors could have found that all of the murders were related to one another in some way and therefore part of a common scheme or course of conduct.

*Can conduct that straddles the date of enactment of the capital murder statute support defendant's capital murder convictions?*

Robinson next argues that K.S.A. 21-3439(a)(6) does not apply to murders that occurred prior to July 1, 1994, the effective date of the statute. The State failed to prove that the murders of Lisa Stasi, Sheila and Debbie Faith, and Beverly Bonner occurred after July 1, 1994, and, therefore, Robinson argues, his capital murder convictions must be vacated.

Whether K.S.A. 21-3439(a)(6) applies to a common scheme or course of conduct that straddles in time the date of enactment requires us to interpret the legislative act.

> "The most fundamental rule of statutory construction is that the intent of the legislature governs if that intent can be ascertained. *State v. Arnett*, 290 Kan. 41, 47, 223 P.3d 780 (2010). But if a statute is plain and unambiguous, this court will not speculate about legislative intent or turn to canons of construction or legislative history. *State v. Coman*, 294 Kan. 84, 92, 273 P.3d 701 (2012)." *State v. Reese*, 300 Kan. 650, 653, 333 P.3d 149 (2014).

Generally, a statute will operate only prospectively unless the legislature indicates by clear language that it is intended to operate retroactively. *Gleason*, 299 Kan. at 1157; *State v. Wells*, 297 Kan. 741, 761, 305 P.3d 568 (2013); *State v. Jaben*, 294 Kan. 607, 612-13, 277 P.3d 417 (2012).

K.S.A. 21-3439(a)(6) sets out the definition of capital murder relevant here, providing:

> "(a) Capital murder is the:
> . . . .

(6) intentional and premeditated killing of more than one person as a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct."

From this language we can ascertain at least two separate elements that must be met before this iteration of capital murder has been committed. The first element of the crime requires intentional and premeditated killing of more than one person. The second element requires that these killings be part of the same act or transaction or multiple acts or transactions connected together or constituting parts of a common scheme or course of conduct. K.S.A. 21-3106(6) provides: "An offense is committed either when every element occurs, or, if a legislative purpose to prohibit a continuing offense plainly appears, at the time when the course of conduct or the defendant's complicity therein is terminated." Robinson could not have completed capital murders until both of the statutory elements were satisfied.

The murders of Trouten and Lewicka each constituted parts of the common scheme or course of conduct that included the murders of Stasi, Sheila and Debbie Faith, and Bonner. Accordingly, the elements of capital murder as charged under K.S.A. 21-3439(a)(6) were not united and fulfilled until the principal charged capital murder victims, Trouten in Count II and Lewicka in Count III, had been killed. A reasonable juror could conclude from the State's evidence that the murders of Trouten and Lewicka both occurred after July 1, 1994, the effective date of K.S.A. 21-3439. Simply put, Robinson did not complete the crimes of capital murder as charged in the Fourth Amended Complaint until after the statute was in effect.

The Oregon Court of Appeals was presented with a similar issue in *State v. Zelinka*, 130 Or. App. 464, 882 P.2d 624 (1994). There, defendant was convicted of three

237

counts of murder by abuse and criminal mistreatment. Oregon's murder by abuse statute, provided:

> "(1) Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder:
>
> . . . .
>
> (c) By abuse when a person recklessly under circumstances manifesting extreme indifference to the value of human life, causes the death of a child under 14 years of age . . . and the person has previously engaged in a pattern or practice of assault or torture of the victim or another child under 14 years of age or a dependent person." Ore. Rev. Stat. § 163.115(1)(c) (1990).

Defendant argued the trial court improperly allowed acts of abuse committed before the enactment of the statute to prove the element of pattern or practice of assault or torture, arguing it was a retroactive application violating the Ex Post Facto Clause of the United States Constitution. Rejecting this claim, the Oregon Court of Appeals found that "[d]efendant's ex post facto argument turns on an artificial disassociation of the pre-enactment assaults from the post-enactment murder. Murder by abuse requires *both* elements. Accordingly, defendant's crime was not completed until after the enactment of the statute." 130 Ore. at 472.

The *Zelinka* rationale applies equally to Robinson's challenge. As charged, K.S.A. 21-3439(a)(6) includes two separate elements, the killing of multiple persons and a common scheme or course of conduct. Robinson cannot artificially disassociate the preenactment murders from the postenactment murders of the principal victims that constituted parts of defendant's common scheme or course of conduct. The elements of the capital murder statute were not completed until Robinson murdered Trouten, under Count II, and Lewicka, under Count III—acts that occurred subsequent to enactment.

238

Likewise, the California Supreme Court addressed a similar issue in *People v. Grant*, 20 Cal. 4th 150, 83 Cal. Rptr. 2d 295, 973 P.2d 72 (1999). There, defendant was convicted under the continuous sexual abuse of a minor statute, which prohibited any person residing with or having access to a child under the age of 14 to molest that child at least three times during a period of not less than 3 months. The court examined whether abusive conduct that began before, but continued after, the effective date of the controlling statute could support defendant's conviction. The California Supreme Court observed that a statute is applied retroactively only if it penalizes a crime completed before the law's effective date. As such, the critical question was "whether the last act or event necessary to trigger application of the statute occurred before or after the statute's effective date." 20 Cal. 4th at 157. In affirming the conviction, the court held:

> "Here, defendant was convicted of continuous sexual abuse . . . after the court instructed the jury to return a verdict of guilty only if it found that one of the required minimum of three acts of molestation occurred after section 288.5's effective date. In other words, defendant could be convicted only if the course of conduct constituting the offense of continuous sexual abuse was completed after the new law became effective. Because the last act necessary to trigger application of section 288.5 was an act of molestation that defendant committed after section 288.5's effective date, defendant's conviction was not a retroactive application of section 288.5 and therefore not a violation of the statutory prohibition against retroactive application of the Penal Code." 20 Cal. 4th at 157-58.

For Robinson, the last act or event necessary to trigger application of K.S.A. 21-3439(a)(6) was the murder of Trouten in Count II and the murder of Lewicka in Count III. Both murders were committed subsequent to the enactment of the capital murder statute. As in *Grant*, because the final acts necessary to trigger application of K.S.A. 21-3439(a)(6) were committed after the effective date of the statute, Robinson's convictions and the evidence supporting them do not constitute a retroactive application of the statute.

239

Robinson relies on *United States v. Husted*, 545 F.3d 1240, 1241 (10th Cir. 2008). There, defendant was convicted of a sex crime requiring him to register as a sex offender under Illinois law in 1993. In January 2006, he informed Illinois he was moving to Oklahoma, and he registered in that state the following month. Defendant later fell out of compliance and was arrested in Missouri in March 2007. It was undisputed that defendant had relocated to Missouri prior to the effective date of 18 U.S.C. § 2250 (2006) of the Sex Offender Registration and Notification Act. In order to convict a defendant under this statute, the government must prove that a person required to register, travels in interstate commerce and knowingly fails to register or update his registration. 545 F.3d at 1243. The Tenth Circuit found that Congress' use of the word "travels" expressed an intent that the statute not apply to those who had traveled in interstate commerce prior to enactment of the statute. 545 F.3d at 1243-44.

The holding in *Husted* is largely dependent on Congress' use of the word "travels" in the federal act, and no comparable language in our capital murder statute exists or supports a similar construction. Moreover, in *Husted*, unlike here, defendant had completed all elements of the offense prior to enactment of the statute, and defendant's conviction could stand only by applying the statute retroactively. 545 F.3d at 1246. On these grounds, *Husted* is factually and legally distinguishable.

Based on our construction of K.S.A. 21-3439(a)(6), Robinson completed the acts satisfying elements of the charged offenses only after enactment of the statute. As such, applying the statute prospectively, the State's evidence was sufficient to support his capital murder convictions under Counts II and III.

240

## 6. MULTIPLICITY

Robinson argues the capital murder convictions are multiplicitous with one another, and each is multiplicitous with the first-degree murder conviction.

*Legal Framework and Standard of Review*

> "Multiplicity is the charging of a single offense in more than one count of a complaint or information. It creates the potential for multiple punishments for a single crime, offending the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and Section 10 of the Kansas Constitution Bill of Rights. *State v. Scott*, 286 Kan. at 65 (quoting *Harris*, 284 Kan. 560, Syl. ¶ 1)." *Carr*, 300 Kan. at 163.

In determining whether convictions subject a defendant to double jeopardy, "the overarching inquiry is whether the convictions are for the same offense." *State v. Schoonover*, 281 Kan. 453, 496, 133 P.3d 48 (2006). This inquiry is broken into "two components, both of which must be met for there to be a double jeopardy violation:  (1) Do the convictions arise from the same conduct? and (2) By statutory definition, are there two offenses or only one?" 281 Kan. at 496. As to the second component, "[i]f the double jeopardy issue arises from convictions for multiple violations of a single statute the unit of prosecution test is applied." 281 Kan. at 497. "If the convictions are based upon different statutes, the convictions are multiplicitous only when the statutes upon which the convictions are based contain an identity of elements." *State v. Thompson*, 287 Kan. 238, 244, 200 P.3d 22 (2009).

Our review is unlimited in assessing this question of law. *State v. Appleby*, 289 Kan. 1017, 1026, 221 P.3d 525 (2009).

241

*Were Robinson's capital murder convictions multiplicitous?*

Robinson was convicted of capital murder on Counts II and III of the Fourth Amended Complaint. The counts were identical in charging capital murder under K.S.A. 21-3439(a)(6) for the murders of the principal victims, Trouten in Count II and Lewicka in Count III, as "one of multiple acts or transactions constituting parts of a common scheme or course of conduct in which other human beings were killed in a premeditated and intentional manner, to-wit: Beverly J. Bonner, Sheila Faith, Debbie Faith and Lisa Stasi." The jury convicted and sentenced Robinson to death on both counts. At trial, Robinson challenged his first-degree murder conviction, but not the capital convictions, as multiplicitous. Nevertheless, we consider both challenges in the interests of justice. See *Carr*, 300 Kan. at 163-64.

The "unit of prosecution" under K.S.A. 21-3439(a)(6) is the killing of more than one person, and the killing of the second (and subsequent) victim(s) makes the murders of the group of victims punishable by death. As such, we have held previously that multiple capital murder convictions under K.S.A. 21-3439(a)(6) based on the killing of the same victims are multiplicitous. *Carr*, 300 Kan. at 164; *State v. Harris*, 284 Kan. 560, 571-78, 162 P.3d 28 (2007).

The State acknowledges this precedent but argues it is distinguishable because not all of the victims of the multiple murders are listed in all of the capital counts of the complaint. Specifically, Trouten is not mentioned in Count III of the complaint and Lewicka is not mentioned in Count II of the complaint. The State emphasizes language in *Harris* acknowledging that "under other circumstances, a defendant may be convicted and punished appropriately and constitutionally on multiple counts of capital murder, as that offense is defined in K.S.A. 21-3439(a)(1) through (7)." 284 Kan. at 578. The State maintains this case presents those "other circumstances" because the serial killings of

Trouten and Lewicka constituted discrete acts rather than unitary conduct. *Schoonover*, 281 Kan. at 464 (double jeopardy issue not raised where defendant convicted and sentenced for discrete and separate acts or courses of conduct but, instead, where conduct is unitary).

However, in *Schoonover* we acknowledged "[t]he overarching inquiry is whether the convictions are for the same offense." 281 Kan. at 496. Here, the legislature has defined capital murder to include the killing of more than one person "in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct." K.S.A. 21-3439(a)(6). Because the legislature defined the offense to include two or more discrete acts or transactions, the unitary conduct inquiry here must necessarily focus on the nature of the "common scheme or course of conduct," not merely on the "killing of more than one person." See *Schoonover*, 281 Kan. at 472 (unit of prosecution not necessarily dependent on whether there is a single act or victim, but, instead, the key is the nature of the conduct described; unit of prosecution can be determined by scope of the course of conduct defined by statute rather than discrete physical acts composing that course of conduct); see also *State v. Olsson*, 2014-NMSC-012, ¶ 18, 324 P.3d 1230 (N.M. 2014) (relevant inquiry in a unit of prosecution case is whether legislature intended punishment for the entire course of conduct or for each discrete act).

Here, the State alleged, argued, and proved that all of the murders in Counts II and III were tied together by the same common scheme or course of conduct. The State did not allege or prove the existence of a separate, distinct common scheme or course of conduct for each capital murder charge. The lone common scheme or course of conduct connecting all murders charged in Counts II and III is properly characterized as unitary conduct under K.S.A. 21-3439(a)(6). Also, by statutory definition, there is but one offense because the legislature defined the unit of prosecution as more than one murder

tied together by or constituting parts of a common scheme or course of conduct, even if committed in discrete acts. Robinson's capital murder convictions are multiplicitous.

Robinson believes the proper remedy is to reverse one capital conviction and resentence him on the other, reasoning that these convictions might have prejudiced the jury against defendant "by creating the impression of more criminal activity on his part than in fact may have been present." To the contrary, we have consistently held that the remedy for multiplicitous convictions in unit of prosecution cases is the reversal of all but one conviction based upon a single unit of prosecution. "There can be only one conviction for each allowable unit of prosecution." *Schoonover*, 281 Kan. at 497-98; see *Harris*, 284 Kan. at 577-78. Robinson cites no authority directly supporting his theory of prejudice or resentencing as a proper remedy, and, even if there were, we hold "the death verdict actually rendered in this trial was surely unattributable" to the fact that the prosecution charged Robinson with two counts of capital murder instead of one, as both convictions supported but one aggravating circumstance and no new evidence was admitted during the penalty phase to support it. See *State v. Kleypas*, 272 Kan. 894, 1087-88, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834, *overruled on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006).

We reverse the conviction and vacate the sentence on Count III, which simply by being the second capital murder charge in the complaint is the multiplicitous count giving rise to the double jeopardy violation. In doing so, we emphasize and cannot overstate that this holding in no way excuses Robinson's conduct or makes his murder of Lewicka any less reprehensible. Nor, we hope, should it reopen, heighten, or otherwise cheapen the terrible pain and suffering Robinson's conduct caused to Lewicka and the still living victims of her murder. Had the State included her murder in Count II or alleged the existence of a different common scheme or course of conduct in Count III, the situation would be different.

244

*Was Robinson's first-degree murder conviction multiplicitous?*

In addition to the two capital murder convictions, Robinson was also convicted and sentenced to life in prison with eligibility for parole after 15 years on Count V, the first-degree premeditated murder of Lisa Stasi. Robinson maintains this conviction and sentence is multiplicitous with both capital murder counts since Stasi's death is alleged as a predicate murder for both those counts.

We settled this issue in *State v. Scott*, 286 Kan. 54, 65-68, 183 P.3d 801 (2008), holding that two convictions arising out of a double homicide, one for capital murder based on the intentional and premeditated killing of more than one person and the other for premeditated first-degree murder, were improperly multiplicitous because, under K.S.A. 21-3107(2)(d), the first-degree premeditated murder was a crime necessarily proved if the capital murder was proved and the legislature had not authorized multiple prosecutions. We have continued to apply the *Scott* holding in similar circumstances. See *State v. Gleason*, 299 Kan. 1127, 1184-85, 329 P.3d 1102 (2014) (capital murder conviction based on multiple intentional, premeditated murders and first-degree premeditated murder conviction multiplicitous), *cert. denied* 135 S. Ct. 1698 (2015); *Trotter v. State*, 288 Kan. 112, 124, 200 P.3d 1236 (2009) (same). The State concedes the error.

We reverse the conviction and vacate the sentence on Count V as it is unconstitutionally multiplicitous with the capital counts.

## 7. JURISDICTIONALLY DEFECTIVE COMPLAINT

Robinson argues the Fourth Amended Complaint was so poorly drafted that it failed to confer jurisdiction on the trial court over the capital murder and aggravated interference with parental custody counts, Counts II, III, and VI.

*Standard of Review*

"This court reviews de novo whether a complaint is sufficient to give the district court jurisdiction over a charge." *State v. Hurd*, 298 Kan. 555, 565, 316 P.3d 696 (2013).

Because Robinson timely filed a motion for arrest of judgment based on a defective complaint, we review the issue under the pre-*Hall* standard. *Hurd*, 298 Kan. at 565; see *State v. Hall*, 246 Kan. 728, 764-65, 793 P.2d 737 (1990), *overruled in part on other grounds by Ferguson v. State*, 276 Kan. 428, 78 P.3d 40 (2003). "Under this standard, an information which omits one or more of the essential elements of the crime it attempts to charge is jurisdictionally and fatally defective, and a conviction based on such an information must be reversed." *Scott*, 286 Kan. at 63. Nevertheless,

> "[u]nder the pre–*Hall* standard, an information is sufficient if it substantially follows the language of the statute or charges the offense in equivalent words or others of the same import, so long as the defendant is fully informed of the particular offense charged and the court is able to determine under what statute the charge is founded." *State v. Reyna*, 290 Kan. 666, Syl. ¶ 6, 234 P.3d 761, *cert. denied* 131 S. Ct. 532 (2010).

*Was the complaint jurisdictionally defective?*

K.S.A. 21-3439(a)(6), under which the two capital counts were brought, provides that capital murder is the "intentional and premeditated killing of more than one person as

a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct."

The capital counts provided:

"Count II- Further, that between the 29th day of February, 2000, and the 3rd day of June, 2000, in the County of Johnson, State of Kansas, JOHN EDWARD ROBINSON, SR., did then and there unlawfully, feloniously, intentionally, and with premeditation kill a human being, to-wit: Suzette Marie Trouten, by striking said Suzette Marie Trouten in the head with a blunt instrument, and that said premeditated intentional killing of Suzette Marie Trouten was one of multiple acts or transactions constituting parts of a common scheme or course of conduct in which other human beings were killed in a premeditated and intentional manner, to-wit: Beverly J. Bonner, Sheila Faith, Debbie Faith and Lisa Stasi, an off-grid person felony, in violation of K.S.A. 21-3439(a)(6) and K.S.A. 21-4706(c).

"Count III- Further that between the 1st day of August, 1999, and the 3rd day of June, 2000, in the County of Johnson, State of Kansas, JOHN EDWARD ROBINSON, SR., did then and there unlawfully, feloniously, intentionally, and with premeditation kill a human being, to-wit: Izabela Lewicka, by striking said Izabel [sic] Lewicka in the head with a blunt instrument, and that said premeditated intentional killing of Izabela Lewicka was one of multiple acts or transactions constituting parts of a common scheme or course of conduct in which other human beings were killed in a premeditated and intentional manner, to-wit: Beverly J. Bonner, Sheila Faith, Debbie Faith and Lisa Stasi, an off-grid person felony, in violation of K.S.A. 21-3439(a)(6) and K.S.A. 21-4706(c)."

The aggravated interference with parental custody statute under which Robinson was charged provided:

"(a) Aggravated interference with parental custody is:
(1) Hiring someone to commit the crime of interference with parental custody, as defined by K.S.A. 21-3422 and amendments thereto; or

247

(2) the commission of interference with parental custody, as defined by K.S.A. 21-3422 and amendments thereto, by a person who:

(A) Has previously been convicted of the crime;

(B) commits the crime for hire;

(C) takes the child outside the state without the consent of either the person having custody or the court;

(D) after lawfully taking the child outside the state while exercising visitation or custody rights, refuses to return the child at the expiration of the rights;

(E) at the expiration of visitation or custody rights outside the state, refuses to return or impedes the return of the child; or

(F) detains or conceals the child in an unknown place, whether inside or outside the state.

"(b) Aggravated interference with parental custody is a class E felony.

"(c) This section shall be a part of and supplemental to the Kansas criminal code." K.S.A. 21-3422a.

K.S.A. 21-3422, incorporated by reference into K.S.A. 21-3422a, defined interference with parental custody as "leading, taking, carrying away, decoying or enticing away any child under the age of 16 years with the intent to detain or conceal such child from its parent, guardian, or other person having the lawful charge of such child."

Count VI of the complaint alleged:

"Count VI - That on or about the 10th day of January, 1985, in the County of Johnson, State of Kansas, JOHN EDWARD ROBINSON, SR., did then and there unlawfully, feloniously and intentionally take or carry away a child under sixteen (16) years of age, to-wit: Tiffany Stasi, who was then in the custody of a parent, to-wit: Lisa Stasi, with the intent to deprive the parents, Lisa and/or Carl Stasi of the custody of the child, and said child was taken outside the State of Kansas without the consent of said parents or the court, and the fact of such crime was actively concealed by JOHN EDWARD ROBINSON, SR., until July, 2000, in violation of K.S.A. 21-3422a and K.S.A. 21-4501(e)."

248

Robinson believes the complaint failed to adequately allege that he, as opposed to some other unidentified person, committed all of the acts necessary to establish the elements of capital murder and aggravated interference with parental custody.

We addressed a similar challenge in *Scott*, 286 Kan. 54, where the State charged the defendant with killing Elizabeth and Douglas Brittain as the couple slept in their home. Like here, the complaint in *Scott* alleged defendant

> "did then and there unlawfully, intentionally and with premeditation kill Elizabeth G. Brittain, and that the intentional and premeditated killing of Elizabeth G. Brittain, and Douglas G. Brittain, was part of the same act or transaction or two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct." 286 Kan. at 62.

Scott argued the complaint was defective in failing to allege that he killed Douglas Brittain. We disagreed, finding that "the allegation Scott killed Douglas Brittain was necessarily implied by the language used and a common-sense reading of the charge." 286 Kan. at 64.

Robinson attempts to distinguish *Scott* on several grounds. His arguments illustrate that the language in the complaint could have been more specific and precise. Nevertheless, it is easily discernible from the complaint as a whole what the charges were and that Robinson was the person charged under the capital murder and the aggravated interference with parental custody counts. See *Reyna*, 290 Kan. 666, Syl. ¶ 6.

## 8. EVIDENTIARY CHALLENGES

Robinson challenges a number of Judge Anderson's evidentiary rulings on appeal. Specifically, he contends the trial court erred by: (1) admitting Cathy Norman's

testimony regarding contents of a writing discussing victim Sheila Faith's sexual proclivities; (2) admitting e-mails in violation of the best evidence and authentication rules; (3) admitting evidence of uncharged homicides in violation of K.S.A. 60-445 and K.S.A. 60-455; (4) allowing the medical examiner to testify that Sheila Faith's injury was consistent with a defensive wound; and (5) disparately ruling on defendant's hearsay objections when compared with similar objections from the State.

*Cathy Norman's Testimony Regarding the Contents of a Writing*

1. *Additional Factual and Procedural Background*

Again, Cathy Norman was victim Sheila Faith's sister. At the end of her direct examination, prosecutor Welch asked Norman whether Sheila Faith had an interest in BDS&M, which resulted in the following exchange:

"[Prosecutor]: Now, ma'am, did you know if your sister Sheila—or are you aware that your sister, Sheila, had an interest in bondage and discipline and sadomasochistic sex?

"[Norman]: Yes.

"[Prosecutor]: How do you know that?

"[Norman]: For some reason she had moved out of this house and my other sister, Michelle, and I had to clean it up and we found correspondence to where she was into the kinky sex.

"[Prosecutor]: Anything in specific?

"[Norman]: Spanking.

"[Prosecutor]: And do you know about how long ago this was?

"[Norman]: It was a long time ago.

"[Prosecutor]: Was this the house in Texas?

"[Norman]: Yes."

Robinson lodged no objection. During cross-examination, defense counsel effectively challenged the reliability of this correspondence as proof of Sheila Faith's interest in BDS&M, highlighting the fact that Norman found the writing more than 20 years prior, that she saw no other evidence of BDS&M activity at the time she found the writing, and that she had not encountered any new information since then suggesting her sister held an interest in this subculture.

2. *Standard of Review*

"'The admission of evidence lies within the sound discretion of the trial court.'" *State v. Holmes*, 278 Kan. 603, 623, 102 P.3d 406 (2004) (quoting *State v. Jenkins*, 272 Kan. 1366, 1378, 39 P.3d 47 [2002]).

> "We begin by recognizing that when reviewing a district court decision to admit or exclude evidence, we use a multistep analysis. *State v. Shadden*, 290 Kan. 803, 817, 235 P.3d 436 (2010). For the first step, we determine whether the evidence is relevant. Evidence is relevant when it has 'any tendency in reason to prove any material fact.' K.S.A. 60-401(b). Accordingly, relevant evidence must be both probative and material. *State v. Martinez*, 290 Kan. 992, 1009, 236 P.3d 481 (2010) (citing *State v. Dixon*, 289 Kan. 46, 69, 209 P.3d 675 [2009]).

> "Whether evidence is probative is reviewed under an abuse of discretion standard; materiality is judged under a de novo standard. *Shadden*, 290 Kan. at 817 (citing *State v. Reid*, 286 Kan. 494, 507-09, 186 P.3d 713 [2008]).

> "For the second step, we determine which rules of evidence or other legal principles apply. The district court's conclusion is reviewed de novo. *Shadden*, 290 Kan. at 817. For the third step, the district court must apply the applicable rule or principle. This application is reviewed either for abuse of discretion or de novo, depending on the rule or principle being applied. Some rules and principles grant the district court

discretion, while others raise matters of law. 290 Kan. at 817." *State v. Friday*, 297 Kan. 1023, 1043, 306 P.3d 265 (2013).

3. *Did Judge Anderson erroneously admit Cathy Norman's testimony?*

For the first time on appeal, Robinson argues the trial judge erred by allowing Cathy Norman to testify to the correspondence because her testimony was irrelevant, lacked proper foundation, was based on hearsay, and violated the best evidence rule.

Generally, the failure to lodge a contemporaneous objection to the admission of evidence forecloses subsequent challenge on appeal. *State v. Wilson*, 247 Kan. 87, 98, 795 P.2d 336 (1990). However, K.S.A. 21-4627(b), recodified as K.S.A. 2014 Supp. 21-6619(b), compels our review of any issue raised in defendant's brief, even if not preserved properly for appeal. *State v. Cheever*, 295 Kan. 229, 241, 284 P.3d 1007 (2012), *vacated and remanded on other grounds* 571 U.S. ___, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013).

Though not procedurally barred, the absence of a contemporaneous objection raises a very practical problem—it yielded a record devoid of a complete recitation of the factual and legal basis for the objection, a proffer in support of admission, and findings of fact and conclusions of law upon which we typically review the district judge's decision. Other pertinent facts, such as the date and author of the writing, the form or medium in which it was written, the availability of the original, etc., are also absent.

While K.S.A. 2014 Supp. 21-6619(b) compels our review of all issues briefed on appeal, it does "not require that we treat the record other than as it is presented to us." See *State v. Bornholdt*, 261 Kan. 644, 651, 932 P.2d 964 (1997), *disapproved on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004). We thus consider this challenge based on the status of the record presented on appeal and mindful of the fact

that Robinson, as the party alleging error, bears the burden of demonstrating error. See, *e.g.*, *State v. Tague*, 296 Kan. 993, 1005, 298 P.3d 273 (2013) (burden is on party asserting error to establish trial judge abused discretion in limiting cross-examination).

In the absence of any objection, we consider whether Judge Anderson had an affirmative duty to exclude Norman's testimony. See *Bornholdt*, 261 Kan. at 652. Her testimony was relevant to the State's theory that Robinson's pattern of luring women for the purpose of exploiting them sexually, often through BDS&M activities specifically, was part of the common scheme or course of conduct charged under K.S.A. 21-3439(a)(6). There was no lack of foundation or improper authentication of the correspondence because the State did not offer it into evidence. See K.S.A. 60-464 (proper foundation required prior to receiving writing into evidence). While Norman testified in general to the nature of the correspondence, she did so to explain the basis for her belief that Sheila was interested in BDS&M-related activities. Without an adequately developed record, we cannot presume this testimony was offered for the truth of the matter asserted. See *State v. Smith*, 271 Kan. 666, 674, 24 P.3d 727 (hearsay rule inapplicable where statement not offered for truth of matter asserted), *cert. denied* 534 U.S. 1066 (2001). For the same reason, it is not apparent the testimony was offered for the purpose of proving the content of the correspondence, invoking the limitations of the best evidence rule. See K.S.A. 60-467 (original writing required to prove its contents).

Based on the record presented, we simply cannot conclude that Judge Anderson erred by admitting this testimony in the absence of an objection. See *State v. Thornburgh*, 220 N.W.2d 579, 584 (Iowa 1974) ("[A]bsent an objection by opponent's counsel . . . , it is ordinarily not the judge's duty to exclude evidence or interpose an objection to the question.").

*E-mails Admitted over Best Evidence and Authentication Objections*

Robinson argues the trial court abused its discretion by admitting a number of e-mail exchanges between Robinson and the victims or other witnesses, which tended to support the State's theory that he lured his victims and engaged in acts of fraud and deceit to conceal their murders as part of the common scheme or course of conduct charged in the capital counts. In particular, Robinson believes these e-mails were unreliable because most exhibits had been forwarded to law enforcement and printed, rather than printed from the original recipient's computer.

1. *Standard of Review*

We review best evidence and authentication challenges on appeal for an abuse of discretion. See *State v. Hill*, 290 Kan. 339, 364, 228 P.3d 1027 (2010) (authentication).

2. *Did admission of the e-mails violate the best evidence rule?*

Robinson contends the trial court violated the best evidence rule by admitting numerous e-mails that were forwarded to police rather than printed from the victims' or witnesses' computers. Robinson also challenges exhibits containing e-mail strings rather than individual, segregated messages.

The best evidence rule provides that "[a]s tending to prove the content of a writing, no evidence other than the writing itself is admissible, except as otherwise provided in these rules." K.S.A. 60-467(a). A "writing" is defined broadly to include every means of recording, upon any tangible thing, any form of communication or representation. K.S.A. 60-401(m). Both parties presume the challenged e-mails constitute "writings" and were offered to prove their content. We assume, without deciding, the same. *Cf. State v. Schuette*, 273 Kan. 593, 599, 44 P.3d 459 (2002) (caller ID displays not

a writing because "[t]he results cannot be printed out or saved on an electronic medium"); *State v. Wilson*, No. 103,749, 2012 WL 718916 (Kan. App. 2012) (unpublished opinion) (assuming "text messages may be writings subject to the best evidence rule"), *rev. denied* 296 Kan. 1136 (2013); see *State v. Dale*, 293 Kan. 660, 663, 267 P.3d 743 (2011) (best evidence rule applies only when evidence offered to prove content of a writing).

Generally the best evidence rule requires the original writing be introduced when available. See *State v. Goodwin*, 223 Kan. 257, 258, 573 P.2d 999 (1977) (original required, but secondary evidence admissible where original unavailable). However, when a writing is stored electronically, what constitutes an original and the practicalities of any production are not automatically clear. After all, "[p]roduction of a true original of an email or social networking page is not necessarily possible because both are always electronic." Pannozzo, *Uploading Guilt: Adding A Virtual Records Exception to the Federal Rules of Evidence*, 44 Conn. L. Rev. 1695, 1708 (2012). K.S.A. 60-467(a) does not squarely address what constitutes an original for best evidence purposes when "the writing itself" is stored electronically, and we have not had occasion to address the subject previously.

In the absence of controlling authority, the parties turn to the federal equivalent of our best evidence rule. Like K.S.A. 60-467, the federal rule contemplates that "[a]n original writing . . . is required in order to prove its content" unless otherwise provided by rule or statute. Fed. R. Evid. 1002. More importantly, the federal rule specifically contemplates that "[f]or electronically stored information, 'original' means any printout— or other output readable by sight—if it accurately reflects the information." Fed. R. Evid. 1001(d). This definition is consistent with Federal Rule of Evidence 1003, which provides that "[a] duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity or the circumstances make it unfair to admit the duplicate." A "duplicate" is defined as "a counterpart produced by a

mechanical, photographic, chemical, electronic, or other equivalent process or technique that accurately reproduces the original." Fed R. Evid. 1001(e).

We regard the federal rule, along with similar state counterparts, as instructive, and we are persuaded by the authority interpreting these provisions. See *Fredricks v. Foltz*, 221 Kan. 28, 30, 557 P.2d 1252 (1976) (finding federal interpretations persuasive where state and federal rules similar). The federal version of the rule is consistent with our prior holdings allowing the use of duplicates or secondary evidence, barring genuine disputes as to fraud or alteration. See, *e.g.*, *Goodwin*, 223 Kan. at 258-59 (defendant's best evidence challenge flawed where he never suggested contents of secondary evidence were less than the truth; absent proof of discrepancy, secondary evidence admissible). Likewise, by excluding printouts of electronically stored information or duplicates where the content is inaccurate, the federal rules further the underlying purpose of the best evidence rule—the prevention of fraud. See *United States v. Yamin*, 868 F.2d 130, 134 (5th Cir. 1989) (purpose is to prevent fraud).

Based on the federal definition of an "original" and "duplicate" writing, along with the underlying rule accepting both for best evidence purposes, any printed version of e-mail communications may be admitted as the original, provided there is no genuine dispute regarding authenticity. See *New Image Painting, Inc. v. Home Depot U.S.A., Inc.*, No. SACV 09-1224 AG (RNBx), 2009 WL 4730891, at *2 (C.D. Cal. 2009) (unpublished opinion) (copies of e-mails constitute duplicate originals under Fed. R. Evid. 1003); *Dirickson v. State*, 104 Ark. App. 273, 277, 291 S.W.3d 198 (2009) (printouts of Internet conversations fall within definition of original); *Commonwealth v. Amaral*, 78 Mass. App. 671, 675-76, 941 N.E.2d 1143 (2011) (accepting printed e-mails as best evidence). Courts have found such printouts acceptable for best evidence purposes, even where the e-mails have been forwarded. *Greco v. Velvet Cactus, LLC*, Civ. No. 13-3514, 2014 WL 2943598, at *2-3 (E.D. La. 2014) (unpublished opinion)

(text messages converted to e-mail format and forwarded to counsel for printing constituted "original" for best evidence purposes).

Robinson cites *Bobo v. State*, 102 Ark. App. 329, 335-36, 285 S.W.3d 270 (2008), for the proposition that a printout of a forwarded e-mail violates the best evidence rule. However, *Bobo* did not hold that printouts of forwarded e-mails could not be deemed a proper "original" or "duplicate" per se. Instead, it merely ruled in favor of the argument advanced by the prosecution in that case—that e-mails were admissible under the loss or destruction-of-original exception to the best evidence rule. 102 Ark. App. at 335-36.

Robinson also cites *Ruberto v. C.I.R.*, 774 F.2d 61 (2d Cir. 1985), and *State v. Lewis*, No. 96,005, 2008 WL 142105, at *6 (Kan. App. 2008) (unpublished opinion), in support of his best evidence argument. In both those cases, the prosecution attempted to admit photocopies of cancelled checks, instruments that formed the very subject of the criminal charges. However, without the original checks, there were legitimate proof problems in attempting to match the endorsements on the back of the checks. Neither *Ruberto* nor *Lewis* involved the use of printouts of electronically stored information, and the e-mails in this case did not give rise to the unique proof problems experienced with the photocopies of the original checks. The cited authority is distinguishable.

Robinson also argues the State's e-mail evidence is not an original writing as defined under the federal rules. He relies on an Advisory Committee Note explaining that a duplicate "describes 'copies' produced by methods possessing an accuracy which virtually eliminates the possibility of error." Fed. R. Evid. 1001 Advisory committee Note 4. Robinson reasons that forwarded e-mails do not possess an accuracy virtually eliminating error because their text can be manipulated.

Of course, Robinson's argument applies to the use of duplicates under Federal Rule of Evidence 1003 only, and it completely ignores Federal Rule of Evidence 1001(d), which defines an original to include any accurate printout of electronically stored information. Furthermore, the Advisory Committee Note Robinson cites provides that the *method* of reproducing the communication must be accurate, not that the process must be immune from subsequent fraudulent alteration. Fed. R. Evid. 1001 Advisory Committee Note 4; *cf. United States v. Safavian*, 435 F. Supp. 2d 36, 41 (D.D.C. 2006) ("The *possibility* of alteration does not and cannot be the basis for excluding e-mails as unidentified or unauthenticated as a matter of course, any more than it can be the rationale for excluding paper documents (and copies of those documents)."); *Simon v. State*, 279 Ga. App. 844, 847, 632 S.E.2d 723 (2006) ("e-mail offers unique opportunities for fabrication, [but] it is held to the same standards of authentication as other similar evidence"); *Commonwealth v. Purdy*, 459 Mass. 442, 450, 945 N.E.2d 372 (2011) ("While e-mails and other forms of electronic communication present their own opportunities for false claims of authorship, the basic principles of authentication are the same."). Robinson does not dispute that e-mail programs accurately reproduce the content of the prior e-mail exchanges between a sender and recipient, *i.e.*, the e-mail string, anytime a party clicks "reply" or "forward" within the e-mail program. This method of reproduction appears to be the very type of process the Advisory Committee deemed acceptable for purposes of a duplicate original.

Robinson also argues that the e-mails did not constitute the best evidence because there were signs of possible alteration. We address this argument fully in defendant's authentication challenge.

We find no error in Judge Anderson's ruling that accurate printouts of e-mails are akin to duplicates or otherwise satisfy the best evidence rule, even if the e-mail messages are forwarded or contain e-mail strings. See *Adams v. State*, 2005 WY 94, ¶ 22-26, 117

P.3d 1210 (Wyo. 2005) (admission of edited printouts of chat room messages did not violate best evidence rule; computer printouts subject only to proof of authenticity).

3. *Were the Challenged E-mails Authenticated Properly?*

"Authentication of a writing is required before it may be received in evidence." K.S.A. 60-464. "The authentication requirement is 'satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *United States v. Hernandez-Herrera*, 952 F.2d 342, 343 (10th Cir. 1991) (quoting Fed. R. Evid. 901[a]). The proponent of the writing must proffer evidence upon which a reasonable juror could conclude that the message is what it purports to be. *Safavian*, 435 F. Supp. 2d at 38; *People v. Downin*, 357 Ill. App. 3d 193, 202-03, 828 N.E.2d 341 (2005). Courts have characterized this burden of proof as minimal or slight. *United States v. Gagliardi*, 506 F.3d 140, 151 (2d Cir. 2007) (standard "minimal"); *Lexington Ins. v. Western Pennsylvania Hosp.*, 423 F.3d 318, 328 (3d Cir. 2005) (burden "slight"); *Manuel v. State*, 357 S.W.3d 66, 74 (Tex. App. 2011) (not a "particularly high hurdle").

"[W]hether a writing has been properly authenticated is a matter for the court to decide, according to no precise formula, but based upon proof to its satisfaction." *United States v. Wagner*, 475 F.2d 121, 123 (10th Cir. 1973). We have recognized that such proof may be in the form of indirect or circumstantial evidence. *State v. Hill*, 290 Kan. 339, 365, 228 P.3d 1027 (2010). Circumstantial evidence may include "appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances." Fed. R. Evid. 901(b)(4); *United States v. Smith*, 918 F.2d 1501, 1510 (11th Cir. 1990) (Document may be authenticated solely through circumstantial evidence, "including the document's own distinctive characteristics and the circumstances surrounding its discovery. [Citations omitted.]"), *cert. denied sub nom.*

259

*Hicks v. United States*, 502 U.S. 849 (1991), and *Sawyer v. United States*, 502 U.S. 890 (1991).

Once the proponent has offered sufficient authentication evidence, discrepancies and other conflicting evidence go to the weight, not the admissibility, of the writing. See *State v. Peoples*, 227 Kan. 127, 133, 605 P.2d 135 (1980); *People v. Lucas*, 60 Cal. 4th 153, 262, 177 Cal. Rptr. 3d 378, 333 P.3d 587 (2014).

Robinson's challenge focuses on the genuineness of numerous e-mail exhibits. Given the number of e-mails in question, the various senders and recipients involved, and the different forms in which they were admitted, we divide them into the following four categories for purposes of our analysis:  (1) e-mails sent to or from Lore Remington; (2) e-mails sent to or from Tammi Taylor; (3) e-mail to Marshalla Chidester; and (4) e-mails seized pursuant to search warrant.

### a. *E-mails Sent to or from Lore Remington*

Robinson contends the e-mail messages between Robinson and Lore Remington, State's Exhibits 4, 5, 11, and 12, were not properly authenticated.

At trial, the State proffered Remington's testimony outside the presence of the jury to authenticate these exhibits. Based on her independent recollection, Remington testified that State's Exhibits 4 and 5 were printouts from her home computer of e-mails she received from and sent to Robinson when he was posing as Trouten. She confirmed the content of the messages were true and accurate and that she did not alter them in any way. Based on this testimony, the State adequately authenticated State's Exhibits 4 and 5. See *Bobo*, 102 Ark. App. at 334-36 (copies of e-mails properly admitted where witness confirmed content matched his independent recollection of messages); *Simon*, 279 Ga.

App. at 847-48 (e-mails properly authenticated where witness testified printouts accurately reflected exchange between the parties and messages contained indicia of reliability); *Kearley v. State*, 843 So. 2d 66, 70 (Miss. App. 2002) (e-mails properly authenticated where witness vouched for accuracy of printouts); *Shea v. State*, 167 S.W.3d 98, 105 (Tex. App. 2005) (e-mails authenticated where complaining witness testified she was familiar with the defendant's e-mail and received the messages from him); *Tibbetts v. RadioShack Corp.,* No. 03-C-2249, 2004 WL 2203418, at *13 (N.D. Ill. 2004) (unpublished opinion) (copies of e-mails authenticated by sales manager's testimony that they were true and accurate copies); see also Annot., 34 A.L.R. 6th 253 (Authentication of Electronically Stored Evidence) § 2, pp. 269-70 (citing Mueller and Kirkpatrick, Federal Evidence § 9:9 [3d ed.] [witness who viewed original e-mail need only testify printout is an accurate reproduction]).

Other circumstantial evidence corroborated Remington's testimony and the authenticity of these e-mails. State's Exhibit 4 is a copy of the original message Robinson, posing as Trouten, sent to Remington on Trouten's Hotmail account. State's Exhibit 5 depicts the entire exchange of messages that occurred between the two on March 2, 2000, including the original message contained in State's Exhibit 4, Remington's response, and Robinson's reply to that response. The content within each message is logically connected to the others and reflects an ongoing exchange or dialogue between the parties. See *Downin*, 357 Ill. App. 3d at 203-04 (e-mails authenticated where witness sent e-mail to defendant's address, and defendant's reply was responsive to message). In the final message of the e-mail string in State's Exhibit 5, Robinson, posing as Trouten, referred Remington to an eruditemaster@email.com address and encouraged her to contact the party at that address to meet a new BDS&M master. Before her proffer to the district judge, Remington had testified that she sent an e-mail message to the "eruditemaster" address, received a response, and began communicating regularly with a man she came to know as "James Turner," one of Robinson's known aliases. See *Hill*,

290 Kan. at 365 (writing authenticated where contents reveal knowledge particularly held by parties or substance uniquely identifiable); *State v. Rives*, 220 Kan. 141, 143-44, 551 P.2d 788 (1976) (writing may be admitted where contents and circumstances reasonably imply author is person sought to be charged).

As to State's Exhibits 11 and 12, Remington testified they were copies of two e-mail exchanges between Remington and Robinson, posing as Turner, at the eruditemaster address, which she forwarded to investigators at the Lenexa Police Department. Remington confirmed these exhibits were true and accurate copies of the original messages she observed on her computer screen. The only difference was that the exhibits had caret symbols located in front of the body of the message, signifying the content had been forwarded to investigators. Remington testified she did not alter the content of the messages before forwarding them to police.

Additional circumstances corroborated Remington's testimony and the authenticity of these exhibits. Before her proffer, Remington testified that she began communicating with Robinson, posing as Turner, at the eruditemaster address around the third week of March 2000 and continued to do so until Robinson's arrest in June. See *State v. Bohlman*, No. A05-207, 2006 WL 915765, at *7 (Minn. App. 2006) (unpublished opinion) (e-mails authenticated where witness testified she regularly communicated with defendant at address appearing on exhibits). The e-mail communications carried over into telephone conversations. Remington testified that she spoke to Robinson, posing as Turner, by telephone on 20 to 30 occasions. One of those conversations, which was intercepted by wiretap and played for the jury, closely paralleled the content of the e-mail message admitted as State's Exhibit 12. See *State v. Franklin*, 280 Kan. 337, 342, 121 P.3d 447 (2005) (text messages authenticated where content consistent with defendant's activities and statements); see also *United States v. Siddiqui*, 235 F.3d 1318, 1321-22 (11th Cir.

2000) (e-mails properly authenticated where witness testified that subject matter of e-mail conversations carried over into telephone conversations).

Also, while searching Robinson's Olathe storage unit, police found several printed documents stored in a briefcase, including State's Exhibit 19EE—a printout of an e-mail from Remington to "JT," presumably James Turner. The body of this e-mail message is identical to the body of the message contained in State's Exhibit 11. The only difference between the exhibits is that the header information on State's Exhibit 11 shows the e-mail was sent from Remington's e-mail account and the header information on State's Exhibit 19EE shows the e-mail was received on Robinson's e-mail account. While State's Exhibit 19EE was admitted after Judge Anderson had admitted State's Exhibits 11 and 12, it nevertheless confirms the accuracy of the contents of these exhibits.

Despite this evidence, Robinson argues the e-mails should have been excluded because of possible indicators of alteration. First, Robinson highlights a time stamp discrepancy between State's Exhibit 4 and State's Exhibit 5. State's Exhibit 4 contains a time stamp indicating the first e-mail sent by Robinson to Remington was delivered at 9:15 a.m. State's Exhibit 5, which includes the entire string of e-mails sent between the two on March 2, includes a time stamp indicating that the same message was sent at 8:15 a.m. Remington could not definitively explain the reason for the difference but confirmed the 8:15 a.m. time stamp on State's Exhibit 5 did not originate from her computer; it came from Robinson's, suggesting the clocks on their computers were not synchronized or perhaps set to different time zones. Remington testified to the actual dates and times she sent and received the messages in these exhibits based on her independent recollection, and Robinson does not challenge the accuracy of their content. Judge Anderson's authentication findings are supported by substantial competent evidence. See *Schlaikjer v. Kaplan*, 296 Kan. 456, 468, 293 P.3d 155 (2013) (appellate courts accept findings supported by substantial competent evidence).

Second, Robinson argues the header information in State's Exhibit 5 is suspicious. In the first message of that e-mail string, the subject line read: "I'm off." In the second message, the header read: "Re: I'm off." In the third message, the subject line again read: "Re: I'm off." During her proffer, Remington explained her e-mail program automatically generated a "Re:" in the subject line when she responded to a message but that not all e-mail programs did so. During cross-examination, Robinson's counsel suggested the final message in Exhibit 5 should have included a "Re: Re:" in the subject line—apparently forgetting that the final message was sent by Robinson, not Remington. Defense counsel seemed to realize the oversight, withdrawing his line of questioning and abandoning the argument. Robinson's attempt to revive the issue is wholly unpersuasive.

Third, Robinson argues that all exhibits authenticated through Remington should have been excluded due to her propensity to alter electronic messages. Remington sent investigators logs of her online chat sessions with Trouten in two separate e-mails. The first time, Remington included only the logs she thought were most relevant to the investigation. She later sent a complete set of the requested logs. Robinson believes Remington "omitted material information" and demonstrated "a pattern of manipulating documents" by sending an incomplete set of chat logs in her first e-mail. Judge Anderson rejected the argument, finding that Remington never said the first submission was complete and, in fact, disclosed otherwise. Indeed, in the first e-mail submission, Remington made clear she was including only a selection of her chat logs with Trouten. Once again, Judge Anderson's finding is supported by substantial competent evidence.

Finally, Robinson argues State's Exhibits 11 and 12 are unreliable because the State redacted header information showing the e-mails had been forwarded to it by Remington. However, the defense received unredacted versions of these e-mails during discovery and nothing prevented counsel from using them on cross-examination.

264

Remington's testimony confirmed the redacted versions of the e-mails were true and accurate copies of the original messages on her computer, and Robinson does not suggest otherwise. In fact, in his brief, Robinson compares a redacted version of an e-mail to the unredacted version, and the content of the two messages is identical.

Remington's testimony and other corroborating evidence authenticated State's Exhibits 4, 5, 11, and 12. Robinson's arguments founded on immaterial, technical deviations in the writings failed to establish a genuine issue as to their accuracy. Such arguments went to the weight, not the admissibility, of the evidence. See *Gagliardi*, 506 F.3d at 151; *United States v. Tank*, 200 F.3d 627, 630 (9th Cir. 2000); *Purdy*, 459 Mass. at 451; *State v. Bell*, 145 Ohio Misc. 2d 55, 67, ¶ 34, 882 N.E.2d 502 (2008), *aff'd* 2009 WL 1395857, at *5 ¶ 31 (Ohio App. 2009) (unpublished opinion); *Commonwealth v. Koch*, ___ Pa. ___, 106 A.3d 705, 712-14 (Pa. 2014).

### b. *E-mails Sent to or from Tammi Taylor*

Robinson next challenges the admission of State's Exhibits 13 to 16, which were e-mails sent to and from Trouten's friend, Tammi Taylor.

Prior to admitting these exhibits, Remington and Taylor testified that they were friends of Trouten who shared an interest in BDS&M and talked regularly, often via online chat messaging. In March 2000, Remington told Taylor she had been communicating with James Turner. Taylor jokingly told Remington to ask Turner if he knew any other available masters. Remington did just that, asking Robinson, posing as Turner, whether he knew of someone interested in serving as a master in a BDS&M relationship with her friend Taylor. Robinson, posing as Turner, told Remington that "Tom" was interested and gave Remington "Tom's" e-mail address to pass on to Taylor. Remington told Taylor to contact "Tom" at "preipo@usa.net."

Taylor sent an e-mail to "Tom" at this e-mail address, expressing her interest in a BDS&M relationship. Taylor received a response from "Tom," identified as State's Exhibit 13. The exhibit is a printout of an e-mail message from a person at preipo@usa.net. In the e-mail, the author provides some personal background information and outlines his rules and expectations as a master in BDS&M relationships. The message is signed "T." Taylor testified State's Exhibit 13 was a true and accurate copy of the e-mail response she received from "Tom."

Robinson objected to the admission of this e-mail because Taylor had forwarded the e-mail to law enforcement officers, who then printed it from their computer system. Judge Anderson overruled the objection, explaining he would admit this and other e-mail exhibits, provided the witness could confirm accuracy.

Taylor then testified that after receiving this response from "Tom," the two maintained an ongoing e-mail relationship, communicating several times a week until Robinson's arrest in June 2000. Taylor identified State's Exhibit 14 as one of the e-mails she received from "Tom" at preipo@usa.net. In that e-mail, Robinson, posing as "Tom," gave Taylor BDS&M training activities to complete as his slave. Taylor confirmed the exhibit was a true and accurate copy of the message she received on her Hotmail account.

Taylor testified Robinson, posing as "Tom," later began contacting her by phone. Robinson left Taylor a voicemail message, advising Taylor that he was replacing his preipo@usa.net address with a new account, mbdsm@hotmail.com. On May 28, 2000, Taylor received an e-mail from this new address, identified as State's Exhibit 15. In the message, Robinson, posing as "Tom," asked Taylor to meet him in Kansas City. This time, the e-mail was signed "MASTER." Based on this testimony, Judge Anderson admitted State's Exhibits 14 and 15.

Before accepting Robinson's invitation to meet him in Kansas City, Taylor asked "Tom" for a reference from a former submissive/slave. Robinson, posing as "Tom," told Taylor she could talk to one of his former slaves at slavedancer@hotmail.com. Taylor sent an e-mail to the slavedancer address, explaining that "Tom" had given her this e-mail address to learn more about him. Taylor received a response from this e-mail address, identified as State's Exhibit 16, in which Robinson, posing as slavedancer, responded to each of Taylor's questions. Taylor confirmed the content was a true and accurate copy of the message she originally received on her computer. The message refers to "Tom" as "MASTER," just as "Tom" signed his name in Exhibit 15.

Additional record evidence corroborates the accuracy of these exhibits. When law enforcement searched Robinson's Olathe residence, they found a note with the preipo@usa.net address written on it. They also found a list of e-mail addresses and passwords, including slavedancer@hotmail.com, written on a sheet of legal paper, along with e-mails confirming Robinson's registration of the slavedancer address on several e-mail servers. Taylor testified that her ongoing communication with "Tom" ceased after Robinson's arrest on June 2, 2000.

Robinson again highlights minor, technical variances, such as the location of caret symbols on one of the e-mails, as evidence of possible alteration but does not specifically controvert Taylor's testimony or the additional circumstances corroborating the authenticity of the messages. Taylor's testimony, along with the distinctive characteristics and subject matter of these interrelated messages, provide substantial competent evidence supporting Judge Anderson's rulings on State's Exhibits 13 to 16. See *Hill*, 290 Kan. at 366 (note properly authenticated where it included distinctive language and content common to defendant); see also *Safavian*, 435 F. Supp. 2d at 40 (e-mails authenticated

267

where they included distinctive characteristics and addressed topics pertinent to parties' communications).

### c. *E-mail Sent to Chidester*

Robinson argues the State failed to properly authenticate State's Exhibit 20, a copy of an e-mail sent from Trouten's Hotmail account to several family members, including Trouten's aunt, Marshalla Chidester, because the State redacted the header information showing that Chidester had forwarded the e-mail to them.

However, Chidester testified the exhibit was identical to the e-mail she received on her computer. Robinson did not controvert this testimony. Other evidence introduced after Judge Anderson admitted State's Exhibit 20 corroborated its authenticity. For example, Chidester was convinced the e-mail was fraudulent because the word choices, style, and format were not consistent with Trouten's writing. Also, when law enforcement officers searched Robinson's Olathe storage unit, they found a contact list Trouten had prepared with Chidester's assistance that included e-mail addresses for all four recipients of State's Exhibit 20. Law enforcement also seized e-mails confirming that Trouten had given her login and password information to Robinson, including the information to access the Hotmail account used to send State's Exhibit 20. We hold there was no error.

### d. *Lewicka E-mails*

Robinson argues the district judge erred by admitting three e-mail exchanges between Izabela Lewicka and her father, Andrzej, admitted as State's Exhibits 69 to 71. Robinson challenges the exhibits because they contain e-mail strings rather than segregated messages admitted as separate exhibits.

268

Andrzej confirmed the accuracy of these exhibits, and Robinson does not controvert this testimony. Judge Anderson's rulings are supported by substantial competent evidence, and we find no error in the admission of these exhibits.

### e. *E-mails Seized Pursuant to Search Warrant*

Finally, Robinson argues Judge Anderson erroneously admitted State's Exhibits 19EE, 19NN-RR, 19TT-WW, 19XX, 52O, and 52Q because they were introduced through law enforcement officers rather than the parties to the messages.

Robinson's challenge to State's Exhibit 19EE is plainly without merit. Detective Layman testified this e-mail from Remington to Robinson, posing as Turner or JT, was seized during the search of Robinson's Olathe storage locker. The body of the message is identical to State's Exhibit 11, which was authenticated independently through Remington's proffer. See *United States v. Safavian*, 435 F. Supp. 2d 3d 36, 40 (D.D.C. 2006) (e-mails may be authenticated by other specimens that have already been independently authenticated).

State's Exhibits 19NN-RR, 19TT-XX, 52O, and 52Q are a series of e-mail communications between Robinson and Trouten. The messages were sent to or from Trouten at her "peka@tdi.net" e-mail address and most include conversations touching on various BDS&M topics.

Detective Layman testified that law enforcement seized State's Exhibits 19NN-RR and 19TT-XX from inside a brown briefcase during the search of Robinson's storage locker in Olathe. During this search, law enforcement also seized a number of items belonging to Trouten. Detective Owsley testified that law enforcement seized State's Exhibits 52O and 52Q from inside a black, soft-sided case inside a closet during the

269

search of Robinson's residence in Olathe. This testimony was sufficient to authenticate the documents found in Robinson's possession or under his control. See *United States v. Wake*, 948 F.2d 1422, 1434 (5th Cir. 1991) (law enforcement officer testimony describing the circumstances in which writings were seized from defendant's possession or control adequately supported finding of authentication); *United States v. Alisal Water Corp.*, 114 F. Supp. 2d 927, 933 (N.D. Cal. 2000) (rejecting authentication challenge to documents EPA agents seized from laboratory; declaration of EPA agent who described documents' seizure and chain of custody adequately authenticated writings).

*Admission of Other Crimes or Civil Wrongs Evidence*

Robinson argues the district judge admitted evidence or allowed testimony concerning his prior crimes or civil wrongs in violation of K.S.A. 60-445 and 60-455. Robinson also claims the district judge erroneously denied a motion for mistrial in connection with the testimony of one of the State's witnesses.

1. *Legal Framework and Standard of Review*

The admissibility of all other crimes and civil wrongs evidence is governed by K.S.A. 60-455. *State v. Gunby*, 282 Kan. 39, 57, 144 P.3d 647 (2006). We have adopted a multistep analysis for determining the admission of such evidence and defined the standard of review applicable to each step:

> "Determining whether evidence was properly admitted pursuant to K.S.A. 60-455 requires several steps. The appellate court must determine that the fact to be proven is material, *e.g.*, concerning intent, motive, knowledge, or identity. In other words, the court must determine whether the fact has a legitimate and effective bearing on the decision in the case. The appellate court standard of review for materiality is de novo. The appellate court must also determine whether the material fact is disputed, *i.e.*, the element or elements being considered must be substantially at issue in the case. The

appellate court must also determine whether the evidence presented is relevant to prove the disputed material fact, *i.e.*, whether it has any tendency in reason to prove that fact. The appellate court reviews relevance—in particular, the probative element—of K.S.A. 60-455 evidence for abuse of discretion. The burden of proof is on the party alleging the discretion is abused. The court must also determine whether the probative value of the evidence outweighs the potential for producing undue prejudice. The appellate standard for reviewing this determination is abuse of discretion." *State v. Hollingsworth*, 289 Kan. 1250, Syl. ¶ 6, 221 P.3d 1122 (2009).

Additionally, as it relates to the denial of Robinson's motion for mistrial, we review this issue for an abuse of discretion. *State v. Warrior*, 294 Kan. 484, 505, 277 P.3d 1111 (2012).

2. *Did admission of Carlos Ibarra's testimony violate K.S.A 60-455?*

During the State's direct examination, Carlos Ibarra, a maintenance employee, testified that Robinson frequently talked about his girlfriend and asked Ibarra to find a "Mexican woman . . . for him." Defense counsel objected, but the district judge overruled after the State explained the evidence was relevant to establishing Robinson's common scheme or course of conduct. Ibarra then testified that Robinson wanted him to find "a good looking woman from Mexico" and that he would lease an apartment for her and handle her immigration issues, provided they were sexually compatible. Ibarra also testified that Robinson showed him a nude picture of a "girlfriend" depicted in a BDS&M-themed pose.

Robinson argues this testimony, particularly Robinson's request to be set up with "a good looking woman from Mexico," violated K.S.A. 60-455 because the implication was that he sought an additional victim to exploit sexually and then murder, improperly demonstrating propensity to commit the charged crimes. At trial, Robinson objected only to the relevance of Ibarra's testimony, but K.S.A. 21-4627(b) and K.S.A. 2014 Supp. 21-

271

6619(b) compel our review of the challenge under K.S.A. 60-455. *State v. Cheever*, 295 Kan. 229, 241, 284 P.3d 1007 (2012), *vacated and remanded on other grounds* 571 U.S. ___, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013).

Robinson's argument is unavailing. Contrary to defendant's assertion, Ibarra's testimony was relevant. It tended to prove or corroborate other evidence that Robinson lured women to Kansas with offers of travel, employment, or other personal or financial support with the intent to exploit them financially or sexually. This fact was material because it supported the State's theory that Robinson's luring and exploitation were components of his common scheme or course of conduct under K.S.A. 21-3439(a)(6).

More importantly, the challenged testimony falls outside the scope of K.S.A. 60-455. Under its plain language, the statute specifically limits application of this provision "'to situations involving "evidence that a person *committed* a crime or civil wrong on a specified occasion" to infer a person has the disposition or propensity to "commit[ ] another crime or civil wrong on another specified occasion."'" (Emphasis added.) *State v. Molina*, 299 Kan. 651, 658, 325 P.3d 1142 (2014) (quoting *State v. Breeden*, 297 Kan. 567, 577, 304 P.3d 660 [2013]). Ibarra's testimony did not establish that Robinson committed a crime or civil wrong on a specified occasion. Robinson's request that Ibarra set him up with another woman was not a crime or civil wrong.

Robinson argues this testimony implied he made the request in hopes of luring a woman from Mexico and then murdering her. However, K.S.A. 60-455 "is not triggered by juror speculation, but by evidence of prior crimes committed by a defendant." *State v. Conley*, No. 94,096, 2006 WL 2129127, at *3 (Kan. App. 2006) (unpublished opinion);

Robinson relies on *State v. Warledo*, 286 Kan. 927, 942, 190 P.3d 937 (2008), to argue that any prior acts testimony is excluded under K.S.A. 60-455, so long as it creates

an inference of propensity to commit the charged offense. The argument flies in the face of the plain language of K.S.A. 60-455, which requires exclusion only where the evidence concerning a prior act constitutes a crime or civil wrong. Also, defendant misconstrues *Warledo*. There, the State argued K.S.A. 60-455 did not apply because defendant's prior acts did not constitute criminal offenses. We rejected the argument, expressly finding the acts in question "were criminal acts." 286 Kan. at 942. Having determined the witness testified to defendant's prior crimes, we then analyzed whether such crimes inferred propensity to commit the charged offenses. Here, defendant failed to clear the first hurdle, as Ibarra's testimony did not establish that Robinson committed a prior criminal act.

Robinson also cites *State v. Hall*, 246 Kan. 728, 793 P.2d 737 (1990), *overruled in part on other grounds by Ferguson v. State*, 276 Kan. 428, 78 P.3d 40 (2003), in support of the same argument. However, in *Hall*, defendant's prior acts clearly constituted a criminal offense; namely, conspiracy to commit murder. 246 Kan. at 738-40. In fact, the State did not dispute that Hall's prior conduct constituted a criminal offense. Robinson's reliance on *Hall*, like his reliance on *Warledo*, is misplaced.

K.S.A. 60-455 does not bar admission of Ibarra's testimony because he did not testify to any prior crimes. See *Molina*, 299 Kan. at 658 (evidence of gang membership and expectation that members engage in crime is not evidence that a particular person committed a particular crime on a particular occasion and is not excluded under K.S.A. 60-455); *State v. Winston*, 281 Kan. 1114, 1135, 135 P.3d 1072 (2006) (same); *State v. Gaines*, 260 Kan. 752, 766, 926 P.2d 641 (1996) ("[K.S.A. 60-455] does not apply to the toe sucking evidence because toe sucking is not a crime"); *State v. Sexton*, 256 Kan. 344, 349, 886 P.2d 811 (1994) (K.S.A. 60-455 did not apply because "sexual bondage between consenting adults is [not] a crime."); *State v. Reves*, No. 98,233, 2008 WL 2796461, at *1-2 (Kan. App. 2008) (unpublished opinion) ("the selling of scrap material

273

is not a crime and . . . would not be subject to K.S.A. 60-455"), *rev. denied* 287 Kan. 768 (2009). We see no error.

3. *Did admission of Jean Glines' testimony violate K.S.A 60-455?*

Again, Glines was a former employee of Nancy Robinson at a mobile home park in Independence, Missouri. Glines met Robinson while working for his wife. In January 1997, Glines moved to California and her marriage later dissolved. Robinson told Glines he and Nancy had also divorced, and they began a long-distance relationship, communicating by phone, letters, and e-mails.

In March 2000, Robinson asked Glines to mail some letters for him from California. Glines agreed to mail the letters if Robinson stopped calling her. The prosecutor asked Glines why she wanted Robinson to stop calling her, and she explained:

> "He was wanting me to come back here and live with him, work for him and totally abandon, so to speak—or never speak to any family again. As to the fact that my kids were in California, I was out there with them. I guess I talked about them a lot when we talked on the phone. He didn't seem to care for the fact that I had other interests besides him. He wanted me to give up my family and my grandkids or my grandchild and come and work with him and live with him."

Defense counsel lodged no objection to Glines' testimony. Robinson now argues Glines' testimony, particularly her comments that Robinson asked her to move back to Kansas, live with him, work for him, and never speak to her family again, violated K.S.A. 60-455. Once again, the testimony did not establish that Robinson committed a particular crime or civil wrong on a particular occasion and falls outside the scope of the statute.

Robinson argues adultery is a crime under Kansas law, K.S.A. 21-3507, and that Glines' testimony regarding his solicitation to commit adultery constituted an attempt to commit that crime. Yet Glines' testimony did not clearly establish Robinson's solicitation to commit adultery. Even if it had, mere solicitation to commit adultery is not an attempt to commit the crime. See *State v. Bowles*, 70 Kan. 821, 835, 79 P. 726 (1905) (citing *State v. Butler*, 8 Wash. 194, 35 P. 1093 [1894]). More importantly, however, this offense does not imply defendant's propensity to commit capital murder or the other charged offenses and is not barred under K.S.A. 60-455. See *State v. Anthony*, 282 Kan. 201, 214, 145 P.3d 1 (2006) (evidence of defendant's prior civil eviction and restraining order did not imply propensity to commit first-degree premeditated murder, testimony falls beyond limitations of K.S.A. 60-455).

Independently, Robinson argues Glines' testimony introduced collateral facts that were irrelevant under K.S.A. 60-401(b). However, Glines' testimony explained her motivation to comply with Robinson's rather unusual request to mail letters from a California address, evidence that supported the State's theory that Robinson sent fraudulent letters to the victims' family members as part of his common scheme or course of conduct under K.S.A. 21-3439(a)(6). We cannot conclude from the undeveloped record created by the absence of objection that this testimony included irrelevant collateral facts. See *State v. Vaughn*, 254 Kan. 191, Syl. ¶ 6, 865 P.2d 207 (1993) ("evidence of collateral facts must be confined to the issues, but need not bear directly on them").

*4. Did testimony of tools seized during Linn County search violate K.S.A 60-455?*

During the execution of the warrant to search Robinson's Linn County property, law enforcement seized nine hammers, two picks, and a chisel from various locations on the property. Robinson moved in limine to exclude testimony regarding the number of

275

tools seized. In response, the State argued that it intended to introduce testimony that those items were seized during the search and that experts found no blood, tissue, or other trace evidence on them, but that such items could be cleaned easily. The district judge denied the motion, explaining:

> "It's very relevant; it has probative value; the Court finds little or no prejudicial effect with respect to the numbers that we're dealing with here. Given that we're talking about a rural location and a dwelling that was in the process of being refurbished over a period of time, based upon the testimony I've heard thus far, and it becomes a question of weight."

At trial, the medical examiners testified the victims died as a result of blunt force brain trauma inflicted with a hard object, and one medical examiner testified specifically that the injuries were consistent with those inflicted by a hammer. Rundle, a forensic chemist with the JOCO Lab, confirmed that nine hammers, two picks, and one chisel were seized for further forensic examination during the Linn County search. Detective Booth testified that he looked at these items under a microscope to examine all the crevices and defects on the tools—"anyplace where blood or tissue would be hiding." Occasionally he also used a Hemostik to test for the presence of blood. Nevertheless, Booth confirmed he found no blood, tissue, or hair on any of these tools.

Robinson argues the trial court erred by allowing Rundle to testify to the number of tools seized during the search because it "implied some sort of obsession with the type of weapon purportedly used to kill Suzette Trouten, as well as the defendant's desire to kill yet more women in the same manner and at the same place." Clearly, Rundle did not testify to a prior crime within the meaning of K.S.A. 60-455, and Judge Anderson did not err in admitting the testimony under this statutory provision.

Robinson also claims that Rundle's testimony was improper because there was not a sufficient connection between the tools and the defendant or the charges against him. The tools were not admitted as physical evidence. Instead, the State's witnesses merely testified to the fact of their seizure and subsequent testing for trace evidence. Even so, our precedent addressing the admission of physical evidence provides useful guidance.

"The admissibility of physical evidence is based on its relevance in connection with the accused and the crime charged. Physical evidence should be admitted unless it is clearly irrelevant. The jury may attribute such weight and effect as it sees fit. [Citation omitted.]" *State v. Trammell*, 278 Kan. 265, 282, 92 P.3d 1101 (2004); *State v. Whitesell*, 270 Kan. 259, 277, 13 P.3d 887 (2000) (same); see *State v. Mitchell*, 220 Kan. 700, 704, 556 P.2d 874 (1976) (weapon properly admitted where witness testified it looked similar to the one used in the crime; evidence highlighting difference between admitted weapon and one described from the scene went to weight, not admissibility).

The record establishes a logical connection between the tools, defendant, and the capital murder charges. The bodies of Lewicka and Trouten were recovered inside metal drums located on Robinson's Linn County property. Trace bloodstains inside Robinson's trailer on the property matched the DNA of victims Trouten and Lewicka. The medical examiners opined that Trouten and Lewicka were killed as a result of blunt-force trauma to the head inflicted by a hard object. The tools were seized in close physical and temporal proximity to the discovery of the bodies and the trace evidence. Based on this record evidence, Judge Anderson properly admitted the testimony. See *State v. Gardner*, 264 Kan. 95, 104-05, 955 P.2d 1199 (1998) (no abuse of discretion in admitting jeans and boots where witnesses testified they saw defendant in similar attire around time of murder and blood spots tested positive for human blood; evidence that clothing did not belong to defendant went to weight, not admissibility of evidence).

277

Robinson relies on *State v. Bornholdt*, 261 Kan. 644, 658, 932 P.2d 964 (1997), *disapproved on other grounds by State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004), *rev'd on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), to argue the tools were not logically connected to the crimes. There the State introduced testimony that drugs were taken from defendant's car at the time of his arrest. The district judge allowed this testimony as res gestae because it showed defendant's involvement with drugs in a case where the State's theory was that defendant murdered the victim in retaliation for testifying in another drug case. However, we held that the testimony was "clearly not part of the res gestae" because the drugs were seized 10 days after the commission of the charged offenses and had no direct connection to them. *Bornholdt*, 261 Kan. at 659-60. Here the victims were killed by blunt-force trauma inflicted by a hard object consistent with the tools seized on Robinson's property. These tools were recovered close in time and proximity to the bodies and trace evidence of the victims. *Bornholdt* is distinguishable.

Robinson argues the prosecutor's proffer for the admission of Rundle's testimony was misleading because experts did not testify that blood could be removed easily from the tools, and evidence admitted under such false pretenses violated his right to due process. However, this argument assumes Judge Anderson's ruling was dependent on the prosecutor's proffer that crime lab experts would testify that hammers can be cleaned easily. This was not the case. Judge Anderson found the testimony was clearly relevant based on the totality of the circumstances. Nothing suggests the admission of this testimony was dependent on the prosecutor's proffer regarding the expert's testimony. Furthermore, defense counsel, not the prosecution, elicited the testimony from the State's experts on cross-examination that it would be difficult to wash away blood from certain crevices of certain hammers. Nothing in the record suggests the State anticipated this testimony. Moreover, by establishing that forensic investigators found no trace evidence, despite extensive investigation and the difficulty in removing blood from certain tools,

278

Robinson demonstrated that Rundle's testimony gave rise to no adverse inferences. Robinson fails to demonstrate an abuse of discretion.

5. *Did Loretta Mattingly's testimony compel a mistrial?*

Robinson believes the trial court should have granted his motion for mistrial after witness Loretta Mattingly failed to testify in accordance with the prosecutor's proffer. To understand the nuances of the challenge, a summary of the procedural facts and background is in order.

Mattingly managed the rental of storage units at Stor-Mor For Less in Raymore, Missouri (Stor-Mor). In December 1993, Robinson rented unit F-10 at Stor-Mor under Bonner's name and maintained possession of the unit until Summer 1996. In January 1994, Robinson leased a second unit at Stor-Mor, unit E-2, under Bonner's name and maintained possession through his arrest in June 2000.

At preliminary hearing, Mattingly testified on cross-examination that she never received any complaints from other renters about noises or smells from Robinson's storage units. On redirect, Mattingly clarified she had never received any complaints related to unit E-2, but when the prosecutor asked about unit F-10, Mattingly said:

> "There was a problem with one of the units behind [F-10] of a mattress that had gotten damaged, and I did walk by and see Mr. Robinson cleaning out F10. And when the other person behind went to move out, there was stuff all over a mattress that had bleeded [*sic*] through and he told me it was a raccoon. . . . A raccoon had gotten in there."

At trial, the State intended to establish that Robinson stored the barrels containing the bodies of Sheila Faith, Debbie Faith, and Beverly Bonner in unit F-10 but moved them to unit E-2 and wrapped them in plastic after they began to leak. To support this

279

argument, the State planned to have Mattingly testify to the odor or property damage complaint concerning unit F-10, in addition to having police testify that the barrels found in unit E-2 had been wrapped in large plastic sheeting with kitty litter placed along the bottom to form a dam that would contain seepage of biological fluids.

At trial, the defense objected when the prosecutor asked Mattingly if she received any complaints related to Robinson's lease of unit F-10, arguing the testimony called for hearsay and was irrelevant and prejudicial. Prosecutor Welch proffered outside the presence of the jury that Mattingly would testify that she received an odor complaint from a lessee of a unit adjacent to unit F-10, that she told Robinson about it, that she saw defendant cleaning up some kind of bloody fluid outside unit F-10 soon thereafter, and that defendant told her a dead raccoon was the source. Prosecutor Welch argued jurors could reasonably infer from the proffered testimony that Robinson previously stored the barrels containing the victims' bodies in unit F-10; they leaked, causing another renter to complain of an odor; and Robinson cleaned up the seepage and moved the barrels to unit E-2, carefully wrapping them in plastic to avoid any further incident. The prosecutor offered Mattingly's testimony regarding the complaint to explain her future action, *i.e.*, informing Robinson that she had received a complaint, not for the truth of the matter asserted. The judge asked, "[S]he's going to testify that she encountered him cleaning out the lockers?" Prosecutor Welch responded, "Yes, and that his explanation was there was a dead raccoon in there; from his mouth, there was a dead raccoon in there."

Judge Anderson overruled Robinson's objections, allowing Mattingly to "testify in accordance with the proffer." The district judge provided a limiting instruction so the jury would not consider the lessee's complaint for the truth of the matter asserted.

After the jury had been instructed, the prosecutor conducted the following examination of Mattingly:

"Q.    Did you ever receive a complaint about F10?

"A.    I did when somebody was moving out.

"Q.    All right. And what was the complaint?

"A.    Was that something had leaked through from one of the other units and ruined a mattress.

"Q.    All right. And who did you notify about that?

"A.    Mr. Robinson.

"Q.    Okay. And what did you tell him?

"A.    I told him that whatever he had used cleaning his unit had leaked through to another one.

"Q.    And after you told him this, did you see Mr. Robinson at that unit?

"A.    I had seen him before.

"Q.    Okay. And what had you seen him doing?

"A.    Cleaning something out of there with—like some kind of soap solution."

At this juncture, the defense renewed its objection, arguing the testimony was inconsistent with the proffer because Mattingly testified that she observed Robinson cleaning unit F-10 before the complaint, not after, as suggested in the proffer, and the liquid was a cleaning solution, not a bloody substance, as stated in the proffer. Robinson also moved for a mistrial based on the improper inference that Robinson had dead bodies in barrels in unit F-10. Judge Anderson found Mattingly's testimony was inconsistent with the proffer and unreliable. He denied the motion for mistrial but did instruct the jury to disregard Mattingly's testimony on the subject.

Robinson argues the prosecution "misrepresented its own evidence" in the proffer, and the district judge's refusal to declare a mistrial left the jury with "the distinct impression that Mr. Robinson had killed or wished to kill yet other women, stuffed them into yet other barrels, and kept them in yet another storage unit—all on the basis of a false proffer from the State."

To warrant a mistrial, the trial court must decide if there is a fundamental failure of the proceeding, and if so, whether it is possible to continue without an injustice. See K.S.A. 22-3423(c); *State v. Ward*, 292 Kan, 541, 550, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). Robinson's claim does not warrant relief under this standard.

First, there was no fundamental failure of the proceeding. A close examination of Mattingly's preliminary hearing testimony and the State's proffer undercuts Robinson's claim that prosecutor Welch intentionally misrepresented Mattingly's testimony in her proffer to the court. Prosecutor Welch proffered that Mattingly, consistent with her statements during preliminary hearing, would testify that (1) she received an odor complaint regarding unit F-10; (2) she informed Robinson; (3) a short time later, she observed him cleaning unit F-10 to remove a bloody, "yucky" fluid; and (4) Robinson's explanation for the fluid was that there was a dead raccoon in his unit. Mattingly's preliminary hearing testimony was generally consistent with the proffer.

The most significant variance among Mattingly's preliminary hearing testimony, the prosecutor's proffer, and Mattingly's trial testimony concerned the timing or sequence of these events—specifically, the point in time at which Mattingly observed Robinson cleaning unit F-10. The precise sequence of events was important because if Mattingly observed Robinson cleaning unit F-10 subsequent to the lessee's complaint, the logical inference was that some other foreign substance caused the mattress stain, *i.e.*, biological fluid from a raccoon, according to Robinson, or seepage from the barrels holding the bodies of the victims, according to the State. However, if Mattingly observed Robinson cleaning unit F-10 with a cleaning solution before the lessee's complaint, then the inference was that the cleaning solution itself stained the mattress. As such, the sequence of the events determined whether Mattingly's testimony was inculpatory or benign.

It was not until Mattingly's direct examination at trial that she clarified that she had first observed Robinson cleaning unit F-10 and then, at a later point in time, received the complaint from the third-party lessee. Once this testimony came out and the sequence of events was made clear, the reasonable inference was that the cleaning solution Robinson had used, not seepage of biological fluid from a dead raccoon or bodies in barrels, damaged the adjacent lessee's mattress. In fact, Mattingly testified that she told Robinson that his cleaning solution had leaked through to the adjacent unit. These circumstances demonstrate the prosecutor did not intentionally or maliciously misrepresent Mattingly's testimony in her proffer. They also demonstrate that Mattingly's testimony was not prejudicial and, in fact, worked to Robinson's benefit.

Not only was Mattingly's trial testimony stripped of the inculpatory content described in the State's proffer, but also the district judge instructed the jury to disregard it altogether. "The general rule is that an admonition to the jury normally cures the prejudice from an improper admission of evidence." *State v. Navarro*, 272 Kan. 573, 582, 35 P.3d 802 (2001). "Accordingly, where the trial court sustains an objection and admonishes the jury to disregard the objectionable testimony, reversal is not required unless the remarks are so prejudicial as to be incurable." *State v. Gleason*, 277 Kan. 624, 642, 88 P.3d 218 (2004). Mattingly's trial testimony was not of the type immune to such instruction.

Because there was no fundamental failure in the proceedings, Judge Anderson's decision to proceed resulted in no injustice. See *State v. Albright*, 283 Kan. 418, 426-27, 153 P.3d 497 (2007) (no error in denying mistrial where prosecutor's violation of limine order was not malicious and had little weight on minds of jurors).

6. *Did Judge Anderson err in allowing the medical examiner's testimony regarding defensive wounds?*

Jackson County Medical Examiner Thomas Young performed autopsies on the three victims found inside barrels at Robinson's Missouri storage unit. Young testified to various injuries he observed during Sheila Faith's autopsy, concluding that the cause of death was the result of blunt-force trauma to the head. Young also testified Sheila Faith had sustained a fracture to her right ulna at a point located close to her wrist. After identifying this injury, prosecutor Morrison asked, "Would that be consistent with a defensive wound?" Defense counsel objected, arguing the question called for speculation. Judge Anderson allowed defense counsel to voir dire the expert.

The defense made the following inquiries during voir dire of Young:

"[COUNSEL]: Do you have any idea where that hand or arm was at the time that injury was inflicted?

. . . .

"[YOUNG]: Are you asking what was the position of the hand? No, I don't know.

"[COUNSEL]: It may have been at the side as likely as raised (indicating)?

"[YOUNG]: Sure.

"[COUNSEL]: So the truth is you don't know whether that injury was inflicted in any type of defensive posture by the victim or not, do you?

"[YOUNG]: It is consistent with a defensive, warding off a defensive blow. Could I tell in and of itself that was the case, I can't tell. I can say it's consistent though.

"[COUNSEL]: It could be?

"[YOUNG]: It's consistent with it.

"[COUNSEL]: You have no personal knowledge of that, nor does your examination reveal the position of the arm at the time that it was broken; is that true?

"[YOUNG]: Okay. In terms of personal knowledge, I wasn't there at the time. I just performed an autopsy. In terms of the position that the arms or hand was

284

in at the time the blow was inflicted, that's not something that you would
determine from an autopsy.

"[COUNSEL]: You did not determine that?

"[YOUNG]: As I said, it's not something that you would determine from an
autopsy."

The defense renewed its objection. The district judge overruled it, reasoning the question was whether the injury was consistent with a defensive blow, not whether the injury was in fact a defensive wound, and the challenge went to the weight, not the admissibility, of the testimony.

The State had established Young's education, training, and experience on direct examination, which demonstrated his competence to render an opinion on the subject. Defense counsel's voir dire did not otherwise challenge these qualifications. In this regard, Young was sufficiently qualified from his prior knowledge and experience to testify on this subject. See K.S.A. 60-419.

Robinson suggests the testimony was not useful to the jury. However, the defense did not object to Young's testimony on this basis at trial, and therefore, the record provides no basis in fact to support this new theory of error on appeal. We cannot say that no reasonable jurist would have allowed Young's testimony. See *Moore v. Associated Material & Supply Co.*, 263 Kan. 226, 244, 948 P.2d 652 (1997) (trial court granted broad discretion regarding admission of expert testimony); see also *Caldwell v. State*, 245 Ga. App. 630, 632, 538 S.E.2d 531 (2000) (no error in permitting officer to "testify about her observations of the victim's wounds, to make an inference based on her training and on her observations of the wounds, and to opine that the victim's wounds were consistent with 'defensive' ones, a conclusion that is beyond the ken of the average layman"). Thus we find no abuse of discretion. See *Carr*, 300 Kan. at 223-24 (court reviews decision to admit or exclude expert testimony for abuse of discretion).

*Allegedly Disparate Rulings on Similarly Situated Hearsay Objections*

Robinson claims the district judge violated his substantive due process rights by denying his hearsay objections when they were similarly situated to those lodged by the State and sustained by Judge Anderson.

1. *Legal Framework and Standard of Review*

Substantive due process protects individuals from arbitrary state action. *Darling v. Kansas Water Office*, 245 Kan. 45, 51, 774 P.2d 941 (1989). To satisfy substantive due process requirements, the court's actions must not be applied to parties in an arbitrary or capricious manner. *Wesley Medical Center v. McCain*, 226 Kan. 263, 266, 597 P.2d 1088 (1979).

2. *Did Judge Anderson's hearsay rulings violate due process?*

Robinson argues the district judge failed to apply the hearsay rules consistently between similarly situated challenges of the defendant and the State. Specifically, Robinson relies on two examples to support his substantive due process challenge.

First, Robinson points to Judge Anderson's ruling allowing Kathy Klingensmith, Stasi's sister, and Overland Park Sergeant Ronald Wissel to testify over defense objection that a desk clerk at the Roadway Inn told Klingensmith that Robinson, not John Osborne, had paid for Lisa Stasi's motel room. The State argued, and Judge Anderson agreed, that the testimony was offered to explain Klingensmith's future actions; specifically, her decision to file a missing persons report. Yet, during the defense's questioning of Wissel, Judge Anderson sustained the State's hearsay objection and did not allow him to testify to the names of other persons of interest in the Stasi investigation, even though such

testimony, according to Robinson, would have explained Wissel's future investigative actions.

Robinson's argument is unsupported by the record. During recross of Wissel, the defense asked if he had completed any independent investigation before handing the case over to Detective Scott. Wissel said he had called Robinson's business, Equi II. Defense counsel then asked, "And you got names, several names, from your investigation at that location; is that correct?" Wissel agreed. Defense counsel began listing the names "Jim Lions, Bob—," at which point the State lodged its hearsay objection and the district judge sustained it. The defense made no proffer or argument in support of its line of questioning. It simply moved on. Robinson did not argue the testimony was being elicited to explain Wissel's future investigative actions. As such, Robinson fails to establish that Judge Anderson's rulings on these competing hearsay objections were similarly situated, and we find no due process violation.

In his second example, Robinson compares two allegedly inconsistent rulings under the "persons present" hearsay exception in K.S.A. 60-460(a). First, Robinson highlights Judge Anderson's decision to exclude certain testimony from Suzette Trouten's former landlord, John Stapleton. Stapleton testified that Suzette Trouten told him she was moving to Kansas to undergo cancer treatment. Stapleton was also prepared to testify that when he informed Carolyn Trouten of this fact, she instructed him not to share this information with law enforcement. When Robinson attempted to elicit this testimony from Stapleton, the district judge sustained the State's hearsay objection. Robinson argues this ruling is inconsistent with Judge Anderson's decision to allow Detective Brown to testify, over Robinson's hearsay objection, to Carolyn Trouten's declarations concerning the last time she spoke to her daughter.

The record confirms that Judge Anderson did not disparately apply the "persons present" hearsay rule under K.S.A. 60-460(a). In interpreting and applying K.S.A. 60-460(a) in connection with Brown's testimony, Judge Anderson explained that under the person's present exception, "as long as the subject matter was inquired into earlier [with the declarant] and there's been an opportunity to cross-examine as to the subject matter, [the prosecutor] can go into it [with the third party witness] without it being hearsay." Brown testified that Carolyn Trouten informed him that she last spoke to Suzette late in the evening of February 29 or during the early morning hours of March 1, 2000. During direct examination, Carolyn Trouten testified to these facts, and she was subject to cross-examination from Robinson. As such, Judge Anderson properly found Brown's testimony regarding Carolyn Trouten's declarations were admissible under K.S.A. 60-460(a). In contrast, Carolyn Trouten did not address the subject of Stapleton's testimony during her direct or cross-examination, and therefore, his testimony regarding Carolyn Trouten's declarations were not admissible under K.S.A. 60-460(a). See *State v. Wilson*, 35 Kan. App. 2d 333, 338, 130 P.3d 139 (2006) (police officer's testimony regarding declarant's statements improperly admitted where declarant was available but was not called and did not testify to subject of officer's testimony).

The district judge arrived at different rulings between Stapleton and Brown, not because he applied the rules in an arbitrary or disparate fashion, but because the facts supported different rulings under K.S.A. 60-460(a). We hold there was no due process violation.

Robinson also claims these rulings were invalid under state hearsay rules. Our analysis above suggests otherwise. Judge Anderson's rulings were supported by substantial competent evidence, and we cannot conclude from the record that no reasonable jurist would have agreed with them. We hold there was no abuse of discretion.

288

## 9. SUFFICIENCY OF THE EVIDENCE—COUNTS I AND V

Robinson claims the evidence was insufficient to support the jury's convictions on Count I, aggravated kidnapping of Trouten, and Count V, first-degree premeditated murder of Stasi. Independently, he argues the State relied on multiple acts to prove a single aggravated kidnapping charge and the district court's failure to provide a special unanimity instruction constituted clear error.

*Sufficiency of the Evidence Supporting Counts I and V*

### 1. *Standard of Review*

"'When sufficiency of evidence is challenged in a criminal case, our standard of review is whether, after review of all the evidence, examined in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt.' [Citations omitted.] 'In reviewing the sufficiency of the evidence, this court will not reweigh the evidence. It is the jury's function, not ours, to weigh the evidence and determine the credibility of witnesses.' [Citations omitted.]" *State v. Cosby*, 293 Kan. 121, 133-34, 262 P.3d 285 (2011).

### 2. *Was the State's evidence sufficient to support Robinson's aggravated kidnapping conviction?*

Robinson advances two specific challenges to the sufficiency of the evidence supporting his aggravated kidnapping conviction under Count I. First, he argues the State failed to provide sufficient evidence of a taking by deception. Robinson also claims the State failed to prove he took Trouten with specific intent to inflict bodily injury upon her.

At the time Robinson committed the offense, kidnapping included "the taking or confining of any person, accomplished by force, threat or deception, with intent to hold such person:  . . . (c) to inflict bodily injury or to terrorize the victim or another." K.S.A.

21-3420. The Criminal Code defined "deception" as "knowingly and willfully making a false statement or representation, express or implied, pertaining to a present or past existing fact." K.S.A. 21-3110(5). "Aggravated kidnapping is kidnapping . . . when bodily harm is inflicted upon the person kidnapped." K.S.A. 21-3421.

In Count I of the Fourth Amended Complaint, the State alleged:

"That between the 12th day of February, 2000, and the 1st day of March, 2000, in the City of Lenexa, County of Johnson, State of Kansas, JOHN EDWARD ROBINSON, SR, did then and there unlawfully, knowingly, willfully and feloniously take a person, to wit: Suzette Marie Trouten, by force and or threat and or deception with the intent to hold such person to inflict bodily injury on another, to-wit:  Suzette Marie Trouten, and did inflict bodily harm on Suzette Marie Trouten, a severity level 1 person felony, in violation of K.S.A. 21-3421, K.S.A. 21-4704 and K.S.A. 21-4707."

At trial, the State's theory was that Robinson kidnapped Trouten by deception, with the specific intent of killing her, and that he, in fact, accomplished this purpose.

a. *Did the evidence establish a taking by deception?*

Robinson first challenges the sufficiency of the evidence supporting the State's theory that Robinson took Trouten by way of deception. At trial, the State advanced two arguments in support of this theory. First, the prosecution argued Trouten was taken by deception when Robinson lured her from Michigan to Kansas with false promises of employment and travel, for the specific purpose of killing her. Second, the prosecutor argued the jury could possibly find that Trouten was taken by deception when Robinson lured her to his Linn County property under the guise of fulfilling her BDS&M fantasy.

The State provided substantial evidence in support of its first theory of taking by deception. Trouten's mother testified that in the summer of 1999, Trouten told her that

290

Robinson had offered her a job caring for his elderly father. Trouten explained the job would allow her to travel with them to business meetings overseas. Trouten also told her friends about the opportunity. She told Taylor that she would care for the elderly father of a man named "John" and accompany them while they traveled domestically and abroad. Trouten told Remington she would earn $6,500 a month and travel to Australia and Hawaii. Trouten provided similar descriptions of the job and travel opportunities to her father, aunt, and Michigan employer. Trouten traveled to Kansas City on two occasions in the fall of 1999, purportedly to interview for the position and find a place to live.

This testimony was corroborated by Trouten's subsequent conduct and other circumstantial evidence. Before the move to Johnson County, Carolyn Trouten observed her daughter researching overseas educational opportunities, and Trouten began filling out a passport application, a copy of which was seized during the search of Robinson's Olathe storage unit. Robinson reserved a room for Trouten at the Guesthouse Suites under his company's name, Specialty Publications. When Robinson boarded Trouten's two dogs at a veterinary clinic, he said the dogs belonged to his employee. While in Kansas, Trouten called her mother almost every day, updating her on the trip itinerary. Early morning on March 1, 2000, Trouten told her mother she was leaving with Robinson on their trip later that day. Trouten's journal, recovered during the search of Robinson's Olathe storage unit, included an entry dated February 21 where Trouten wrote: "Found out this morning that we will be leaving for the trip next Monday. I am excited about going." In online chat sessions, Remington and Trouten discussed her work for and relationship with Robinson. After her disappearance, Robinson posed as Trouten and sent communications to her family explaining she had left town on an "adventure of a lifetime." When Carolyn Trouten called Robinson to find her daughter, Robinson said, "'Well, she had met some man, a Jim Turner, and that *she decided not to take the job*, and that *they were traveling*.'" (Emphasis added.)

291

This evidence was more than sufficient to prove Robinson took Trouten by deception; specifically, making false representations of employment and/or travel opportunities. See *State v. Holt*, 223 Kan. 34, Syl. ¶ 1, 574 P.2d 152 (1977) (State must prove taking was accomplished through defendant's false statement or representation, express or implied, pertaining to a present or past fact to support conviction under K.S.A. 21-3421).

Robinson argues the record establishes but one theory: that Robinson's taking of Trouten was accomplished by his truthful statements regarding his desire to serve as her BDS&M master. Robinson highlights e-mails and other evidence confirming the two were involved in a BDS&M sexual relationship to support this argument.

Essentially, Robinson argues the evidence supporting his theory of a truthful taking was more credible than the evidence supporting the State's theory of a taking by deception. We do not "reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations" when reviewing the sufficiency of the evidence. *State v. Williams*, 299 Kan. 509, 525, 324 P.3d 1078 (2014). The State's evidence was sufficient to establish a taking by deception, and Robinson's arguments to the contrary fail to establish otherwise. See *State v. Dull*, 298 Kan. 832, 840-41, 317 P.3d 104 (2014) (defendant's arguments regarding weakness and inconsistency of State's evidence "failed to meet our demanding standard for reversal for insufficiency of the evidence").

Having confirmed that the jury's verdict on Count I is supported by sufficient evidence of a taking by deception, we need not consider the sufficiency of the evidence supporting the State's alternative argument.

b. *Did the evidence establish Robinson's specific intent to cause bodily injury?*

Robinson also argues the State failed to prove he possessed the specific intent to hold Trouten for the purpose of inflicting bodily injury upon her.

To convict defendant, the State was required to prove he took or confined Trouten with specific intent to carry out one of the enumerated acts in the statute. See *State v. McGee*, 224 Kan. 173, 177, 578 P.2d 269 (1978). Here, the State alleged defendant took the victim and held her to inflict bodily injury. Thus it had to prove "not only that [defendant] had the general intent to take or confine a person by force, threat, or deception, but also that he had the specific intent to inflict bodily injury or to terrorize the victim or another." *State v. Becker*, 290 Kan. 842, 852, 235 P.3d 424 (2010).

"Specific intent as an element of the crime charged is normally a question of fact for the jury . . . ." *State v. Dubish*, 234 Kan. 708, 717, 675 P.2d 877 (1984). "Specific intent may be shown by acts, circumstances, and reasonable inferences deducible therefrom; it need not be shown by direct proof." *Becker*, 290 Kan. at 852.

The State offered sufficient evidence to support the jury's finding that Robinson took Trouten by deception and held her with the specific intent to inflict bodily injury. First, the State's evidence of Robinson's common scheme and course of conduct established that he lured multiple women to the Kansas City area in order to exploit and later kill them. Jurors could reasonably infer from this evidence that Robinson intended to do the same with Trouten. See *State v. Drennan*, 278 Kan. 704, 718, 101 P.3d 1218 (2004) (prior murder probative of intent and premeditation, given similarity of incidents), *overruled in part on other grounds by State v. Neighbors*, 299 Kan. 234, 328 P.3d 1081 (2014); *State v. Henson*, 221 Kan. 635, 645, 562 P.2d 51 (1977) (evidence of prior knifing probative of identity and premeditation, given similarity of offenses). The jury

293

was free to consider this evidence offered in support of the capital murder counts, Counts II and III, as probative of Robinson's specific intent to inflict bodily injury under Count I, aggravated kidnapping. See *Carr*, 300 Kan. at 149 (jury free to consider evidence offered in support of one charge in considering separate felony-murder charge, where all charges properly joined together in a single complaint); *State v. Cromwell*, 253 Kan. 495, 509-10, 856 P.2d 1299 (1993) (where charges tried together, evidence of defendant's commission of charged offense admissible to support other charges).

Also, the State's evidence of Robinson's planning and preparation to kill Trouten and conceal her disappearance is probative of his specific intent to inflict bodily injury. After Trouten's disappearance, her mother and father each received a handwritten letter from their daughter describing her supposed departure on a trip of a lifetime. Robinson's former paramour, Aleisa Cox, testified that Robinson had her draft similar letters to her family members before they were supposedly scheduled to leave on a trip to Europe—a trip that ultimately fell through. Trouten's family continued to receive typewritten letters signed by Trouten that they believed were fraudulent. During the search of Robinson's storage unit, law enforcement found 42 envelopes preaddressed to members of Trouten's family, along with 31 pieces of pastel-colored stationary that were blank, except for a handwritten closing that read: "'Love you, Suzette.'"

This evidence suggests Robinson planned to kill Trouten and prepared to conceal the crime well before committing the act, and such evidence is probative of his specific intent to inflict bodily injury. See *State v. Harper*, 9 Kan. App. 2d 349, 351-52, 676 P.2d 774 (a defendant's preparation to steal can reasonably support inference of specific intent for burglary), *rev'd on other grounds* 235 Kan. 825, 685 P.2d 850 (1984); *State v. Holmes*, 388 So. 2d 722, 728 (La. 1980) (jury could reasonably infer from defendant's planning and execution of robbery a specific intent to kill or inflict great bodily harm); *People v. Youngblood*, 165 Mich. App. 381, 387, 418 N.W.2d 472 (1988) (premeditation

294

can be founded on circumstantial evidence of organized planning and conduct prior to or after killing); see also *State v. Kettler*, 299 Kan. 448, 467, 325 P.3d 1075 (2014) (defendant's conduct before and after crime is relevant factor in deciding whether evidence gives rise to inference of premeditation).

Once again, Robinson argues the evidence at trial established only that he took Trouten with the specific intent of engaging in a consensual BDS&M relationship with her. The argument invites the court to reweigh the competing evidence and substitute our judgment in place of the jury's. This we cannot do. Together, the evidence establishing Robinson's common scheme and course of conduct, along with his extensive planning and preparation for Trouten's murder, was sufficient for a reasonable juror to conclude that he took Trouten by deception with the specific intent to inflict bodily injury upon her. See *Durbish*, 234 Kan. at 717 (specific intent may be shown by acts, circumstances, and inferences reasonably deducible from them).

3. *Was the State's evidence sufficient to support Robinson's first-degree murder conviction?*

Robinson next challenges the sufficiency of the evidence supporting his first-degree premeditated murder conviction for the killing of Lisa Stasi, as alleged in Count V. Robinson believes the evidence was insufficient because Stasi's body was never found and that the evidence does not tie him to her disappearance.

As discussed in the analysis of the multiplicity issue, we are reversing Robinson's first-degree premeditated murder conviction under Count V because it is unconstitutionally multiplicitous with his capital murder conviction under Count II, which also alleged that Robinson killed Stasi intentionally and with premeditation as part of his common scheme or course of conduct. Given our holding on the multiplicity issue,

we need not address Robinson's challenge to the sufficiency of the evidence supporting his conviction under Count V in detail.

*Multiple Acts, Count I—Aggravated Kidnapping*

Robinson argues the State relied on multiple acts to prove its aggravated kidnapping charge in Count I, and therefore, the district judge's failure to force the State to elect one act or to give a special unanimity instruction constituted clear error.

1. *Legal Framework and Standard of Review*

In assessing a multiple acts challenge, "[t]he threshold question is whether we are presented with a multiple acts case. If not, [defendant's] argument fails." *State v. Voyles*, 284 Kan. 239, 244, 160 P.3d 794 (2007). In a multiple acts case, several acts are alleged and any one of them could constitute the crime charged. *State v. Kesselring*, 279 Kan. 671, 682, 112 P.3d 175 (2005).The court "treat[s] the question of whether a case presents a multiple acts issue as one of law over which [it has] unlimited review." *State v. King*, 299 Kan. 372, 379, 323 P.3d 1277 (2014).

2. *Did the State present a multiple acts case?*

In Count I, the State alleged Robinson took Trouten but did not specify the precise act that constituted the taking. At trial, the State presented evidence and made argument in support of two possible "takings":  (1) Robinson lured Trouten from Michigan to Kansas with false representations of employment and travel; and (2) Robinson took Trouten to his rural Linn County property with representations of fulfilling her sexual fantasy. Robinson contends that the two takings constitute multiple acts, and therefore, the district judge should have compelled the State to elect a single theory of taking to

296

submit to the jury or provided the jury with a special unanimity instruction requiring jurors to agree unanimously on the criminal act constituting the taking.

Here, the two separate theories of Trouten's taking could support but one conviction for aggravated kidnapping. As the State points out in its brief, a crime is completed when every element of the offense has occurred. See *Cox v. State*, 197 Kan. 395, 405, 416 P.2d 741 (1966) (the crime of kidnapping in the second degree is complete when without lawful authority a person is forcibly seized with intent to secretly confine the person in this state against his or her will); K.S.A. 21-3106(6) (crime committed when every element occurs). The actual infliction of bodily injury is one of the essential elements of aggravated kidnapping. K.S.A. 21-3421. The State's evidence established that Robinson inflicted nonconsensual bodily injury only once—at the time of Trouten's murder. Any bodily injury Trouten may have sustained through consensual BDS&M sex could not, as a matter of law, support the bodily injury element of the aggravated kidnapping statute. See *State v. Mason*, 250 Kan. 393, 396-98, 827 P.2d 748 (1992) (court properly instructed that bodily injury must be against the victim's will under kidnapping statute).

Because the State's two theories as to how Robinson "took" Trouten could support but one conviction, rather than two, Count I and the State's evidence supporting it did not constitute a multiple acts case. Accordingly, the trial court did not err in failing to force the State to elect one theory or, alternatively, in failing to provide a special unanimity instruction to the jury. See *State v. Colston*, 290 Kan. 952, 961, 235 P.3d 1234 (2010) (multiple acts case exists when the State charges defendant with a single count and presents evidence of multiple acts—each of which, independently, is sufficient to support the crime charged).

Robinson claims several instances of alleged prosecutorial misconduct prejudiced his right to a fair trial. In particular, he highlights the prosecutor's use of what he characterizes as imaginary scripts on closing argument; comments that allegedly undermined the presumption of innocence, burden of proof, and right to remain silent; and the failure to disclose the State's theory regarding defendant's common scheme or course of conduct until the rebuttal portion of closing argument.

*Legal Framework and Standard of Review*

> "For many years, we have said that 'review of prosecutorial misconduct claims involves a two-step process. The court first decides whether the comments were outside the wide latitude a prosecutor is allowed, *e.g.*, in discussing the evidence. If so, there was misconduct. Second, if misconduct is found, we have said the court must determine whether the improper comments prejudiced the jury and denied the defendant a fair trial. *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 (2012).' *State v. Bridges*, 297 Kan. 989, 1012, 306 P.3d 244 (2013)." *State v. Carr*, 300 Kan. 1, 248, 331 P.3d 544 (2014), *cert. granted in part* 135 S. Ct. 1698 (2015).

*Use of Imaginary Scripts*

Robinson argues the prosecutor improperly utilized "imaginary scripts":  (1) during closing argument when the prosecutor advanced the rhetorical question, "And one must wonder, did that poor, fat, disabled Debbie Faith, did she watch her mom get killed?"; (2) during closing argument when the prosecutor said, "We know that there he is grinning like a Cheshire cat; within hours of Lisa Stasi having that baby ripped from her arms."; and (3) during closing argument when the prosecutor made argument based on a letter Robinson purportedly sent to victim Lisa Stasi's brother, which was not admitted into evidence.

1. *Did the prosecutor's suggestion that Debbie Faith witnessed her mother's death constitute prosecutorial misconduct?*

At the start of closing argument, prosecutor Morrison characterized Robinson's acts as sinister and provided examples of his conduct warranting the title. In the process, he commented, "And one must wonder, did that poor, fat, disabled Debbie Faith, did she watch her mom get killed?"

Defense counsel objected, claiming the comment invited speculation from jurors. Judge Anderson did not clearly rule on the objection. Instead, he commented that "I understand [the prosecutors] have a certain degree of latitude here. On the other hand, it's probably not a good thing for us to get too speculative." The defense requested a curative instruction, but the district judge felt it would draw the jury's attention to the remark. Robinson believes the comment was improper and prejudicial to his due process rights.

Under the controlling framework, we first consider whether the remark fell beyond the wide latitude afforded prosecutors in discussing the evidence. *State v. Martinez*, 290 Kan. 992, 1012, 236 P.3d 481 (2010). Prosecutors are granted wide latitude to argue cases because it is their duty to present them with "'earnestness and vigor and to use every legitimate means to bring about a just conviction.'" *State v. King*, 288 Kan. 333, 351, 204 P.3d 585 (2009) (quoting *State v. Ruff*, 252 Kan. 625, 634, 847 P.2d 1258 [1993]). "'Inherent in this wide latitude is the freedom to craft an argument that includes reasonable inferences based on the evidence.'" *King*, 288 Kan. at 351 (quoting *State v. Pabst*, 268 Kan. 501, 507, 996 P.2d 321 [2000]).

However, we have made clear that this wide latitude is not limitless, and prosecutors may not comment on facts beyond the evidence. *King*, 288 Kan. at 351; *State v. Ly*, 277 Kan. 386, 393, 85 P.3d 1200, *cert. denied* 541 U.S. 1090 (2004). For example,

"[p]rosecutorial comments referring to what the victim was thinking are improper because they ask the jury to speculate on facts not in evidence." *State v. Kleypas*, 272 Kan. 894, 1113, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), *overruled on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006); see *State v. De La Torre*, 300 Kan. 591, 610, 331 P.3d 815, *cert. denied* 135 S. Ct. 728 (2014). Likewise, "[i]t is improper for the prosecutor to create an 'imaginary script' in order to create and arouse the prejudice and passion of the sentencing jury." *Kleypas*, 272 Kan. at 1113.

The evidence relevant to the prosecutor's comment established that Debbie Faith was a disabled minor who depended on her mother, Sheila Faith, as her primary caregiver. They left Colorado together to visit Robinson and were never seen alive again. Their bodies were found in two metal drums at Robinson's Raymore, Missouri, storage unit. The coroner testified both were killed by blunt-force trauma to the head. He could not determine if the blows rendered them immediately unconscious. Nor could he provide a precise date of death but said the decomposition was consistent with the State's theory that they had been murdered 6 years earlier.

The State offered no direct evidence that Debbie Faith witnessed her mother's murder. Nor did the circumstantial evidence reasonably give rise to such an inference. The State did not prove which victim Robinson killed first or, for that matter, whether they were killed at the same time or location. It is speculative to presume from the record that Debbie Faith saw Robinson kill her mother. The form of the prosecutor's rhetorical question, "One must *wonder* . . . ," did just that and invited jurors to speculate about events unsupported by the evidence. As such, the comment exceeded the wide latitude afforded prosecutors in discussing the evidence. See *State v. Flournoy*, 272 Kan. 784, 796-97, 36 P.3d 273 (2001) (comment speculating about victim's final thoughts improper).

The State attempts to distinguish *Flournoy*, arguing the prosecutor's comments there were unsupported and concerned the victim's possible last thoughts rather than the events she may have witnessed. The distinction is one without a legal difference. In both instances, the State's evidence, and reasonable inferences from it, failed to support the events or scenario the prosecutor painted for the jury during closing argument.

Having determined the comment was beyond the scope of the evidence, we next decide whether Robinson suffered prejudice as a result. See *State v. Maestas*, 298 Kan. 765, 774, 316 P.3d 724 (2014). In doing so, we consider: "(1) whether the misconduct was gross and flagrant; (2) whether the misconduct showed ill will on the prosecutor's part; and (3) whether the evidence was of such a direct and overwhelming nature that the misconduct would likely have had little weight in the minds of jurors." 298 Kan. at 774.

After careful consideration of these factors, we hold that the prosecutor's comment was not prejudicial to Robinson's right to a fair trial. Prosecutor Morrison's isolated, stray remark was not gross and flagrant. See *State v. Adams*, 292 Kan. 60, 68-69, 253 P.3d 5 (2011) (comments not gross or flagrant when "the prosecutor only made a passing reference to the victim and did not dwell on or repeat the point"); *State v. Miller*, 284 Kan. 682, 719, 163 P.3d 267 (2007) (accumulation of multiple comments may render them gross and flagrant).

The record also confirms the absence of any ill will. After Robinson's objection, the prosecutor moved on to other issues at the district judge's urging and made no further reference to the subject. *Cf. State v. McHenry*, 276 Kan. 513, 525, 78 P.3d 403 (2003) (ill will exists where prosecutor expressed indifference to court's rulings, mocked the defendant, or engaged in repeated acts of misconduct), *disapproved on other grounds by*

*State v. Gunby*, 282 Kan. 39, 144 P.3d 647 (2006); *State v. Washington*, 275 Kan. 644, 672, 68 P.3d 134 (2003) (a few comments in lengthy transcript do not show ill will).

Finally, we are convinced this isolated remark had little weight in the minds of jurors. The prosecutor did not argue Debbie Faith definitively witnessed her mother's murder. Because the form of the rhetorical question was equivocal, the potential impact on jurors was diminished. Moreover, this isolated remark was likely to have far less impact than the State's overwhelming and compelling evidence establishing that Robinson violently murdered this young, disabled teenager and her mother and, for years thereafter, reaped the financial benefits of his horrific acts by stealing their Social Security benefit payments. See *Miller*, 284 Kan. at 721 (prosecutor's improper comment held little weight in light of the overwhelming evidence against defendant).

We find this isolated comment, uttered amongst thousands of pages of transcript, was not prejudicial to Robinson's right to a fair trial.

   2. *Did the prosecutor's remark about ripping Lisa Stasi's baby from her arms constitute prejudicial misconduct?*

During the rebuttal portion of the State's closing argument, the prosecutor responded to Robinson's argument challenging the State's evidence that Robinson murdered Stasi. As the prosecutor discussed the timeline of events, he commented, "We know that there [Robinson] is grinning like a Cheshire cat, within hours of Lisa Stasi having that baby ripped from her arms."

The district judge sustained Robinson's objection, instructed the jury to disregard the comment, and admonished the prosecutor not to comment on matters not in evidence. The prosecutor then clarified his argument, explaining to the jury:

"Would a young mother. . . willingly give up her baby, willingly give her baby away to a stranger? I think we all know the answer to that question; don't we? I think we all know that she wouldn't just walk away from her baby. I think we all know what happened to Lisa Stasi for her baby."

Defendant did not object to the prosecutor's argument as clarified.

Robinson contends the prosecutor's suggestion that baby Tiffany was "ripped" from Stasi's arms was beyond the scope of the evidence. The record established that Stasi was hysterical and crying when she called her mother-in-law on the afternoon of her disappearance, explaining somebody was trying to have her sign papers and take baby Tiffany from her. The evidence showed that Robinson later returned to his home with a baby named Tiffany and gave the child to his younger brother in furtherance of what turned out to be his adoption ruse.

The evidence did not establish that Robinson actually "ripped" baby Tiffany from Lisa Stasi's arms. Nor could one reasonably make such an inference from the evidence. The record simply contains no evidence describing how it came to pass that Robinson obtained physical control over baby Tiffany. We agree with Judge Anderson that the comment exceeded the scope of the evidence.

Nevertheless, it did not prejudice Robinson's right to a fair trial. The lone, isolated remark was not gross and flagrant. Though technically improper, the remark did not land far beyond the wide latitude afforded prosecutors in discussing the evidence because Stasi's emotional response to the situation suggested she was unwilling to part ways with her baby voluntarily. See *State v. Naputi*, 293 Kan. 55, 65, 260 P.3d 86 (2011) (misuse of the word "corroborate" was not gross and flagrant misconduct or the product of ill will).

Nor was the comment motivated by ill will. After the ruling, the prosecutor immediately explained that the State's argument was that Stasi would not have voluntarily relinquished her parental rights—an inference reasonably supported by the evidence. Prosecutors made no further remark on the subject inconsistent with the district judge's ruling. *Cf. McHenry*, 276 Kan. at 525 (noting that ill will has been found in cases where the prosecutor expressed indifference to a court's rulings or engaged in repeated acts of misconduct).

Finally, the comment would have supported little weight in the minds of jurors. The isolated comment paled in comparison to the State's overwhelming evidence establishing that Robinson created a sham charitable outreach program claiming to offer assistance to young, vulnerable women with newborn babies; he recruited young, Caucasian mothers without strong family connections to participate; he enticed Stasi into this program, and thereafter, murdered her and delivered her baby to his brother as part of a fraudulent private adoption scheme. See *State v. Crawford*, 300 Kan. 740, 757, 334 P.3d 311 (2014) (misconduct could not have been prejudicial in light of highly persuasive evidence incriminating defendant).

In addition, whatever prejudicial impact the comment may have created was mitigated by the district judge's instruction to jurors to disregard the remark altogether. See *State v. Warbritton*, 215 Kan. 534, Syl. ¶ 1, 527 P.2d 1050 (1974) (improper remarks will not provide basis for reversal where jury instructed to disregard same, unless remarks are so prejudicial as to be incurable). The comment was not immune to such instruction. As such, we hold that the remark did not prejudice Robinson's right to a fair trial.

3. *Did the prosecutor's comments on matters not in evidence constitute prejudicial misconduct?*

During the rebuttal portion of closing argument, while discussing evidence establishing that Robinson murdered Stasi, Morrison argued:

> "You know what, he knew her car sat in front of Kathy Klingensmith's house and he thought, How am I going to explain that? What would Lisa say about that? So there's a part in the letter about it. He wrote to Marty, her brother, told him to let the bank take the car back. The payments are so far behind. She wants the money or the car. I don't have the money to pay the bank all the back payments. The car needs lots of work. A whole paragraph and a half trying to explain why she would leave her car there. Why, that car sat there day after day, week after week collecting dust. Why would she leave her car there? Because she's dead, because she's dead."

The comments drew no objection from the defense.

Robinson argues the prosecutor committed prejudicial misconduct by discussing the letter sent to Stasi's brother, Marty Elledge, because it was not admitted into evidence. The State agrees the comments were improper but argues they were not prejudicial.

Indeed, in discussing the letter sent to Elledge, the prosecutor improperly referenced a document that was not admitted into evidence. See *State v. Peppers*, 294 Kan. 377, 394, 276 P.3d 148 (2012) (prosecutors free to make argument, provided it is supported by admitted evidence).

Even so, we find no prejudice. The prosecutor's comments were not gross or flagrant or motivated by ill will. He mentioned the letter on only one occasion, drawing no objection from the defense. See *King*, 288 Kan. at 349 (while not required to preserve issue on appeal, lack of objection can be relevant to prejudice analysis); *Miller*, 284 Kan.

305

at 720 (lack of objection relevant to whether comments motivated by ill will). The circumstances suggest the comment, or the failure to introduce the letter, resulted from a mere oversight by the prosecutor. The State admitted numerous letters that Robinson, posing as the victim, sent to the victims' families, including a letter to Stasi's mother-in-law. The State also admitted a photocopy of an envelope with an affixed postage stamp addressed to Stasi's brother, seized during the search of Robinson's Olathe residence. Before referencing the letter, the prosecutor reminded jurors that all of these letters were in evidence, and he asked them to review this evidence during deliberations.

Robinson believes the prosecutor should have known the letter was not in evidence because Judge Anderson had previously sustained defendant's hearsay objection after Stasi's aunt, Karen Moore, tried to testify to its contents. However, this objection was founded on Moore's attempt to testify to the contents of the letter, not to its admission of the letter itself. Also, the ruling was made 10 days before closing argument, in the midst of an extremely complex, multiweek criminal trial. It is unlikely this particular ruling was fresh in the prosecutor's mind during the rebuttal portion of closing argument.

Finally, the comments would have supported little weight in the minds of jurors. Morrison made reference to this letter, among other evidence, to rebut the defense's closing argument that the evidence failed to establish that Stasi was dead or that she had fallen victim to Robinson's foul play. However, the State put on substantial evidence, independent of this letter, establishing the fact of Stasi's murder and Robinson's connection to it. Morrison's comments on the content of the letter to Elledge did little, if anything, to bolster this evidence. Moreover, the trial court instructed jurors to disregard any testimony or exhibit not admitted and that counsels' remarks were not evidence, further mitigating any risk of prejudice.

Based on the foregoing, we find the isolated remarks did not prejudice Robinson's right to a fair trial.

*Comments with Potential Impact on Defendant's Constitutional Rights*

Robinson also contends that the prosecutor committed misconduct by making comments that undermined his substantial rights. Specifically, he claims the prosecutor improperly: (1) commented on Robinson's silence; (2) shifted the burden of proof to the defense; (3) appealed to community interests; and (4) undermined the presumption of innocence during voir dire.

1. *Did the prosecutor comment improperly on defendant's silence?*

"The Fifth Amendment to the United States Constitution, as well as § 10 of the Kansas Constitution Bill of Rights, prohibits a prosecutor from making direct, adverse comments on a defendant's failure to testify on his or her own behalf." *State v. McKinney*, 272 Kan. 331, 347, 33 P.3d 234 (2001), *overruled on other grounds by State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2006). "An indirect comment may also violate the privilege where the language used was manifestly intended or was of such a character that the jury would necessarily take it to be a comment on the failure of the accused to testify." *McKinney*, 272 Kan. at 347.

During the rebuttal portion of closing, the State argued that Robinson's common scheme or course of conduct was characterized by four circumstances or elements, including similar methods of killing the victims and subsequent concealment of the bodies. In discussing these elements, Morrison said, "Finally, concealment, the barrels hidden away or isolated. Of course, in Lisa Stasi's case a body not found. That's the ultimate concealment; isn't it? It's the ultimate concealment."

307

Robinson argues this remark was an indirect and impermissible comment on Robinson's right to remain silent. We disagree. The remarks were consistent with and within the scope of the evidence, which was sufficient to establish that Robinson murdered Stasi and five other women and that law enforcement officers conducted an extensive investigation that led to the discovery of all the victims' bodies, other than Stasi's. From this evidence, one could reasonably infer that Robinson had disposed of Stasi's body in a manner that prevented law enforcement from discovering the corpus delicti. Considering the record and argument in its totality, the prosecutor was addressing law enforcement's inability to find Stasi's body—not Robinson's failure to take the stand or to otherwise inform law enforcement of the body's location—as the "ultimate concealment." Jurors would not have necessarily and naturally understood Morrison's remark as a comment on Robinson's postarrest silence, and, therefore, it was not improper. See *State v. Ninci*, 262 Kan. 21, 48, 936 P.2d 1364 (1997); see also *McKinney*, 272 Kan. at 346 (prosecutor free to draw reasonable inferences "provided that the remarks do not indirectly draw an adverse inference regarding the defendant's failure to testify").

2. *Did the prosecutor improperly shift the burden of proof?*

During closing, the defense argued Robinson did not act alone, in hopes of creating reasonable doubt or, perhaps more likely, residual doubt for the penalty phase. To support the theory, counsel argued that the metal drums holding the bodies were too heavy for Robinson to move alone and that the unidentified fingerprint on the roll of duct tape stained with Lewicka's blood suggested others were involved.

At the outset of rebuttal, the prosecutor told jurors he would address these specific issues, but first he wanted to remind them of the strength of the evidence of Robinson's guilt:

"Before we spend a lot of time talking about whether or not there's a fingerprint on duct tape or why Izabela Lewicka didn't send letters, before we get caught up in those things, let's just remember one thing. Let's think about how intertwined the defendant's conduct with all these women was. And let's not forget the fact that these barrels with their bodies are on his farm. Think about that. Mr. O'Brien wants us all to think, gosh, this is a circumstantial case, look at all these questions here, questions here, questions there over 17 years, *that's the best he can come up with*. There are very few questions in this case that are unanswered, very, very few." (Emphasis added.)

Robinson argues the comment "that's the best he can come up with" had the effect of shifting the burden of proof to the defendant.

We disagree. The comment was clearly intended to remind the jury not to lose sight of the overwhelming evidence of Robinson's guilt when evaluating the defendant's reasonable doubt arguments. Moreover, the district judge properly instructed the jurors on the burden of proof. Viewing the remark in context, we find it to be within the wide latitude afforded prosecutors in discussing the evidence. See *State v. Cosby*, 293 Kan. 121, 137, 262 P.3d 285 (2011) (prosecutor's rhetorical question whether jury had heard any evidence to contradict the State's position "constituted only a general question about the absence of evidence to rebut the State's witnesses," especially given district judge's instruction on burden of proof); *McKinney*, 272 Kan. at 347 (prosecutors may make inferences from the balance or lack of evidence presented at trial; comment suggesting that defendant failed to prove State's witness was lying was proper argument on lack of evidence where jury instructed properly on burden of proof).

Robinson cites *State v. Tosh*, 278 Kan. 83, 91 P.3d 1204 (2004), in support of his position. There we held the prosecutor improperly shifted the burden of proof by questioning whether there was "'"any evidence that [the crimes] didn't happen? Is there

309

any evidence that the things [the victim] told you didn't happen?"'" 278 Kan. at 92. However, in arriving at this holding, we noted the importance of considering the context in which the comments were made. The prosecutor not only made the challenged remark, but also suggested defendant's challenge of the victim's account was akin to "'rap[ing] her again,'" and questioned why defendant would even do so, having confessed previously. 278 Kan. at 90, 92. When viewing the remarks together in context, we found the improper motive and effect of the comment was apparent. 278 Kan. at 92.

In stark contrast, Morrison made the comment at issue here in the context of rehabilitating the State's evidence. He was responding directly to the challenges the defense had lodged to the State's theory during closing. In this context, "the best they can come up with" remark was not an attempt to shift the burden of proof. *Tosh* is distinguishable, and the remark was not improper under these facts. See *City of Dodge City v. Ingram*, 33 Kan. App. 2d 829, 837-38, 109 P.3d 1272 (2005) (prosecutor's comments that defense "'simply arguing smoke and mirrors'" and "'[g]rasping at straws'" not improper).

3. *Did the prosecutor improperly appeal to community interests?*

In his final remarks to the jury, the prosecutor said:

> "Now is your opportunity to decide whether or not you want to hold the defendant accountable for his actions for all these years. I hope you do. Thank you."

Robinson argues this comment improperly appealed to community interests.

Whether a statement properly calls for a conviction based on the evidence or, instead, improperly appeals to larger community interests is a matter of degree and dependent on the nature of the remark and the context in which it is made. See, *e.g.*, *State*

*v. Anderson*, 294 Kan. 450, 463, 276 P.3d 200 ("statement that the victim's 'redemption' would come with a guilty verdict is an appeal to emotion that attempts to pressure a verdict from the jury out of pity for the victim, rather than the defendant's guilt, and is an attempt to divert the jury's attention from the evidence"), *cert. denied* 133 S. Ct. 529 (2012); but see *State v. Finley*, 273 Kan. 237, 244-45, 42 P.3d 723 (2002) ("prosecutor's comments asking the jury not to let the defendant get away with the crime is in most instances permissible comment"). A prosecutor's argument to convict based on the evidence is proper. In contrast, remarks that imply that an acquittal will result in adverse impact on the community or otherwise appeal to community-wide interests are improper. 273 Kan. at 245 ("'[w]e don't want people making meth in our communities'" and we need to prevent "'people from making meth in our community'"); *State v. Ruff*, 252 Kan. 625, 636, 847 P.2d 1258 (1993) (arguing jurors had a duty to send a message to the community that charged conduct will not be tolerated).

Here the prosecutor's closing remarks to the jury, on their face, did not invoke a plea for jurors to consider broader community-wide interests. Instead, after summarizing the relevant evidence and arguments, the prosecutor asked the jury to hold Robinson accountable for his actions by finding him guilty. Such a comment was not improper.

4. *Did the prosecutor's voir dire comments undermine the presumption of innocence?*

Robinson believes the prosecutor undermined the presumption of innocence during jury selection by: (1) telling veniremembers that a juror should enter proceedings with no preconceived opinions of guilt or innocence; and (2) suggesting Robinson could be acquitted only if the prosecution did a "bad job" of presenting the case at trial.

A prosecutor's statements must accurately reflect the law. *Tosh*, 278 Kan. at 90. If not, they are deemed misconduct. *State v. Raskie*, 293 Kan. 906, 917-18, 269 P.3d 1268 (2012) (once misstatement of law established, analysis shifts to prejudice inquiry).

a. *Were the prosecutor's remarks about panelists' preconceived opinions improper?*

Robinson first argues the prosecutor misstated the law by saying jurors should enter the box without preconceived opinions of guilt or innocence. During the second phase of jury selection, Judge Anderson assigned veniremembers to small group panels for questioning on bias related to pretrial publicity and the death penalty. While questioning one of the small group panels, the prosecutor told Juror 342:

> "Obviously, if somebody comes in with a notion then they know the whole story or they think that somebody is guilty, *they think that somebody is not guilty*, if they do have some of that baggage, they need to be able to set it aside." (Emphasis added.)

Defense counsel objected, explaining the presumption of innocence allows jurors to believe defendant is not guilty unless or until proven otherwise. Morrison immediately responded, "I didn't mean it in that context." Judge Anderson sustained the objection and instructed the panelists to disregard the statement.

Notwithstanding the district judge's ruling, Robinson argues, the prosecutor continued to make the same comments. First, Robinson highlights the prosecutor's remarks to the twenty-second small group panel on September 25, 2002:

> "Okay. And does everybody here understand that's really kind of why we're asking these questions, because the law . . . doesn't expect everybody to, you know, have a totally blank mind and not to have ever heard anything about a case. That's not really the issue.

312

"What the issue is, if you're going to be a juror on this case, jurors have got to be able to set that aside. Preconceived opinions or notions that you have about facts of the case, you've got to be able to say, 'I can check that at the door, I can . . . leave that outside the courtroom and not let that affect me.'"

Robinson also highlights the prosecutor's comments to the thirteenth small group panel on September 23, 2002, when he asked prospective jurors 85 and 87 if they could set aside the information they learned and any opinions formed as a result of exposure to pretrial publicity and decide the case based on the evidence presented at trial.

The prosecutor's initial comment to the small group panel did not prejudice Robinson's substantial rights. The comment was made in the context of discussing pretrial publicity, not the appropriate burden of proof at trial. Moreover, the prosecutor immediately clarified that he had not intended for his remarks to be construed as a statement on the presumption of innocence. Judge Anderson also provided a curative instruction to the panelists, none of whom served on Robinson's jury.

Likewise, neither of the later comments is objectionable or inconsistent with Judge Anderson's prior ruling. Each reflected the proper standard for juror qualification where media coverage has been widespread. *Patton v. Yount*, 467 U.S. 1025, 1036, 104 S. Ct. 2885, 81 L. Ed. 2d 847 (1984) (where juror exposure to publicity raises concerns of bias, relevant question is whether he or she can set information aside and judge case on the evidence). The prosecutor did not suggest to jurors that the goal of impartiality undercut or should subvert the presumption of innocence.

313

b. *Was the prosecutor's hypothetical that assumed the State did a "bad job" presenting the case improper?*

At various times during small group voir dire, some panelists expressed uncertainty as to their ability to set aside pretrial publicity. In these situations, the prosecutor occasionally presented the panelists with a hypothetical question to the effect that "assuming the prosecution did a horrible or bad job presenting the case and you had serious doubts that the State had met its burden, how would you vote, or would you vote to acquit?" In doing so, Robinson believes the prosecutor implied that acquittal would be proper only if the prosecutors did a horrible job presenting the case.

Contrary to Robinson's assertion, Morrison's use of this hypothetical question did not improperly shift the burden of proof or undermine the presumption of innocence. The prosecutor phrased the question as a hypothetical scenario for the purpose of establishing panelists' willingness and ability to set aside media facts and opinions formed as a result of exposure to them. The question was particularly appropriate, given that the entire purpose of small group voir dire during the second phase of jury selection was to explore potential bias created by exposure to pretrial publicity and panelists' death penalty views. Throughout the voir dire process, the prosecutor emphasized the applicable evidentiary burdens and legal presumptions to veniremembers. Viewing the voir dire record in its entirety, we hold the remarks were not misconduct.

*Timing of Discussion of State's "Common Scheme or Course of Conduct" Theory*

In Count II and III of the Fourth Amended Complaint, the State alleged that Robinson killed Suzette Trouten and Izabela Lewicka, respectively, as part of a common scheme or course of conduct that included the murders of Sheila Faith, Debbie Faith, Beverly Bonner, and Lisa Stasi. Robinson claims the prosecutors engaged in misconduct

314

by withholding the factual basis of or theory regarding the common scheme or course of conduct until the rebuttal portion of closing argument.

"'As a general rule, [prosecutors] should not be allowed to develop new arguments on rebuttal, but should be restricted to answering the arguments put forth by defense counsel.'" *Hall v. United States*, 540 A.2d 442, 448 (D.C. 1988) (quoting *Moore v. United States*, 344 F.2d 558, 560 [D.C. Cir. 1965]); see Supreme Court Rule 168(a)(2) (2014 Kan. Ct. R. Annot. 276) ("Plaintiff may not argue a general issue not discussed in the opening portion of plaintiff's closing argument, unless in rebuttal.") The general rule, however, is not applied in a rigid fashion and "has evolved to give trial courts a modicum of discretion to allow a more substantial rebuttal which is not so narrowly tailored to the scope of defense counsel's summation." *Bailey v. State*, 440 A.2d 997, 1003 (Del. 1982); see *State v. Rosa*, 170 Conn. 417, 428, 365 A.2d 1135 ("no rigid requirement that a prosecutor's final summation must be limited solely to rebuttal of matters raised in the defendant's argument."), *cert. denied* 429 U.S. 845 (1976).

Robinson's argument fails for at least two reasons. First, it is unsupported by the record. At the outset of trial, during opening statements, the prosecutor told jurors that the evidence would demonstrate that Robinson employed a common scheme or course of conduct that included elaborate scams to exploit victims financially or sexually, kill them, and conceal their deaths. During its case-in-chief, the State put on evidence supporting the inference that Robinson's killings were linked together by common elements, including: luring victims with promises of financial benefit or travel, exploitation of the victims financially or sexually, similar methods of killing and disposal or concealment of the bodies, and acts of deceit and fraud to hide all of these crimes. During the first portion of the State's closing argument, prosecutor Morrison claimed that Robinson was the common thread that ran through the similar characteristics of all the murders, including

315

the bogus cover stories used to lure victims, the similar manner of killings, and the various efforts taken to conceal the deaths.

Additionally, the defense opened the door to the State's rebuttal argument. Robinson devoted a substantial portion of his closing to challenging the sufficiency of the evidence supporting the existence of a common scheme or course of conduct. The prosecutor's challenged remarks were proper rebuttal to Robinson's closing argument. *United States v. Sharp*, 400 Fed. Appx. 741, 750-51 (4th Cir. 2010) (unpublished opinion) (prosecutor did not commit misconduct by referring to altered records during rebuttal argument where it replied to theory raised in defendant's closing argument); *State v. Harrison*, 631 So. 2d 531, 534 (La. App. 1994) (prosecutor's rebuttal argument proper where defense counsel opened the door during closing argument).

Thus we hold the prosecutor did not engage in misconduct by discussing the elements of Robinson's common scheme or course of conduct during the rebuttal portion of closing argument.

*Summary of Guilt Phase Prosecutorial Misconduct Issues*

In the end, we find the prosecutor made three isolated improper remarks during a jury selection process and guilt phase trial that continued for several weeks. In particular, the prosecutor made comments beyond the scope of the evidence when he: (1) speculated whether Debbie Faith witnessed her mother's murder; (2) suggested baby Tiffany was ripped from Lisa Stasi's arms; and (3) discussed the contents of a letter sent to Lisa Stasi's brother. Viewed together, the one-time-only nature of each of the comments does not demonstrate that they were gross and flagrant or motivated by ill will. Also, they would have held little weight in the minds of jurors, given the State's overwhelming evidence of Robinson's guilt. The cumulative effect of these statements

316

was not prejudicial to Robinson's fair trial rights. See *State v. Kleypas*, 272 Kan. 894, 1088, 40 P.3d 139 (2001) (even if instances of prosecutorial misconduct are harmless error in and of themselves, their cumulative effect must be analyzed), *cert. denied* 537 U.S. 834 (2002), *overruled on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 439 (2006).

## 11. INSTRUCTIONAL ERROR—GUILT PHASE

Robinson lodges three challenges to the district judge's guilt phase instructions. In particular, he argues the capital murder elements instructions were deficient in failing to define "common scheme or course of conduct." Similarly, he contends the lack of such a definition rendered those terms unconstitutionally vague. Finally, he complains the venue instruction was incomplete and confusing.

### *Failure to Define "Common Scheme" or "Course of Conduct" in Instructions*

The district judge provided a separate elements instruction for each capital murder count, Counts II and III of the Fourth Amended Complaint. The instructions were identical except for the name of the primary victim, Trouten or Lewicka, and the relevant dates of the offense. Each instruction informed the jury that, as one of the elements of the offense, the State had to prove the killing of Trouten or Lewicka, along with the killings of Bonner, Sheila Faith, Debbie Faith, and Stasi, "were multiple acts or transactions constituting parts of a common scheme or a course of conduct."

Robinson requested that the trial judge include the following definitions of "common scheme" and "course of conduct" for the jury:

> "A common scheme exists between multiple acts if such acts are closely connected in time, place, occasion, and the nature of the activity.

317

"A course of conduct is a pattern of conduct composed of a series of acts over a period of time, however short, evidencing a continuity of purpose."

Judge Anderson declined, finding the terms were not particularly difficult for a lay person to resolve. Robinson now contends the failure to define the terms was erroneous.

### 1. *Standard of Review*

"For jury instruction issues, the progression of analysis and corresponding standards of review on appeal are: (1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; (2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 256 P.3d 801 (2011), *cert. denied* ___ U.S. ___, 132 S. Ct. 1594 (2012)." *State v. Salary*, 301 Kan. 586, Syl. ¶ 1, 343 P.3d 1165 (2015).

### 2. *Did "common scheme" or "course of conduct" require definition?*

Because the reviewability of the issue is not in dispute, our inquiry focuses on the second step of the analysis—whether defendant's proposed instruction defining "common scheme" and "course of conduct" was legally appropriate. In assessing whether definition of instructional terms is legally appropriate, we have held that

"a trial court 'need not define every word or phrase in the instructions. It is only when the instructions as a whole would mislead the jury, or cause them to speculate, that additional terms should be defined.' *State v. Norris*, 226 Kan. 90, 95, 595 P.2d 1110 (1979). We further stated that '[a] term which is widely used and which is readily comprehensible

need not have a defining instruction.' 226 Kan. at 95." *State v. Armstrong*, 299 Kan. 405, 440, 324 P.3d 1052 (2014).

The legislature has not defined the phrases "common scheme" or "course of conduct." The Notes on Use to PIK Crim. 4th 54.020, the elements instruction for capital murder, suggest instructions on definitions of terms should be given as defined in PIK Crim. 4th 54.150 (homicide definitions), which does not define "common scheme" or "course of conduct."

We have not previously had occasion to address whether the phrases "common scheme" or "course of conduct" under K.S.A. 21-3439(a)(6) necessitate further definition. However, other state appellate courts have held that these or similar terms in their capital murder statutes are commonly understood and require no further elaboration. *Duke v. State*, 889 So. 2d 1, 31 (Ala. Crim. App. 2002) (terms "one scheme" and "course of conduct" could be "understood by the average juror in their common usage"), *cert. granted, judgment vacated on other grounds* 544 U.S. 901 (2005); *Sendejo v. State*, 676 S.W.2d 454, 456 (Tex. App. 1984) (no need to define "pursuant to one scheme or continuing course of conduct" as the phrase includes terms of common understanding); *State v. Yates*, 161 Wash. 2d 714, 749, 168 P.3d 359 (2007) ("common scheme or plan" under Washington capital murder statute are words of common understanding requiring no definition); *State v. Cross*, 156 Wash. 2d 580, 617, 132 P.3d 80 (2006) (same).

Robinson cites multiple dictionary definitions of the words "common," "scheme," "course," and "conduct" in an effort to illustrate the terms have varied meanings and require further definition. The problem with this approach is that the meaning of the individual words is not at issue. Rather, the issue is whether the phrases "common scheme" and "course of conduct" are easily understood by lay jurors. The phrases use words in combination, not isolated definitions in combination, and, consequently, in

319

common usage are more precise than the sum of their parts. See K.S.A. 77-201 *Second* (words and phrases in a statute "shall be construed according to the context and the approved usage of the language"); see also *United States v. Williams*, 553 U.S. 285, 294, 128 S. Ct. 1830, 170 L. Ed. 2d 650 (2008) ("[M]eanings are narrowed by the common-sense canon of *noscitur a sociis*—which counsels that a word is given more precise content by the neighboring words with which it is associated."); *State v. Ross*, 2007 UT 89, ¶¶ 28-29, 174 P.3d 628 (Utah 2007) (statutory terms become clearer considered in context of the whole provision; "the clarity of the whole of the statute is greater than the sum of its individual parts").

Robinson also claims this court and the legislature have confused matters by using the terms in "wide-ranging" ways. He reviews various cases and statutes in which the phrases have been used and concludes that collectively they demonstrate no one meaning can be identified. But this argument also ignores context and relies on an unacknowledged and incorrect premise that the jurors asked to construe the phrases in this capital murder trial were aware of and confused by their use in other contexts. Robinson points to nothing in the record evidencing such confusion among Robinson's jurors.

Neither the legislature nor the PIK Committee recommended a definition for "common scheme" or "course of conduct" in K.S.A. 21-3439(a)(6), implying both believed the phrases were easily understood. Consistent with this view, other state courts have held that these or similar phrases in their capital murder statutes required no further definition. Defendant's proposed instruction defining "common scheme" and "course of conduct" was not legally appropriate, and we hold there was no error.

*"Common Scheme" or "Course of Conduct" as Unconstitutionally Vague*

In a similar vein, Robinson suggests Judge Anderson's failure to define the terms "common scheme" and "course of conduct" rendered the capital murder statute unconstitutionally vague, in violation of his due process and Eighth Amendment rights.

1. *Standard of Review*

"When the application of a statute is challenged on constitutional grounds, this court exercises an unlimited, de novo standard of review. *State v. Myers,* 260 Kan. 669, 676, 923 P.2d 1024 (1996), *cert. denied* 521 U.S. 1118 (1997). We presume that legislative enactments are constitutional and resolve all doubts in favor of a statute's validity. *State v. Wilkinson*, 269 Kan. 603, 606, 9 P.3d 1 (2000). We will not declare a statute unconstitutional as applied unless it is clear beyond a reasonable doubt that the statute infringes on constitutionally protected rights. See 269 Kan. at 606." *State v. Cook*, 286 Kan. 766, 768, 187 P.3d 1283 (2008).

2. *Are the Phrases "common scheme" or "course of conduct" unconstitutionally vague?*

We apply a two-part test in analyzing whether a statute is unconstitutionally vague under the Due Process Clause of the Fourteenth Amendment to the United States Constitution:

"First, the [statute] must give adequate notice to those tasked with following it. More specifically, the [statute] must 'convey sufficient definite warning and fair notice as to the prohibited conduct in light of common understanding and practice.' *Steffes*, 284 Kan. at 389 (citing [*City of Wichita v.*] *Hackett*, 275 Kan. [848,] 853-54[, 69 P.3d 621 (2003)]). We have recognized that [a statute] that '"requires or forbids the doing of an act in terms so vague that persons of common intelligence must necessarily guess at its meaning and differ as to its application is violative of due process."' *Hackett*, 275 Kan. at 853 (citing *State v. Dunn*, 233 Kan. 411, 418, 662 P.2d 1286 [1983]); see *Connally v. Gen. Constr.*

*Co.*, 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926). But on the other hand, Kansas has long held that [a statute] is not unconstitutionally vague if it employs words commonly used, previously judicially defined, or having a settled meaning in law. *Hackett*, 275 Kan. at 853-54 (citing *City of Wichita v. Lucero*, 255 Kan. 437, 451, 874 P.2d 1144 [1994]).

"In the second prong of our inquiry, we require that [a statute]'s terms must be precise enough to adequately protect against arbitrary and discriminatory action by those tasked with enforcing it. *Steffes*, 284 Kan. at 389 (citing *Hackett*, 275 Kan. at 854); see *Hill v. Colorado*, 530 U.S. 703, 732, 120 S. Ct. 2480, 147 L. Ed .2d 597 (2000). We acknowledge that a law is invalid if it violates either prong. *City of Chicago v. Morales*, 527 U.S. 41, 56, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999). However, 'the more important aspect of the vagueness doctrine "is not actual notice but the other principal element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement."' *Kolender v. Lawson*, 461 U.S. 352, 358, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983) (citing *Smith v. Goguen*, 415 U.S. 566, 574-75, 94 S. Ct. 1242, 39 L. Ed. 2d 605 [1974]). And in analyzing this second prong for vagueness, we are further mindful that '[t]he standards of certainty in [a statute] punishing criminal offenses are higher than in those depending primarily upon civil sanctions for enforcement.' *Steffes*, 284 Kan. at 389." *City of Lincoln Center v. Farmway Co-Op, Inc.*, 298 Kan. 540, 545-46, 316 P.3d 707 (2013).

See *City of Wichita v. Hackett*, 275 Kan. 848, 853, 69 P.3d 621 (2003).

In elaborating further on the second part of the framework, we explained:

"'[I]f arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.'" 276 Kan. at 822 (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108-09, 92 S. Ct. 2294, 33 L. Ed. 2d 222 [1972]).

322

A vagueness challenge based on the Eighth Amendment to the United States Constitution is subject to a substantially similar analysis. See *Kleypas*, 272 Kan. at 1025 (when statutory language challenged as unconstitutionally vague, court must decide whether language is too vague to guide discretion of jurors regarding the sentencing process); see also *Maynard v. Cartwright*, 486 U.S. 356, 361-62, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988) (claims of vagueness under Eighth Amendment assert inadequate notice failing to limit a sentencer's discretion).

Robinson makes clear his challenge arises under the second part of the framework, arbitrary enforcement. As such, we must decide whether the failure of the trial judge to define "common scheme" and "course of conduct" for the jury rendered the language susceptible to arbitrary and capricious or discriminatory application by the jury.

Robinson believes the statutory language was susceptible to arbitrary application because his case lies at the boundaries of the concepts of "common scheme" and "course of conduct," and, therefore, it was difficult for the jury to determine whether his conduct fell within them.

The Supreme Court rejected the very premise of Robinson's argument in *Williams*, 553 U.S. 285, where it reviewed a due process vagueness challenge to a statute criminalizing the pandering or solicitation of child pornography. The Eleventh Circuit had held language in the statute void for vagueness, concluding that under certain hypothetical scenarios it demanded close calls on whether conduct fell within the statute's prohibition. This meant innocent individuals could be prosecuted under the law. The Supreme Court disagreed:

"[T]he Eleventh Circuit's . . . basic mistake lies in the belief that the mere fact that close cases can be envisioned renders a statute vague. That is not so. Close cases can be imagined under virtually any statute. The problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt. See *In re Winship*, 397 U.S. 358, 363[, 90 S. Ct. 1068, 25 L. Ed. 2d 368] (1970).

"What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is. Thus, we have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings. See *Coates v. Cincinnati*, 402 U.S. 611, 614[, 91 S. Ct. 1686, 29 L. Ed. 2d 214] (1971); *Reno* [*v. American Civil Liberties Union*, 521 U.S. 844,] 870-871, and n.35[, 117 S. Ct. 2329, 138 L. Ed. 2d 874 (1997)]." *Williams*, 553 U.S. at 305-06.

*Williams* makes clear the pivotal question here is not whether it might be difficult for the jury to determine if Robinson's conduct constituted a common scheme or course of conduct, but rather whether the jury can apply those concepts in a reasoned, nonarbitrary way to the evidence it received.

Courts have consistently found that "common scheme," "course of conduct," and similar terms are not unconstitutionally vague. *Sheriff v. Smith*, 91 Nev. 729, 731-32, 542 P.2d 440 (1975) (the phrase "common plan or scheme" interpreted to mean a single plan or scheme contemplating two or more offenses before the plan has been completed, did not violate due process); *State v. Perez*, 124 Ohio St. 3d 122, 156 ¶ 233, 920 N.E.2d 104 (2009) (rejecting course-of-conduct specification as unconstitutionally vague); *Corwin v. State*, 870 S.W.2d 23, 28-29 (Tex. Crim. App. 1993) ("same scheme or course of conduct" in capital murder statute not unconstitutionally vague; fact that marginal cases may make it difficult to determine whether offense committed not grounds to find statute unconstitutionally vague); *Ross*, 174 P.3d at 633-34 ("incident to one act, scheme, course

of conduct, or criminal episode" not unconstitutionally vague on due process grounds); *State v. Pirtle*, 127 Wash. 2d 628, 662, 904 P.2d 245 (1995) ("common scheme or plan is not unconstitutionally vague" because jury instructions and verdict forms could be understood by an average person). This authority also suggests Robinson's jury could apply the concepts in a reasoned, non-arbitrary fashion. Accordingly, we hold that the phrases "common scheme" and "course of conduct" are not unconstitutionally vague.

Robinson's citation to *State v. Locklear*, 105 Wash. App. 555, 560-62, 20 P.3d 993 (2001), *aff'd on other grounds sub nom. State v. Rodgers*, 146 Wash. 2d 55, 43 P.3d 1 (2002), do not dissuade us from this ruling. In *Locklear*, the Washington Court of Appeals reversed defendant's conviction under a state drive-by shooting statute it found to be unconstitutionally vague. However, on appeal, defendant argued the intermediary appellate court erred by reversing his conviction on constitutional grounds rather than on the basis of insufficient evidence supporting the conviction. Citing the "well-established rule of judicial restraint that the issue of the constitutionality of a statute will not be passed upon if the case can be decided without reaching that issue," 146 Wash. 2d at 60, the Washington Supreme Court, sitting en banc, noted: "It seems obvious that one is not in the immediate area of a vehicle that is parked two blocks away from the place where that person discharges a firearm" and held that the evidence was insufficient to support defendant's conviction under the drive-by shooting statute. 146 Wash. 2d at 62. *Locklear* appears to be of questionable authority even in Washington, and we find it unpersuasive here.

*Defendant's Challenge to Venue Instruction*

The trial court's instructions on the capital murder counts, along with the lesser included offense instructions, provided that the jury must find that the murders occurred in Johnson County, Kansas. However, the bodies of the capital murder victims, Trouten

325

and Lewicka, were discovered in Linn County. To assist jurors on the venue issue, the district judge gave the following instruction:

"INSTRUCTION NO. 11

"If you find that the defendant committed criminal acts in one county which were a substantial and integral part of an overall continuing crime plan, and which were in partial execution of that plan, the prosecution may be in any county in which any of such acts occur."

Robinson neither objected to the venue instruction nor offered an alternative. He now complains that Instruction No. 11 was confusing and erroneous and that the trial court should have given an additional instruction informing the jury of the presumption contained in K.S.A. 22-2611 that "[d]eath shall be presumed to have occurred in the county where the body of the victim is found."

1. *Standard of Review*

Because Robinson failed to object to the venue instruction or request an alternative instruction, we review the challenge for clear error. See K.S.A. 22-3414(3); *State v. Briseno,* 299 Kan. 877, 882, 326 P.3d 1074 (2014). We apply a two-part test to determine whether a jury instruction is clearly erroneous.

"First, 'the reviewing court must . . . determine whether there was any error at all. To make that determination, the appellate court must consider whether the subject instruction was legally and factually appropriate, employing an unlimited review of the entire record.'" *State v. Herbel*, 296 Kan. 1101, 1121, 299 P.3d 292 (2013) (quoting *State v. Williams*, 295 Kan. 506, Syl. ¶ 4, 286 P.3d 195 [2012]).

If error is found, we next conduct a reversibility inquiry, where

326

"'the court assesses whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The party claiming a clearly erroneous instruction maintains the burden to establish the degree of prejudice necessary for reversal.' *Williams*, 295 Kan. 506, Syl. ¶ 5." *Herbel*, 296 Kan. at 1121.

2. *Was the venue instruction erroneous?*

"Venue must be proved to establish the jurisdiction of the court; it is a question of fact to be determined by the jury, albeit the existence of jurisdiction is a question of law, subject to unlimited appellate review." *State v. Hunt*, 285 Kan. 855, 859, 176 P.3d 183 (2008). Being tried in the proper venue is a right granted by the Kansas Constitution Bill of Rights, § 10. K.S.A. 22-2602 states that "[e]xcept as otherwise provided by law, the prosecution shall be in the county where the crime was committed."

However, in some instances, it may not be apparent where a crime was committed. The legislature has developed a number of rules to address more complicated venue questions. Relevant to this case is K.S.A. 22-2603, which provides "[w]here two or more acts are requisite to the commission of any crime and such acts occur in different counties the prosecution may be in any county in which any of such acts occur," and K.S.A. 22-2611, which provides that "[i]f the cause of death is inflicted in one county and the death ensues in another county, the prosecution may be in either of such counties. Death shall be presumed to have occurred in the county where the body of the victim is found."

The district judge's venue instruction failed to incorporate either statutory provision. Instruction No. 11 is similar to the language of K.S.A. 22-2603, but there are significant differences. The statute requires two or more acts that are "requisite to the commission" of the crime. The instruction, on the other hand, focuses on acts that are a "substantial and integral part of an overall continuing crime plan." Instruction No. 11

327

does not focus on a crime, which is problematic because the instruction is intended to assist jurors in deciding where the crimes occurred.

Furthermore, Instruction No. 11 failed to include the statutory presumption under K.S.A. 22-2611 altogether. The failure to do so is particularly troubling given that the prosecution occurred in Johnson County, but the bodies of Trouten and Lewicka were found in Linn County. See *Hunt*, 285 Kan. at 859-60 (State had burden to prove venue proper; jury should have been instructed that it must find murder occurred in venue of prosecution and further instructed that death presumed to occur in county where victim's body found under K.S.A. 22-2611).

Instruction No. 11 was modeled after language from *State v. Grissom*, 251 Kan. 851, 889, 840 P.2d 1142 (1992), where we held that the Johnson County District Court had territorial jurisdiction to prosecute defendant because "[t]here [wa]s evidence from which a jury could find that Grissom committed criminal acts in Kansas which were a substantial and integral part of an overall continuing crime plan and which were in partial execution of the plan." 251 Kan. at 889. The district judge's reliance on this language was misplaced. *Grissom* was a territorial jurisdiction case, not a venue case. 251 Kan. at 889-90 (Kansas court has jurisdiction over murder prosecution involving victims who had disappeared after last being seen in Missouri). Moreover, the statutory venue rules, particularly K.S.A. 22-2611, were not helpful in *Grissom* because the victims' bodies were never found. Here, territorial jurisdiction was not an issue, and K.S.A. 22-2603 and 22-2611 were directly applicable to the evidence developed at trial.

Finally, we believe the language in Instruction No. 11 concerning where "the prosecution may be" must have been confusing to the jury. Nowhere else in the instructions does it matter where the prosecution may be, and it is reasonable to believe that a juror would conclude that issue had long since been decided. *Cf. State v. Rivera*, 42

Kan. App. 2d 1005, 1011, 219 P.3d 1231 (2009) ("A juror might conclude that Instruction No. 9 was supposed to modify Instruction No. 4 so as to allow the crime to have been committed either in Kingman County or its neighboring county. That apparently was the district court's intention. But that's a pretty confusing way to express that concept to lay jurors."), *rev. denied* 290 Kan. 1102 (2010).

The trial court's capital murder elements instructions, requiring the jury find facts supporting venue, were appropriate. See *Rivera*, 42 Kan. App. 2d at 1010. However, the venue instruction was incomplete, inaccurate, and confusing. As such, we find that Instruction No. 11 was erroneous.

3. *Was the venue instruction clearly erroneous?*

For Robinson to prevail on this claim, however, the court must be firmly convinced that the jury would have reached a different verdict had the instruction error not occurred, and Robinson has the burden of convincing the court. See *Williams*, 295 Kan. 506, Syl. ¶ 5.

He argues that the forensic evidence does not support a finding that the deaths occurred in Johnson County. To the contrary, as it relates to Count III, the capital murder of Lewicka, the State presented compelling forensic and circumstantial evidence that Robinson killed Lewicka in her Johnson County apartment.

Robinson leased an apartment for Lewicka at 901A Edgebrook in Olathe. Lewicka was residing at this location at the time of her disappearance around fall 1999. In September 1999, Robinson delivered a check for that month's rent to the property manager, Julie Brown, and informed her that he had vacated the apartment even though several months remained on the term of the lease. Brown later conducted a "check-out"

inspection of Lewicka's apartment and noticed she had left behind a fish tank, microwave, and table. A substantial portion of the dwelling was unkempt, but the two bedrooms had been cleaned meticulously.

On October 12, 2000, law enforcement officers searched Lewicka's apartment for trace evidence. In the southwest bedroom, one of the rooms that had been cleaned meticulously, the officers found hundreds of small reddish-brown spots on the south wall that tested presumptively positive for blood. Subsequent testing confirmed the blood matched Lewicka's DNA.

When law enforcement officers discovered Lewicka's body inside a metal drum at Robinson's Linn County property, she was partially clothed in a nightshirt. Law enforcement officers also recovered a pillow and pillowcase from inside the barrel that matched the pattern of Lewicka's bedsheets, which Robinson had since given to his paramour, Barbara Sandre. This circumstantial evidence lent further support to the State's theory that Robinson had killed Lewicka as she slept or lay in her bed at the Olathe apartment.

Other than her body, there was little evidence connecting Lewicka's murder to Linn County. There was a small bloodstain on a roll of duct tape recovered from Robinson's Linn County trailer that matched Lewicka's DNA. Law enforcement officers also found several strips of duct tape inside the barrel containing Lewicka's body. However, this evidence also was consistent with the State's theory that Robinson killed Lewicka in Johnson County and transported her body to Linn County to conceal the crime.

With regard to Count II, the capital murder of Trouten, Robinson is correct that the forensic evidence did not clearly establish the location of Trouten's murder. In fact,

during closing argument, the State argued that Robinson "perhaps" killed Trouten inside her room at the Guesthouse Suites in Lenexa or inside the trailer at his Linn County property but admitted the theories were speculative. If anything, the State's forensic evidence presented a more convincing case that Robinson killed Trouten inside his Linn County trailer because of the trace evidence identified at this location, including blood samples and a hair root matching Trouten's DNA.

Robinson's argument in support of clear error focuses on the forensic evidence suggesting a greater probability that Robinson killed Trouten in Linn County than in Johnson County. Robinson's argument presumes incorrectly that the location of the murder alone is determinative of the venue question. However, K.S.A. 22-2603 provides that "where two or more acts are requisite to the commission of any crime and such acts occur in different counties the prosecution may be in any county in which any of such acts occur." The existence of a common scheme or course of conduct connecting the murders is one of the acts requisite to the commission of capital murder under K.S.A. 21-3439(a)(6) as charged in Counts II and III. To the extent Robinson engaged in conduct within Johnson County that established or furthered the alleged common scheme or course of conduct, such evidence not only satisfies an element of the offense but also establishes Johnson County as an appropriate venue.

At trial, the State presented evidence that Robinson employed a common scheme or course of conduct characterized by luring women to Johnson County, exploiting them financially or sexually, killing them and disposing of their bodies in a similar fashion, and engaging in fraud and deceit to conceal the murders. Given that Robinson resided in and ran his businesses out of Johnson County, it is not surprising that the State's evidence overwhelmingly demonstrated that he carried out this common scheme or course of conduct almost exclusively within Johnson County. For example, Robinson lured Trouten from Michigan to Johnson County with offers of employment, travel, and other benefits.

To facilitate such luring, Robinson paid for Trouten to stay at the Guesthouse Suites in Lenexa; paid for a moving truck to transport Trouten's belongings from Michigan to Johnson County; and, after her arrival, stored Trouten's belongings in his Olathe storage unit and boarded her two dogs at an Olathe animal clinic.

Robinson also employed fraud and deceit to conceal Trouten's murder as part of his common scheme and course of conduct. To facilitate the cover-up, Robinson disposed of Trouten's two dogs by reporting them to an Olathe animal control officer; moved Trouten's belongings out of her Lenexa hotel room; and made arrangements with a resident of Mexico, while she was visiting her son in Johnson County, to mail fraudulent letters to Trouten's family members postmarked from Mexico.

Moreover, as to the other victims identified in the capital counts, Robinson carried out a substantial portion of his common scheme or course of conduct in Johnson County. For example, in luring Stasi, Robinson held himself out as a successful Johnson County businessman who had established a program to provide assistance to young women with babies. To successfully lure Stasi, he paid for her to stay at the Roadway Inn in Overland Park. To conceal her disappearance, Robinson fabricated an alibi and paid a third party to provide a false statement to Overland Park police consistent with it. At the same time, while residing in Johnson County, Robinson employed an adoption ruse to conceal the disappearance of Stasi's baby. To complete the scheme, Robinson had his brother execute fraudulent adoption paperwork at Robinson's Johnson County business office and pick up the baby at Robinson's home in Stanley.

Robinson also engaged in a variety of conduct within Johnson County to lure and then exploit Sheila and Debbie Faith financially. The State's evidence demonstrated Robinson killed both victims to steal their Social Security benefit payments. To do so,

332

Robinson set up a private mailbox under their names in Olathe and submitted a change of address form to the SSA directing benefit checks to this Johnson County address.

Robinson's common scheme and course of conduct also included the financial exploitation of Beverly Bonner and, later, the use of deceit to conceal her murder. As with the Faiths, Robinson set up a private mailbox in Olathe under Bonner's name. Bonner's alimony checks were mailed to this Olathe mailbox, and Robinson deposited them into joint bank accounts set up under his and Bonner's names. Robinson also used this mailbox to facilitate his fraudulent letter writing campaign aimed at Bonner's family.

The State presented persuasive forensic and circumstantial evidence that Robinson killed Lewicka at her apartment in Johnson County. Furthermore, the State presented overwhelming evidence that Robinson carried out a substantial portion of the common scheme and course of conduct common to all six murders within Johnson County, where he lived and conducted business. Based on this evidence, Robinson has failed to firmly convince us that the verdict would have changed but for the instructional error. As such, the district judge's erroneous venue instruction does not constitute clear error.

## 12. CUMULATIVE ERROR—GUILT PHASE

Robinson argues that the cumulative effect of the pretrial and guilt phase errors require the court to reverse all of his convictions.

*Legal Framework and Standard of Review*

> "Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is

333

overwhelming. *State v. Cosby*, 285 Kan. 230, Syl. ¶ 9, 169 P.3d 1128 (2007). Moreover, this doctrine does not apply if no error or only one error supports reversal. See *State v. Carter*, 284 Kan. 312, 332, 160 P.3d 457 (2007)." *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009).

"This court utilizes a de novo standard when determining whether the totality of circumstances substantially prejudiced a defendant and denied the defendant a fair trial based on cumulative error." *State v. Brown*, 298 Kan. 1040, 1056, 318 P.3d 1005 (2014).

*Did the Aggregate Effect of Errors Deny Robinson a Right to a Fair Trial?*

As we have already stated, Judge Anderson conducted proceedings with great deference toward and respect for Robinson's fair trial rights. The results speak for themselves. In a highly complex, capital trial that continued for weeks on end, we have detected only three errors.

Robinson's two capital murder convictions, Counts II and III, were multiplicitous with each other, and his conviction for first-degree murder, Count V, was multiplicitous with the capital convictions. However, this had no effect on jurors, and our reversal of the second capital conviction and the first-degree murder conviction cures any prejudice. We also have ruled that the prosecutor made three isolated remarks that exceeded the scope of the evidence. Yet, the cumulative impact of the remarks was not prejudicial. Finally, the trial court's venue instruction was erroneous, but the overwhelming nature of the State's evidence established convincingly that this error did not affect the outcome of the proceedings.

When considered together, the errors are negligible in comparison to the nature of these proceedings and the enormous weight of the evidence against Robinson.

Considering the totality of the circumstances, we find the cumulative effect of the errors did not substantially prejudice Robinson or deny him the right to a fair trial.

FACTUAL AND PROCEDURAL BACKGROUND—PENALTY PHASE

*The State's Case*

In the penalty phase, the State alleged the existence of one aggravating circumstance: "That the defendant knowingly or purposely killed more than one person." The State asked the jury to consider all the guilt phase evidence presented during its case-in-chief relevant to this aggravator in deciding the sentence.

*The Defendant's Case*

Robinson alleged the existence of several mitigating circumstances, including:

"1. If not sentenced to death, the defendant will peacefully spend the rest of his life in prison.

"2. The defendant is likely to make a satisfactory adjustment to prison life.

"3. If the defendant is not sentenced to death, a term of imprisonment is sufficient to defend and protect the people's safety.

"4. If the defendant receives a life sentence, he will be able to maintain a relationship with his wife, children, grandchildren and other family members.

"5. Defendant's family will suffer grief and loss if he is executed.

"6. The degree to which, if any, others may have participated in the crimes and share a degree of moral culpability or blame."

335

1. *Maintaining family relationships and familial grief*

The defense called Nancy Robinson to testify in support of mitigating circumstances 4 and 5, maintaining family relationships if sentenced to life and familial grief if sentenced to death.

Nancy testified that she met Robinson in 1963 in Oak Park, Illinois. They married several months later and moved to the Kansas City area in late 1963 or early 1964. Robinson and Nancy had four children. Nancy said Robinson played an important role in the lives of his children and actively participated in and attended their activities. Even when Robinson served time in state prison in the late 1980s and early 1990s, the children visited him and their relationship remained strong. All of Robinson's children grew to be productive and contributing members of their communities.

Robinson was also involved in the lives of his grandchildren. Robinson's youngest daughter, Christy, had a daughter and younger son. Robinson was involved in the lives of both of Christy's children and babysat them on a regular basis while their parents were at work. Robinson shared a particularly close relationship with Christy's daughter, who spent time with Robinson every day. Robinson's arrest affected her the most because she viewed Robinson as a role model or idol. She became so upset that the family arranged special contact visits, with the approval of sheriff's department personnel, while Robinson was in jail awaiting trial. Christy's daughter continued to talk to Robinson by phone during trial.

Nancy testified that the prospect of Robinson's execution has had a devastating impact on their entire family. If Robinson were sentenced to life imprisonment, Nancy said, the family would continue to maintain a relationship with him. Nancy, in particular, always stood by Robinson. She testified on his behalf when he was convicted of fraud in

Johnson County in 1986. She stayed with him after his theft conviction in Missouri and when he went back to prison after his probation was revoked. Despite Robinson's multiple, ongoing extramarital affairs, Nancy stayed in the relationship. Even Robinson's conviction for capital murder did not break their marriage. Despite everything, Nancy testified that she still shared a bond with Robinson and that it would continue if the jury spared his life.

2. *Satisfactory adjustment to prison, community safety*

The defense offered the testimony of expert witnesses Mark D. Cunningham and Paul Delo in support of mitigating circumstances 1 through 3 (peaceful prison existence, satisfactory adjustment to prison life, and life imprisonment as sufficient to defend and protect the public). The defense retained Cunningham, a clinical and forensic psychologist, to conduct a risk assessment of Robinson and render an opinion on his future dangerousness in prison. The defense retained Delo, a retired prison warden and correctional consultant, to assess Robinson's propensity for violence in prison.

Cunningham had testified as an expert on more than 150 occasions. He reviewed correctional records, information about the offenses of conviction, the presentence reports, and Robinson's criminal history and educational and medical records. Cunningham also interviewed Robinson's family members and correctional officials who supervised Robinson while in custody.

Cunningham compared the case-specific facts he gathered from these records with risk assessment factors established in the field of forensic psychology and other statistical information on prison adjustment. Through this comparative analysis, Cunningham identified four key factors, in decreasing order of significance, supporting his opinion that Robinson would experience a positive, nonviolent adjustment in the prison system,

including:  (1) his age; (2) his past behavioral history in custody; (3) correctional staff appraisals; and (4) contact with family and children.

### a. *Age of Offender*

Robinson was born on December 27, 1943, and was 58 years old at the time of trial. Cunningham identified studies showing a significant reduction in the risk of prison violence among offenders who are age 45 years or older, referring to this phenomenon as the "aging effect." This aging effect is generally consistent with data among the general population that shows a decreasing tendency for violence with increased age. Cunningham noted that research confirms this aging effect still holds true and applies equally to offenders who commit violent crimes at an advanced age, such as in Robinson's case. Delo corroborated this testimony, confirming that as an inmate ages, the risk of violence decreases. He opined that an inmate's age is the most significant factor influencing propensity for violence.

### b. *Prior Behavioral History in Custody*

Cunningham identified Robinson's past behavioral history in prison as the second risk assessment factor relevant to his analysis. Cunningham and Delo testified that an inmate's conduct during prior incarcerations is often an indicator of future behavior.

Robinson served a 40-month term of imprisonment with Kansas Department of Corrections (KDOC) from 1987 to 1991. Thereafter, he was transferred to the Western Missouri Correctional Center for 22 months. Following his arrest in June 2000, Robinson was detained at the Johnson County jail for 22 months awaiting trial. Cunningham found it particularly relevant that Robinson served all of his time in custody after murdering

Stasi because this showed he was already prone to violence before entering the prison system.

Robinson was not involved in any acts of serious violence during his 62-month stint in the state prison system or his 22-month stay in county jail. Cunningham found only a few minor disciplinary infractions in Robinson's record. First, in the Johnson County jail, Robinson was written up for bringing a salt shaker back to his cell, which he used to create a saltwater rinse for his sore throat. Second, at KDOC, Robinson received a written infraction for using a typewriter to draft 17 grievances that he distributed to other inmates. Finally, in Missouri, he received a written infraction for failing to take his prescribed medication. Delo testified that an exemplary inmate will receive five or fewer disciplinary infractions a year, making Robinson's record one of the best he had seen during his time working within the Missouri prison system.

Instead of turning to violence, Cunningham found that Robinson used his time in custody constructively and had a positive "work adjustment" in the prison setting. Robinson worked on an inmate building crew and performed a substantial amount of computer work for the benefit of the prison. Delo testified that Robinson also took advantage of several educational and training opportunities.

c. *Appraisal of Correctional Staff*

Cunningham testified that correctional staff's assessment and appraisal of an inmate is a relevant factor in predicting his or her propensity for violence in prison.

Cunningham found that staff's appraisals of Robinson were favorable. Robinson began his term at KDOC in maximum security, but he was reduced to medium security within several months. Robinson began his pretrial confinement at the Johnson County

Detention Center in a medium security setting but was later transferred to maximum security when the State charged him with capital murder. Even so, officials at the Johnson County jail allowed Robinson's granddaughter to have contact visits with him, which suggested to Cunningham that their compassion for the young girl outweighed any concern they had about Robinson's propensity for violence.

Cunningham interviewed two staff members at KDOC who had supervised Robinson, and both confirmed he was an exceptional worker. One of the staff members noted that Robinson was particularly skilled in the field of computer technology and that prison officials had Robinson troubleshoot computer problems and develop software programs used by the prison. However, both of these correctional officials told Cunningham that Robinson fraudulently altered documents containing their signatures and used them to bolster his position before the parole board.

### d. *Relationship with Family*

Cunningham identified an inmate's relationship with family as the final assessment factor, explaining that inmates who are in routine contact with their families tend to have better prison adjustment and fewer disciplinary issues. Cunningham testified that during the 22 months Robinson spent in pretrial detention, his wife, youngest daughter, and granddaughter visited him with some regularity.

### e. *Other Risk Factors*

Cunningham knew Robinson used computers and the Internet to perpetrate a number of his crimes of conviction. Nevertheless, he expressed little concern with Robinson's history of computer use in prison because he would be placed in a maximum security setting, which he presumed would offer Robinson little to no opportunity to have

unsupervised access to the Internet. Cunningham also observed that Robinson's previous computer activity in prison was focused on software and troubleshooting, not Internet activity. Cunningham admitted, however, that he did not speak to KDOC officials regarding their policy and did not know definitively whether Robinson would have Internet access in its facilities.

Cunningham also testified that the violent nature of Robinson's offenses did not increase his propensity for violence in prison. Cunningham highlighted studies conducted by the United States Department of Justice that found that an inmate's conviction for violent crime was not a reliable predictor of prison adjustment and did not correlate with higher rates of prison violence. Cunningham also explained that Robinson had committed violent crimes in the community before entering the prison system, yet he exhibited no propensity for violence while incarcerated.

Cunningham admitted that Robinson had a history of deception both inside and outside of the prison setting, and he predicted this behavior would continue. Delo also confirmed that as an inmate ages, he may rely more on manipulation or deception in order to survive and thrive within the prison system. However, Cunningham believed Robinson's use of deceit inside prison was motivated primarily by his desire to secure an earlier release, and Robinson would have no such opportunity with his crimes of conviction.

Cunningham could not completely rule out the possibility that Robinson might use deceit and manipulation to further a plan of escape, but he noted that Robinson had shown no propensity for flight and cited data illustrating the extraordinarily low percentage of successful escapes from maximum security prisons.

Cunningham also had no serious concerns about Robinson's history of manipulating women inside prison, particularly Bonner. Cunningham explained that Robinson would be placed in a much higher security level, limiting his interaction with and access to prison staff. Also, Cunningham believed that Bonner knew Robinson only as a white collar criminal. In the future, it would be harder for Robinson to manipulate women behind bars because he is widely known for luring, deceiving, and killing multiple women. However, Delo admitted that it is not uncommon for prison staff to form relationships with and fall victim to the manipulation of inmates within the system.

Based on his assessment of the key risk factors, Cunningham opined that Robinson would have a positive adjustment to prison free from violence. Delo offered a similar opinion.

### 3. *Residual Doubt*

In support of mitigating circumstance 6, Robinson argued that there was residual doubt as to whether he acted alone, suggesting that his moral culpability should be diminished by or shared with his cohorts. In closing argument, Robinson's counsel highlighted evidence, including the weight of the barrels housing the bodies and the unidentified fingerprints found on the plastic sheeting inside his Raymore, Missouri, storage locker and on the roll of duct tape stained with Lewicka's blood, as proof of others' involvement.

### 4. *Mercy*

Finally, Robinson's counsel asked the jury to consider mercy as an independent basis for imposing a life sentence. Robinson's counsel acknowledged his client did not

"deserve" mercy, but he asked the jury to grant it for the sake of Robinson's family and in light of the residual doubt surrounding his role in the capital murders.

*Jury Deliberations and Verdict*

The parties put on evidence in support of their penalty phase cases on October 31, 2002, and the cause was submitted to the jury on November 1, 2002.

During the evening of November 1, 2002, Juror 147 consulted a Gideon Bible that he found in the hotel room where the jury had been sequestered. Juror 147 had essentially made up his mind to vote for a sentence of death and consulted the Bible to see if anything would force him to reconsider. Juror 147 wrote down the book and verse numbers of passages he had consulted, but not the Biblical text itself, on a slip of paper that he placed inside the Bible. He testified that nothing in the Bible aided him in arriving at his sentencing decision, which remained unchanged after consulting the Bible.

On Saturday, November 2, 2002, at approximately 9:15 a.m., the jurors entered the jury room to resume deliberations. Juror 147 brought the Bible with the slip of paper into the jury room. The jury immediately took a vote by written ballot and determined that all jurors were in unanimous agreement as to the proper sentence. The foreman testified that at that point the sentence had been decided and all that remained was for him to sign the verdict form and inform the district judge. After the vote, the jurors engaged in a general conversation about their time on the jury. The conversation was brief and several jurors described it as a moment of decompression or unwinding after a long and arduous trial. During the conversation, Juror 147 told another juror that he had learned from the Bible that in order to be granted mercy, one must ask for mercy, repent, and forgive. Juror 147 did not read from or quote any particular verse in making these remarks. Instead, he shared his view or interpretation of what the Bible says about the concept of mercy based

343

on his review from the night before. None of the jurors read from or consulted the Bible that Juror 147 had brought into the jury room.

In the meantime, a bailiff had observed Juror 147 enter the jury room with the Bible and informed the district judge, who removed the juror, along with the Bible, around 9:20 a.m., approximately 5 minutes after the jury had resumed deliberations. The district judge called each juror independently and inquired into the matter before allowing the parties to make their own inquiry. One juror thought Juror 147 might have opened the Bible at one point and quoted from one of the verses in the jury room, but he was not confident about the accuracy of this fact. The other 10 jurors testified that Juror 147 did not read from or quote any verse from the Bible during deliberations that morning or at any time prior.

The defense moved for a mistrial on the penalty phase proceeding only. The district judge found that Juror 147 had brought the Bible into the jury room but had not read or quoted from it during deliberations, and the statement Juror 147 made in reference to the Bible occurred after the parties had arrived at a unanimous decision on sentence. Judge Anderson, relying on the then-recently published opinion in *State v. Kleypas*, 272 Kan. 894, 40 P.3d 139 (2001), *cert. denied* 537 U.S. 834 (2002), *overruled on other grounds by Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), concluded that these events did not "play a major role in the deliberations to this point" and denied the motion.

However, Judge Anderson provided the following supplemental instruction:

"What the Bible says about the appropriateness of a death penalty in a particular case is not a legitimate concern of a penalty phase jury. The law specifies when the death

344

penalty is appropriate. A jury may not independently consult the biblical scriptures for guidance in reaching its life and death decision."

Judge Anderson delivered the supplemental instruction to the jury and released them to continue deliberations. A short time later, the jury returned a verdict of death on both capital murder counts.

The court sentenced Robinson on January 21, 2003. The court imposed a sentence of death on the capital murder convictions, Counts II and III. Robinson was sentenced to 246 months in prison for the aggravated kidnapping of Suzette Trouten, Count I; 7 months for the theft of Vicki Neufeld's property, Count IV; a life sentence with parole eligibility after 15 years for the first-degree premeditated murder of Lisa Stasi, Count V; and a pre-Guidelines sentence of 5 to 20 years or a post-Guidelines sentence of 13 months for the continuing offense of aggravated interference with parental custody, Count VI. Robinson was further ordered to pay restitution in the amount of $9,122.24.

During sentencing, neither the court nor the parties addressed whether the crimes of conviction were sexually motivated. After sentencing, Judge Anderson designated Counts I, II, and III as sexually motivated in the journal entry of judgment.

PENALTY PHASE ISSUES

13. JUROR MISCONDUCT

Robinson contends that the district judge erred in denying his motion for mistrial founded on Juror 147's alleged misconduct regarding his use of the Bible.

*Legal Framework and Standard of Review*

"K.S.A. 22-3423(1)(c) permits a trial court to declare a mistrial because of prejudicial conduct, in or outside the courtroom, which makes it impossible to proceed with the trial without injustice to the defendant or the prosecution. Applying the statute, a trial court must engage in a two-step analysis. First, the trial court must decide if there is some fundamental failure of the proceeding. If so, in the second step of the analysis, the trial court must assess whether it is possible to continue the trial without an injustice. This means that if there is prejudicial conduct, the trial court must determine if the damaging effect can be removed or mitigated by admonition or instruction to the jury. If not, the trial court must determine whether the degree of prejudice results in an injustice and, if so, declare a mistrial." *State v. Ward*, 292 Kan. 541, Syl. ¶ 1, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012).

"On appeal, the trial court's decision denying a motion for mistrial is reviewed under an abuse of discretion standard." *State v. Williams*, 299 Kan. 509, 559, 324 P.3d 1078 (2014). When reviewing the denial of a motion for mistrial founded on claims of juror misconduct, we consider whether the trial court abused its discretion in determining: "(1) whether juror misconduct occurred and (2) if so, whether the misconduct substantially prejudiced [defendant's] right to a fair trial." *State v. Armstrong*, 299 Kan. 405, 442, 324 P.3d 1052 (2014). Judicial discretion is abused if the ruling is arbitrary, fanciful, or unreasonable, *i.e.*, no reasonable person would have taken the view adopted by the trial court, or if it is based on an error of law or fact. *State v. Gonzalez*, 290 Kan. 747, 755-56, 234 P.3d 1 (2010). The burden of proving error rests with the party alleging the misconduct. *State v. Wells*, 297 Kan. 741, 754, 305 P.3d 568 (2013). However, once error is established, the burden to demonstrate prejudice or the lack thereof shifts to the party benefitting from the error. *Ward*, 292 Kan. at 578.

*Did Juror 147's Use of the Bible Constitute Juror Misconduct?*

"Juror misconduct is a broad label which has been used to describe communications with jurors from outsiders, witnesses, bailiffs, or judges; and actions by jurors in the unauthorized viewing of premises, or reading of newspaper articles." *State v. Fenton*, 228 Kan. 658, 664, 620 P.2d 813 (1980). "Ordinarily, jury misconduct occurs when, during deliberations, a jury considers matters completely outside the evidence and issues in the case." *State v. Leaper*, 291 Kan. 89, Syl. ¶ 4, 238 P.3d 266 (2010). Such misconduct runs afoul of the Sixth Amendment to the United States Constitution, which guarantees criminal defendants the right to a fair and impartial trial by a jury capable of deciding the issues based solely on the evidence. 291 Kan. at 97. "Juror misconduct is not a ground for . . . mistrial unless it is shown to have substantially prejudiced a party's rights." *Fenton*, 228 Kan. at 664.

Robinson argues Juror 147 committed misconduct by referring to the Bible at his hotel room after deliberations had concluded for the day, by bringing the Bible into the jury room at the outset of the second day of deliberations, and by making comments to other jurors about his interpretation of what the Bible says about the concept of mercy. The State concedes that Juror 147 engaged in misconduct. We note, however, that our precedent does not clearly establish that the State's concession is legally compelled. See *Kleypas*, 272 Kan. at 970 (trial court did not abuse its discretion in denying a recall or inquiry where juror quoted Biblical passage during penalty phase deliberations). Other courts considering this issue have decided there was no error in similar circumstances. See, *e.g.*, *Robinson v. Polk*, 438 F.3d 350, 363-64 (4th Cir. 2006) (state court's finding that jury's reading of Bible during sentencing deliberations in capital proceeding did not violate Sixth Amendment is neither contrary to nor unreasonable application of clearly established federal law); *Lenz v. Washington*, 444 F.3d 295, 310-12 (4th Cir. 2006) (following *Robinson*); *United States v. Rodriguez*, 667 F. Supp. 2d 218, 222 (D. Mass.

2009) ("There is no proscription on jurors reading the Bible before or after deliberations, or having a personal Bible in their possession."), *aff'd* 675 F.3d 48, 59-61 (1st Cir. 2012); *cf. State v. DeMille*, 756 P.2d 81, 84 (Utah 1988) (juror's communication to other jurors that defendant's guilt was revealed to her through prayer did not constitute extraneous influence undermining jury's verdict). Today, we need not, and do not, decide that juror misconduct necessarily results from the use of outside religious texts. But, based on the State's concession, we presume that Juror 147 engaged in misconduct and focus our discussion on the second prong of the analysis—prejudice.

*Did Juror 147's Conduct Substantially Prejudice Robinson's Fair Trial Rights?*

A juror's use of or reliance on the Bible during penalty phase deliberations is not so uniquely influential that it warrants a finding of prejudice per se. *United States v. Lara-Ramirez*, 519 F.3d 76, 88-89 (1st Cir. 2008) (no "per se rule that juror discussion of the Bible in the jury room during deliberations creates an incurable taint"). Thus we are charged with the task of deciding whether Judge Anderson abused his discretion in concluding that Robinson's fair trial rights were not substantially prejudiced by Juror 147's conduct. See *Armstrong*, 299 Kan. at 442.

Because Robinson asserts error of a constitutional magnitude, we can affirm his death sentence only if "there is no reasonable possibility that the juror's misconduct affected the outcome of the trial." See *Williams*, 299 Kan. at 562. Moreover, in conducting this analysis, we are mindful that our prejudice inquiry must be limited to objective facts rather than the subjective evidence of the jurors' mental impressions. See K.S.A. 60-441; K.S.A. 60-444.

Robinson claims he was prejudiced by Juror 147's consultation of the Bible, his decision to bring it into the jury room, and his comments referencing it during

deliberations. As to Juror 147's independent review of the Bible after deliberations had concluded for the day, courts have been reluctant to condemn such conduct. In *Billings v. Polk*, 441 F.3d 238, 248 (4th Cir. 2006), a juror declared by affidavit that on the night before the jury's sentencing deliberations, he read the Bible at home because he was "'very confused and didn't know what to do,' and that his study of the Bible helped him conclude that the death penalty was the 'right sentence.'" The Fourth Circuit held that it was neither contrary to nor an unreasonable application of federal law to conclude that a juror's private consultation of the Bible outside deliberations did not violate the Sixth Amendment. 441 F.3d at 248-49.

As to Juror 147's decision to bring the Bible into the jury room, the district judge found, based on the jurors' testimony, that they did not read from or use it as a resource during deliberations. This finding is supported by substantial competent evidence and is entitled to deference. See *Venters v. Sellers*, 293 Kan. 87, 93, 261 P.3d 538 (2011). Moreover, the mere presence of the Bible in the jury room, standing alone, is not deemed to have affected any juror's sentencing decision. See *Ackerman v. State*, 737 So. 2d 1145, 1148 (Fla. Dist. App. 1999) (mere presence of Bible in jury room during deliberations is not prejudicial).

Finally, as to Juror 147's comments regarding his view of what the Bible says about mercy, there is no reasonable possibility they affected the jurors' sentencing decision. The juror did not read from the Bible or quote any particular verse. Instead, he made a brief remark expressing his opinion or interpretation about what the Bible says regarding mercy. See, *e.g.*, *Bieghler v. State*, 690 N.E.2d 188, 203 (Ind. 1997) ("'conscientious people who are faced with a life and death decision resort to their religious scruples in making such decision'" and "[s]uch deep introspection neither violates principles of justice nor prejudices the defendant"); *Young v. State*, 2007 OK CR 17, ¶¶ 111-13, 12 P.3d 20 (Okla. Crim. App. 2000) (juror discussion of biblical propriety

of death penalty or their religious beliefs while deliberating death penalty is not offensive to defendant's Sixth Amendment rights); see also *Perkins v. State*, 144 So. 3d 457, 496 (Ala. Crim. App. 2012) ("'[T]he situation where a juror quotes the Bible from memory . . . assuredly would not be considered an improper influence.'"); *Lenz v. Warden of the Sussex I State Prison*, 267 Va. 318, 330-31, 593 S.E.2d 292 (2004) (denying habeas relief where "a juror recited, by memory, the location of a Bible passage relating to the appropriate punishment for murder").

We embraced a similar rationale in *Kleypas*, 272 Kan. at 968-70, where the defendant requested vacation of his death sentence or recall of the jury based on evidence that a juror had "'quoted the Bible'" to other jurors during deliberations. 272 Kan. at 968. However, because the juror had merely quoted the biblical passage from memory and did not read from the Bible directly or use it as a source of reference with other jurors during deliberations, we found no error in the district judge's refusal to grant the defendant relief. 272 Kan. at 970.

Here, Juror 147's comments were even more benign because he did not quote a Bible verse but, instead, gave his interpretation of biblical passages. In addition, Juror 147's comments were very brief in nature, did not lead to ongoing discussions among jurors, and were made only after the jury had taken a vote in which all were in unanimous agreement as to Robinson's sentence. Faced with far more egregious misconduct, where the Bible was in the jury room and used collaboratively as a resource by jurors during deliberations, courts have found such mitigating factors sufficient to rebut claims of prejudice. See *Oliver v. Quarterman*, 541 F.3d 329, 343-44 (5th Cir. 2008) (circumstances, including conflicting evidence as to whether jurors' consultation of Bible occurred before or after jury reached decision, evidence that Bible was not the focus of discussions, and court's instruction to base sentence on facts and law rebutted claim of prejudice, notwithstanding fact that biblical passage in question was particularly relevant

350

to sentencing facts); *McNair v. Campbell*, 416 F.3d 1291, 1308-09 (11th Cir. 2005) (State overcame presumption of prejudice where Bible verses that jury foreman read to members of the jury were innocuous, the extraneous information came from a juror and not the judge, and the strength of the government's evidence was overwhelming); *People v. Danks*, 32 Cal. 4th 269, 308-09, 8 Cal. Rptr. 3d 767, 82 P.3d 1249 (2004) (juror's misconduct in sharing Bible passages with fellow jurors did not establish a substantial likelihood of actual bias, given that conduct was isolated, that there was no evidence of ongoing discussion about the verses shared with other jurors, and that other comments regarding jurors' Christian beliefs did not constitute misconduct).

Furthermore, the court's curative instruction provided additional assurance that Juror 147's conduct did not prejudice Robinson's right to a fair penalty phase proceeding. Within minutes after Juror 147 had entered the jury room with the Bible, Judge Anderson had removed him and confiscated the Bible and his notes. The district judge spent the next 5 hours conducting a thorough examination of each juror to assess the extent to which each or the group had relied upon the Bible in the course of deliberations. Judge Anderson's inquiry was supplemented by the parties' own examination of the jurors. Armed with this information and fully informed of the circumstances, Judge Anderson determined the proceedings could continue without injustice to Robinson. Nevertheless, out of an abundance of caution, he delivered a supplemental written instruction directing jurors to decide defendant's sentence without reference to or reliance on the Bible. The instruction was legally appropriate and calculated to remove any taint created by Juror 147's conduct.

In some contexts, juror instructions are insufficient to cure the taint created by prejudicial information. However, courts have not found jurors' use of the Bible during deliberations to be immune to curative instruction. In *Lara-Ramirez*, the First Circuit reviewed a district court's decision to declare a mistrial based on the fact that a juror

351

brought a Bible into the jury room, referred to specific portions of the text, and told fellow jurors that they should consider what God says in the Bible in their deliberations. In reversing the order granting a mistrial, the First Circuit found the district court had employed a legally incorrect presumption that curative instructions would be inadequate after the jury had embarked upon deliberations. "Our case law does not support such a restrictive view of curative instructions. Although the issue does not arise often, [citation omitted], we have held that curative instructions are an appropriate remedy when jurors are exposed, during their deliberations, to extraneous materials." 519 F.3d at 87. The First Circuit concluded that "[w]e cannot assume, as the district court apparently did, that individual voir dire of the jurors and a curative instruction would not have eradicated the risk of prejudice in this case." 519 F.3d at 88; see *Cross v. Com.*, No. 2008-SC-000465-MR, 2009 WL 4251649, at *9-10 (Ky. 2009) (unpublished opinion) (curative instruction cured taint from juror's use of the Bible during deliberations).

Robinson argues the curative instruction was ineffective because before making inquiry of each juror, Judge Anderson assured each that he or she had done nothing wrong. However, when read in context, it was apparent that the jurors were nervous and, in some instances, defensive. Judge Anderson made these remarks to calm the jurors so their responses would be forthright and complete, allowing him to make an informed decision based on an accurate recitation of the facts. Also, the district judge delivered the curative instruction *after* making such remarks to jurors, and the sequence of events made clear that jurors were obligated to set aside biblical influences.

Robinson also cites *People v. Hensley*, 59 Cal. 4th 788, 175 Cal. Rptr. 3d 213, 330 P.3d 296 (2014), in support of his claim of prejudicial misconduct. However, in *Hensley*, the juror actually consulted with his minister during the course of deliberations, speaking at length about mercy and the death penalty. The minister's comments sent a clear signal to the juror that "mercy, sympathy, and grace are inconsistent with the 'law of the land,'

that persons who kill must themselves be killed, and that just as a police officer has to kill in the line of duty, a juror must 'go with the law of the land.'" 59 Cal. 4th at 826-27. The California Supreme Court found the conduct prejudicial because the juror actively solicited his pastor's comments while he was still wrestling with his decision and was given directions inconsistent with the jury instructions. 59 Cal. 4th at 827-28.

Here, Juror 147 consulted the Bible personally and did not engage in conversations with any nonjuror, let alone his personal minister, about the Bible's stance on the death penalty. This fact is important because *Hensley* recognized a legally significant distinction between a juror's personal resort to religious values and his or her decision to consult a minister for guidance in deciding the sentence. 59 Cal. 4th at 826-28. Also, the juror in *Hensley* was still struggling with the sentencing decision when he conferred with the pastor. Here, Juror 147 made his comments after the jury had taken a vote, reaching unanimous agreement as to sentence. *Hensley* is distinguishable.

Viewing the totality of the circumstances, we are confident that Juror 147's conduct was harmless beyond a reasonable doubt. See *Chapman v. California*, 386 U.S. 18, 24, 875 S. Ct. 24, 17 L. Ed. 2d 705 (1967). He consulted the Bible outside of deliberations, did not use or read from the Bible in the jury room, and made an isolated remark about the Bible's views on mercy only after the jury's vote evidenced unanimous agreement as to sentence. Furthermore, the juror's comment was brief and did not lead to ongoing discussions, and the district judge provided an appropriate curative instruction. See *People v. Mincey*, 2 Cal. 4th 408, 466-67, 6 Cal. Rptr. 2d 822, 827 P.2d 388 (1992) (no prejudice where trial judge removed and questioned jurors promptly after learning juror had brought Bible into the jury room and provided curative instruction).

Robinson challenges the sufficiency of the evidence supporting the State's lone aggravating circumstance—that defendant knowingly or purposely killed more than one person. More particularly, Robinson argues we have defined "aggravating circumstance" so narrowly that the State's evidence did not fall within the scope of the definition.

*Standard of Review*

> "The standard of review on appeal as to the sufficiency of evidence regarding an aggravating circumstance is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the existence of the aggravating circumstance beyond a reasonable doubt." *Kleypas*, 272 Kan. at 1019.

However, to the extent Robinson's argument is dependent on an interpretation of the aggravating circumstances statute, we review his challenge de novo. See *Dodge City Implement, Inc. v. Board of Barber County Comm'rs*, 288 Kan. 619, 638, 205 P.3d 1265 (2009) ("Interpretation or construction of a statute raises a question of law reviewable on appeal under a de novo standard.").

*Was the Evidence Sufficient to Support the State's Aggravating Circumstance?*

The State's lone aggravating circumstance is set out in K.S.A. 21-4625(2), which provides that "[a]ggravating circumstances shall be limited to the following: . . . (2) The defendant knowingly or purposely killed or created a great risk of death to more than one person."

To establish the existence of this aggravating circumstance, Robinson believes the statute requires the State to prove that the killing of more than one person occurred

during the course of the charged murder. More specifically, Robinson seems to believe the statute limits the operation of the aggravator to situations in which more than one person is killed essentially at the same time. He then argues that Stasi, Sheila Faith, Debbie Faith, and Bonner were not killed during the course of, or in conjunction with, the murders of the primary capital murder victims, Trouten and Lewicka, and, therefore, the State failed to establish the existence of this aggravating circumstance.

Robinson's application of the statute is flawed. He cites to our hard 40 precedent, *State v. Brady*, 261 Kan. 109, 929 P.2d 132 (1996), and *State v. Spain*, 263 Kan. 708, 953 P.2d 1004 (1998), in support of his argument. In *Brady*, we held that a trial court may impose a hard 40 sentence for a first-degree murder conviction if the defendant knowingly or purposefully killed more than one person in the course of the charged murder. 261 Kan. at 113. In *Spain*, we recognized that under K.S.A. 21-4636(b), there must be a direct relationship or nexus between the multiple murders or the great risk of death to more than one person, *i.e.*, the aggravating circumstance, and the charged murder. However, we made clear that such a risk need not be contemporaneous with the homicide. 263 Kan. at 718. Thereafter, in *State v. Hazelton*, 267 Kan. 384, 386, 985 P.2d 698 (1999), we acknowledged that proof of the aggravating circumstance did not require that the multiple murders occur contemporaneously and held that K.S.A. 21-4636(b) was applicable because the killings there occurred during the same course of conduct.

Here, the State's evidence established that all of the murders charged in the capital counts (the primary capital victims, Lewicka and Trouten, along with the other victims, Stasi, the Faiths, and Bonner) were connected together as part of a "common scheme or course of conduct" under K.S.A. 21-3439(a)(6). The existence of such a common scheme or course of conduct demonstrates a sufficient nexus between Robinson's killing of more than one person, the aggravating circumstance, and the charged capital offenses. As such, we find K.S.A. 21-4652(2) applies to all of the murders identified in the capital charges

and hold that the State's evidence was sufficient to support the existence of the "multiple murders" aggravating circumstance. *Cf. State v. Gleason*, 299 Kan. 1127, 1187, 329 P.3d 1102 (2014) (using risk of death to more than one person as both a narrowing qualification for the death penalty at the guilt phase and an aggravating factor at the penalty phase constitutionally permissible and in conformance with legislative intent), *cert. granted* 135 S. Ct. 1698 (2015).

## 15. PROSECUTORIAL MISCONDUCT—PENALTY PHASE

Robinson claims the prosecutor committed several acts of misconduct that deprived him of his right to a fair penalty phase proceeding and requests the court vacate his death sentences. Particularly, Robinson believes he was prejudiced by misstatements of the law concerning mitigating circumstances during voir dire, improper cross-examination of mitigation witnesses, and the prosecutor's closing argument remarks.

*Standard of Review*

We apply the traditional two-step framework in analyzing Robinson's penalty phase prosecutorial misconduct challenges, considering first whether the prosecutor exceeded the permissible scope of his or her authority by engaging in the challenged conduct and, if so, whether defendant suffered prejudice as a result. *Kleypas*, 272 Kan. at 1084.

However, in the prejudice analysis, the framework varies slightly from that used in the guilt phase analysis. To the extent the court employs a harmless error analysis as part of the prejudice inquiry, we have described the standard as follows:

> "Thus, the standard of review and the ultimate question that must be answered
> with regard to whether prosecutorial misconduct in the penalty phase of a capital trial was

356

harmless is whether the court is able to find beyond a reasonable doubt that the prosecutorial misconduct, viewed in the light of the record as a whole, had little, if any, likelihood of changing the jury's ultimate conclusion regarding the weight of the aggravating and mitigating circumstances. In this determination, the overwhelming nature of the evidence is a factor to be considered, although its impact is limited. Also, in making the determination as to whether an error was harmless, it is important to recognize that the question for the reviewing court is not what effect the constitutional error might generally be expected to have upon a reasonable jury but, rather, what effect it had upon the actual verdict in the case at hand. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 124 L. Ed. 2d 182, 113 S. Ct. 2078 (1993). 'The inquiry, in other words, is not whether, in a trial that occurred without the error, a [verdict for death] would surely have been rendered, but whether the [death verdict] actually rendered in this trial was surely unattributable to the error.' 508 U.S. at 279." *Kleypas*, 272 Kan. at 1087-88.

*Alleged Misconduct during Closing Argument*

Robinson argues that the prosecutor engaged in prejudicial misconduct during closing argument by: (1) commenting on Robinson's demeanor; (2) making an argument unsupported by the evidence; (3) unfairly attacking Nancy Robinson; and (4) expressing his personal opinion regarding the quality of defense counsel's argument.

1. *Did the prosecutor improperly comment on Robinson's demeanor?*

During the State's rebuttal portion of the penalty phase closing, prosecutor Morrison argued:

"When the defendant cried, cried one time during this trial, he didn't cry when there was testimony about Lisa Stasi. He didn't cry when there was testimony about Izabela Lewicka's body was taken out of that barrel. He didn't cry when there was testimony about Suzette Trouten—when her family testified—when her body was taken out of that barrel or Beverly Bonner or Sheila Faith or Debbie Faith. He cried for himself.

357

That says it all. He doesn't care anything about anybody but himself. Manipulation and deceit, they go hand in hand with the defendant throughout these last 20 years."

Robinson argues these remarks commented improperly on defendant's silence and injected remorse as a nonstatutory aggravating circumstance. We agree the remark was improper, but on different grounds. The prosecutor's comment pertaining to the one occasion Robinson cried during trial was certainly beyond the scope of the penalty phase evidence. See *State v. Whitaker*, 255 Kan. 118, 134, 872 P.2d 278 (1994) (argument beyond evidence improper). The remarks appear to serve no legitimate purpose other than to inflame the passions or prejudices of the jurors and divert their attention from the task at hand—weighing the aggravating and mitigating circumstances and, therefore, were improper. *State v. Tosh*, 278 Kan. 83, 90, 91 P.3d 1204 (2004) ("A prosecutor should not make statements intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling law.").

However, the remarks were brief and isolated. The prosecutor referenced Robinson's demeanor on only one occasion at the end of his rebuttal closing argument. See *State v. Chanthaseng*, 293 Kan. 140, 148, 261 P.3d 889 (2011) (when deciding whether conduct is gross and flagrant appellate courts look to whether the prosecutor repeated or emphasized the misconduct). The remark was such that it drew no objection from the defense. *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 (2009) ("the presence or absence of an objection may figure into our analysis of the alleged misconduct"). Nor did the comment run afoul of any prior ruling of the district judge. See *Chanthaseng*, 293 Kan. at 148-49 (prosecutor's ill will reflected through deliberate and repeated misconduct or indifference to prior rulings). We hold the improper comment was not gross and flagrant. See *State v. Novotny*, 297 Kan. 1174, 1190, 307 P.3d 1278 (2013) (even

358

assuming prosecutor's comment on defendant's demeanor was misconduct, isolated nature of remarks did not rise to the level of being gross or flagrant).

The brief and isolated nature of the comment also leads us to conclude that it bore little weight in the minds of jurors during their consideration of the evidence supporting the aggravating and mitigating circumstances. This is particularly true given that the remarks comprised a few lines of a closing argument in a multiweek trial recorded in thousands of pages of transcript. See *State v. Washington*, 275 Kan. 644, 672, 68 P.3d 134 (2003) (improper closing argument remarks in a few lines in a trial transcript over 1300 pages did not establish prejudice to fair trial rights). The district judge instructed the jury that arguments of counsel were not to be considered as evidence and that the jury was to decide defendant's sentence by weighing aggravating circumstances against mitigating circumstances. Also, the State presented overwhelming evidence supporting its lone aggravating circumstance that Robinson killed more than one person, and the State effectively challenged and often discredited Robinson's mitigation evidence. In light of the totality of the circumstances, we are confident that the prosecutor's remarks had no effect on the sentencing decision. See *Kleypas*, 272 Kan. at 1084-85 (citing *Chapman*, 386 U.S. at 24); see also *Novotny*, 297 Kan. at 1190 (comment on demeanor was harmless beyond reasonable doubt, given lack of gross or flagrant remarks and solid evidence presented by the State).

2. *Did the prosecutor make arguments unsupported by the evidence?*

Robinson challenges three instances where the prosecutor allegedly advanced an argument unsupported by the evidence.

### a. Tender Mercies *Comments*

During rebuttal closing, prosecutor Morrison argued against Robinson's impassioned plea for mercy during his closing, and in the process used the movie *Tender Mercies* as a rhetorical device:

> "There's an old movie out several years that had Robert Duvall, he was a down and out alcoholic country singer and the movie was called <u>Tender Mercies</u>. And in the movie he talks about how hard this guy's life has been and how he was a success at one time. He drank it all away. Now, he's living in some shack with some divorced woman and her little kid and he helps her kind of. He talks in that movie about tender mercies in life, how life is full of tender mercies, these tender mercies are things like being able to hear the rain on the ceiling, getting out of bed in the morning, filling your lungs with air and standing up and stretching or maybe laying in bed for a few extra minutes. Tender mercies are about being able to have a drink of coffee in the morning. Tender mercies are about being able to have visits with loved ones, read letters from them. He wants you to extend all those things to him. He says, gosh, you know, you got you need to, let me live because I'm going to be peaceful in prison, although I haven't demonstrated that."

The defense objected, but only to the prosecutor's remark about Robinson claiming he would be peaceful in prison. The district judge sustained the objection and directed the prosecutor to proceed.

The prosecutor continued:

> "I've got a history of incredible violence, but let me see my family. When you think of those tender mercies, six dead people in this case, six dead people in this case, they don't have those mercies o[r] they don't get to listen to the rain."

Defense counsel again objected. The district judge sustained the objection, explaining that the prosecutor was beginning to move past a discussion of the aggravating

circumstance and entering into victim impact. As discussed below, we have since clarified that a prosecutor may properly introduce evidence of and make argument on victim impact during the penalty phase.

Robinson argues that the prosecutor's *Tender Mercies* speech constituted misconduct because it was a "lengthy imaginary script from an actual movie," the type we disapproved of in *Kleypas*. To the contrary, we disagree that the prosecutor's comments were akin to those we found improper in *Kleypas*. There the prosecutor invited jurors to speculate what the victim "'must have thought when [defendant] burst through that door'"; "'the anguish she must have felt when she saw that knife'"; and "'how long that time must have seemed to [the victim].'" 272 Kan. at 1112. Then the prosecutor provided answers to those questions through an imaginary script of the deceased victim, which told jurors about the victim's final thoughts based on pure speculation. We found the arguments improper because "when the prosecutor began speculating as to the victim's thoughts and essentially making up an [i]nternal dialogue for the victim, he crossed the line into a blatant appeal to the emotions of the jury." 272 Kan. at 1114.

Here, Morrison's argument did not speculate as to the victims' thoughts and did not offer an imaginary dialogue from the deceased. Instead, he used the *Tender Mercies* film to illustrate why the aggravating factor of multiple murders should outweigh Robinson's closing argument appeals for mercy and a life sentence. See *State v. Hilt*, 299 Kan. 176, 199, 322 P.3d 367 (2014) (prosecutor's use of *Goodfellas* film as rhetorical device not misconduct where reference to the iconic film in connection with the case "brought order to the facts and placed them in the meaningful context of the prosecution's theory of the case"). We find the comments fell within the wide latitude afforded prosecutors in discussing the evidence.

## b. *"I bet the [families of the victims] wouldn't agree"* Comment

The defense devoted a substantial portion of its penalty phase case putting on evidence suggesting Robinson posed a low risk of violence in prison. In the first portion of the prosecutor's closing argument, he challenged this evidence and commented:

> "I bet you Bev Bonner's family wouldn't agree with that. I bet you the Troutens wouldn't agree with that. I bet you the Lewickas wouldn't agree with that or the Faiths, or the Stasis, I bet they wouldn't agree with that."

Robinson contends the remarks were beyond the latitude afforded prosecutors in arguing the evidence.

It is a well-established rule in this State that error is committed when a prosecutor injects his or her personal opinion into the closing argument. See *State v. Longoria*, 301 Kan. 489, 525, 343 P.2d 1128 (2015). On their face, the comments improperly expressed the opinion of the prosecutor and were improper. We disagree with the State's attempt to characterize the comments as mere rhetorical expressions.

Nevertheless, the conduct was not prejudicial to Robinson. The prosecutor made the comments on one occasion in response to the defense's mitigation theory; the defense lodged no objection; and the remarks did not run afoul of the district judge's prior rulings. We find the remarks were not gross or flagrant or the product of ill will. Moreover, while beyond the wide latitude afforded prosecutors in discussing the evidence, the comments were made in response to expert testimony concerning defendant's propensity toward violence in prison. Though not insulating the comments from a claim of prosecutorial misconduct, these circumstances mitigate the prejudicial force of the comments. See *State v. Williams*, 299 Kan. 911, 938, 329 P.3d 400 (2014) (considering responsive nature of comments in prejudice analysis, but not applying immunity based on this fact); *State v.*

*Marshall*, 294 Kan. 850, 860-61, 281 P.3d 1112 (2012) (responsive, extemporaneous, or rebuttal nature of a prosecutor's improper comment or argument is a factor relevant to the prejudice analysis, albeit not determinative). Considering the totality of the facts, along with the strength of the State's aggravating circumstance evidence and Robinson's less than compelling mitigation evidence, the comments did not affect the jury's consideration of the penalty phase evidence.

### c. *Comments about the Severity of Robinson's Capital Murders*

During penalty phase opening statements, the prosecutor explained that the purpose of the penalty phase under Kansas' capital sentencing scheme is to distinguish between capital murders that warrant a life sentence and those that warrant a sentence of death. The prosecutor repeated this explanation at the outset of closing argument.

During the rebuttal portion of penalty phase closing argument, the prosecutor challenged Robinson's mitigation case and emphasized the significance of the multiple murder aggravating circumstance. In making this argument, the prosecutor remarked:

> "Is this a severe capital murder? Is it one of greater enormity than the—is it one of greater gravity than the average? Of course it is. Is somebody who kills in a course of conduct that lasts almost two decades the worst kind of murderer imaginable? Does he deserve the death penalty? We all know the answer to that question. We all know the answer to that question."

In his final remarks to the jury, the prosecutor returned to the purpose of the penalty phase proceedings under Kansas' statutory scheme.

> "This process is all about finding just punishment, fairness, and I'm sure we would all agree that capital punishment should be reserved for the most severe crimes. It

should be reserved for the most severe crimes, only the most heinous of acts should be punished with that sentence. Obviously with this, if not him, then who? I'll leave you with that thought."

Robinson believes that these remarks, both those explaining the purpose of the penalty phase process and those commenting on the gravity of Robinson's crimes, improperly called on the jury to compare Robinson's murders to other capital murders that were not part of this record.

We disagree. Morrison's remarks explaining the purpose of the penalty phase reasonably conveyed to jurors that the process served as a mechanism to narrow the class of individuals eligible to receive a sentence of death by comparing aggravating and mitigating circumstances. See *State v. Scott*, 286 Kan. 54, 108, 183 P.3d 801 (2008) ("In order for a capital sentencing scheme to pass constitutional muster, it must 'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.' One way in which sentencing schemes do so is in the use of aggravating circumstances." [quoting *Zant v. Stephens*, 462 U.S. 862, 877, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983)]).

The prosecutor's other challenged remarks simply advanced the appropriate argument that the aggravating circumstance was so abhorrent that this case warranted imposition of a sentence of death, notwithstanding defendant's mitigation evidence. Through the remarks, the prosecutor tied together the purpose of the penalty phase, *i.e.*, narrowing the class of death‑eligible capital murders, with the State's aggravating circumstance evidence that Robinson had killed six people. The prosecutor did not inject information from other capital cases or otherwise discuss matters beyond the evidence. The remarks properly suggested that Robinson's conduct and moral culpability was so

severe that it warranted a sentence of death, an argument within the wide latitude afforded prosecutors in discussing the evidence. *Cf. Scott*, 286 Kan. at 81 (prosecutor may refer to defendant as a murderer or killer when arguing that evidence shows defendant committed murder).

Robinson believes the prosecutor's attempt to answer his own rhetorical question—"Is this a severe capital murder?"—injected his own personal opinion based on his experience as a prosecutor. However, when viewed in context, the prosecutor was using a rhetorical device to emphasize the weight of the multiple murders evidence and to illustrate that under the narrowing function of Kansas' capital sentencing scheme, a death sentence was warranted. See *Hall v. Luebbers*, 341 F.3d 706, 716-17 (8th Cir. 2003) (finding no misconduct from prosecutor's argument that not every capital murder meets the legal requirements for the death penalty, but this one did based on evidence proving all requirements for imposing death penalty); *Cunningham v. Hudson*, No. 3:06CV0167, 2010 WL 5092705, at *49 (N.D. Ohio 2010) (unpublished opinion) (in capital murder proceeding, "the prosecutor's comment characterizing the murders as 'the most cold-blooded calculated inhumane murder' fell within the latitude permitted to both parties"), *vacated and remanded on other grounds* 756 F.3d 477 (6th Cir. 2014). For the same reasons, the argument did not inject a nonstatutory aggravating circumstance.

Robinson also suggests that the prosecutor's final remark—"[I]f not him, then who?" —appealed to the jurors' sense of duty to maintain the death penalty as a viable sentencing option under state law, contrary to our holding in *Scott*, 286 Kan. at 79 (Prosecutorial comments that tell "jurors to honor their oath and return a verdict of guilty" impliedly suggest that to do otherwise would be a violation of such duty and are improper.). However, the prosecutor did not suggest jurors would violate their oath by sentencing the defendant to life imprisonment. Instead, his comment was designed to emphasize the weight of the aggravating circumstance and demonstrate the propriety of a

death sentence under the narrowing function of Kansas' capital sentencing scheme. See *State v. Davis*, 175 Wash. 2d 287, 339-40, 290 P.3d 43 (2012) (prosecutor's closing argument comment of "'If not now, then when? And, if not [defendant], then who?'" did not constitute prosecutorial misconduct; comment was made in the context of arguing that the death penalty was appropriate, given the circumstances of the crime, and was within latitude granted to prosecutors).

Accordingly, we hold that these comments fell within the wide latitude afforded prosecutors in arguing the evidence.

3. *Did the prosecutor improperly attack Nancy Robinson?*

During Robinson's penalty phase case, Nancy Robinson testified to the character of her husband as a good father, grandfather, and family man. She also informed jurors that she and other family members would continue to maintain relationships with Robinson and be spared grief if he were sentenced to life imprisonment. The State effectively challenged the credibility and reliability of her opinions on cross-examination.

During the initial portion of the State's penalty phase closing argument, the prosecutor commented on Nancy Robinson and the credibility of the opinions she provided to the jury.

> "Then we had Nancy Robinson, in some ways a tragic figure, and in some ways a sad figure, in some ways a pathetic figure, who takes the term 'stand by your man' to a whole new level. In many ways if you look at the evidence in this case, Nancy Robinson is just another of the many victims of this man (indicating), just another victim.
> "She's up here crying (indicating), lives probably been ruined because of what he has done, because of what he has done to her and that family. Has she been manipulated? Has she been deceived? Look at the letter that I put in yesterday; read the note. That will

366

answer that question for you. She had been manipulated to stand by after a continuum of 5, 10, 15, 25 year streams of girlfriends right under her nose, BDS&M relationships, prison terms, probation revs, trials, the 'stand by him,' is she a victim? Yep. After conviction of multiple murders that are of the most heinous yesterday, she tells us, well, I'm not sure if I want a divorce or not.

. . . .

"Decide for yourselves. When I asked her, you know, you testified for him before in his earlier trials; haven't you? Yep. You were there at his hearings and his sentencing probation revocations? Yep. Well, didn't you know that he was a suspect back in the mid '80s in the disappearance of a woman and little girl? I must have been out in the hall and her fall-back answer, 'Nobody asked me.' What do you think? What do you think? Can you be a great dad when you're in prison? Can you be a great dad and grandpa when you're doing the kind of things the defendant has done? You answer that question."

Defense counsel objected midway through these comments after the prosecutor mentioned Nancy Robinson's uncertainty as to whether she would divorce Robinson. The district judge overruled the objection, finding the comment within the scope of the evidence.

Robinson argues these remarks were improper because they communicated the theme that Nancy Robinson's pleas to spare her husband's life should be disregarded because "the prosecutor held her in suspicion."

Robinson seems to misconstrue the prosecutor's argument. He was not attempting to implicate Nancy Robinson in her husband's criminal activity. Instead, the comments challenged the credibility and reliability of her opinion regarding Robinson's character as a good family man. His comments were founded on her cross-examination testimony and reasonable inferences from it. The argument was well within the latitude afforded prosecutors in arguing the evidence. See *State v. Todd*, 299 Kan. 263, 285-86, 323 P.3d 829 (prosecutor's comment that witness lacked credibility was reasonable inference that

the prosecutor could argue based on evidence), *cert. denied* 135 S. Ct. 460 (2014); *Marshall*, 294 Kan. at 863 (comments regarding witness' honesty not improper when tied to evidence); *Chanthaseng*, 293 Kan. at 148 (prosecutor's statements about the witness' credibility proper where based on reasonable inferences from evidence); *State v. Duong*, 292 Kan. 824, 830-32, 257 P.3d 309 (2011) (prosecutor's statements about the victim's credibility proper where based on evidence).

4. *Did the prosecutor improperly attack defense counsel's argument?*

Finally, Robinson takes issue with prosecutor Morrison's personalized attack of arguments advanced by defense counsel. During defense counsel's closing argument, he suggested that there was residual doubt as to whether Robinson acted alone. At the beginning of the State's rebuttal closing, the prosecutor said, "I find it absolutely insulting and astonishing that [defense counsel] wants to talk about whether," at which point defense counsel lodged an objection and the district judge sustained it. The prosecutor moved on, returning to a discussion of the aggravating circumstance evidence.

Comments that disparage the arguments of the defense or the role of defense counsel in the adversarial process are improper. *State v. Knox*, 301 Kan. 671, 684, 347 P.3d 656 (2015); see *State v. Lockhart*, 24 Kan. App. 2d 488, 492, 947 P.2d 461, *rev. denied* 263 Kan. 889 (1997). The prosecutor's remark suggested he personally felt one of the defense's arguments was "insulting and astounding." The remark was an improper comment on the evidence.

Nevertheless, it was not prejudicial. The prosecutor's remark was isolated, and it was incomplete because the statement was interrupted by the defense's objection and district judge's ruling. We find the comment was not gross or flagrant. Because of its isolated and incomplete character, along with the fact that the prosecutor continued on in

368

compliance with the district judge's ruling, the remark also fell short of establishing ill will. Nor would the comment have weighed heavily in the minds of jurors. Had the prosecutor completed his statement, Robinson might have had a more viable argument. However, the interruption left jurors only with the knowledge that the prosecutor was offended by some argument the defense had made, a relatively benign statement. Considering the totality of the circumstances, we hold that the comment was harmless beyond a reasonable doubt. See *Kleypas*, 272 Kan. at 1084 (citing *Chapman*, 386 U.S. at 24); see also *State v. Douglas*, 274 Kan. 96, 108, 49 P.3d 446 (2002) (comment that defendant's "'story is ridiculous and absurd and ludicrous'" did not prejudice defendant where objection sustained and jury instructed to disregard); *State v. Hernandez*, No. 94,873, 2007 WL 316787, at *13 (Kan. 2007) (unpublished opinion) (calling defense theory "'ludicrous'" not gross or flagrant; no ill will was shown; no likelihood it changed the result of the trial); *State v. Norwood*, No. 109,419, 2014 WL 6909514, at *11-12 (Kan. App. 2014) (unpublished opinion) (calling defense position "ridiculous" not prejudicial, given remark was isolated and State's evidence compelling), *rev. denied* 302 Kan. ___ (July 22, 2015).

*Alleged Misconduct during State's Cross-Examination*

Robinson asserts that the prosecutor engaged in prejudicial misconduct when making assertions of fact in questions posed during cross-examination of defendant's mitigation witnesses. Robinson identifies five specific instances of this alleged misconduct, each addressed in turn.

We apply the same two-part standard when reviewing claims of prosecutorial misconduct based on a prosecutor's questioning of witnesses on cross-examination. *State v. Edgar*, 281 Kan. 47, 66, 127 P.3d 1016 (2006); *State v. Tosh*, 278 Kan. 83, Syl. ¶ 1, 91 P.3d 1204 (2004).

369

1. *Did the prosecutor commit misconduct during the cross-examination of Nancy Robinson?*

During the defense's mitigation case, Nancy Robinson testified to defendant's character as a good family man, father, and grandfather. During cross-examination, the prosecutor asked, "[W]ould it affect your opinion of your husband if you knew that he had taken [their granddaughter] to liaisons with one of his BDS&M girlfriends?"

The defense objected, and the district judge held a bench conference. The prosecutor informed the district judge it had a witness who could substantiate the factual basis of the question, *i.e.*, that during the course of their BDS&M relationship, Robinson brought his infant grandchild to their BDS&M liaisons on more than one occasion. Judge Anderson ruled that the defense had opened the door to the inquiry, which was properly calculated to elicit relevant evidence to impeach Nancy Robinson's opinion of Robinson's character as caring grandfather. Based on the prosecutor's proffer, the district judge allowed the inquiry, and Nancy Robinson testified that she did not know whether her opinion would be affected by this fact unless she knew the entirety of the circumstances.

A prosecutor's questions must be relevant and supported by a good-faith basis for believing the asserted matter to be true. *State v. Overton*, 279 Kan. 547, 558, 112 P.3d 244 (2005). Robinson contends the prosecutor lacked a good-faith basis for the question, and, therefore, it was improper.

The record demonstrates otherwise. The prosecutor made a proffer of the testimony that supported his good-faith basis for the question at the time of the objection. The district judge not only found that the prosecutor had established a good-faith basis for his questioning, but also ruled appropriately that the inquiry was calculated to elicit

370

relevant evidence impeaching Nancy Robinson's testimony regarding Robinson's character as a good grandfather.

Moreover, the following day, the prosecutor intended to introduce testimony from Sandra Shields to establish that Robinson brought his infant grandchild with him on more than one BDS&M liaison. The State intended to introduce this testimony to rebut the defense's evidence that the Johnson County Detention Center allowed Robinson to have contact visits with his grandchild, giving rise to the inference that they shared a special relationship. The prosecutor provided a more detailed proffer of Shields' testimony, but the district judge ruled that it was not proper rebuttal to the defense's evidence of Robinson's contact visits. While inadmissible for that purpose, the proffer confirms that the prosecutor had a good-faith basis for his cross-examination of Nancy Robinson.

Robinson takes issue with the fact that the jury never heard the good-faith basis for the questions posed to Nancy Robinson, citing *State v. McCaslin*, 291 Kan. 697, 720, 245 P.3d 1030 (2011), *overruled on other grounds by State v. Astorga*, 299 Kan. 395, 324 P.3d 1046 (2014). There we found the prosecutor engaged in misconduct by lodging inflammatory questions that lacked a good-faith factual basis and were never intended to elicit a substantive response. Although the prosecutor later provided a good-faith basis for the questions during the hearing on defendant's motion for new trial, the jury never heard it, potentially leaving the jury to imagine "'all kinds of damaging and prejudicial but false or inadmissible facts'" that the defense could not refute. 291 Kan. at 720. Like *McCaslin*, in this case the jury was left to imagine certain details; but unlike *McCaslin*, the basic asserted facts in the prosecutor's questions were supported by proffered testimony and reasonably calculated to elicit relevant testimony from Nancy Robinson. Moreover, the defense had no intention of exposing the jury to the facts supporting the prosecutor's good-faith basis for his questioning. In fact, defense counsel fought vigorously to exclude Shields' testimony for good reason—these facts were detrimental to

his mitigation case. Even if there was error in the exclusion of Shields' testimony, it would have been invited by the defense. We hold there was no misconduct.

2. *Did the prosecutor commit misconduct during the cross-examination of Mark Cunningham?*

The defense called Cunningham to testify that Robinson would make a positive, nonviolent adjustment to prison. During direct examination, defense counsel asked Cunningham whether Robinson would have access to the Internet. Cunningham responded, "No, sir," explaining that prisoner communications are very carefully monitored in a maximum security setting and that it would be negligent to allow a prisoner who had used the Internet to facilitate his crimes to have access to the same tool inside prison. Cunningham also said that whatever computer access defendant would have, would be restricted, especially the Internet.

During cross-examination, prosecutor Welch asked Cunningham about Internet access within the Kansas Department of Corrections institutions.

"Q.    Now, you talked a little bit with [defense counsel] about the defendant's access or potential access to the computers should he be incarcerated. I kind of got the impression that perhaps you hadn't spoken with Kansas DOC about specific access to computers?

"A.    No, ma'am, I have not.

"Q.    *We're* not sure whether he would have access to computers or what type of access he would have or not, correct?

"A.    Not definitively to Kansas as a general—I mean, a lot of prisons across the United States on a pretty routine basis there is not access to computers in prison that there are in our homes, and particularly Internet access, but I have not

372

questioned Kansas specifically about their computer policy with inmates."
(Emphasis added.)

During closing argument, prosecutor Morrison challenged Robinson's mitigation evidence by highlighting his use of fraud and deception to facilitate crime both inside and outside the prison environment.

"Gosh, if they [recommendation letters fraudulently created or altered by Robinson] would have been real, the people would have said good things about it. What does that tell us? Model inmate, somebody who should be allowed to peacefully live out his life in prison, somebody who won't be a threat. You've never heard us say for a second that we're concerned about the defendant attack[ing] somebody in prison [and] starting a gang or riot. That's not his way. His way is manipulation, his way is deceit that often ends in tragic consequences. You decide. *I thought it interesting that Mr. Cunningham didn't take two minutes to decide whether or not his bait of choice, the computer, will even be available for him in prison.* Would you agree that that's his lure of choice?" (Emphasis added.)

Robinson argues that the prosecutor's use of the term "we're," instead of "you're," in questioning Cunningham improperly suggested that both the State and Cunningham personally thought it possible that Robinson could have Internet access in prison. He also believes prosecutor Morrison's comments during closing argument were improper if, in fact, KDOC prohibited Internet access to prisoners. Robinson then cites to a KDOC policy from 2002, attached to the briefing, which appears to prohibit Internet access for inmates.

The problem for Robinson is that the court is limited to record evidence in analyzing the prosecutorial misconduct challenge, and the KDOC policy was never introduced as evidence during the penalty phase. As to prosecutor Welch's questioning of Cunningham, her use of the word "we're" rather than "you're" is of little significance.

373

Robinson offers no support for his claim that the prosecutor lacked a good-faith basis for her questioning, and even if he did, the expert's testimony on direct implied that he had not researched KDOC policy specifically, providing the prosecutors with a good-faith basis for the inquiry on cross-examination.

Based on the foregoing, the prosecutor's questions to Cunningham and the closing argument remarks were well within the appropriate bounds of cross-examination witnesses and closing argument. Robinson has failed to demonstrate misconduct on this basis.

3. *Did the prosecutor improperly question Nancy Robinson about the infant?*

During the cross-examination of Nancy Robinson, prosecutor Morrison asked whether she reported to authorities that Robinson came home with an infant baby at the time of Stasi's disappearance in January 1985. The district judge overruled the defense's general objection, finding the question relevant.

Robinson argues that the prosecutor did not have an adequate basis for asking the question and that it improperly implied that Nancy Robinson was an accomplice to defendant's crimes. However, the State's evidence had established that Robinson returned home with an infant around the time of Lisa Stasi's disappearance. Her testimony also implied that she did not report this incident to law enforcement. The record confirms the prosecutor's good-faith basis for the inquiry.

The prosecutor's question was also relevant. Contrary to Robinson's assertion, the prosecutor did not ask the question to implicate Nancy Robinson in any criminal activity. Instead, the question was designed to challenge the credibility of Nancy Robinson and her testimony that her husband was a good family man. As such, the prosecutor did not engage in any misconduct.

4. *Were questions about Social Security benefit checks improper?*

The record evidence established that Robinson murdered Sheila and Debbie Faith and, thereafter, deposited their Social Security benefit checks into various accounts under his control. Two of these checks were cashed in Florida, around the time defendant and his wife were there attending a wedding. During cross-examination, the prosecutor asked Nancy Robinson if she was there when defendant cashed those two checks. The defense lodged no objection.

Robinson now alleges that the prosecutor supplied no factual basis for the questioning. The above summary of the record evidence suggests the contrary. Moreover, the defense did not object to the question at trial, and the prosecution had no reason to affirmatively supply a factual basis for the inquiry. See *Kleypas*, 272 Kan. at 1090 ("The failure of the defendant to object and to trigger the prosecutor's proffer of a good faith basis precludes a finding of error on this issue.").

5. *Were questions related to Cunningham's written report improper?*

During the State's cross-examination of Cunningham, prosecutor Welch explored the expert's qualifications, methodology, and fee. Through this questioning, the State established that Cunningham earned $11,000 for his services. Prosecutor Welch then asked Cunningham whether he had prepared a written report, to which he answered, "No, ma'am." Prosecutor Welch then asked, "Were you asked by defense counsel not to write a report?," to which Cunningham again responded, "No, ma'am."

Robinson argues the prosecutor lacked a good-faith basis to assert as fact that defense counsel advised Cunningham not to produce a written report. However, the prosecutor's question did not assert this as fact. Instead, the prosecutor asked the question

in a fact-neutral manner, "Were you asked by defense counsel not to write a report?" This allowed Cunningham to respond, "No ma'am," dispelling any notion that defense counsel had instructed the expert not to prepare a written report. The prosecutor's inquiry was proper.

Robinson cites *State v. Atkins*, 405 N.J. Super. 392, 964 A.2d 845 (2009), in support of his claim. There, the prosecutor asked a series of questions of the defense investigator as to why he did not prepare a written report. On appeal, the New Jersey Superior Court found the trial court should have provided the jury with an instruction that no written report was required and that it should draw no adverse inference from its absence. 405 N.J. Super. at 406. However, the Superior Court did not find that the prosecutor had engaged in misconduct by exploring this line of questioning, and it did not suggest that the prosecutor lacked a good-faith basis for such questions. Instead, it found error because the trial judge compelled the defense to produce its retained investigator's notes from an interview with the victim, and these notes contained the victim's prior consistent statements that defendant had molested her, violating the privilege for nontestifying experts. At trial, the prosecutor used this evidence against the defendant, effectively turning defense counsel's consulting expert into a witness for the prosecution. The prosecutor's questions regarding the existence of a written report compounded the trial court's error in compelling production of the written notes in the first instance. *Atkins* is factually distinguishable and lacks persuasive value when compared to Robinson's facts.

In the end, Robinson has failed to establish misconduct as it relates to any of the five challenges alleging that prosecutors lacked a good-faith basis for facts asserted within their cross-examination questioning of Robinson's mitigation witnesses.

*Alleged Misstatements of the Law during Voir Dire*

Robinson argues the prosecutor committed prejudicial misconduct by misstating the law relating to mitigating circumstances during voir dire. Specifically, he contends that the prosecutor: (1) mischaracterized mitigating circumstances as those pertaining to the crime itself; and (2) improperly suggested jurors could assign mitigation evidence no weight whatsoever.

We apply the same two-part standard of review for alleged prosecutorial misconduct during voir dire. *State v. Simmons*, 292 Kan. 406, 412, 254 P.3d 97 (2011) (noting that two-part framework has been applied to the voir dire process).

1. *Did prosecutors define mitigating circumstances improperly?*

Robinson first contends the prosecutor misstated the law in summarizing the concept of mitigating circumstances during voir dire.

A prosecutor's misstatement of the law is improper and satisfies the first prong of the two-part prosecutorial misconduct standard. See *State v. Cosby*, 285 Kan. 230, 247-48, 169 P.3d 1128 (2007) (prosecutor's comment was a misstatement of law on premeditation and thus was improper). We have defined mitigating circumstances as those "which in fairness may be considered as extenuating or reducing the degree of moral culpability, or blame, or which justify a sentence of less than death, even though they do not justify or excuse the offense. " *Kleypas*, 272 Kan. 894, Syl. ¶ 79.

Robinson identifies three occasions where prosecutor Morrison allegedly misstated the definition of mitigating circumstances during small group voir dire. First, during voir dire of the fourth panel, which included petit Juror 39, the prosecutor explained, "Mitigating circumstances would be those circumstances that would make it

377

not as bad, if you will, not as morally wrong, if you will, as your typical capital murder." Robinson contends this definition improperly limited mitigating circumstances to the facts of the crime.

Robinson's argument lacks merit. The prosecutor's description of mitigating circumstances as those that diminish the moral culpability of the offense is entirely consistent with the definition set forth in *Kleypas*. Contrary to Robinson's assertion, the prosecutor's definition did not exclude circumstances outside the facts of the crime itself.

Robinson argues the prosecutor reinforced this allegedly narrow construction by following up his definition with hypothetical questions that focused on the facts of the crime rather than the background and character of the defendant. The argument is misplaced. When Juror 41 suggested she would automatically vote for the death penalty regardless of the circumstances, prosecutor Morrison provided a hypothetical comparing two contract killings: one where a drug dealer contracted the murder of a police officer and the other where a sexually abused woman contracted the murder of her abuser. The prosecutor asked Juror 41 if she would view those hypothetical cases the same in terms of punishment or, instead, would consider the circumstances unique to each. The prosecutor was not attempting to provide a legal definition of mitigating circumstances but, instead, was properly exploring whether the veniremember was mitigation-impaired. In fact, the second hypothetical actually highlighted the defendant's social history and background as a victim of sexual abuse and was not limited to the facts of the crime itself. The prosecutor did not exceed the bounds afforded to him in questioning veniremembers.

Second, Robinson objects to the prosecutor's discussion of aggravating and mitigating circumstances during voir dire of the thirteenth small group panel, which included petit Jurors 87 and 92. Prosecutor Morrison asked Juror 82 whether he would consider aggravating and mitigating circumstances and if he agreed that every case is

different. After responding in the affirmative to both questions, prosecutor Morrison asked, "And if I gave you a scenario of a hundred homicides, we'd be able to find differences in the facts and circumstances of all of them, correct?" Defense counsel objected, claiming that the question unduly narrowed mitigating circumstances to the facts surrounding the crime itself, but the district judge overruled, explaining that the objection presumed the question dealt only with the elements of the crime and not other mitigating and aggravating factors. We find no basis in the record to disagree with Judge Anderson's interpretation of the prosecutor's question and find no misconduct on this basis.

Finally, Robinson contends that petit Juror 246 was exposed to similar misstatements of the law. During voir dire of the twenty-second small group panel, prosecutor Morrison made the following comments while describing the capital sentencing scheme:

> "The second phase is after a defendant has been convicted of capital murder. And in that phase, evidence is heard called evidence of aggravating circumstances and evidence of mitigating circumstances. Aggravating circumstances will be those things that tend to favor a death sentence. *Mitigating circumstances will be those things that will tend to favor a life sentence.* Everybody kind of understand? Worse stuff generally is aggravated. *Things that tend to lessen guilt or excuse behaviors tend to be mitigation.* Understand? Everybody with me?" (Emphasis added.)

The prosecutor's description of mitigating circumstances was consistent with Kansas law. *Kleypas*, 272 Kan. at 1103 (defining mitigating circumstances as those which justify a sentence of less than death or reduce moral culpability or blame). While it is improper for a prosecutor to argue that circumstances are not mitigating because they do not excuse the crime, *State v. Scott*, 286 Kan. 54, 118, 183 P.3d 801 (2008), the prosecutor did not make such an argument to the small group panel.

379

We see no error in the prosecutor's remarks to the small group panels regarding the concept of mitigating circumstances.

2. *Did the prosecutor comment improperly on weight assigned to mitigating circumstances?*

Robinson also challenges comments prosecutor Morrison made during voir dire of the fourth small group panel, which he sees as suggesting that a juror could assign little or no weight to mitigating circumstances evidence.

Specifically, during voir dire of this panel, the prosecutor explained, "[T]he rules are going to say 'you shall consider' [mitigating circumstances]. Doesn't necessarily mean you have to give a lot of weight to it or even any weight, but you shall consider." Moments later, prosecutor Morrison commented:

> "Does everybody here understand it is for you to determine what, if any, weight you give to an aggravating circumstance or a mitigating circumstance? It is for you to determine what, if any, weight you give. But you must be willing to consider those things. That's the question."

Contrary to Robinson, we find these comments were consistent with established law. In *Johnson v. Texas*, 509 U.S. 350, 361, 113 S. Ct. 2658, 125 L. Ed. 2d 290 (1993), the Supreme Court made clear:

> "'*Lockett* and its progeny stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence, either by statute or judicial instruction, or by limiting the inquiries to which it is relevant so severely that the evidence could never be a part of the sentencing decision at all.' [Citations omitted.]"

380

See *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978). While *Lockett* proscribes State conduct that bars defendant's presentation of mitigation evidence, "[i]t does not prohibit a capital sentencing jury from assessing the weight of mitigating evidence 'and find[ing] it wanting as a matter of fact[.]'" *State v. Cheever*, 295 Kan. 229, 269, 284 P.3d 1007 (2012), *vacated and remanded on other grounds*, 571 U.S. ___, 134 S. Ct. 596, 187 L. Ed. 2d 519 (2013). Jurors are free to assign whatever weight they deem appropriate, or no weight at all, to evidence offered in mitigation. *Kleypas*, 272 Kan. at 1074-75 (the sentencer is free to conclude that some circumstances claimed to be mitigating are not mitigating circumstances); see *Eddings v. Oklahoma*, 455 U.S. 104, 114-15, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982) ("The sentencer . . . may determine the weight to be given relevant mitigating evidence."); *United States v. Basham*, 561 F.3d 302, 337 (4th Cir. 2009) (neither the Constitution nor laws of the United States "'require a capital jury to give mitigating effect or weight to any particular evidence'" so long as they did not refuse to consider evidence altogether); *United States v. Bernard*, 299 F.3d 467, 485 (5th Cir. 2002) (no constitutional requirement that capital jury give mitigating effect or weight to any particular evidence); *Allen v. Buss*, 558 F.3d 657, 667 (7th Cir. 2009) ("The rule of *Eddings* is that a sentencing court may not exclude relevant mitigating evidence. [Citation omitted.] But of course, a court may choose to give mitigating evidence little or no weight."); *United States v. Paul*, 217 F.3d 989, 999 (8th Cir. 2000) (Neither *Lockett* nor *Eddings* require a capital jury to give mitigating effect or weight to any particular evidence.); *Schwab v. Crosby*, 451 F.3d 1308, 1329 (11th Cir. 2006) ("The Constitution requires that the sentencer be allowed to consider and give effect to evidence offered in mitigation, but it does not dictate the effect that must be given once the evidence is considered; it does not require the sentencer to conclude that a particular fact is mitigating or to give it any particular weight.").

The prosecutor's remarks were consistent with this precedent and in line with our definition of mitigating circumstances and controlling precedent defining the jury's role

in assessing the weight of evidence offered in mitigation. There was no prosecutorial misconduct on these grounds.

## 16. CHALLENGES TO PENALTY PHASE INSTRUCTIONS

Robinson advances four challenges to the penalty phase instructions given to the jury. We address each challenge in turn.

*Standard of Review*

In reviewing challenges to jury instructions in the penalty phase of a capital trial, we have employed the following standard of review:

> "In considering a [preserved] claim that a jury instruction in the penalty phase of a capital trial prevented the jury from giving proper consideration to mitigating evidence, our standard of review is 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.' *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990). However, we consider the instructions as a whole and do not isolate any one instruction. Even if erroneous in some way, instructions do not result in reversible error if they properly and fairly state the law as applied to the facts of the case and could not reasonably have misled the jury. *State v. Edgar*, 281 Kan. 47, 54, 127 P.3d 1016 (2006)." *Scott*, 286 Kan. at 104-05.

*Defining Standard of Proof for Aggravating Circumstances*

Robinson first argues the penalty phase instructions created an unreasonable risk that the jury would fail to recognize it must find that aggravating factors outweighed mitigating factors beyond a reasonable doubt in order to impose a death sentence.

382

The Kansas death sentencing scheme requires that the jury make two findings beyond a reasonable doubt in arriving at a sentence of death.

> "In Kansas, the death penalty may be imposed only if the jury unanimously finds beyond a reasonable doubt that (1) the aggravating circumstances alleged by the State exist and (2) the existence of such aggravating circumstances is not outweighed by any mitigating circumstances found to exist. K.S.A. 21-4624(e)." *State v. Gleason*, 299 Kan. 1127, 1186, 329 P.3d 1102 (2014), *cert. granted* 135 S. Ct. 1698 (2015).

One historical interpretive note is warranted. Robinson's trial was conducted after *Kleypas,* 272 Kan. 894, where in order to survive constitutional scrutiny, we construed the statutory weighing equation to require a showing that aggravating circumstances outweighed mitigating circumstances before a sentence of death could be imposed. 272 Kan. 894, Syl. ¶ 48. Consequently, in its instructions, the trial court used the then-applicable language from *Kleypas*, requiring jurors to find that aggravating circumstances outweighed mitigating circumstances before imposing a sentence of death. After Robinson's trial, in *Marsh*, 548 U.S. at 170-73, the United States Supreme Court found the statutory weighing equation had been constitutional as enacted, *i.e.*, a sentence of death could be imposed so long as aggravators were not outweighed by mitigators.

Robinson's argument arises under Instruction No. 10, which provides: "The State has the burden to prove beyond a reasonable doubt that there are one or more aggravating circumstances and that they outweigh any mitigating circumstances believed to exist." The instruction was based on the recommended instruction in PIK Crim. 3d 56.00-E and mirrored the language of the applicable statute, K.S.A. 21-4624(e) (Furse 1995), with one minor alteration.

Robinson believes this language is ambiguous because "beyond a reasonable doubt" only clearly modifies the State's burden to prove that there are one or more

aggravating circumstances, giving rise to the possibility that the instruction creates two burdens of proof: beyond a reasonable doubt for proof of the existence of aggravating circumstances; and preponderance of the evidence for whether aggravators outweigh mitigators. Robinson argues his position is corroborated by prosecutor Welch's argument during the jury instructions conference that the State did not have a double reasonable doubt burden and that she did not read the instructions to create one.

Robinson offers little aside from speculation to suggest jurors would adopt his interpretation of the instructions rather than the one chosen by the district judge, the PIK Committee, and the legislature. See *State v. Scott*, 271 Kan. 103, 117, 21 P.3d 516 (highly encouraging courts to follow the language found in the PIK instructions unless facts of case dictate otherwise), *cert. denied* 534 U.S. 1047 (2001). The ultimate question is "whether there is a reasonable likelihood that *the jury* has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence." *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 108 L. Ed. 2d 316 (1990).

Robinson's argument does not rise above the level of speculation. The assistant district attorney's argument notwithstanding, a commonsense interpretation of the language in Instruction No. 10 is that the State's burden of proof beyond a reasonable doubt applies to both object clauses of the sentence—that aggravators exist and that aggravators outweigh mitigating circumstances. That interpretation is clearly confirmed by language in Instruction No. 12, which provides: "[I]f one or more jurors is not persuaded beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances, then you should sign the appropriate alternative verdict form," and Instruction No. 8, which states that "[m]itigating circumstances are to be determined by each individual juror when deciding whether the State has proved beyond a reasonable doubt that the death penalty should be imposed."

Reading the instructions together, we find no reasonable likelihood that jurors applied the instructions in a way that prevented consideration of constitutionally relevant evidence.

*Alleged Failure to Convey that Each Juror Could Find Mitigating Circumstances*

In *Kleypas*, 272 Kan. at 1078, this court advised that, going forward,

"[a]ny instruction dealing with the consideration of mitigating circumstances should state (1) they need to be proved only to the satisfaction of the individual juror in the juror's sentencing decision and not beyond a reasonable doubt and (2) mitigating circumstances do not need to be found by all members of the jury in order to be considered in an individual juror's sentencing decision."

We have repeated the advisement in almost every death penalty decision since. See *Scott*, 286 Kan. at 106-07; *Cheever*, 295 Kan. at 266; *Gleason*, 299 Kan. at 1193-97; *State v. Carr*, 300 Kan. 1, 303, 331 P.3d 544 (2014), *cert. granted in part* 135 S. Ct. 1698 (2015).

The trial judge had the benefit of the *Kleypas* opinion at trial and included the following paragraph in the mitigating circumstances instruction, Instruction No. 8:

"The determination of what are mitigating circumstances is for you as jurors to decide under the facts and circumstances of the case. Mitigating circumstances are to be determined by each individual juror when deciding whether the State has proved beyond a reasonable doubt that the death penalty should be imposed. The same mitigating circumstances do not need to be found by all members of the jury in order to be considered by an individual juror in arriving at his or her sentencing decision. You may consider any mitigating circumstance which you believe to exist, regardless of whether it has been proved beyond a reasonable doubt."

385

Robinson argues that Instructions Nos. 10, 12, 13 and the verdict forms conflicted with Instruction No. 8 because language used in those instructions referring to "mitigating circumstances believed to exist" implied that mitigating circumstances must be unanimously found by the jury. Robinson compares this case to the instructions in *Scott*. But in *Scott*, the trial court did not include any instruction informing the jurors that it was unnecessary they agree on mitigating factors. Robinson also relies on *Abu-Jamal v. Horn*, 520 F.3d 272, 302 (3d Cir. 2008), *cert. granted, judgment vacated, and case remanded sub nom. Beard v. Abu-Jamal*, 558 U.S. 1143 (2010). But there the jury was not given any instruction on how to determine mitigating circumstances. Moreover, after Robinson's brief was filed, the *Abu-Jamal* case was vacated and remanded in light of the Supreme Court's opinion in *Smith v. Spisak*, 558 U.S. 139, 148-49, 130 S. Ct. 676, 175 L. Ed. 2d 595 (2010).

We disagree with Robinson. Instruction No. 8 clearly informs the jurors that mitigating circumstances "are to be determined by each individual juror" and "do not need to be found by all members of the jury in order to be considered by an individual juror." Viewing the instructions collectively, there is no reasonable likelihood that the jury applied them in a way that prevented the consideration of constitutionally relevant evidence.

*Instructions' Alleged Encouragement of a Death Verdict*

In his third challenge to the penalty phase instructions, Robinson argues the language used to convey the contours of the sentencing decision confronting the jury created a presumption of death and improperly influenced the jury to arrive at such a determination. Robinson focuses on language in Instructions Nos. 12 and 13 and in the four verdict forms that describes a jury decision not to impose the death penalty as an

inability to reach a decision. Robinson characterizes this language as speaking "of a death sentence as if it were something that the jury should strive to achieve, and a life sentence as a failure or inability to reach that objective."

Robinson recognizes the primary shortcoming of his argument, that the instructions given by the trial judge were based on the language of the statute providing for the penalty phase hearing, which provides:

> "If, by unanimous vote, the jury finds beyond a reasonable doubt that one or more of the aggravating circumstances enumerated in K.S.A. 21-4625 and amendments thereto exist and, further, that the existence of such aggravating circumstances is not outweighed by any mitigating circumstances which are found to exist, the defendant shall be sentenced to death; otherwise, the defendant shall be sentenced as provided by law. The jury, if its verdict is a unanimous recommendation of a sentence of death, shall designate in writing, signed by the foreman of the jury, the statutory aggravating circumstances which it found beyond a reasonable doubt. If, after a reasonable time for deliberation, the jury is *unable to reach a verdict*, the judge shall dismiss the jury and impose a sentence of imprisonment as provided by law and shall commit the defendant to the custody of the secretary of corrections." (Emphasis added.) K.S.A. 21-4624(e) (Furse 1995).

In *Kansas v. Marsh*, 548 U.S. 163, 178-79, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), the United States Supreme Court reviewed K.S.A. 21-4624(e) and held this language to be constitutional. Moreover, the Court reviewed instructions based on K.S.A. 21-4624(e) and said:

> "Kansas jurors, presumed to follow their instructions, are made aware that: a determination that mitigators outweigh aggravators is a decision that a life sentence is appropriate; a determination that aggravators outweigh mitigators *or* a determination that mitigators do not outweigh aggravators—including a finding that aggravators and mitigators are in balance—is a decision that death is the appropriate sentence; and an

inability to reach a unanimous decision will result in a sentence of life imprisonment."
548 U.S. at 179-80.

Contrary to Robinson's argument that jurors are not given a way to express a decision for a life sentence, *Marsh* suggests they are told exactly how to do that. *Cf. Bobby v. Mitts*, 563 U.S. 395, __, 131 S. Ct. 1762, 1763-65, 179 L. Ed. 2d 819 (2011) (instructions did not impermissibly encourage death sentence by requiring jury to reject death penalty before considering life sentence); *State v. Wakefield*, 190 N.J. 397, 475-78, 921 A.2d 954 (2007) (defendant was not entitled to a *sua sponte* instruction on the presumption of life during penalty phase of capital murder trial; although the trial court did not, in so many words, instruct the jury that it must presume a sentence of life imprisonment, it did instruct the jury that a death sentence could be reached only if (1) the jury found the existence of an aggravating factor beyond a reasonable doubt and (2) the aggravating factor outweighed any mitigating factors).

Robinson has not established that there is a reasonable likelihood the jury has applied the challenged instruction in a way that prevented the consideration of constitutionally relevant evidence.

*Challenge to Instruction No. 12*

In supplemental briefing, Robinson challenged Instruction No. 12, which provided:

> "As to each count, if you find unanimously beyond a reasonable doubt that the aggravating circumstance claimed by the State exists and that it outweighs mitigating circumstances believed to exist, then you *shall* impose a sentence of death and sign the appropriate verdict form.
> "However, if one or more jurors is not persuaded beyond a reasonable doubt that aggravating circumstances outweigh mitigating circumstances, then you *should* sign the

388

appropriate alternative verdict form indicating the jury is unable to reach a unanimous verdict sentencing the defendant to death. In that event, the defendant will not be sentenced to death but will be sentenced by the court as described in Instruction 9." (Emphasis added.)

Robinson argues that the "shall" in the first paragraph of Instruction No. 12 improperly forbade the jury from exercising its historic nullification power. See *State v. Smith-Parker*, 301 Kan. 132, 164, 340 P.3d 485 (2014) (jury instruction which provided that jury "will" enter verdict of guilty in absence of reasonable doubt clearly erroneous because "[i]t essentially forbade the jury from exercising its power of nullification"). However, the use of the term "shall" in Instruction No. 12 tracks the statutory language. K.S.A. 21-4624(e) (providing defendant "shall" be sentenced to death if aggravating circumstances not outweighed by mitigating circumstances). Instruction No. 12 also provides guidance for the jury to provide an alternative verdict for a life sentence. As such, we find the instruction is unlike the situation in *Smith-Parker* and does not "fly too close to the sun of directing a verdict for the State." 301 Kan. at 164. Indeed, the possibility of jury nullification logically requires, as a necessary precondition, the existence of a mandatory charge from the court, such as "shall impose."

In addition, Robinson argues the "should" in the second paragraph of the instruction misstated Kansas law and improperly slanted the instruction toward the death penalty. Ideally, the instruction should have employed the term "shall" in discussing the both the life verdict and the death verdict, consistent with K.S.A. 21-4624(e). However, when the instructions are read together as a whole, they made clear to jurors that there were two sentencing options available and that jurors' ultimate sentencing decision was dependent on the jurors' application of the evidence to the statutory weighing equation. As such, Instruction No. 12 was unlikely to create juror confusion and did not create a reasonable likelihood that jurors would have applied it in a way that prevented

389

consideration of constitutionally relevant evidence. Despite the absence of error under these facts, we caution that similar instructions should conform with the statutory language, for under a different set of facts, the instruction may be deemed erroneous under the applicable standard of review.

## 17. SENTENCING UNDER ALLEGEDLY VOID LAW

Robinson makes a novel, albeit unpersuasive, argument that this court's decision in *State v. Marsh*, 278 Kan. 520, 102 P.3d 445 (2004), *rev'd and remanded* by 548 U.S. 163, and *vacated in part by* 282 Kan. 38, 144 P.3d 48 (2006), requires that his death sentence, imposed under the invalidated *Kleypas* interpretation of the weighing equation, be vacated and replaced by a life sentence with a mandatory minimum.

### Standard of Review

Robinson's argument is founded in part on statutory construction and application of caselaw under Kansas' capital sentencing scheme. "To the extent resolution of this issue requires interpretation of the capital sentencing statutes or application of caselaw, our review is unlimited." *State v. Burnett*, 293 Kan. 840, 847, 270 P.3d 1115 (2012).

### Sentencing Under an Allegedly Void Capital Murder Scheme

As mentioned above, in *State v. Kleypas*, 272 Kan. at 1016-18, we found unconstitutional as applied the provision contained in K.S.A. 21-4624(e) that directed a penalty phase jury to impose the death sentence if aggravating circumstances found to exist were not outweighed by mitigating circumstances found to exist. Rather than invalidating the statute, however, the court construed it to require the jury to be directed to impose the death penalty only if aggravating circumstances outweighed mitigating circumstances. 272 Kan. at 1018.

390

In *State v. Marsh*, 278 Kan. 520, decided by this court on December 17, 2004, this court reversed tack on *Kleypas* and declared the original weighing equation provision of K.S.A. 21-4624(e) unconstitutional on its face. 278 Kan. at 534-44. The United States Supreme Court later reversed *Marsh* and held the Kansas death penalty scheme, including the weighing equation as originally written, constitutional. *Kansas v. Marsh*, 548 U.S. at 173, 181.

Robinson was tried in 2002, subsequent to *Kleypas* but before our opinion in *Marsh* and the Supreme Court's later reversal of that opinion. Broken down to its syllogistic form, Robinson argues: (1) *Kleypas* was wrongly decided because the court usurped legislative authority and rewrote K.S.A. 21-4624(e); (2) had *Kleypas* been correctly decided, the court would have simply declared the statute unconstitutional as it did in *Marsh*; (3) had the *Kleypas* court declared K.S.A. 21-4624(e) unconstitutional, there would have been no death penalty in Kansas; (4) in the absence of a death penalty, Robinson would have been sentenced to life in prison with a hard 50‑year or hard 25-year minimum sentence without parole; and, therefore, (5) we should vacate his death sentence and remand for imposition of a life sentence.

It is apparent most, if not all, of Robinson's premises are incorrect. According to Robinson, *Marsh* leads to the conclusion that *Kleypas* should have declared K.S.A. 21-4624(e) unconstitutional. The *decision* in *Kleypas* did declare the weighing equation of K.S.A. 21-4624(e) unconstitutional. *Marsh*, 278 Kan. at 534; *Kleypas*, 272 Kan. 894, Syl. ¶ 45. The *remedy* we chose was to construe it constitutionally. *Marsh*, 278 Kan. at 544; *Kleypas*, 272 Kan. 894, Syl. ¶¶ 46-48. The historical fact Robinson chooses to ignore is that the United States Supreme Court held the weighing equation as originally drafted by the legislature was constitutional. *Marsh*, 548 U.S. at 173, 181. Therefore, if *Kleypas* was wrongly decided, and the Supreme Court of the United States says it was, then the correct

391

decision in *Kleypas* would have been to uphold the statute as written. Contrary to Robinson's premise that there would have been no death penalty at the time of his trial, his jury would actually have been instructed to impose death if his mitigators did not outweigh aggravators, and the State would have had an easier bar to clear.

Accordingly, we find no basis to vacate Robinson's sentence on this asserted error.

### 18. CUMULATIVE ERROR—PENALTY PHASE

Robinson argues the cumulative effect of penalty phase errors requires the vacation of his death sentences.

*Legal Framework and Standard of Review*

> "Cumulative error, considered collectively, may be so great as to require reversal of a defendant's conviction. The test is whether the totality of the circumstances substantially prejudiced the defendant and denied him or her a fair trial. No prejudicial error may be found under the cumulative error doctrine if the evidence against the defendant is overwhelming. *State v. Cosby*, 285 Kan. 230, Syl. ¶ 9, 169 P.3d 1128 (2007). Moreover, this doctrine does not apply if no error or only one error supports reversal. See *State v. Carter*, 284 Kan. 312, 332, 160 P.3d 457 (2007)." *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009).

"This court utilizes a de novo standard when determining whether the totality of circumstances substantially prejudiced a defendant and denied the defendant a fair trial based on cumulative error." *State v. Brown*, 298 Kan. 1040, 1056, 318 P.3d 1005 (2014).

*Did the Cumulative Effect of Errors Prejudice Robinson's Fair Trial Rights?*

In analyzing the penalty phase proceedings, we presumed without holding that Juror 147's use of the Bible constituted juror misconduct. Nevertheless, the circumstances surrounding his use of and comments regarding the Bible, including the fact that they were isolated, brief, and made after the jurors' vote had revealed they were in unanimous agreement as to sentence, combined with the district judge's curative instruction, mitigated any prejudice. Likewise, the prosecutor made improper remarks during closing, but those comments were not gross and flagrant and would have had little weight in the minds of jurors when considered individually and collectively. In light of the length and complexity of these proceedings, and the abundant evidence against Robinson on the aggravating circumstance when compared with the relatively weak evidence in his favor on mitigation, we hold that the totality of the circumstances did not substantially prejudice Robinson or deny him the right to a fair penalty phase proceeding.

### 19. DESIGNATION OF ROBINSON AS A SEX OFFENDER

The district judge sentenced Robinson on January 21, 2003. During the sentencing hearing, the State did not argue and the district judge did not find that any of the crimes of conviction were sexually motivated. Nevertheless, in the journal entry of judgment, the district judge *sua sponte* designated Robinson's convictions on Counts I, II, and III as sexually motivated. Robinson argues that the sexually motivated designation constitutes an unlawful variance from the sentence announced from the bench.

*Standard of Review*

"Whether a sentence is illegal is a question of law over which this court has unlimited review." *State v. Howard*, 287 Kan. 686, 691, 198 P.3d 146 (2008). Likewise, to the extent Robinson's challenge requires the court to interpret the statutory

requirements of the Kansas Offender Registration Act, the issue presents a question of law subject to de novo review. *State v. Wilson*, 295 Kan. 605, 627, 289 P.3d 1082 (2012).

*Improper Designation of Convictions as Sexually Motivated*

We have confirmed repeatedly that "the actual sentencing occurs when the court pronounces the sentence from the bench. [Citations omitted.]" *State v. Garcia*, 288 Kan. 761, 765, 207 P.3d 251 (2009); see *State v. Royse*, 252 Kan. 394, 397, 845 P.2d 44 (1993); *State v. Moses*, 227 Kan. 400, Syl. ¶¶ 1, 2, 3, 607 P.2d 477 (1980). "[A] journal entry is merely a record of the sentence imposed and the sentencing court has no jurisdiction to change the sentence after pronouncement." *Garcia*, 288 Kan. at 766.

Before a conviction may be deemed sexually motivated, the district judge must make such a finding based on the evidence. See *State v. Patterson*, 25 Kan. App. 2d 245, 251, 963 P.2d 436 (specific findings from evidence properly supported finding that burglary sexually motivated), *rev. denied* 265 Kan. 888 (1998). Here, the district judge's actual sentence from the bench failed to make any findings that Robinson's convictions were sexually motivated. The sentencing judge thus lacked jurisdiction to make such a designation *sua sponte* in the journal entry. See *Abasolo v. State*, 284 Kan. 299, 304, 160 P.3d 471 (2007) ("where the sentence announced from the bench differs from the sentence later described in the journal entry, the orally pronounced sentence controls"); *Royse*, 252 Kan. at 398 ("Once a sentence is imposed, the district court is powerless to vacate that sentence and impose a harsher sentence."); see also *In re L.L.B.*, No. 106,469, 2012 WL 1658933, at *1-2 (Kan. App. 2012) (unpublished opinion) (reversing and remanding for evidentiary hearing where trial court failed to make findings of fact on the record or in the journal entry to support conclusion that crime was sexually motivated), *rev. denied* 295 Kan. 1173 (2013).

This was not a situation where the context of the sentencing hearing made clear that the district judge intended to find the convictions were sexually motivated but failed to designate them as such when pronouncing sentence because of a mere oversight or technical error. See *Garcia*, 288 Kan. at 765-67 (though district court had not made pronouncement from the bench that the murder was sexually motivated, its journal entry filed the same day had confirmed its intention to do so); *Howard*, 287 Kan. at 694-95 (finding that trial judge could clarify sentence in follow up hearing when original sentence was "indistinct"). The State offered no evidence at the sentencing hearing to suggest any of the convictions were sexually motivated, and the question was never at issue.

The State concedes the error. Accordingly, we vacate that portion of Robinson's sentence and remand for the trial court to file a corrected journal entry.

## 20. THE STATE'S CROSS-APPEAL

In its cross-appeal, the State argued that Judge Anderson's rulings limiting the prosecution's ability to argue victim impact evidence during penalty phase closing arguments were erroneous.

We settled this issue in *State v. Scott*, 286 Kan. 54, 118-19, 183 P.3d 801 (2008), holding that a prosecutor's remarks about the victim and the impact of the murder on the victim's family were relevant to the question of sentence and, therefore, proper. The State acknowledged the effect of this holding in its reply brief and admitted that "consideration of the issue appears no longer necessary."

In light of the foregoing, we deem the issue to be abandoned or otherwise no longer of statewide importance, and it is hereby dismissed.

395

CONCLUSION

The outcome of this appeal is a testament to Judge Anderson's diligence and commitment to Robinson's fair trial rights. The caution he exercised and the preventative measures he employed were well planned and reasonably calculated to mitigate the risk of extraneous factors influencing the outcome of the guilt phase and penalty phase proceedings. These efforts have facilitated our determination that the sentence of death was not "imposed under the influence of passion, prejudice or any other arbitrary factor"; that the State's lone aggravating circumstance existed; and that Robinson's mitigating circumstances were insufficient to outweigh it. See K.S.A. 21-4627(c)(2).

In sum, we affirm Robinson's capital murder conviction charged in Count II. We reverse his capital murder conviction charged in Count III and his first-degree murder conviction charged in Count V as unconstitutionally multiplicitous with the capital murder conviction in Count II. All remaining convictions are affirmed. We affirm Robinson's death sentence under his capital murder conviction in Count II. We vacate only that portion of Robinson's sentence designating certain of his crimes sexually motivated and remand so that the trial court can correct the journal entry.

Affirmed in part, reversed in part, vacated in part, and remanded with directions.

LUCKERT, J., not participating.
MICHAEL J. MALONE, Senior Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:** Senior Judge Malone was appointed to hear case No. 90,196 vice Justice Luckert under the authority vested in the Supreme Court by K.S.A. 20-2616.

MALONE, J., concurring: I agree with the decision reached by the majority and the analysis Justice Stegall has written for the court. I write separately to address the majority's holding that the prosecutor's closing argument pertaining to occasions when Robinson cried and did not cry during the trial was beyond the scope of the penalty phase and served no purpose but to inflame the passion of the jurors and divert their attention from sentencing. Specifically, I write to emphasize why, in my opinion, any comment regarding the demeanor of a nontestifying defendant amounts to improper closing argument. Nevertheless, I agree the misconduct in this case was harmless beyond a reasonable doubt.

Robinson never took the stand during his trial. During the penalty stage of his final closing argument, the prosecutor declared to the jury:

"When the defendant cried, [he] cried one time during this trial, he didn't cry when there was testimony about Lisa Stasi. He didn't cry when there was testimony about Izabela Lewicka's body was taken out of that barrel. He didn't cry when there was testimony about Suzette Trouten—when her family testified—when her body was taken out of that barrel or Beverly Bonner or Sheila Faith or Debbie Faith. He cried for himself. That says it all. He doesn't care anything about anybody but himself. Manipulation and deceit, they go hand in hand with the defendant throughout these last 20 years."

Preliminarily, I address the State's argument that these rebuttal comments were proper because they were made in response to defendant's closing argument. That contention is not strongly supported by the record but, even if true, the comments were still improper. See *State v. Longoria*, 301 Kan. 489, 522, 343 P.3d 1128 (2015) (while not excusing prosecutorial misconduct, "the defense counsel's closing arguments provide

context for the State's rebuttal statements"); *State v. Marshall*, 294 Kan. 850, 860-61, 281 P.3d 1112 (2012) (defendants do not open the door to prosecutorial misconduct, but rebuttal nature of prosecutor's arguments is a factor to be considered by appellate court).

During closing argument the prosecutor may discuss "*admitted evidence* as long as the remarks accurately reflect the evidence, accurately state the *law*, and are not intended to inflame the passions or prejudices of the jury or divert the jury from its duty to decide the case based on the evidence and the controlling law." (Emphasis added.) *State v. Friday*, 297 Kan. 1023, Syl. ¶ 5, 306 P.3d 265 (2013). In delivering this summary, a prosecutor has wide latitude to craft arguments that include reasonable inferences to be drawn from the evidence but may not comment on facts outside the evidence. See *Longoria*, 301 Kan. at 524; *State v. Novotny*, 297 Kan. 1174, Syl. ¶ 7, 307 P.3d 1278 (2013); *State v. Ly*, 277 Kan. 386, 392, 85 P.3d 1200, *cert. denied* 541 U.S. 1090 (2004).

When a prosecutor argues facts not in evidence, misconduct is committed. *State v. Akins*, 298 Kan. 592, 601, 315 P.3d 868 (2010). And a prosecutor generally exceeds the proper bounds of argument by offering a personal opinion about witness credibility "because such comments are 'unsworn, unchecked testimony, not commentary on the evidence of the case.'" *State v. Duong*, 292 Kan. 824, 830, 257 P.3d 309 (2011).

Here, the prosecutor's comments about the defendant crying and not crying—while seated at counsel table—were not about evidence that came from the witness stand but rather about what the prosecutor said *he observed* and *his opinion* about these observations. In essence, the prosecutor made himself an eyewitness and an expert witness who was not subject to the rules of evidence or cross-examination. Of course, jurors may see a defendant laugh, cry, yawn, stretch, sit without expression, or visit with counsel. From their own observations, jurors may form opinions about a defendant. These observations are a natural consequence of a jury trial; however, a prosecutor

should not draw attention to these appearances and behaviors—which may have gone unnoticed by the jurors—and then pontificate about what these actions mean. See *Novotny*, 297 Kan. at 1189-90 (assuming prosecutor's comment on defendant "eye-balling the witnesses" was misconduct). Absent an examined explanation from a defendant, it is difficult to know why a defendant would show or not show a certain behavior or emotion during his or her trial.

While I agree with the majority that the prosecutor's closing comments were improper and that the misconduct does not warrant a reversal in this case, my concerns go beyond those expressed by the majority. Commenting on the courtroom demeanor of a nontestifying defendant defies the purpose of closing argument, so neither party should be allowed to expressly or implicitly refer to it. Indeed, the only proper comment about the courtroom demeanor of a nontestifying defendant is that the jurors should not consider it in reaching a decision.

\* \* \*

JOHNSON, J., dissenting:  I agree with the majority's reversal of the capital murder conviction under Count III, which included the killing of Izabela Lewicka; but I dissent from the majority's determination that the State proved capital murder, as the prosecutor chose to charge it, in Count II of the complaint. The prosecutor has the duty to prepare a charging document that actually describes a valid crime and then the State must prove all of the elements of the charged crime beyond a reasonable doubt. From a legal, factual, or logical viewpoint, one simply cannot say that those duties were fulfilled in this case. This court should not provide cover for a prosecutor's charging mistakes in any case, much less a death penalty case. Accordingly, both capital murder convictions should be set aside, along with both corresponding sentences of death.

The majority jumps the rails at the start of its journey by describing the capital murder charges as follows: "The State charged Robinson with two counts of capital murder, one count for the intentional, premeditated murder of Suzette Marie Trouten (Count II) and the other for the intentional, premeditated murder of Izabela Lewicka (Count III)." Slip op. at 18. It then recites that "the murders of Trouten and Lewicka were each part of a common scheme or course of conduct that also included the intentional, premeditated murders of Beverly J. Bonner, Sheila Faith, Debbie Faith and Lisa Stasi." Slip op. at 18. The majority is apparently implying that the defendant was guilty of the capital murder of Trouten and the capital murder of Lewicka and that the murders of the four other women simply served as proof of a common scheme or course of conduct. Later, the majority refers to Trouten and Lewicka as the "principal capital murder victims," declaring that their killings completed the elements of capital murder in each count. Slip op. at 237-38. Although the majority's characterization of the capital murder charges comports with a fair reading of the State's complaint, it is not supported by the plain language of the capital murder statute. See K.S.A. 21-3439(a)(6).

I begin with the statutory definition of the precise crime for which the defendant was purportedly charged, convicted, and sentenced to death. That starting point is critical because it is a legislative function to define crimes. See *State v. Bolin*, 200 Kan. 369, 370, 436 P.2d 978 (1968) ("Generally speaking, of course, it is within the power of the legislature to define what acts shall constitute crimes."). Neither an executive branch prosecutor, nor a judicial branch appellate court, has the authority to redefine the acts that constitute a legislatively created crime. Here, the relevant part of the applicable statutory language states: "(a) Capital murder is the: . . . (6) intentional and premeditated killing of more than one person as a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct." K.S.A. 21-3439(a)(6). Hereafter, I will discuss that statute as it relates to the

400

one count of capital murder that the majority affirmed, albeit the discussion would apply equally to the manner in which the State charged the other capital murder count.

Given its collective experience discerning the plain language of statutes, what should jump out at the majority is that, first and foremost, the crime requires the State to prove "the killing of more than one person." Pointedly, the legislature did not say that capital murder is the killing of one person after having previously killed one or more other persons. It did not say that capital murder is the killing of one person as part of a common scheme or course of conduct involving the killing of others. Rather, the legislature said that the State must prove that the defendant killed at least two persons, and the crime-defining statute makes absolutely no qualitative distinction between those two or more victims. In other words, proof of the intentional, premeditated murder of each and every victim is a required essential element of the charged crime of capital murder equal in importance to every other element. As the prosecutor charged Count II, the State's burden to prove that the defendant killed Bonner, the Faiths, and/or Stasi was no less (or no more) than its burden to prove defendant killed Trouten. Consequently, the designation of Trouten as a "principal capital murder victim" is a phantom concept, manufactured by the State's charging document and perpetuated here by the majority, but totally devoid of any legal support.

Granted, a complaint "drawn in the language of the statute[] shall be deemed sufficient." K.S.A. 22-3201(b). And here, the prosecutor incorporated most of the statutory words into the complaint, albeit not in the same order as set forth in the statute. Nevertheless, in this case, the most damning aspect of the mischaracterization of capital murder as the killing of one person after engaging in a course of conduct of killing others is that it permits the majority to divine a new theory whereby the State is permitted to execute a defendant for a murder that occurred before there was a death penalty in this State.

401

The rule of law has always been that the district court must sentence a person within the maximum punishment allowable by the law in effect when that person committed the crime for which sentence is being imposed. See *Cooper v. Werholtz*, 277 Kan. 250, Syl. ¶ 1, 83 P.3d 1212 (2004) ("Criminal statutes and penalties in effect at the time of the criminal act are controlling."). Likewise, as the majority acknowledges, a statute will operate prospectively in the absence of clear language that it is intended to operate retroactively, and K.S.A. 21-3439 lacks such clear retroactive language. Moreover, the Ex Post Facto Clause of the United States Constitution "is aimed at laws that 'retroactively *alter the definition of crimes* or increase the punishment for criminal acts.' [*Collins v. Youngblood*, 497 U.S. 37,] at 43 (citing *Calder v. Bull*, 3 Dall. 386, 391-392 (1798) (opinion of Chase, J.); *Beazell v. Ohio*, 269 U.S. 167, 169-170 (1925))." (Emphasis added.) *California Dept. of Corrections v. Morales*, 514 U.S. 499, 504-05, 115 S. Ct. 1597, 131 L. Ed. 2d 588 (1995). Here, the majority retroactively alters the definition of the crimes Robinson committed prior to the July 1, 1994, enactment of capital murder and increases his punishment for those crimes.

In this case, when defendant killed Bonner, the Faiths, and Stasi, the maximum penalty for those murders was life in prison. Indeed, in this very case, the district court sentenced the defendant to a hard 15 life sentence for the killing of Stasi. But the majority vacated that sentence in favor of a death sentence. Given that all of the elements of Stasi's intentional, premeditated murder had to be proved in order to fulfill the elements of the capital murder charge, the previously completed intentional, premeditated murder of Stasi was a lesser included offense of the charged capital murder. See K.S.A. 21-3107(2)(b) ("A lesser included crime is: . . . a crime where all elements of the lesser crime are identical to some of the elements of the crime charged."). And a person "may be convicted of either the crime charged or a lesser included crime, but not both." K.S.A. 21-3107(2). But permitting the State to use a predeath penalty murder to fulfill the capital

402

murder requirement of two or more killings effectively alters the definition of the prior murders and increases the penalty for the previously completed "lesser included offense" murders from life in prison to death.

To rationalize the retroactive application of the death penalty to murders that pre-dated the legislative authority to impose that draconian penalty, the majority fashions a completed-crime theory of prosecution, whereby a murder completed years earlier is subsequently utilized as an element of a capital murder that is "completed" after the fact by adding a new killing. Pointedly, the majority cites to no Kansas case that has permitted such a ploy in any context, much less a capital case. Instead, curiously, the majority points to a statute of limitations statutory provision, K.S.A. 21-3106(6), as direct authority for converting a previously completed crime into an element of a newly defined, more serious crime. The majority's manufactured rationale is flawed.

First, the statutory provision forming the foundation of the majority's theory is a subsection of a statute that is entitled "Time limitations for commencement of prosecutions." K.S.A. 21-3106. In other words, the majority's magical provision declaring that an offense is committed when every element occurs is direct authority only when a court is determining whether the time limit for prosecuting an offense has expired. But K.S.A. 21-3106(1) states unequivocally that "[a] prosecution for murder . . . may be commenced *at any time*." (Emphasis added.) Thus, we have no need to ruminate on when the current capital murder was committed for statute of limitation purposes because there is no statutory time limitation on prosecuting capital murder. Quite simply, then, K.S.A. 21-3106(6) is not applicable here.

Perhaps the majority intended to apply the statute of limitations provision by analogy, *i.e.*, as persuasive support for its "completed crime" theory of retroactively imposing the death sentence. If so, I submit that a statutory provision that is facially more

analogous to the determination of which crime is applicable is found in K.S.A. 21-3102(4), which addressed the scope and application of the Kansas Criminal Code that was effective July 1, 1970. The provision states:

> "This code has no application to crimes committed prior to its effective date. A crime is committed prior to the effective date of the code if any of the essential elements of the crime as then defined occurred before that date. Prosecutions for prior crimes shall be governed, prosecuted and punished under the laws existing at the time such crimes were committed." K.S.A. 21-3102(4).

Granted, this court has construed that provision to be applicable only to the adoption of the entire new criminal code rather than applying to any subsequent amendments to crimes within the code. *State v. Noah*, 246 Kan. 291, 293, 788 P.2d 257 (1990) (K.S.A. 21-3102[4] refers to crimes committed prior to July 1, 1970, effective date of new criminal code). Nevertheless, it is no less persuasive as to how the law should be applied than the majority's statute of limitations provision. Having completed first-degree premeditated murder before the existence of capital murder, the prosecution for that prior murder should, intuitively as well as logically, be governed under the laws existing at the time such crime was committed. That paradigm comports with the long-standing rule that courts are to impose the punishment that was in effect when the crime was committed and precludes the punishment-increasing gamesmanship displayed here.

Next, even accepting that K.S.A. 21-3106(6) might have something to do with the question presented to us in this case, it actually confirms that the murders of Bonner, the Faiths, and Stasi should be deemed "committed" before the adoption of the death penalty. Every element of first-degree premeditated murder had "occurred" before the adoption of capital murder. And to the extent that the majority contends that the prior killings had not fulfilled their role as its purported "second element" of capital murder prior to Trouten's murder, the opinion contradicts itself.

The majority describes that "second element" as a requirement that "these killings be part of the same act or transaction or multiple acts or transactions connected together or constituting parts of a common scheme or course of conduct." Slip op. at 237. But previously, in discussing the sufficiency of the evidence, the majority asserted that there was enough evidence that "the jurors could have found that *all of the murders* were related to one another in some way and therefore part of a common scheme or course of conduct." (Emphasis added.) Slip op. at 235. If it were true that all of the murders were sufficient evidence of the second element, then all of the statutory elements of capital murder had occurred before the defendant killed Trouten. The defendant had killed more than one person as part of the same act or transaction (the Faiths) or as parts of a common scheme or course of conduct (Bonner, the Faiths, and Stasi), completing all of the statutory elements of capital murder *before* it was statutorily enacted. Contrary to the majority's declaration, the murder of Trouten was unnecessary to complete the elements of capital murder. Rather, the Trouten murder added nothing to the State's theory of prosecution, except to use its occurrence date to invoke the death penalty and thereby increase the punishment for the previously completed crimes. In my view, this is a blatant example of ex post facto jurisprudence.

To bolster its contention that the State can increase the penalty for a completed first-degree premeditated murder, *i.e.*, after the murder has been "committed," the majority resorts to cases from foreign jurisdictions that are not on point. As the majority points out, the crime involved in *State v. Zelinka*, 130 Or. App. 464, 472, 882 P.2d 624 (1994)—murder by abuse and criminal mistreatment—required proof that the defendant murdered the victim by abuse after having *previously* assaulted or tortured the victim or another child. Slip op. at 237-38. Allowing the *previous* assaults or torture to occur before enactment of the murder by abuse statute might have been an analog here if capital murder was defined as the intentional, premeditated murder of one person, after having

405

previously murdered others. But as discussed above, that is not how our statute defines capital murder.

Likewise, the crime involved in *People v. Grant*, 20 Cal. 4th 150, 83 Cal. Rptr. 2d 295, 973 P.2d 72 (1999), was a violation of a *continuous* sexual abuse of a minor statute, whereby the defendant had to molest the child three times during a period of not less than 3 months. See Slip op. at 239. Where a statute *requires* continuous conduct over a specified time period, it makes sense that the crime is not completed until the last act is committed. But capital murder can occur in one act or transaction, which presumably happened when defendant killed both Sheila and Debbie Faith, thus completing all of the elements of the later-to-be-established crime of capital murder.

In that vein, the majority's assertion that "the last act or event necessary to trigger application of K.S.A. 21-3439(a)(6) was the murder of Trouten" because she was killed after the enactment of capital murder skews the plain statutory language. Slip op. at 239. To belabor the point, the statute required "the killing of more than one person," not the killing of one person after having killed others. When the prosecutor included the killings of Bonner, the Faiths, and Stasi in the complaint, all of the elements of capital murder were effectively pled, without considering the killing of Trouten.

The majority rejects Robinson's proffer of *United States v. Husted*, 545 F.3d 1240 (10th Cir. 2008), because the federal act applicable there used the word "travels" which did not apply to someone who had previously "traveled." Slip op. at 240. Yet, our capital murder statute suggests the present tense when it defines the crime as "the *killing* of more than one person." Like *Husted*, that language does not express an intent to apply to someone who has "killed" prior to the statute's enactment. Rather, to commit capital murder under subsection (a)(6), I submit that the defendant had to kill more than one

person *after* the enactment of the capital murder statute in order to fulfill the indispensable initial *actus reus* of the crime.

Even if one is seduced by the majority's interpretation of the capital murder statute, I contend that my present-tense interpretation is certainly a reasonable reading of the statute. In that circumstance, the rule of lenity "'requires the court to interpret [the statute's] meaning in favor of the accused.'" *State v. Reese*, 300 Kan. 650, 658, 333 P.3d 149 (2014) (quoting *State v. Coman*, 294 Kan. 84, 97, 273 P.3d 701 [2012]). That construction principle is even more compelling in a death penalty case, considering the following:

> "'[D]eath is a different kind of punishment from any other which may be imposed in this country. . . . From the point of view of the defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice or emotion.' *Gardner v. Florida*, 430 U.S. 349, 357-358 [1977] (opinion of STEVENS, J.)." *Beck v. Alabama*, 447 U.S. 625, 637-38, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980).

The majority not only fails to employ the rule of lenity, it bends over backward to create a way to affirm the capital conviction. That tack baffles me, especially given that the State did not need to ask this court to retroactively apply the capital murder statute. Both Trouten and Lewicka were killed *after* the enactment of the capital murder statute. Consequently, the prosecutor could have avoided the need to use preenactment killings to satisfy the "killing of more than one person" element of capital murder by simply charging the murders of Trouten and Lewicka in one capital count, *i.e.*, alleging that Robinson killed both Trouten and Lewicka as part of a common scheme or course of conduct. Then, the killings of Bonner, the Faiths, and Stasi could have been the subject of

407

four separate counts of first-degree, premeditated murder without being vulnerable to a multiplicity or double jeopardy challenge. The reason for splitting the death-eligible murders into two separate counts of capital murder is not readily apparent. Obviously, a death sentence can only be imposed once; the State's drive to obtain two death sentences accomplished nothing beyond creating grist for the appeal mill.

In short, if the State is going to kill its own citizens, even those who commit heinous and unfathomable acts, it is not unreasonable to require that the State strictly comply with the laws that authorize the imposition of that ultimate punishment. Here, the prosecution did not strictly conform with the law, and it is this court's duty to throw a flag and call that foul. I would reverse the remaining capital murder conviction and remand for resentencing as a first-degree premeditated murder. That course of action would permit the first-degree premeditated murder conviction and accompanying life sentence for Stasi's killing to be affirmed and would permit the defendant to be convicted for Lewicka's killing, albeit for the lesser included offense of first-degree premeditated murder.

Even if the State could clear the "killing of more than one person" hurdle, I believe it stumbles in its attempt to tie the Trouten murder to the others to meet the majority's "second element." I disagree with the majority's emphasis on the cherry-picked, out-of-context phrase from *State v. Harris*, 284 Kan. 560, 572, 162 P.3d 28 (2007), to conclude that the multiple killings only need to "'be related to one another in some way.'" Slip op. at 232, 233. Nevertheless, even using the majority's liberal concept of nexus, Trouten's murder does not fit. Stasi was apparently murdered for her child, Bonner for her divorce maintenance payments, the Faiths for their Social Security benefit payments, and Lewicka to clear the way for a former paramour. The majority states no apparent motive for the Trouten killing. I do not believe that it is sufficient for some of the killer's methods to be similar. The *killings* have to be related to one another, not the killer's

methods. I do not read the subsection as including serial, but completely separate, killings. Again, I would reverse the remaining capital murder conviction on evidentiary grounds.

Finally, although there are other aspects of the majority opinion with which I take exception, I see no reason for further argument here. I do, however, take the liberty of using this platform to echo the sentiments that Justices Breyer and Ginsburg expressed in their dissent in the recent case of *Glossip v. Gross*, 576 U.S. ___, 135 S. Ct. 2726, 2755-77, 192 L. Ed. 2d 761 (2015) (Breyer, J., joined by Ginsburg, J., dissenting), in which they called for a reexamination of whether the death penalty, in and of itself, constitutes a legally prohibited cruel and unusual punishment under the Eighth Amendment to the United States Constitution. 135 S. Ct. at 2756. Notwithstanding the egregious nature of the crimes and the compelling evidence of guilt presented in this particular case, I believe it is time for this court to reexamine the constitutionality of the death penalty under § 9 of the Kansas Constitution Bill of Rights, which prohibits the infliction of "cruel or unusual punishment."

The *Glossip* dissent opined that in 1976, when the United States Supreme Court upheld the death penalty, "the Court thought that the constitutional infirmities in the death penalty could be healed," and it "delegated significant responsibility to the States to develop procedures that would protect against those constitutional problems." 135 S. Ct. at 2755 (Breyer, J., dissenting). But "[a]lmost 40 years of studies, surveys, and experience strongly indicate . . . that this effort has failed." 135 S. Ct. at 2755 (Breyer, J., dissenting). The dissent related that the current administration of the death penalty "involves three fundamental constitutional defects: (1) serious unreliability, (2) arbitrariness in application, and (3) unconscionably long delays that undermine the death penalty's penological purpose." 135 S. Ct. at 2755-56 (Breyer, J., dissenting). Moreover, the dissent noted that, perhaps as a result of these constitutional defects in the death

penalty, "most places within the United States have abandoned its use," which makes the penalty "unusual." 135 S. Ct. at 2756 (Breyer, J., dissenting).

*Cruel—Lack of Reliability*

On the first point, the dissent noted the obvious, *i.e.*, that "the finality of death" makes it a qualitatively different punishment that requires a heightened need for reliability. 135 S. Ct. at 2756 (Breyer, J., dissenting.) One cannot undo an execution. Yet, researchers have uncovered "convincing evidence that, in the past three decades, innocent people have been executed," as well as striking evidence that the death penalty has been wrongly imposed. 135 S. Ct. at 2756 (Breyer, J., dissenting). As of the date of this year's dissent in *Glossip*, "the number of exonerations in capital cases [had] risen to 115." 135 S. Ct. at 2757 (Breyer, J., dissenting). And that only included exonerations in the sense that the defendant was granted "relief from *all* legal consequences of a capital conviction through a decision by a prosecutor, a Governor[,] or a court, after new evidence of the defendant's innocence was discovered." 135 S. Ct. at 2757 (Breyer, J., dissenting).

Interestingly, "exonerations occur far more frequently where capital convictions, rather than ordinary criminal convictions, are at issue." 135 S. Ct. at 2757 (Breyer, J., dissenting). Courts or governors are 130 times more likely to exonerate a defendant where a death penalty is at issue and 9 times more likely where capital murder, rather than noncapital murder, is at issue. 135 S. Ct. at 2757 (Breyer, J., dissenting). Some researchers have opined that the disparity is at least partially explained by a "*greater likelihood of an initial wrongful conviction*" in a death penalty case, precipitated in part because capital crimes are typically horrendous murders that generate an "intense community pressure on police, prosecutors, and jurors to secure a conviction." 135 S. Ct. at 2757 (Breyer, J., dissenting). That pressure increases the probability of a wrongful conviction. Moreover, I would add my belief that the intense public pressure

410

accompanying the case on appeal increases the likelihood that a wrongful capital conviction will be affirmed by a state Supreme Court.

Granted, there are other factors that explain the inordinate number of death penalty exonerations, one of which is the practice of death-qualification of the capital jury, *i.e.*, no one can serve as a juror unless he or she is willing to impose the death penalty. Research has led to the conclusion that "'[f]or over fifty years, empirical investigation has demonstrated that death qualification skews juries toward guilt and death.'"135 S. Ct. at 2758 (Breyer, J., dissenting). Likewise, flawed forensic testimony, such as faulty hair analysis, has been used in a number of capital cases. In light of all of the factors, "researchers estimate that about 4% of those sentenced to death are actually innocent." 135 S. Ct. at 2758 (Breyer, J., dissenting).

If one expands the analysis beyond cases establishing actual innocence, the instances in which the law was not followed in capital cases is breathtaking. "Between 1973 and 1995, courts identified prejudicial errors in 68% of the capital cases before them." 135 S. Ct. at 2759 (Breyer, J., dissenting). "In sum, there is significantly more research-based evidence today indicating that courts sentence to death individuals who may well be actually innocent or whose convictions (in the law's view) do not warrant the death penalty's application." 135 S. Ct. at 2759 (Breyer, J., dissenting).

*Cruel—Arbitrariness*

"The arbitrary imposition of punishment is the antithesis of the rule of law." 135 S. Ct. at 2759 (Breyer, J., dissenting). "[S]tudies indicate that the factors that most clearly ought to affect application of the death penalty—namely, comparative egregiousness of the crime—often do not," while "circumstances that ought *not* to affect application of the death penalty, such as race, gender, or geography, often *do*." 135 S. Ct. at 2760 (Breyer,

J., dissenting). In other words, "[t]he research strongly suggests that the death penalty is imposed arbitrarily." 135 S. Ct. at 2762 (Breyer, J., dissenting). Because the "imposition and implementation of the death penalty seems capricious, random, [and] arbitrary," its imposition on a defendant would seem to be "the equivalent of being struck by lightning." 135 S. Ct. at 2764 (Breyer, J., dissenting). "How then can we reconcile the death penalty with the demands of a Constitution that first and foremost insists upon a rule of law?" 135 S. Ct. at 2764 (Breyer, J., dissenting).

Reconciling the death penalty with the rule of law under our Kansas Constitution is no less imperative. Like elsewhere, the gatekeeper in this State is the prosecutor, who has unfettered discretion in any capital-eligible case to seek, or to not seek, the death penalty. To state the obvious, unfettered discretion is fertile ground for sprouting arbitrariness. In my view, Kansas is fortunate to have so many competent attorneys who are willing to engage in public service as prosecutors. Nevertheless, those popularly elected public servants cannot be totally immune to the intense public pressure generated by high-profile cases. A system that does not safeguard against such potential arbitrariness cannot withstand constitutional scrutiny.

*Cruel—Excessive Delays*

Ironically, the solutions to the problems of unreliability and unfairness "almost inevitably lead to a third independent constitutional problem: excessively long periods of time that individuals typically spend on death row, alive but under sentence of death." 135 S. Ct. at 2764 (Breyer, J., dissenting). As of last year, the average length of time between sentencing and execution in the United States was almost 18 years. 135 S. Ct. at 2764 (Breyer, J., dissenting). Kansas has yet to execute anyone since the 1994 adoption of the current capital murder statute, so the average time between sentencing and execution in this State is currently incalculable. Despite this court's recent efforts to

412

improve the processing of death penalty cases, even when faced with chronic underfunding of the Judicial Branch budget, nothing suggests that Kansas will beat the national average on death penalty delays in the foreseeable future.

The "lengthy delays create two special constitutional difficulties." 135 S. Ct. at 2765 (Breyer, J., dissenting). The first is the fact that a lengthy delay "'subjects death row inmates to decades of especially severe, dehumanizing conditions of confinement.'" 135 S. Ct. at 2765 (Breyer, J., dissenting). "Indeed, one death row inmate, who was later exonerated, still said he would have preferred to die rather than to spend years on death row pursuing his exoneration." 135 S. Ct. at 2766 (Breyer, J., dissenting). In Robinson's case, it has been 13 years since he was sentenced to death, and he is still pursuing his direct appeal. After the direct appeal is finally resolved, Robinson has the right to pursue collateral relief in both State and federal courts, which could take years, if not decades. Robinson is now 72 years old, making it highly probable that Kansas will face the prospect of executing an octogenarian. See Rapaport, *A Modest Proposal:  The Aged of Death Row Should Be Deemed Too Old To Execute*, 77 Brook L. Rev. 1089 (2012).

The second problem is that lengthy delays "undermine the death penalty's penological rationale, perhaps irreparably so." 135 S. Ct. at 2767 (Breyer, J., dissenting). The classic rationale for punishment is to secure deterrence, incapacitation, retribution, or rehabilitation. Obviously, there is no rehabilitation of an executed person, albeit death most certainly incapacitates that person. But life in prison without possibility of parole is no less incapacitating. Accordingly, "the death penalty's penological rationale in fact rests almost exclusively upon a belief in its tendency to deter and upon its ability to satisfy a community's interest in retribution." 135 S. Ct. at 2767 (Breyer, J., dissenting).

With respect to deterrence, decades of studies have been unable to establish reliable statistical evidence to prove one way or the other whether capital punishment

413

deters potential killers. But common sense would dictate that, where a person sentenced to death "is two or three times more likely to find his [or her] sentence overturned or commuted than to be executed," and "has a good chance of dying from natural causes before any execution (or exoneration) can take place," the deterrent effect of a death penalty statute would be *de minimis*. 135 S. Ct. at 2768 (Breyer, J., dissenting).

Likewise, while "[r]etribution is a valid penological goal," one has to question "whether a 'community's sense of retribution' can often find vindication in 'a death that comes,' if at all, 'only several decades after the crime was committed.'" 135 S. Ct. at 2769 (Breyer, J., dissenting). Arguably, whatever interest in retribution that might be served by the death penalty can be similarly served by a sentence of life in prison without parole. 135 S. Ct. at 2769 (Breyer, J., dissenting). Moreover, in that event, one would hope that the victim's family and friends could attain some semblance of closure sooner if they are spared decades of death penalty appeals.

In short, "[t]he upshot is that lengthy delays both aggravate the cruelty of the death penalty and undermine its jurisprudential rationale." 135 S. Ct. at 2769 (Breyer, J., dissenting). And if the death penalty fails to reach the goals of deterrence or retribution, "'it is nothing more than the purposeless and needless imposition of pain and suffering and hence an unconstitutional punishment.'" 135 S. Ct. at 2769-70 (Breyer, J., dissenting).

Granted, some uninformed, chest-pounding death penalty proponents will demand that the delays between sentencing and execution be shortened, if not eliminated. One ploy would be to seek a time limit on an appellate court's consideration of a death penalty appeal. But doing so would only increase the already too high incidence of unreliable and arbitrary death penalties and "risk causing procedural harms that also undermine the death penalty's constitutionality." 135 S. Ct. at 2770 (Breyer, J., dissenting). Indeed, one

offender was exonerated by DNA evidence 30 years after his conviction, so that an abbreviated or cursory appellate review would have resulted in the execution of an innocent man. 135 S. Ct. at 2770-71 (Breyer, J., dissenting). In other words, the death penalty presents a Catch-22 dilemma: to avoid unconstitutionality, a death sentence must be thoroughly and completely examined and reexamined, but the resultant delay renders the punishment unconstitutional. The remedy is to declare the punishment unconstitutional.

*Unusual—Decline in Death Penalty Use*

The Eighth Amendment proscribes punishments that are cruel *and* unusual, whereas § 9 of the Kansas Constitution Bill of Rights proscribes punishments that are cruel *or* unusual. The *Glossip* dissent's Eighth Amendment analysis reviews the recent decline in the number of states that are using the death penalty, as well as the decline in the number of executions in those states still using the punishment. In 2014, only seven states carried out an execution, *i.e.*, 86% of the states did not execute anyone last year. Even in Texas, which perennially leads the nation in executions, the number decreased from 40 in the year 2000, to 10 in the year 2013. Consequently, considering the nation as a whole, "[i]t seems fair to say that it is now unusual to find capital punishment in the United States." 135 S. Ct. at 2774 (Breyer, J., dissenting).

I would reiterate what I said in *State v. Carr*, 300 Kan. 1, 327, 331 P.3d 544 (2014) (Johnson, J., concurring in part and dissenting in part), *cert. granted in part* 135 S. Ct. 1698 (2015), about giving credence to the Kansas founding fathers' choice to use the disjunctive "or" in § 9 of the Kansas Constitution Bill of Rights. Under a plain reading of our constitution, a punishment would be infirm if it is either "cruel," or it is "unusual." Nevertheless, in my view, the death penalty fits both and I would declare it unconstitutional in this state.